UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL A. BROWN Individually and on behalf of all others similarly situated, | Case No: |
| Plaintiff, | COMPLAINT -- CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| WIRECARD AG, MARKUS BRAUN, JAN MARSALEK, BURKHARD LEY, ALEXANDER VON KNOOP, SUSANNE STEIDL, WULF MATTHIAS, and ERNST & YOUNG GMBH WIRTSCHAFTSPRUEFUNGSGESELLSCHAFT, | |
| Defendants. | |

Plaintiff Carol A. Brown ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, public filings, wire and press releases published by and regarding Wirecard AG ("Wirecard," the "Group," or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Wirecard securities between August 17, 2015 and June 24, 2020,

inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Wirecard's North American headquarters is located in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Wirecard securities during the Class Period and was economically damaged thereby.

7.     Defendant Wirecard is a technology company which purports to provide outsourcing and white label solutions for electronic payments worldwide. The Company

operates in three segments: Payment Processing & Risk Management, Acquiring & Issuing, and Call Center & Communication Services. Wirecard is incorporated in Germany and its head office is located at Einsteinring 35, Aschheim 85609, Germany. Wirecard's securities trades over-the-counter under the ticker symbols "WRCDF" and "WCAGY."

8.     Defendant Markus Braun ("Braun") served as the Company's Chief Executive Officer ("CEO") and Chief Technology Officer ("CTO") at all relevant times.

9.     Defendant Jan Marsalek ("Marsalek") has served as the Company's Chief Operating Officer ("CFO") at all relevant times.

10.    Defendant Burkhard Ley ("Ley") served as the Company's Chief Financial Officer ("CFO") until December 31, 2017 and has served as a consultant since January 1, 2018.

11.    Defendant Alexander von Knoop ("von Knoop") has served as the Company's ("CFO") since January 1, 2018.

12.    Defendant Susanne Steidl ("Steidl") has served as the Managing Director of Wirecard North America Inc. since March 2017 and as a member of the Company's Executive Board since January 2018.

13.    Defendant Wulf Matthias ("Matthias") has served as the Chairman of the Supervisory Board of Board until January 11, 2020 and as a member of the Supervisory board at all relevant times.

14.    Defendants Braun, Ley, Marsalek, von Knoop, Steidl, and Matthias are collectively referred to herein as the "Individual Defendants."

15.    Each of the Individual Defendants:

        (a)     directly participated in the management of the Company;

3

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

16.     Wirecard is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Wirecard under *respondeat superior* and agency principles.

18.     Defendant Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("EY") is an accounting firm and was Wirecard's external auditor during the Class Period.

19.     Defendants Wirecard, the Individual Defendants, and EY are collectively referred to herein as "Defendants."

4

**SUBSTANTIVE ALLEGATIONS**

**Materially False and Misleading**
**Statements Issued During the Class Period**

20.    On August 17, 2015, Wirecard issued its "Interim Report as at June 30, 2015"

(the "Q2 15 Report") which was signed by Defendants Braun, Ley, and Marsalek.

21.    In the Q2 15 Report, Wirecard stated that its total assets were €2,125,384,000 as

of June 30, 2015.

22.    In the Q2 15 Report, Wirecard stated the following regarding its cash, in pertinent

part:

**Method used to measure cash and cash equivalents**

For the purposes of the cash flow statement, a cash position is used that consists
of cash and cash equivalents. ***Cash includes cash in hand and demand deposits.***

***Cash equivalents comprise current, extremely liquid financial investments that
can be converted at any time at short notice into certain amounts of cash and
are only subject to negligible fluctuations in value.***

As of 30 June 2015 and 30 June 2014, the Company held both cash and cash
equivalents.

**Reconciliation to cash and cash equivalents according to IAS 7.45**

The balance of financial resources at the end of the period includes cash in hand
and bank balances disclosed under cash and cash equivalents (30 June 2015:
kEUR 724,495; 30 June 2014: kEUR 585,089), less current (immediately due and
payable) liabilities to banks (30 June 2015: kEUR – 186; 30 June 2014: kEUR –
796), disclosed under current, interest-bearing liabilities. In addition, financial
resources corresponding to current customer deposits from banking operations (30
June 2015: kEUR – 275,509; 30 Juen 2014 kEUR – 140,764) were deducted or
reported as a reduction on the balance of financial resources in the consolidated
cash flow statement according to IAS 7.22.

Current customer deposits are reported on the equity and liabilities side of the
Wirecard consolidated financial statements as other liabilities (customer deposits).
These customer funds are comparable in economic terms with short-term
(bank)account loans or overdraft facilities. ***On the assets side, separate accounts
have been set up for these funds, which may not be used for any other business
purposes.*** Given these circumstances, securities (so-called collared floaters and

5

short-term and medium-term interest-bearing securities) to the total amount of the customer deposits with a nominal value of kEUR 201,965 (30 June 2014: kEUR 205,138), deposits with the central bank and demand and short-term fixed deposits with banks are held in an amount of kEUR 275,509 (30 June 2014: kEUR 140,794). These are reported in the Wirecard Group under the balance sheet items of "cash and cash equivalents", "non-current financial and other assets" and "current interest-bearing securities".

First-time consolidations resulted in an increase in cash and cash equivalents of kEUR 1,020 (6M 2014: kEUR 5,106).

(Emphasis added.)

23.    In the Q2 15 Report, Wirecard stated the following regarding its net assets, in

pertinent part:

**Net assets**

***Assets reported in the balance sheet of Wirecard AG increased by kEUR 103,225 in the first half year 2015, rising from kEUR 1,995,159 to kEUR 2,125,384****. In the period under review, **both non-current and current assets grew, with the latter increasing from kEUR 1,183,013 to kEUR 1,283,102**. In addition, the changes are also partially due to operating business growth, which is primarily as a result of the consolidation of the assets and liabilities acquired as part of the acquisition in the year under review. This has caused various balance sheet items to increase substantially. As a result, comparisons can only be made to a limited extent. This comprises particularly the asset items of "intangible assets", "goodwill" and "customer relationships", as well as the "receivables" and "cash and cash equivalents" items, and, on the equity and liabilities side of the balance sheet, the item "trade payables".

In addition to the assets reported in the balance sheet, the Wirecard Group also has unreported intangible assets, such as software components, customer relationships, human and supplier capital, amongst others.

(Emphasis added.)

24.    In the Q2 15 Report, Wirecard stated that its revenues were €340,086,000 as at

June 30, 2015.

25.    In the Q2 15 report, Wirecard stated that its earnings before interest, taxes,

depreciation and amortization ("EBITDA") was €98,299,00 as at June 30, 2015.

26.     In the Q2 15 Report, Wirecard stated the following regarding its risks, in pertinent part:

### 7. REPORT ON OPPORTUNITIES AND RISK

For the Wirecard Group, the deliberate assumption of calculable risks and the consistent exploitation of the opportunities associated with these risks form the basis for its business practices as part of the scope of value-based corporate management. With these strategies in mind, the Wirecard Group has implemented a risk management system that lays the foundations for risk-oriented and earnings-oriented corporate governance.

***In the interests of securing the Company's success on a long-term and sustainable basis, it is thus indispensable to identify, analyse, assess and document critical trends and emerging risks at an early stage.*** Where it makes economic sense, the aim is to adopt corrective countermeasures. In principle, it is possible to limit, reduce, transfer or accept risks in order to optimize the Company's risk position relative to its earnings. ***The implementation and effectiveness of any approved countermeasures are continuously reviewed.***

(Emphasis added.)

27.     On August 18, 2015, Wirecard released a presentation entitled "Half year results 2015 Investor Presentation" in which Wirecard stated its "Cash and cash equivalents" were €724,495,000 and €695,076,000 as of June 30, 2015 and December 31, 2014, respectively. Wirecard also stated that its "Total assets" were €2,125,384,000 and €1,995,159,000 as of June 30, 2015 and December 31, 2014, respectively.

28.     The 2015 Investor Presentation also stated that Wirecard's net cash position was €513,420,000 and €457,492,000 as of June 30, 2015 and December 31, 2014, respectively.

29.     On November 18, 2015, Wirecard released a presentation entitled "Results 9M/Q3 of fiscal year 2015 Investor Presentation" in which Wirecard stated its "Cash and cash equivalents" were €793,297,000 and that its "Total assets" were €2,187,909,000 as of September 30, 2015.

30.     On August 17, 2016, Wirecard issued its "Interim Reports as at 30 June 2016" (the "Q2 16 Report") which was signed by Defendants Braun, Ley, and Marsalek.

31.     In the Q2 16 Report, Wirecard stated that its total assets were €3,201,807,000 and its cash and cash equivalents were €701,603,000 as at June 30, 2016.

32.     In the Q2 16 Report, Wirecard stated the following regarding its cash, in pertinent part:

> The cash and cash equivalents item (30 June 2016: kEUR 1,172,609; 31 December 2015: kEUR 1,062,968) includes cash in hand and bank balances (demand deposits, fixed-term deposits with a term of up to three months and overnight (call money) deposits). These also include resources from current customer deposits of Wirecard Bank AG and Wirecard Card Solutions Ltd. which are not placed in interest-bearing securities (30 June 2016: kEUR 467,996; 31 December 2015: kEUR 419,539) and funds derived from the acquiring business of Wirecard Bank AG. To improve its interest income, Wirecard Bank AG invested some of the customer deposits in various short, medium and long-term interest-bearing securities (so-called collared floaters and interest-bearing securities). These are reported under non-current financial and other assets and current interestbearing securities. Excluding the purchase of these securities and the fixed-term deposits with a term of more than three months across the whole Group, cash and cash equivalents would have been kEUR 281,290 (31 December 2015: kEUR 182,272) higher.

> It should also be noted that as a result of delayed payments due to public holidays at the end of the fiscal year, the cash item was very high due to these effects at the balance sheet date. This item increased in this quarter due to the receipt of kEUR 71,821 due to the sale of Visa Europe Ltd. to Visa Inc.

> *       *       *

> The capital reserve amounts to kEUR 494,682 as of 30 June 2016 (31 December 2015: kEUR 494,682).

> (Emphasis added.)

33.     The Q2 16 Report stated that Wirecard's revenues were €451,790,000 as at June 30, 2016.

34.     The Q2 16 Report stated that Wirecard's EBITDA was €132,351,000 as at June 30, 2016.

35.     The Q2 16 Report stated the following regarding the Company's risks, in pertinent part:

> In the interest of securing the Company's success on a long-term and sustainable basis, it is thus imperative to identify, analyse, assess, and document critical trends and emerging risks at an early stage. Corrective countermeasures will be adopted when and where it makes economic sense. In principle, it is possible to limit, reduce, transfer or accept risks in order to optimise the Company's risk position relative to its earnings. ***The implementation and effectiveness of any approved countermeasures are continuously reviewed.***
>
> *            *            *
>
> ***We note that no going concern risks currently relate to the Group.***

(Emphasis added.)

36.     On April 5, 2017, Wirecard issued its "Annual Report 2016" which was signed by Defendants Braun, Ley, and Marsalek.

37.     The Annual Report 2016 provided "key figures" as:

| WIRECARD GROUP | 2016 | 2015 | |
|---|---|---|---|
| Revenues | 1,028,358 | 771,340 | kEUR |
| EBITDA | 307,363 | 227,315 | kEUR |
| EBIT | 235,188 | 172,844 | kEUR |
| Earnings after taxes | 266,749 | 142,646 | kEUR |
| Earnings per share (undiluted) | 2.16 | 1.16 | EUR |
| Shareholders' equity | 1,474,963 | 1,280,513 | kEUR |
| Total assets | 3,482,062 | 2,935,501 | kEUR |
| Cash flow on ordinary transactions (adjusted) | 283,030 | 199,685 | kEUR |
| Employees (average) | 3,766 | 2,300 | |
| of which part time | 296 | 236 | |

38.     The Annual Report 2016, included the following regarding EY auditing the Company, in pertinent part:

> Ernst & Young GmbH, Wirtschaftsprüfungsgesellschaft, audited the separate financial statements of Wirecard AG as of 31 December 2016, the consolidated financial statements as of 31 December 2016 and the management report for the company and the Group, and issued unqualified audit opinions thereon. The

separate financial statements and the management report of Wirecard AG were prepared according to German Commercial Code (HGB), while the consolidated financial statements and the Group management report were prepared in accordance with the International Financial Reporting Standards (IFRS) as well as the additional requirements of German law pursuant to Section 315a (1) of the HGB.

The aforementioned financial statements and reports, as well as the Management Board's proposal for the appropriation of profit and the auditor's audit reports were submitted to all members of the Supervisory Board in good time before the meeting of the Supervisory Board meeting on 5 April 2017. The members of the Supervisory Board carefully and intensively discussed and checked these financial statements and the reports from the auditor at this meeting. The auditor participated at this meeting of the Supervisory Board, reported on key audit results and was available to the members of the Supervisory Board to provide supplementary information. The auditor also explained his findings on the company's control and risk management system relating to the financial accounting process. The auditor stated his independence and provided information about services that had been rendered in addition to the auditing services in the 2016 fiscal year.

The Supervisory Board approved the results of the audit carried out by the auditor and concluded that no objections needed to be raised based on the final results of its examination. With a resolution dated 5 April 2017, the Supervisory Board approved both the separate financial statements of Wirecard AG prepared according to the HGB and the consolidated financial statements prepared according to IFRS for the 2016 fiscal year. The annual financial statements have consequently been adopted in the sense of Section 172 of the AktG.

*      *      *

The audit opinion issued by the independent auditor of the consolidated financial statements for the 2016 fiscal year was signed by Mr. Dahmen and Mr. Loetscher. Mr. Loetscher signed the audit opinion for the first time for the fiscal year ending on 31 December 2015 and Mr. Dahmen has been appointed as responsible independent auditor as of this year's audit. Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft has been the sole auditor of Wirecard AG since 2011 and was previously the joint auditor together with RP Richter GmbH Wirtschaftsprüfungsgesellschaft since 2009.

39.     The Annual Report 2016 included a section signed by EY, which stated, in pertinent part:

**Audit opinion**

10

. . . We conducted our audit of the consolidated financial statements in accordance with Sec. 317 HGB and German generally accepted standards for the audit of financial statements promulgated by the Institut der Wirtschaftsprüfer [Institute of Public Auditors in Germany] (IDW). Those standards require that we plan and perform the audit such that misstatements materially affecting the presentation of the net assets, financial position and results of operations in the consolidated financial statements in accordance with the applicable financial reporting framework and in the group management report are detected with reasonable assurance. Knowledge of the business activities and the economic and legal environment of the Group and expectations as to possible misstatements are taken into account in the determination of audit procedures. The effectiveness of the accounting-related internal control system and the evidence supporting the disclosures in the consolidated financial statements and the group management report are examined primarily on a test basis within the framework of the audit. The audit includes assessing the annual financial statements of those entities included in consolidation, the determination of entities to be included in consolidation, the accounting and consolidation principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements and the group management report. We believe that our audit provides a reasonable basis for our opinion.

***Our audit has not led to any reservations.***

***In our opinion, based on the findings of our audit, the consolidated financial statements comply with IFRSs as adopted by the EU as well as the additional requirements of German commercial law pursuant to Sec. 315a (1) HGB and give a true and fair view of the net assets, financial position and results of operations of the Group in accordance with these requirements.*** The group management report is consistent with the consolidated financial statements, satsfy [sic] the legal requirements and as a whole provides a suitable view of the Group's position and suitably presents the opportunities and risks of future development.

(Emphasis added.)

40.     On August 16, 2017, Wirecard issued its "Interim Reports as at June 30, 2017" (the "Q2 17 Report") which was signed by Defendants Braun, Ley, and Marsalek.

41.     In the Q2 17 Report, Wirecard stated that its total assets were €4,092,590,000 as at June 30, 2017 and its cash and cash equivalents were €1,592,965,000 and €1,332,631,000 as at June 30, 2017 and December 31, 2016, respectively.

42.     The Q2 17 Report stated that Wirecard's revenues were €615,478,000 as at June 30, 2017.

43.     The Q2 17 Report stated that Wirecard's EBITDA was €176,451,000 as at June 30, 2017.

44.     In the Q2 17 Report, Wirecard stated the following regarding its risks: "We also point out that there are no risks which could endanger the Group as a going concern."

45.     On August 15, 2018, Wirecard issued its "Interim Reports as at June 30, 2018" (the "Q2 18 Report") which was signed by Defendants Braun, von Knoop, Marsalek, and Steidl.

46.     In the Q2 18 Report, Wirecard stated that its total assets were €4,952,900,000 as at June 30, 2018 and its cash and cash equivalents were €2,060,400,000 and €1,901,300,000 as at June 30, 2018 and December 31, 2017, respectively.

47.     The Q2 18 Report stated that Wirecard's revenues were €897,600,000 as at June 30, 2018.

48.     The Q2 18 Report stated that Wirecard's EBITDA was €245,400,000 as at June 30, 2018.

49.     In the Q2 18 Report, Wirecard stated the following regarding its risks: "We also point out that there are no risks which could endanger the Group as a going concern."

50.     On April 2019, Wirecard issued its "Annual Report 2018" which was signed by Defendants Braun, von Knoop, Marsalek, and Steidl. The Annual Report 2018 included the following "key figures":

| Wirecard Group | 2018 | 2017 | |
|---|---|---|---|
| Revenues | 2,016.2 | 1,488.6 | in EUR million |
| EBITDA | 560.5 | 410.3 | in EUR million |
| EBIT | 438.5 | 311.5 | in EUR million |
| Earnings per share (basic) | 2.81 | 2.07 | EUR |
| Equity | 1,922.7 | 1,640.0 | in EUR million |
| Total assets / total equity and liabilities | 5,854.9 | 4,532.8 | in EUR million |
| Cash flow from operating activities (adjusted) | 500.1 | 375.7 | in EUR million |
| Employees (average) | 5,154 | 4,449 | |
| of which part-time | 317 | 329 | |

51.     The Annual Report 2018, in a section signed by Defendant Matthias, included

the following regarding EY auditing the Company, in pertinent part:

**Financial statements of the company and the consolidated financial statements**

Ernst & Young Gmbh Wirtschaftsprüfungsgesellschaft audited the financial statements of the company as of 31 December 2018, the consolidated financial statements as of 31 December 2018 and the management report for the company and the Group, and issued unqualified audit opinions thereon. ***The financial statements and the management report of the company were prepared in accordance with the German Commercial Code (HGB). The consolidated financial statements and the Group management report of the company were prepared in accordance with the International Financial Reporting Standards (IFRS) as well as the additional requirements of German law pursuant to Section 315e (1) of the HGB.***

In addition, Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Stuttgart, Munich branch, was commissioned to complete an audit with limited assurance of the Group non-financial declaration in accordance with ISAE 3000 and produced a corresponding report. The Group non-financial declaration has been published on the company's website at ir.wire.com.

At the meeting on 24 April 2019, ***the Supervisory Board intensively discussed and examined the consolidated financial statements and the Group management report, the Group non-financial declaration prepared in accordance with Section 315b of the HGB, the financial statements and management report for the company, the auditor's report and the Management Board's planned proposal for the appropriation of profit.*** The required documents were submitted to the members of the Supervisory Board in good time before the meeting so that they had sufficient opportunity to examine them. The auditor participated at this meeting of the Supervisory Board, reported on key audit results and was available to the members of the Supervisory Board to provide supplementary information. The auditor addressed in particular key audit

matters which included allegations by a whistle-blower in Singapore. The auditor also explained his findings on the company's control and risk management system relating to the financial accounting process. The Supervisory Board will participate in the further strengthening of these systems in the course of the continuing growth of the company (cf. 2.5 of the Risk Report). ***The auditor stated his independence and provided information about services that had been rendered in addition to the auditing services in the 2018 fiscal year.***

The Supervisory Board approved the results of the audit carried out by the auditor and concluded that no objections needed to be raised based on the final results of its examination. The Supervisory Board in particular concurs with the conclusion of the auditor that - taking into account the corrections made by Wirecard - there are no objections against the accounting treatment of the facts that were the subject of various allegations made by a purported whistle-blower in Singapore (cf. the statements under 2.5 of the Risk Report regarding current investigations of the authorities in Singapore and possible criminal liability of individual employees.) In this context, the Supervisory Board took into consideration in particular the quality of the alleged behavior and the materiality threshold for the group audit. With a resolution dated 24 April 2019, the Supervisory Board approved both the consolidated financial statements of the company prepared according to IFRS for the 2018 fiscal year and the financial statements of the company prepared according to the HGB for the 2018 fiscal year. The financial statements have consequently been adopted in the sense of Section 172 of the AktG.

At the meeting on 24 April 2019, the Supervisory Board approved this Report of the Supervisory Board, as well as the Corporate Governance Report that is combined with the Corporate Governance Statement.

*       *       *

At the Annual General Meeting 2018, Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Stuttgart, Munich branch, was appointed as the auditor for the financial statements of the company and the consolidated financial statements. The responsible auditor for the 2018 fiscal year in Mr. Martin Dahmen. Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft has been the sole auditor of the company and the Group since 2011 and was previously joint auditor together with RP Richter GmbH Wirtschaftsprüfungsgesellschaft since 2009. In December 2018 the company published the invitation to tender for the group audit 2019. After the completion of the tender procedure the new auditor will be elected by the Annual General Meeting 2019.

***It was agreed with the auditor of the financial statements that he/she would report to the Supervisory Board without delay all findings and events material to the duties of the Supervisory Board as determined in the course of its audit. In addition, the auditors are required to inform the Supervisory Board and/or to***

> *make a note in the audit report if they encounter facts in the course of the audit that are irreconcilable with the statement of compliance issued by the management Board and Supervisory Board in accordance with Section 161 AktG.*

(Emphasis added.)

52.     The Annual Report 2018 included a section signed by EY, which stated, in

pertinent part:

> We have audited the consolidated financial statements of Wirecard AG, Ascheim, and its subsidiaries (the Group), which comprise the consolidated statement of financial position as of 31 December 2018, the consolidated income statement, the consolidated statement of comprehensive income, consolidated statement of cash flows for the fiscal year from 1 January 2018 to 31 December 2018, and notes to the consolidated financial statements, including a summary of significant accounting policies. In addition, we have audited the group management report, which has been combined with the management report of Wirecard AG, for the fiscal year from January 1 January 2018 [sic] to 31 December 2018.
>
> *In our opinion, on the basis of the knowledge obtained in the audit,*
>   - *the accompanying consolidated financial statements comply, in all material respects, with the IFRS as adopted by the EU, and the additional requirements of German commercial law pursuant to Sec. 315e (1) of the HGB ["Handelsgesetzbuch": German Commercial Code] and, in compliance with these requirements, give a true and fair view of the assets, liabilities, and financial position of the Group* as at 31 December 2018, and of its financial performance for the reporting year from 1 January 2018 to 31 December 2018, and
>
>   - *the accompanying group management report as a whole provides an appropriate view of the Group's position.* In all material respects, this group management report is consistent with the consolidated financial statements, complies with German legal requirements and appropriately presents the opportunities and risks of future development.
>
> *Pursuant to Section 322 (3) Sentence 1 HGB, we declare that our audit has not led to any reservations relating to the legal compliance of the consolidated financial statements and of the group management report.*
>
> *            *            *
>
> Our audit procedures did not lead to any reservations regarding the identification as business combination and the purchase price allocation of the acquisition of Citigroup's customer portfolios in Asia.

*       *       *

We exercise professional judgment and maintain professional skepticism throughout the audit. We also

- Identify and assess the risks of material misstatement of the consolidated financial statements and of the group management report, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinions. The risk of not detecting a material misstatement resulting from fraud is higher than on resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. . . .

- ***Evaluate the appropriateness of accounting policies used by the management and the reasonableness of accounting estimates made by the management and related disclosures***. . . .

- ***Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express opinions on the consolidated financial statements and on the group management report.*** We are responsible for our audit opinions.

- Evaluate the consistency of the group management report with the consolidated financial statements, its conformity with [German] law, and the view of the Group's position it provides.

(Emphasis added.)

53.    On August 6, 2019, Wirecard issued its "Half Year Financial Report as of 30 June 2019" (the "HY 19 Report") which was signed by Defendants Braun, von Knoop, Marsalek, and Steidl.

54.    In the HY 19 Report, Wirecard stated that its total assets were €6,697,600,000 as at June 30, 2019 and its cash and cash equivalents were €3,047,700,000 and €2,719,800,000 as at June 30, 2019 and December 31, 2018, respectively.

55.    The HY 19 Report stated that Wirecard's revenues were €1,209,800,000 as at June 30, 2019.

16

56.    The HY 19 Report stated that Wirecard's EBITDA was €342,100,000 as at June 30, 2019.

57.    In the HY 19 Report, Wirecard stated the following, in pertinent part, regarding its risks: "We also point out that there are no risks which could endanger the Group as a going concern."

58.    In the HY 19 Report, Wirecard discussed its investigation in Asia where "errors were identified in the revenue recognition for the fiscal year 2017 and 2018, which were corrected retrospectively for the first half year 2018." There was no mention of errors relating to the Company's cash.

59.    On February 14, 2020, Wirecard issued a press release entitled "Wirecard AG: Preliminary results 2019" which stated the following, in pertinent part, regarding the Company's revenue and EBITDA:

> According to preliminary figures, consolidated sales revenues in 2019 rose to EUR 2.8 billion and thus by around 38 percent (2018: EUR 2.0 billion). Preliminary earnings before interest, taxes, depreciation and amortization (EBITDA) rose in the past fiscal year by around 40 percent to EUR 785 million (2018: EUR 561 million). Adjusted for extraordinary expenses for audit, advisory and legal services in Q4/2019, EBITDA amounts to EUR 794 million, an increase of 42 percent.

> In the fourth quarter, preliminary consolidated revenues increased by 46 percent to EUR 835 million compared to the same quarter in the previous year (2018: EUR 571 million). Preliminary earnings before interest, taxes, depreciation and amortization (EBITDA) increased during this time period by about 41 percent to EUR 232 million at Group level (Q4/2018: EUR 165 million). Adjusted for extraordinary expenses for audit, advisory and legal services which were incurred in Q4, EBITDA for the fourth quarter was EUR 241 million, corresponding to an increase of around 46 percent.

> *        *        *

> For the current fiscal year 2020, the Management Board confirms its outlook and expects earnings before interest, taxes, depreciation and amortization (EBITDA) in a range of EUR 1.0 billion to EUR 1.12 billion.

60.     On May 14, 2020, Wirecard issued a press release entitled "Wirecard AG: Preliminary result Q1 2020 (news with additional features)" which stated the following, in pertinent part, regarding the Company's revenue and EBITDA:

> According to preliminary figures, consolidated revenues increased by around 24 percent to EUR 700.2 million (Q1/2019: EUR 566.7 million). Preliminary earnings before interest, taxes, depreciation and amortization (EBITDA) rose by around 26 percent to EUR 199.2 million in the first quarter of 2020 (Q1/2019: EUR 158.0 million). Adjusted by one-off expenses EBITDA would be up by 29 percent to around EUR 204.0 million (+ EUR 4.8 million).

> For the fiscal year 2020, the Management Board confirms its forecast of achieving earnings before interest, taxes, depreciation and amortisation (EBITDA) in a range of EUR 1.0 billion to EUR 1.12 billion.

61.     On May 25, 2020, Wirecard issued a press release entitled "Wirecard AG: Publication of the consolidated financial statements on 18 June 2020" which announced the following, in pertinent part:

> The audit firm Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft has informed Wirecard AG that *all foreign auditors have meanwhile been able to finalize their audit procedures for Group purposes. Within the scope of the completed parts of the audit procedures, Wirecard has not yet been informed of any material findings*. However, not all audit procedures have yet been completed. Against this background, the audit of the annual financial statements and consolidated financial statements for 2019 will not be completed by June 4, 2020, as planned.

> The publication of the consolidated financial statements and the annual press conference will take place on June 18, 2020. *The company expects an unqualified audit opinion.*

> In February 2020, the company had reported preliminary sales revenue growth of 38 percent to EUR 2.8 billion and preliminary EBITDA of EUR 785 million (+40%). Wirecard assumes that there will be no significant deviations from these figures.

> (Emphasis added.)

62.     The statements contained in ¶¶20-61 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Wirecard overstated its cash balances during the Class Period, falsely claiming €1.9 billion of cash in a trust account that was missing; (2) Wirecard overstated its financial results during the Class Period, including revenue and EBITDA; (3) Wirecard did not have adequate risk management or countermeasures; (4) EY failed to audit Wirecard in accordance with applicable auditing principles; and (5) as a result, Defendants' statements about Wirecard's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

63.     On June 18, 2020, before market hours, Wirecard issued a press release entitled "Wirecard AG: Date for publication of annual and consolidated financial statements 2019 delayed due to indications of presentation of spurious balance confirmations" in which the Company announced the following, in pertinent part:

> **Date for publication of annual and consolidated financial statements 2019 delayed due to indications of presentation of spurious balance confirmations**
>
> Wirecard AG's auditor Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Munich, informed Wirecard AG that *no sufficient audit evidence could be obtained so far of cash balances on trust accounts to be consolidated in the consolidated financial statements in the amount of EUR 1.9 billion (approximately a quarter of the consolidated balance sheet total)*.
>
> There are indications that spurious balance confirmations had been provided from the side of the trustee respectively of the trustee's account holding banks to the auditor in order to deceive the auditor and *create a wrong perception of the existence of such cash balances or the holding of the accounts for to the benefit*

*of Wirecard group companies*. The Wirecard management board is working intensively together with the auditor towards a clarification of the situation.

* * *

*If certified annual and consolidated financial statements cannot be made available until June 19, 2020, loans made to Wirecard AG amounting to approximately EUR 2 billion can be terminated.*

(Emphasis added.)

64.    On this news, over the next two trading days, Wirecard's American depositary receipts ("ADRs") (WRCDF) fell $85.69 per ADR, or over 75%, to close at $27.60 per ADR on June 19, 2020, damaging investors.

65.    On this news, over the next two trading days, Wirecard's ADRs (WCAGY) fell $44.75 per ADR, or over 76%, to close at $13.75 per ADR on June 19, 2020, damaging investors.

66.    Then on June 22, 2020, before market hours, Wirecard issued a press release entitled "Wirecard AG: Statement of the Management Board about the current situation of the Company" which stated the following, in relevant part:

The Management Board of Wirecard assesses on the basis of further examination that **there is a prevailing likelihood that the bank trust account balances in the amount of 1.9 billion EUR do not exist**. The company previously assumed that these trust accounts have been established for the benefit of the company in connection with the so called Third Party Acquiring business and has reported them as an asset in its financial accounts. The foregoing also causes the company to question the previous assumptions regarding the reliability of the trustee relationships.

The Management Board further assesses that previous descriptions of the so called Third Party Acquiring business by the company are not correct. The Company continues to examine, whether, in which manner and to what extent such business has actually been conducted for the benefit of the company.

Wirecard withdraws the assessment of (i) the preliminary results of the financial year 2019 (revenue and earnings before interest, taxes, depreciation and amortization (EBITDA)) of 14 February 2020 (last confirmed on 18 June 2020),

(ii) the preliminary results of the first quarter of 2020 (revenue and EBITDA) of 14 May 2020, (iii) the EBITDA prognosis for the financial year 2020 of 6 November 2019 (last confirmed on 14 May 2020) and (iv) the Vision 2025 prognosis for the financial year 2025 on transaction volume, revenue and EBITDA of 8 October 2019. Potential effects on the annual financial accounts of previous years cannot be excluded.

*        *        *

In addition, the Company is examining a broad range of possible further measures to ensure continuation of its business operations, including cost reductions as well as restructuring, disposal or termination of business units and products segments.

(Emphasis added.)

67.     On this news, over the next two trading days, Wirecard's ADRs (WRCDF) fell $12.45 per ADR, or over 45%, to close at $15.51 per ADR on June 22, 2020, further damaging investors.

68.      On this news, over the next two trading days, Wirecard's ADRs (WCAGY) fell $6.35 per ADR, or over 46%, to close at $7.40 per ADR on June 22, 2020, further damaging investors.

69.     Then, on June 23, 2020, during market hours, *CNN* reported that Defendant Braun was arrested "after a $2.1 billion hole exploded in [Wirecard's] accounts." The article further stated that "Munich prosecutors confirmed that Braun, Wirecard's former CEO, was arrested on suspicion of having inflated the digital payment company's balance sheet and sales through fake transactions in order to make it more attractive to investors and customers."

70.     On this news, over the next two trading days, Wirecard's ADRs (WRCDF) fell $1.29 per ADR, or over 8%, to close at $13.86 per ADR on June 24, 2020, further damaging investors.

71.     On this news, over the next two trading days, Wirecard's ADRs (WCAGY) fell $0.55 per ADR, or over 7%, to close at $6.85 per ADR on June 24, 2020, further damaging investors.

72.     Then, on June 24, 2020, *Reuters* reported that "Wirecard's missing $2.1 billion is being investigated by the Philippines," following reports that the Philippine banks the Company claimed held the cash in question "have denied any links with [Wirecard]," and that Defendant Marsalek had fled to the country.

73.     On this news, over the next three trading days, Wirecard's ADRs (WRCDF) fell $12.26 per ADR, or over 88%, to close at $1.60 per ADR on June 26, 2020, further damaging investors.

74.     On this news, over the next three trading days, Wirecard's ADRs (WCAGY) fell $6.06 per ADR, or over 88%, to close at $0.79 per ADR on June 26, 2020, further damaging investors.

75.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Wirecard securities publicly traded over-the-counter during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Defendants, members of the Individual Defendants' immediate families and

their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Wirecard securities were actively traded over-the-counter. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Wirecard securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

82.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Wirecard ADRs were listed and actively traded over-the-counter, an efficient market;

- Wirecard filed periodic public reports;

- Wirecard regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Wirecard's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Wirecard was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

83.     Based on the foregoing, the market for Wirecard securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

<u>**COUNT I**</u>
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
<u>**Against All Defendants**</u>

85.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Wirecard securities during the Class Period.

89.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Wirecard were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Wirecard's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

90.      Individual Defendants, who are the senior officers and/or members of the management board of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other

members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Wirecard personnel to members of the investing public, including Plaintiff and the Class.

91.     As a result of the foregoing, the market price of Wirecard securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Wirecard securities during the Class Period in purchasing Wirecard securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

92.     Had Plaintiff and the other members of the Class been aware that the market price of Wirecard securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Wirecard securities at the artificially inflated prices that they did, or at all.

93.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

94.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Wirecard securities during the Class Period.

<u>**COUNT II**</u>
**Violations of Section 20(a) of the Exchange Act**
<u>**Against the Individual Defendants**</u>

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatements of revenue and profit and false financial statements.

97.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by Wirecard which had become materially false or misleading.

98.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning Wirecard's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Wirecard securities.

99.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)      declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)      awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: July 7, 2020                    **THE ROSEN LAW FIRM, P.A.**


                                       /s/ *Jacob A. Goldberg*
                                       Jacob A. Goldberg
                                       101 Greenwood Avenue, Suite 440
                                       Jenkintown, PA 19046
                                       Telephone: (215) 600-2817
                                       Fax: (212) 202-3827
                                       Email: jgoldberg@rosenlegal.com

                                       Phillip Kim (*pro hac vice application forthcoming*)
                                       275 Madison Ave., 40th Floor
                                       New York, NY 10016
                                       Tel: (212) 686-1060
                                       Fax: (212) 202-3827
                                       Email: pkim@rosenlegal.com

                                       *Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Wirecard AG. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Wirecard AG. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:**      Carol
**Middle initial:**      A
**Last name:**      Brown
**Entity:**      Redacted
**Title:**
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 06/24/2020 | 5000 | 6.670 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 06/25/2020 | 5000 | 2.00 |

**Certification for Carol Brown (cont.)**

7. I have not served as a representative party on behalf of a class under the federal
   securities laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:                    **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.                   **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 07/07/2020