UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re WIRECARD AG SECURITIES LITIGATION | ) ) ) | Civ. Action No. 2:20-cv-03326-AB |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE |
| ALL ACTIONS. | ) ) | FEDERAL SECURITIES LAWS |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................1

II.     JURISDICTION & VENUE..........................................................................5

III.    PARTIES TO THE ACTION .......................................................................7

     A.     Plaintiffs ...........................................................................................7

     B.     Defendants ......................................................................................10

IV.    THE SECURITIES AT ISSUE....................................................................14

     A.     Wirecard ADRs (WCAGY)............................................................14

     B.     Wirecard F-Shares (WRCDF)........................................................20

     C.     The OTC Market............................................................................21

V.      BACKGROUND .........................................................................................23

VI.    DEFENDANTS' FRAUDULENT SCHEME AND MATERIALLY FALSE AND MISLEADING STATEMENTS.............................................25

     A.     Wirecard for Years Denies All Allegations of Improper Accounting and Business Practices.......................................................................25

           1.     The JCAP Report – Accusations of Threadbare Operations in Asia and Overvalued Subsidiaries..................................................26

           2.     The Zatarra Report – Short Seller Accusations of Money-Laundering and Lax Controls and Oversight..............................................27

           3.     Wirecard's Indian Acquisitions and Questions of Who Benefitted from a €300 million "Overpayment" ........................................29

           4.     Whistleblower Allegations of Forged Contracts, Round-Tripping and Money-Laundering in Asia ................................................34

           5.     Wirecard's Falsification of Revenue and Cash Reserves from Third-Party Acquirers in Several Countries .............................47

     B.     KPMG's Investigation Verifies Certain Allegations and Raises Further Questions About Wirecard's Accounting and Operations....................61

     C.     Wirecard's Non-existent €1.9 Billion and its Swift Descent into Insolvency........................................................................................73

**Page**

D.　　E&Y's Years of Complicity in Wirecard's Fraud and Deficient Audits .............. 79

E.　　Further Confirmation of Wirecard's Historic Fraud Following Its Collapse ........ 86

F.　　Wirecard's False and Misleading Financial Statements and Compliance with Applicable Accounting Standards ................................................................ 90

1.　　False and Misleading Financial Results and Statements .......................... 90

2.　　False and Misleading Statements About Compliance with Accounting Standards ................................................................................ 95

3.　　False and Misleading Statements About Internal Controls........................ 99

4.　　E&Y's Materially False and Misleading Audit Opinions........................ 107

VII.　　LOSS CAUSATION AND DAMAGES ................................................. 117

VIII.　　APPLICABILITY OF THE PRESUMPTION OF RELIANCE .................................... 128

IX.　　CLASS ACTION ALLEGATIONS ................................................................ 130

X.　　CLAIMS FOR RELIEF ................................................................ 133

COUNT I ................................................................................................ 133

For Violation of §10(b) of the Exchange Act & Rule 10b-5  Promulgated Thereunder Against All Defendants ................................................................ 133

COUNT II ............................................................................................ 134

For Violation of §20(a) of the Exchange Act  Against the Individual Defendants .................... 134

XI.　　PRAYER FOR RELIEF ................................................................ 135

XII.　　JURY TRIAL DEMAND ................................................................ 136

I.      **INTRODUCTION**

1.      This is a federal securities class action seeking damages from Defendants Wirecard AG ("Wirecard" or the "Company"), Markus Braun ("Braun"), Burkhard Ley ("Ley"), Alexander von Knoop ("von Knoop"), Jan Marsalek ("Marsalek"), Susanne Steidl ("Steidl"), Wulf Matthias ("Matthias") and Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft ("E&Y") (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 ("Exchange Act") in connection with transactions in: (i) Wirecard American Depositary Receipts ("ADR") sold under the ticker symbol WCAGY on the Over-the-Counter ("OTC") Market in the United States; and (ii) Wirecard common stock sold as foreign issue shares under the ticker symbol WRCDF on the OTC Market in the United States.

2.      The claims alleged herein are brought on behalf of a putative Class, consisting of all persons and entities other than Defendants who purchased shares of WCAGY and WRCDF on the OTC Market between August 17, 2015 and June 26, 2020, inclusive (the "Class Period").  Lead Plaintiffs Thanh Sam and Lawrence Gallagher seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

3.      Over the past decade, Wirecard, a payment processing company, presented itself as a financial technology leader with an ever-increasing global network and fast-growing sales and earnings.  Wirecard's stock price followed suit, with prices of its United States-traded ADRs reaching a peak of over $113 per share during the Class Period, which gave the Company a market capitalization greater than Deutsche Bank.  In truth, Wirecard was a fraudulent enterprise whose sales and profits were faked for years and whose value was massively inflated by Defendants' scheme and years of materially false and misleading statements.

- 1 -

4.      In June 2020, Defendants were forced to admit that *€1.9 billion* they claimed had been safely deposited in Philippines bank accounts, in fact, "*do[es] not exist*." The missing money is equivalent to every euro of profit that Wirecard claimed to have earned since 2012.  By June 25, 2020, Wirecard was forced into insolvency and investors lost billions as the price of its shares fell by more than *99%*.

5.      Following the revelation of Wirecard's shocking fraud, several of the Company's former executives, including former Chief Executive Officer ("CEO") Braun, were arrested and charged.  Others, including Defendant and former Chief Operating Officer ("COO") Marsalek, fled.  E&Y, which for more than a decade issued unqualified audit opinions of Wirecard's financial statements, is under criminal investigation by German prosecutors.

6.      Before Wirecard's collapse and throughout the Class Period, Wirecard issued quarterly and annual reports that reported revenues, earnings, cash flows, assets, transaction volumes and other key financial metrics that it claimed were accounted for in accordance with International Financial Reporting Standards ("IFRS").  They were all false.

7.      Similarly, Defendants' repeated assurances during the Class Period that the Company had and enforced effective internal controls "designed to guarantee the timely, uniform and correct accounting of all business processes and transactions" and ensure "compliance with statutory standards [and] accounting regulations" were also false.

8.      Defendants' fraud began to unravel, in part, in January 2019, when the *Financial Times* reported on whistleblower allegations and an ensuing investigation of fraudulent accounting at Wirecard's Singapore subsidiary.  Over the course of several months, the *Financial Times* reported on the details of the improper accounting and other misdeeds in Singapore and their connection to Wirecard's executives in Germany and its business in India.  Wirecard and some of

the Defendants repeatedly denied the allegations in the *Financial Times* and claimed the reporting was "inaccurate, misleading and defamatory."[1]

9.      In March and April 2019, the *Financial Times* published several articles revealing that just three "third-party acquiring partners" – companies that processed payments on Wirecard's behalf in places where it lacked a license in return for part of the fees – accounted for ***nearly half of Wirecard's revenue*** and ***nearly all its profits***.  The *Financial Times* also reported the vast disconnect between the enormous sums the third-party partners generated for Wirecard, and the reality on the ground, including the fact that one operated out of a bus tour company office and another from a retired sailor's house in the outskirts of Manila, Philippines.  As before, Defendants vehemently denied the accusations and accused the journalist of relying on fabricated documents and conspiring with short sellers.

10.     Investors in Wirecard – reassured by Defendants' false denials and promises of robust controls and compliance, regulators' and prosecutors' actions against short sellers and the *Financial Times* and, importantly, E&Y's unqualified audit opinions – remained unaware of the extent of Defendants' fraud.

11.     In October 2019, the *Financial Times* published an article revealing that several customers for one of Wirecard's reportedly most profitable third-party partners ***appeared to not exist***.  This report was followed by two more articles from the *Financial Times* in December 2019. One called into question Wirecard's practice of reporting cash deposited by third-party partners in trust bank accounts on Wirecard's books as its own cash.  The other raised questions about who really benefitted from Wirecard's €330 million purchase of two Indian companies from an opaque

---

[1]     The Company even sued the *Financial Times* and its journalist, Dan McCrum, and worked behind the scenes to pressure German prosecutors to bring charges against them, which they ultimately did.

middleman entity that bought them for only €37 million just weeks before. Wirecard again forcefully denied each point raised in the articles and accused the journalists of misconduct. Wirecard's securities continued to trade at artificially inflated prices due to Defendants' materially false and misleading financial statements, false denials of wrongdoing, false assertions of effective controls and other misstatements.

12.     Following the October 2019 *Financial Times* article, Wirecard commissioned KPMG AG Wirtschaftprüfungsgesellschaft ("KPMG") to conduct a special investigation into the allegations, but consistently stonewalled the KPMG investigators and refused to produce necessary documents and information. At the same time, Defendants continued their pattern of lies, blaming the investigation delays on the coronavirus pandemic and the complexity of analyzing transaction data.

13.     Eventually, however, KPMG completed its report (the "KPMG Report"), part of which was made public on April 28, 2020. Its findings were alarming. KPMG reported that because of a lack of cooperation from Wirecard, its executives, the third-party partners and the trustee in charge of the trust bank accounts, it was ***unable to verify the existence of nearly €1 billion*** in cash Wirecard said it had on deposit. KPMG also found that the three shadowy third-party partners previously identified by the *Financial Times* were the source of the "lion's share" of Wirecard's reported revenue and profits. But, because of vastly insufficient internal controls and a total lack of documentation, KPMG ***could not verify*** the existence of the actual transactions these third parties supposedly processed and thus could not verify whether the revenue from them ***actually existed***. Wirecard's share price dropped significantly on news of the KPMG Report, but continued to trade at artificially inflated prices as the full extent of fraud remained undisclosed.

14.     Shocked out of its torpor by KPMG's findings, E&Y, for the first time during the Class Period, actually sought documentation directly from the banks that supposedly held billions

of euros for Wirecard – an audit procedure so basic that it was later described as "***equivalent to day-one training at audit school***."

15.     On June 18, 2020, E&Y informed Wirecard that it could not issue a clean audit because it was provided "spurious" account statements by the trustee and thus could not confirm the accounts or money existed.  Defendants, ever defiant, continued to mislead, claiming that Wirecard was the one victimized by fraudsters and they were working diligently to figure out what was going on.

16.     On June 22, 2020, only after the head of the Philippines central bank said that Wirecard's purported €1.9 billion had ***never entered the country's financial system***, did the Company admit that the money and accounts, in fact, "***do not exist***."

17.     On June 23, 2020, Braun was arrested, and just a few days later Wirecard's lenders refused to extend its loan payments.  Wirecard declared insolvency on June 25, 2020, and the price of its United States-traded ADR fell below $1.00.

## II.     JURISDICTION & VENUE

18.     The Exchange Act claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

19.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

20.     Wirecard is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below, Wirecard: (i) engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place, and caused foreseeable losses, in the United States and this District; (ii) permitted and encouraged Wirecard's stock to be traded on the OTC Market in the

United States to grow its American shareholder base; (iii) took further advantage of the benefits and protections of United States law by utilizing the Securities and Exchange Commission ("SEC") Rule 12g3-2(b) (17 C.F.R. §240.12g3-2(b)), which exempted Wirecard from registration under §21(q) of the Exchange Act (17 C.F.R. §240.12g-l) so long as the Company, *inter alia*, electronically published reports made in its home country, including relevant annual reports, shareholder communications and other financial reports; (iv) issued false and/or misleading statements in connection with its Rule 12g3-2(b) (17 C.F.R. §240.12g3-2(b)) exemption; (v) marketed Wirecard's securities in the United States, including at its "Capital Markets Day" conferences in New York City, with the benefits and protections of this nation's securities laws; and (vi) operated and controlled Wirecard North America, Inc. ("Wirecard North America") headquartered in Conshohocken, Pennsylvania, for which Steidl was the managing director.

21.     Individual Defendants Braun, Ley, von Knoop, Marsalek, Steidl and Matthias are subject to personal jurisdiction in this District because they: (i) are or were control persons of Wirecard; and (ii) each purposefully directed their activities as alleged herein toward the United States and this District.

22.     E&Y is subject to jurisdiction in this District because it engages in continuous and systematic general business contact within the United States by virtue of: (i) its registration with the Public Company Accounting Oversight Board ("PCAOB"); (ii) signing the audit opinion for at least four United States exchange-listed companies (Centogene N.V., Brickell Biotech Inc., Trivago N.V. and Ceres Orion L.P.); and (iii) substantially participating in the audits of at least 30 United States multinational corporations, including McDonald's Corporation, Expedia Group, Inc., Texas Instruments Incorporated, Archer Daniels Midland Company, and other high-profile United States companies.

23.     E&Y, as alleged in further detail below, purposefully directed its activities in the United States and this District by preparing audit opinions that it knew would be included in Wirecard's annual reports cited herein, which E&Y knew were translated into English and aimed at potential United States investors as required by Wirecard's Rule 12g3-2(b) exemption. E&Y knew, and agreed, that its name, reputation and imprimatur in these annual reports would be relied upon by these United States investors in deciding whether to purchase Wirecard securities in the United States.  E&Y also claimed in its audit reports published with Wirecard's annual reports to have audited the financial statements of Wirecard's subsidiaries, which include Wirecard North America.  The claims at issue in this action arise out of or relate to E&Y's activities within the United States and jurisdiction over E&Y is reasonable under the circumstances.

24.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c)(3), and §27 of the Exchange Act (15 U.S.C. §78aa) as the Company's business has an effect in this District, and because some of the fraudulent acts and misstatements alleged herein occurred or were related to transactions and occurrences in the United States and caused economic harm in the United States, including in this District.

25.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES TO THE ACTION

### A.     Plaintiffs

26.     Lead Plaintiff Thanh Sam ("Sam") lives in Maryland and purchased Wirecard securities at artificially inflated prices during the Class Period and was damaged by the conduct alleged herein.

27.     Lead Plaintiff Sam purchased Wirecard's U.S.-traded shares WCAGY and WRCDF through transactions on the OTC Market in the United States during the Class Period.

28.     The Wirecard ADRs (WCAGY) Lead Plaintiff Sam purchased during the Class Period were issued by Citibank, N.A. ("Citibank") or JPMorgan Chase Bank, N.A. ("JPMorgan") (collectively, the "Depositary Banks"), both located in New York City, within the United States, and represent an ownership interest in shares of WDI (Wirecard common stock) that had been deposited with the Depository Bank(s) or their custodian(s), which held the shares for the benefit of Lead Plaintiff Sam.

29.     Lead Plaintiff Sam incurred irrevocable liability in the United States to purchase the WCAGY and WRCDF shares she acquired during the Class Period.  Lead Plaintiff Sam initiated her purchases of WCAGY and WRCDF by placing the buy orders through her broker, E*Trade Financial Corporation ("E*Trade"), which is based in New York.  Lead Plaintiff Sam purchased WCAGY and WRCDF on the OTC Market using a trading platform based in the United States.  On information and belief based on the facts about the OTC Market alleged herein, the purchase orders and trade confirmations were routed through servers located wholly within the United States.  The WCAGY ADRs reflecting Lead Plaintiff Sam's purchases and her ownership interest in the underlying WDI shares were issued by Citibank or JPMorgan from one of their depositary bank offices in New York.  Lead Plaintiff Sam settled her purchases of WCAGY and WRCDF by paying for them in the United States through her cash account at E*Trade.  As required by the ADR agreements filed with the SEC by Citibank and JPMorgan, a transfer of title establishing Lead Plaintiff Sam's beneficial ownership of WCAGY and, therefore the Wirecard common stock on deposit on her behalf, was recorded on the transfer books maintained in New York.

30.     Lead Plaintiff Lawrence Gallagher ("Gallagher") lives in California and purchased Wirecard securities at artificially inflated prices during the Class Period and was damaged by the conduct alleged herein.

31.     Lead Plaintiff Gallagher purchased Wirecard's United States-traded shares WCAGY and WRCDF through transactions on the OTC Market in the United States during the Class Period.

32.     The WCAGY shares Lead Plaintiff Gallagher purchased during the Class Period were issued by Citibank or JPMorgan, both located in New York City, within the United States, and represent an ownership interest in shares of WDI (Wirecard common stock) that had been deposited with the Depository Bank(s) or their custodian(s), which held the shares for the benefit of Lead Plaintiff Gallagher.

33.     Lead Plaintiff Gallagher incurred irrevocable liability in the United States to purchase the WCAGY and WRCDF shares he acquired during the Class Period.  Lead Plaintiff Gallagher initiated his purchases of WCAGY and WRCDF by placing the buy orders through his broker, Fidelity Investments ("Fidelity"), which is based in Boston, Massachusetts.  Lead Plaintiff Gallagher purchased WCAGY and WRCDF on the OTC Market using a trading platform based in the United States.  On information and belief based on the facts about the OTC Market alleged herein, the purchase orders and trade confirmations were routed through servers located wholly within the United States.  The WCAGY ADRs reflecting Lead Plaintiff Gallagher's purchases and his ownership interest in the underlying WDI shares were issued by Citibank or JPMorgan from their depositary bank offices in New York.  Lead Plaintiff Gallagher settled his purchases of WCAGY and WRCDF by paying for them in the United States by transferring funds from his bank account at Excite Credit Union in San Jose, California to Fidelity.  As required by the ADR agreement filed with the SEC by Citibank or JP Morgan, a transfer of title establishing Lead

- 9 -

Plaintiff Gallagher's beneficial ownership of WCAGY, and therefore the Wirecard common stock on deposit on his behalf, was recorded on the transfer books maintained in New York.

**B.     Defendants**

34.     Defendant Wirecard AG is a global enterprise headquartered in Aschheim, Germany near Munich that, until its recent insolvency due to the years-long fraud described herein, was primarily engaged in processing credit card payments.  Wirecard's securities trade in the United States on the OTC Market under the ticker symbols "WCAGY" and "WRCDF" and in Germany on the Frankfurt Stock Exchange, the Börse Stuttgart and the Tradegate Exchange under the ticker symbol "WDI."  On June 25, 2020, Wirecard filed for insolvency proceedings (similar to bankruptcy in the United States) in Germany.

35.     Defendant Wirecard acted as an "acquirer," which is the entity that collects money from an "issuer" (the bank that issues a customer's credit card) and distributes it to the merchant that charged the customer's card.  Payment processors like Wirecard make money by taking a relatively small portion of each transaction processed.  In Europe, Wirecard is licensed as an acquirer, but in many countries in which it processes payments, it does not have such a license.  In countries where it does not have a license to process payments, Wirecard contracted with licensed companies, known as third-party acquirers or partners, to process payments on its behalf.

36.     Defendant Wirecard operated its business through a worldwide network of subsidiaries and affiliated companies whose operations Wirecard directed and controlled, including Wirecard North America, headquartered in Conshohocken, Pennsylvania.  As it explained in its annual reports, Wirecard assumed the responsibility for strategic corporate planning and central tasks involved with corporate management, as well as the strategic guidance and control of its subsidiaries.

37.     Defendant Wirecard regularly communicated in English with investors during the Class Period through the periodic publication of English-language quarterly and annual reports, and in press releases, conference calls, and investor and analyst presentations.  Wirecard also maintained an English-language corporate website at http://www.wirecard.com, on which it established an Investor Relations section where its quarterly and annual reports, press releases, conference call transcripts, corporate profiles, descriptions of its business and other information about the Company is made available to investors.  Additionally, Wirecard's United States-based employees, including the Vice President of Marketing & Strategic Partnerships at Wirecard North America, contributed to blogs on the Wirecard website.

38.     During the Class Period, Defendant Wirecard held events specifically directed at investors, including those in the United States.  For example, on October 8, 2019, Wirecard and several of the Defendants pitched Wirecard to United States investors at the Company's "Capital Markets Day" in New York City.  Throughout the Class Period, Wirecard reported that most of its shares were held by "institutional investors from the Anglo-American region and Europe."

39.     Defendant Wirecard maintained a substantial presence in the United States through its business activities, operations and corporate representatives in the United States.  During the Class Period, Wirecard North America was a wholly owned subsidiary of Wirecard, organized under United States law and headquartered in Conshohocken, Pennsylvania.  Wirecard owned and controlled Wirecard North America until October 2020, when it was sold as part of Wirecard's insolvency proceedings.

40.     Defendant Wirecard, like many German public companies, has two executive boards – a Supervisory Board and a Management Board.  The Supervisory Board is, among other things, responsible for appointing the members of the Management Board (*e.g.*, CEO, Chief Financial Officer ("CFO")) and "advises the Management Board on its management of the

- 11 -

company and monitors its management activities."  The Supervisory Board also "examines and approves the financial statements of Wirecard AG and the consolidated financial statements of the Group."  The Management Board is comprised of senior executives and, according to Wirecard, "develops the company's strategic orientation, agrees it with the Supervisory Board and ensures its implementation."

41.     Defendant Markus Braun served as the Company's CEO and Chief Technology Officer and as a member of the Company's Management Board from 2004, until his resignation on June 19, 2020.  During the Class Period, Braun owned approximately 7% of Wirecard's shares.

42.     Defendant Burkhard Ley served as Wirecard's CFO and as a member of the Company's Management Board from 2006, until his retirement on December 31, 2017.  Following his retirement, Ley was a paid consultant to Wirecard.

43.     Defendant Alexander von Knoop joined Wirecard in 2005, and served as the Company's CFO and as a member of the Company's Management Board from January 1, 2018, until he was terminated in fall 2020.

44.     Defendant Jan Marsalek served as the Company's COO and as a member of the Company's Management Board from February 2010, until he was terminated in June 2020.

45.     Defendant Susanne Steidl joined Wirecard in 2006, and was Chief Product Officer and a member of the Company's Management Board from January 1, 2018, until she was terminated in fall 2020.  Steidl was also the Managing Director of Wirecard North America from March 2017, through the end of the Class Period.

46.     Defendant Wulf Matthias was the Chairman of Wirecard's Supervisory Board from 2006, until his abrupt January 11, 2020 resignation, more than a year before his term ended.

47.     Defendants Braun, Ley, von Knoop, Marsalek, Steidl and Matthias are referred to herein as the "Individual Defendants."  Wirecard and the Individual Defendants are collectively referred to herein as "Defendants."

48.     Each of the Individual Defendants:  (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was privy to confidential proprietary information concerning the Company and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; (v) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (vi) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (vii) approved or ratified these statements in violation of the federal securities laws.

49.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

50.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Wirecard under *respondeat superior* and agency principles.

51.     Defendant E&Y GmbH Wirtschaftsprüfungsgesellschaft served as the Company's independent auditor for over ten years, including the entire Class Period.  E&Y's audit opinions were incorporated into the Company's annual reports during the Class Period.  E&Y is registered with and has been assigned I.D. Number 1251 by the United States PCAOB.  E&Y is a member of the global audit firm, Ernst & Young Global Limited, which markets itself as a global professional services firm with operations all over the world, including a massive presence in the United States.

IV.     **THE SECURITIES AT ISSUE**

A.     **Wirecard ADRs (WCAGY)**

52.     Wirecard common stock is packaged and sold on the OTC Market in the United States under the ticker symbol "WCAGY."  WCAGY is an ADR reflecting ownership of shares of WDI common stock that have been deposited with or are otherwise controlled by a depositary institution in the United States and held for the benefit of the WCAGY purchaser.  One share of WCAGY conferred on Class Period purchasers a beneficial ownership interest in 0.5 shares of WDI authorized for sale by Wirecard.  At any time, an owner of WCAGY may tender it to a depositary bank in return for the underlying shares of WDI.

53.     In 1927, the sale of ADRs was authorized by Congress as a way to permit American investors to diversify their portfolios by acquiring shares of foreign companies without the necessity of purchasing those shares on foreign exchanges using foreign currency.  The SEC has explained that "ADRs allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to the U.S. capital markets."[2]

54.     The purchase of an ADR is equivalent to the purchase of the underlying foreign securities (here, WDI shares issued by Wirecard) which are held by the depositary banks for the benefit of the purchasers of the ADR (here, WCAGY).

55.     As explained by the SEC:

> An ADR is a negotiable certificate that evidences an ownership interest in American Depositary Shares ("ADSs") which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank.  It is similar to a stock certificate representing shares of stock.  The terms ADR and ADS are often used interchangeably by market participants.  ADRs trade in U.S. dollars

---

[2]     SEC Office of Investor Education and Advocacy, *Investor Bulletin: American Depositary Receipts* (Aug. 2012) at 1 ("SEC ADR Bulletin").

and clear through U.S. settlement systems, allowing ADR holders to avoid having to transact in a foreign currency.[3]

56.     WCAGY and other ADRs are sold in the United States pursuant to regulations adopted by the SEC, including Rule 12g3-2(b) (17 C.F.R. §240.12g3-2(b)).

57.     SEC regulations, including Rule 12g3-2(b), require depositary institutions to acquire and hold shares of foreign securities in an amount equal to the number of those shares sold as ADRs in the United States, based on the ratio of foreign-to-domestic shares stated in the ADR.[4] The underlying shares of common stock must be deposited with the depositary institution by the time the ADR transaction is cleared, thereby removing them from the market until the ADR is cancelled and converted back into ordinary shares.  Thus, the number of foreign shares that can be sold as ADRs in the United States is limited by the number of shares that have been issued and authorized for sale by the foreign issuer.  An ADR program has no ability to expand ownership interests in the foreign issuer beyond the limits established by that issuer.

58.     ADRs may be either "sponsored" or "unsponsored."[5]  Sponsored ADRs are established pursuant to a contract signed by the foreign issuer.  Unsponsored ADRs are established by one or more depositary banks by filing a Form F-6 with the SEC.  Unsponsored ADRs may only be established where, *inter alia*: (i) no sponsored ADR program exists; (ii) the foreign issuer's shares are listed on a regulated foreign exchange; (iii) the foreign issuer provides regular financial reports and other investor information in English, and on a website that is generally available to

---

[3]     SEC ADR Bulletin at 1.

[4]     For example, during the Class Period, WCAGY shares were issued at a ratio of 0.5 foreign shares (WDI) for each ADR.  Thus, for every 1 million shares of WCAGY sold, the depositary banks were required to hold 500,000 shares of WDI for the benefit of the purchasers.

[5]     SEC ADR Bulletin at 1.

United States investors; and (iv) the holder of the ADR is entitled to receive the corresponding deposited shares issued by the foreign company on demand at any time.

59.     Unsponsored ADRs are not sold without the express or implied consent of the foreign issuer.  The depositary institutions involved in the sale of unsponsored ADRs each have a regular practice of contacting foreign issuers before an unsponsored program is established, and will generally not establish or sell unsponsored ADRs where the foreign issuer refuses to consent.

60.     WCAGY is an unsponsored ADR and is denominated in United States dollars, cleared through United States settlement systems, and listed alongside other United States stocks.

61.     Two depositary institutions have filed Forms F-6 with the SEC to register and issue Wirecard ADRs in the United States:  Citibank (Form F-6 filed September 18, 2013), and JPMorgan (Form F-6 filed February 1, 2016).[6]

62.     The number of WCAGY shares that are available for sale in the United States is limited by the number of WDI shares that have been issued and authorized for sale by Wirecard, as explained above.  Depositary banks are prohibited from selling WCAGY shares that are not supported by underlying shares of WDI stock deposited and held by the depositary or its assigned custodian bank.  Thus, as with ADRs generally, the Depositary Banks here have no ability to create or issue additional securities or shares of Wirecard beyond the number of WDI shares that have been specifically issued and authorized for sale by the Company and deposited with the Depositary Banks.

---

[6]     On October 2, 2019, The Bank of New York Mellon filed a Form F-6 to register and sell Wirecard ADRs, but on June 25, 2020, it withdrew its Form F-6, stating in a letter to the SEC that it "no longer wishes to maintain a depositary receipt program representing Shares of the Company" and that "[n]o securities have been issued under the F-6." https://www.sec.gov/Archives/edgar/data/1586941/000101915520000146/wirecardrw.htm.

63.     The Forms F-6 filed by the Depositary Banks identify the location of its depository as a physical address in New York City, New York, within the territory of the United States.  Each Form F-6 includes a form of agreement between the Depositary Bank and the holders of WCAGY shares (a "Form of ADR").  Each such agreement filed by the Depositary Banks states that it is to be interpreted under the laws of New York, within the United States.

64.     Each Form of ADR contains terms:

(a)     certifying that the ADR represents WDI shares that have been deposited with the bank for the benefit of the purchaser;

(b)     obligating the bank to hold the deposited WDI shares for the benefit of the purchaser;

(c)     requiring the bank to deliver the WDI shares to the WCAGY purchaser immediately upon tender of their ADR to the bank;

(d)     affirming that Wirecard publishes financial and other information required by SEC Rule 12g3-2(b) in English on a website generally available to the public;

(e)     undertaking to maintain transfer books at the bank's New York City office that lists the owners of the ADRs to record transfers of title in those books upon the purchase or sale of an ADR, and to make those books available for inspection during regular business hours;

(f)     obligating the bank to distribute dividends and other distributions of cash or rights associated with the WDI shares to the WCAGY purchaser on whose behalf those shares are being held; and

(g)     providing for the reimbursement of certain expenses and fees that may be charged by the bank for its custodial and other services provided under the agreement.

65.     Purchasers of WCAGY have the right under the Form of Receipt filed by the Depositary Banks to tender their ADRs to the Depositary Bank and receive the underlying WDI

shares in return.  The Form of Receipt attached to the Forms F-6 filed by each Depositary Bank requires that, to obtain their underlying WDI shares, purchasers must tender their ADRs at the Depositary Bank's office in New York.

66.     Consistent with the economic reality of the transaction, the Form of ADR filed with the SEC by each Depositary Bank reflects that purchasers are provided with a receipt reflecting their purchase and ownership of shares of common stock – *i.e.*, WDI – that have been authorized and issued by Wirecard.  For example, Citibank's Form of ADR is titled "American Depositary Receipt Evidencing American Depositary Shares Representing Shares of Common Stock of Wirecard AG" and JPMorgan's is similarly titled "American Depositary Receipt Evidencing American Depositary Shares Representing Ordinary Shares of Wirecard AG."

67.     It is a regular practice and custom in the industry for a depositary institution to notify the foreign issuer of securities of its intent to register those securities for sale as unsponsored ADRs in the United States, and to obtain its affirmative or implied consent to the sale of those securities before an unsponsored ADR is sold.  If a foreign issuer refuses to consent or otherwise objects to the establishment of an unsponsored ADR program, a depositary institution ordinarily will not proceed to register or sell unsponsored ADRs.

68.     For example, on April 21, 2008, in a regulatory comment letter sent to the SEC addressing the question of whether proposed regulations should require formal consent from foreign issuers before an unsponsored ADR program is established, Deutsche Bank asserted that such a requirement was unnecessary because: "*[I]n practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program*."  Deutsche Bank further explained:

> In our experience, foreign issuers are often willing to allow a depositary bank to establish an unsponsored ADR program but are reluctant to memorialize this in writing.  We believe that, given the adequacy of the current environment of self-regulation, the protection provided issuers by the ability to affirmatively object to the establishment of an unsponsored ADR program and the benefit provided to U.S.

- 18 -

investors by *unsponsored ADR programs, consent should be implied by a lack of affirmative objection by the issuer*.

69.     Other commentators who regularly advise entities involved in ADR transactions have made similar observations.  In an October 2008 article discussing the SEC's adoption of regulations permitting the sale of unsponsored ADRs, the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP noted, for example, that a "depositary typically requests a letter of non-objection from the issuer before establishing an unsponsored program."[7]   Other law firms involved in advising ADR issuers have made similar observations in the years since.  In 2018, for example, Sullivan & Cromwell LLP advised that "depositary banks frequently seek letters of non-objection from the non-U.S. issuer before establishing an unsponsored ADR facility"[8] and Linklaters LLP wrote that "the depositary will typically request a letter of non-objection from the issuer before establishing the program in order to maintain a good relationship with the issuer."[9]

70.     Based on the foregoing information and belief, and consistent with their business practices and the custom in the industry, the Depositary Banks contacted Wirecard before the ADR program was established and before any WCAGY shares were registered or sold in the United States.  During those contacts, on the same information and belief, the Depositary Banks: (i) provided Wirecard with an opportunity to object to and prevent the establishment of such program; (ii) obtained a letter of non-objection or other evidence of consent from Wirecard; and/or (iii) took

---

[7]   Paul, Weiss, Rifkind, Wharton & Garrison LLP, *SEC Amends Form F-6, which has Implications for Foreign Private Issuers that do not have ADR Programs* (Oct. 2008) at 2.

[8]   Sullivan & Cromwell LLP, *Ninth Circuit Holds That Non-U.S. Issuers Can Be Liable in U.S. for Unsponsored American Depositary Receipt Facility* (July 30, 2018) at 2.

[9]   Linklaters LLP, *Ninth Circuit Holds that Rule 10b-5 Could Apply to Unsponsored ADRs Traded Over the Counter* (July 2018) at 1.

other actions intended to obtain Wirecard's consent to the sale of unsponsored ADRs in the United States or from which such consent could reasonably be implied.

71.     Wirecard either provided its affirmative consent to the sale of its WDI shares as ADRs in the United States or its consent may be implied under the circumstances.

72.     Wirecard did not make any affirmative objection to, or take any other action reasonably calculated to prevent, the sale of its common stock as unsponsored ADRs in the United States, despite having been provided with an opportunity to do so.

73.     WCAGY would not have been offered for sale in the United States absent Wirecard's affirmative or implied consent to the sale of unsponsored ADRs in the United States.

### B.      Wirecard F-Shares (WRCDF)

74.     In addition to being sold as ADRs, Wirecard common stock is sold in the United States as "F-shares" under the ticker "WRCDF."  An F-share, which is traded on the United States OTC Market based in New York, is a foreign security denominated in United States currency.  An F-share is established in the United States when a broker-dealer files with the Financial Industry Regulatory Authority ("FINRA") to create a ticker symbol in order to facilitate trading in the United States in United States dollars.  OTC Markets Group Inc. ("OTC Markets Group"), the operator of the OTC Market, identifies WRCDF as "Ordinary Shares" on its website.[10]

75.     Only shares of common stock issued and authorized by Wirecard were available to be sold in the United States as F-shares under the ticker symbol WRCDF.  Each WRCDF is equal to one share of WDI.

76.     Both WRCDF and WCAGY shares are bought and sold at market prices that closely track the trading price of WDI on German stock exchanges at the time of the transaction, with

---

[10]   *See*              Wirecard              Overview,              OTC              Markets, https://www.otcmarkets.com/stock/WRCDF/overview.

slight variations for currency conversions and fees or commissions associated with the transactions. Thus, events that impact the trading price of WDI shares on German stock exchanges have a contemporaneous impact on the trading price of WRCDF and WCAGY shares sold on the OTC Market in the United States.

### C.    The OTC Market

77.    WCAGY and WRCDF shares trade on the Pink market, which is part of the OTC Market. The OTC Market and the Pink market are both located in the United States, and are operated by OTC Markets Group, which is based in New York City. The OTC Market is regulated by FINRA and the SEC.

78.    Trades on the OTC Market are arranged through the broker-dealers who have subscribed to OTC Link Alternative Trading System ("ATS"), which is registered with the SEC and regulated by both the SEC and FINRA. According to the SEC: "An ATS is a trading system that meets the definition of 'exchange' under federal securities laws but is not required to register as a national securities exchange . . . ."[11]

79.    The OTC Link ATS permits subscribing broker-dealers to view and publish quotes and negotiate trades in Pink-listed securities, including WCAGY and WRCDF. OTC Link ATS is described on OTC Markets Group's website as an "electronic messaging system" where "[t]raders have direct access to send, execute, negotiate or decline trade messages with increased efficiency and speed."[12] OTC Link ATS is operated by OTC Link LLC, located in New York City. As of December 31, 2019, 87 broker-dealers subscribed to the OTC Link ATS.[13] All of the

---

[11]    SEC, *Alternative Trading System* ("*ATS*") *List* (Jan. 2009-Nov. 2020), https://tinyurl.com/p3k5144.

[12]    OTC Link ATS Overview, OTC Markets, https://www.otcmarkets.com/otc-link/overview.

[13]    OTC Markets Group Inc., 2019 Annual Report at 9.

broker-dealers listed on the OTC Markets Group's Broker-Dealer Directory are located in the United States.[14]  According to the company profile posted by Bloomberg L.P.: "OTC Link serves clients in the United States."[15]

80.     The broker-dealers may execute the trade internally or externally through market or limit offers posted on the OTC Link ATS.  Completed trades are reported, cleared and settled by the broker-dealers involved in the transaction.  Trades on the OTC Market are deemed complete upon the delivery of funds by the buyer, and delivery of securities by the seller.

81.     Transactions in WCAGY and WRCDF were conducted via servers and facilities located wholly within the United States.  According to OTC Markets Group's website, broker-dealers access the OTC Market through one of five extranet providers in the United States: BT Radianz, TNS, Century Link, NYSE Technologies Connectivity Inc. (SFTI) or Options-IT.  Moreover, according to OTC Markets Group's annual reports for fiscal years 2016-2019, its operations during the Class Period were conducted from offices located in New York City and Washington D.C.

82.     FINRA members are prohibited from publishing quotations in any security unless the member is prepared to purchase or sell at the price quote and under the conditions stated at the time the offer is posted.  FINRA, Rule 5220 (2012) ("Rule 5220").  The OTC Markets Group further describes Rule 5220 on its website as follows: "Plain speak: Broker-dealers must honor their posted quotes."[16]  Purchasers and sellers of WCAGY and WRCDF thus incur irrevocable

---

[14]   https://www.otcmarkets.com/otc-link/broker-dealer-directory.

[15]   OTC         Link         LLC         Company         Profile,         Bloomberg, https://www.bloomberg.com/profile/company/0719514D:US.

[16]   Regulation Governing Trading in OTCQX, OTCQB and Pink Markets, OTC Markets, https://www.otcmarkets.com/learn/market-101/regulation.

liability in the United States to complete transactions at the stated price at the time their buy or sell orders are placed on the OTC Market.

## V.    BACKGROUND

83.    In 1999, Wirecard was founded near Munich, Germany and nearly went bankrupt following the early 2000s dot-com crash.  In 2002, Braun bought a large stake in the Company, took over as CEO and merged Wirecard with a rival payment processor.

84.    In 2005, Wirecard bought a defunct call center company in order to go public on the Frankfurt Stock Exchange through a reverse merger – *i.e.*, the process by which a privately-traded company becomes publicly-traded by buying a public company.  Reverse mergers avoid certain filing requirements and the scrutiny applied to companies that go public through an initial public offering.

85.    At the time it went public, Wirecard was mainly involved in processing payments for pornography and gambling websites, but by the time of the Class Period, Wirecard claimed these types of risky merchants represented less than 10% of the Company's revenue.

86.    In 2006, Wirecard purchased a German bank and renamed it Wirecard Bank.  Visa and MasterCard licensed Wirecard Bank, allowing Wirecard to act as both an acquirer and an issuer that provides credit cards to consumers.  As the *Financial Times* reported, Wirecard's unusual combination of banking and non-banking operations made the Company's financial results difficult to compare to peers, thus causing investors to rely more heavily on Wirecard's own adjusted versions of its financial results and E&Y's audits.

87.    Much of Wirecard's revenue and customer growth before and during the Class Period was due to its acquisition of numerous companies and customers around the world.  For example, between 2014 and 2018, Wirecard spent approximately €1.3 billion to purchase at least 11 companies and numerous portfolios of customers from other payment companies.  These

- 23 -

acquisitions were primarily in Asia, including approximately €330 million for two Indian companies, Hermes i Tickets PVT Ltd. ("Hermes") and GI Technology PVT Ltd. ("GI") in 2015, and the customer portfolio of Citigroup Inc.'s merchant acquiring business in 11 countries such as Singapore, the Philippines and India in 2017.

88.     During the Class Period, Wirecard also expanded into the United States through its 2017 acquisition of Citigroup's Citi Prepaid Card Services located in Conshohocken, Pennsylvania.   Wirecard renamed the company Wirecard North America, which had approximately 120 employees at the time of acquisition, and installed Steidl as the managing director.  Wirecard's Conshohocken office served the Company's North American market and was considered one of Wirecard's "five key locations."

89.     Wirecard considered the North American acquisition critical to its global growth strategy.  According to its 2017 Annual Report, Wirecard was "able to further expand [its] global growth strategy with the entry onto the US market in 2017."  Wirecard reported that "[f]ollowing the company's entry onto the US market which was completed in early 2017, Wirecard now ha[d] a global presence."  The acquisition "significantly extend[ed] the company's geographical reach and also the available licensing framework."   Wirecard also described the useful connection between its newly acquired United States business and its existing Asian businesses: "[Wirecard's] Asian companies will be used for, amongst other things, activities connected to the acquisition of Citi Prepaid Card Services in the USA and the already completed and further planned acquisition of the customer portfolios for card acceptance in the Asia-Pacific region of the Citigroup."

90.     Since its public listing in 2005, Wirecard's stock price experienced a meteoric rise, with Wirecard's market capitalization expanding to over $25 billion at its peak in 2018.  Wirecard and the Individual Defendants benefited greatly from this rise.  For example, in September 2018,

Wirecard cemented its importance as a public company when it replaced Commerzbank AG ("Commerzbank"), a much larger and older financial institution, on Germany's prestigious DAX Index (the equivalent of the Dow Jones Industrial Average index in the United States). The rising stock price made Braun a billionaire and in 2017, he pledged approximately 4.2 million of his shares as collateral on a €155 million loan to fund his luxurious lifestyle.

91.     Wirecard marketed its increasingly valuable securities directly to United States investors, including on October 8, 2019, at the Company's "Capital Markets Day" in New York City. Braun, von Knoop, Steidl and several executives from Wirecard North America pitched Wirecard as an unmitigated success story, a leader in digital-payment processing and a great investment. As part of the presentation, Wirecard conducted a lengthy interview with a representative of AT&T, which Wirecard touted as one of its satisfied customers. AT&T, the only customer that presented at the Capital Markets Day, purchased pre-paid card services from Wirecard North America.

## VI.    DEFENDANTS' FRAUDULENT SCHEME AND MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    Wirecard for Years Denies All Allegations of Improper Accounting and Business Practices

92.     For years, journalists, short sellers[17] and others raised questions about Wirecard's accounting and business practices and, until admitting in June 2020 that €1.9 billion in supposed profits did not actually exist, Wirecard for just as long vehemently denied all allegations, continued

---

[17]   Short sellers are investors who hope to profit by: (i) borrowing stock with an agreement to return it at a later date; (ii) selling the borrowed stock; and (iii) buying the stock later at a lower price before returning it to the lender. Short sellers are effectively betting that the price of a stock will go down, thus allowing them to profit from the difference between the higher sell price and later. lower, buy price.

to publish materially false and misleading financial statements and claimed its accounting and business practices were proper and legitimate.

### 1.    The JCAP Report – Accusations of Threadbare Operations in Asia and Overvalued Subsidiaries

93.    In November 2015, J Capital Research ("JCAP"), a United States- and Hong Kong-based independent research group, issued a report (the "JCAP Report") on Wirecard detailing JCAP's visits to Wirecard's recently-acquired subsidiaries in Asia.  The JCAP Report found no Wirecard offices or operations in Cambodia or Laos, despite Wirecard's boast that it "rank[ed] among the leading providers in the payment services sector for banks" in those countries and posted an office address in Cambodia on its website.  In Vietnam, Malaysia and Indonesia, JCAP reported thinly staffed offices, with far fewer workers than Wirecard claimed to employ.

94.    Based on its findings, JCAP questioned whether Wirecard's 2014 results, which valued the intangible customer relationships for the acquired Asian subsidiaries at €160 million, were accurate, and whether Wirecard had the personnel necessary to ensure legal and compliance requirements were met for the billions of dollars in transactions that Wirecard reported processing in Asia.  In addition to visiting offices throughout Asia, JCAP tried to load money onto Wirecard prepaid cards in 25 countries, but was only able to do so in Germany.

95.    Wirecard quickly denounced the JCAP Report, claiming it was "misinformation" that "fundamentally misunderstands the Wirecard business model" and calling it "ridiculous" because Wirecard did not need numerous customer-facing personnel to conduct the mainly "back-end" payment processing services it sold in the region.  The Company explained it did not have employees or offices in Cambodia or Laos because all sales for those countries were conducted from Singapore.  Wirecard also claimed it had 901 employees in Asia, including a "dedicated team" to oversee legal and compliance risks.

- 26 -

96.     Many analysts covering Wirecard were quick to reject the JCAP Report and recommended investors buy the Company's securities.  For example, in Kepler Cheuvreux's ("Kepler") November 16, 2015 analyst report titled "Another negative article from the FT," Kepler questioned JCAP's credentials (referring to them as journalists, not securities analysts), and concluded that "[w]e legitimately question the real objective of such a report."  In an April 6, 2016 article, "Debate swirls around German group Wirecard," the *Financial Times* reported the "JCAP Report was rubbished by the company and other analysts" and not entirely unfairly, as it made a critical mistake in part of its analysis of Wirecard's accounting.

### 2.     The Zatarra Report – Short Seller Accusations of Money-Laundering and Lax Controls and Oversight

97.     On February 24, 2016, a previously unknown entity, Zatarra Research & Investigations ("Zatarra"), published a nearly 100-page report (the "Zatarra Report") alleging numerous problems at Wirecard.  The Zatarra Report claimed, among other allegations, that Wirecard's former COO and former chairman of the board were involved in money laundering, that Wirecard was involved in violating United States restrictions on online gambling, and that it had defrauded Visa and MasterCard by obfuscating the risk of many payment transactions in Asia by hiding the real country of origin, source and nature of high-risk transactions.

98.     Wirecard immediately denounced the Zatarra Report as "wholly untrue" and "slanderous" and said it was taking legal action against Zatarra:

> It came to our knowledge that a dubious company called Zatarra calling themselves a Research and Investigation company spread a report which contains wholly untrue allegations against Wirecard and its staff.  Management would like to comment that the whole report contains slanderous allegations none of which are true.  We assume that the report has been spread to negatively influence our share price.  Legal action has been initiated.

99.     In his first interview following the Zatarra Report, Braun told *Reuters*: "We have investigated all allegations.  Every single point is wrong.  These are baseless."  He claimed the

entire Zatarra Report was "based on insinuations and false conclusions that are obscured by the complexity of the allegations" and only dredged up "[o]ld matters . . . that were wrong to begin with."

100.     In addition to its public denials, Wirecard pressed German regulators to investigate Zatarra and other short sellers who were betting against the Company.  According to documents obtained by *Reuters*, Wirecard's lawyers urged the German securities regulator, Federal Financial Supervisory Authority ("BaFin") (equivalent to the SEC) to investigate.  In an email sent just a month after the Zatarra Report was published, Wirecard's lawyers asked whether BaFin was acting against the short sellers and insisted the matter was "very urgent."

101.     German regulators and prosecutors quickly fell in line with Wirecard's position. The very same day, BaFin received an email from Wirecard's lawyers responding they were "investigating the incident with regard to potential market manipulation."  On May 12, 2016, BaFin sent its report (the "BaFin Report"), which criticized Zatarra's conclusions as "misleading," to German prosecutors and outlined the case against Zatarra and other suspects.  Just days later, BaFin forwarded an email from Wirecard's lawyers to the prosecutors that accused short sellers of "acting as a pack" against the Company.  The prosecutors, relying on BaFin's communications, launched their own investigation in May 2016, and eventually brought charges against one of the Zatarra Report's authors.

102.     As with the JCAP Report a few months before, the vast majority of securities analysts following Wirecard rejected the Zatarra Report as untrue and accepted Wirecard's denials. On April 6, 2016, the *Financial Times* reported in the article "Debate swirls around German group Wirecard," that 21 of the securities analysts following Wirecard rated the Company a "buy" and did not change their recommendations following the Zatarra Report.  Following a day-long meeting with Wirecard's investor relations team, analysts at Bryan, Garnier & Co. issued a report

- 28 -

on March 15, 2016, titled "The Great Vendetta" that concluded the Zatarra Report merely re-hashed "past untrue rumors" and portrayed Wirecard executives in "the wrong context," while also implying there was a coordinated effort by the *Financial Times* and short sellers, including Zatarra, to "undermine the image and credibility of Wirecard."

103.    Analysts and investors were also reassured by E&Y's unqualified audit of Wirecard's 2015 results, which was issued after a review of the allegations.  In its April 13, 2016 report recommending investors buy Wirecard securities, analysts at Kepler highlighted E&Y's review as reason to believe the allegations were untrue:

**CEO looks confident that Zatarra issue will be solved shortly**

While Wirecard has already taken legal measures against Zatarra, CEO Braun could not disclose more information for now but looks fairly confident that the situation will be resolved shortly. ***The group's auditors (EY) have reviewed all recent negative "reports" (notably from Zatarra and JCAP) and have made all required verifications before validating the 2015 accounts without any reserves***. Lastly, the CEO continued to buy a large number of shares over the last few weeks (650,000 in 2016 after 500,000 in 2015 and 750,000 in 2014) and now owns 7% of the capital.  ***In all, Zatarra allegations look increasingly untrue and the shares are materially undervalued today***.

104.    The price of Wirecard's securities declined precipitously on February 24, 2016, following the publication of the Zatarra Report but after Wirecard's denials and the apparent validation by BaFin, numerous analysts and E&Y, Wirecard's share price recovered nearly all of its lost value by May 2016.

### 3.    Wirecard's Indian Acquisitions and Questions of Who Benefitted from a €300 million "Overpayment"

105.    On November 12, 2015, the *Financial Times* published an article titled "Rupee do: what is Wirecard buying?" highlighting a number of questionable aspects of two related Indian businesses, Hermes and GI, that Wirecard announced it was buying for a total of approximately €330 million.  The article reported that the companies had little history or operations in payment services, the reason Wirecard said it bought them.  Hermes, which booked airline and train tickets

- 29 -

for customers, had only recently expanded into money transfers, and GI had amended its corporate charter to become involved in remittances only a year before Wirecard's purchase.  The companies also had very modest financial results, with GI having just a few million dollars in assets.  Hermes was more successful, but had wildly exaggerated its success according to its auditor, which found that Hermes' reported €185 million in revenue was overstated by approximately €183 million because it had improperly claimed all proceeds from ticket sales as revenue, not just commissions.

106.    Wirecard disputed the article, and many securities analysts that followed Wirecard saw no reason for concern, agreeing with the Company's claims that everything was proper and accounted for.  For example, in a November 16, 2015 report titled "Another negative article from the FT," analysts at Kepler reported they had spoken with Wirecard about the article and "we found the IRs [investor relations team] to be relaxed and we are pretty convinced by their answers. We see good buying opportunities ahead of Q3 final results."  On November 18, 2015, analysts at Jefferies Group LLC wrote that:

> **We believe the company has provided adequate explanations to questions raised by [the Financial Times] in recent weeks**.  A case in point is the recent acquisition in India . . . , where we believe some may have misunderstood the "retail-assisted cash ecommerce market". . . .

107.    On April 6, 2016, the *Financial Times* published an article titled "Debate swirls around German group Wirecard," which reported that several investors had shorted Wirecard's securities following its acquisition of the Indian businesses.  The article quoted one short seller who suggested that the purchase may have been done to cycle sales between the acquired companies to generate false revenue.

108.    Wirecard rejected "any suggestion of revenue recycling or inflated profits" and said "extensive due diligence was conducted on its purchase by Baker Tilly, Osborne Clarke and BTG Legal."  Wirecard also accused its critics of conspiring to drive down its stock price and pointed to its clean audits from E&Y and claimed its business was healthy and growing.

109.    Again, analysts accepted the Company's denials and explanations and saw no reason for concern.  For example, on April 8, 2016, analysts at Commerzbank described the points raised in the article as "recent unfounded noise" and noted that Wirecard "gave satisfying insights into its extensive due diligence processes for acquiring foreign entities and compliance procedures implemented thereafter."

110.    On January 25, 2018, the *Financial Times* published an article titled "Revisiting Wirecard's big Indian deal," which revealed that Hermes was valued as part of a fundraising pitch at €46 million just a year before Wirecard's €340 million purchase was announced and, only two months before Wirecard announced its deal, was sold to a Mauritius-based intermediary for likely even less.[18]  The pitch also projected more than half of Hermes' revenue would come from plane ticket sales, not payment processing.  The article reported that while Wirecard said it paid €230 million up front (with up to €110 million due later based on profit targets being met), the selling entity's annual report recorded only €35 million in proceeds from the sale, and minority shareholders who sued the Mauritian entity allege they were told Hermes sold for a similar price.  The *Financial Times* noted that reconciling the price paid with the actual payment of cash is important because "[i]f a company were to say it paid one price for an asset, but actually paid a far lower figure, the difference can be recycled through the business over time to give auditors and investors the impression of healthy cash flow."

111.    Ley, Wirecard's then-CFO, was quoted in the article and said none of the issues raised implicated Wirecard, but instead related to the former owners of the acquired companies.

---

[18]   According to the article, Wirecard paid €340 million for Hermes and paid €15 million for a majority stake in GI.

112.     Analysts agreed.  On January 29, 2018, Barclays reported it was not concerned and kept its buy rating because it had "spoken to the 3rd party legal and financial due diligence teams and have found no inconsistencies with the original presentation of the deal."

113.     On December 18, 2019, the *Financial Times* published an article titled "Middleman's profits draw India deal into Wirecard scandal," reporting that several short sellers had published reports questioning whether the substantial increase in purchase price for the Indian business was done by Wirecard as part of a scheme to inflate revenue and questioning who controlled the Mauritian middleman company that appeared to make a massive windfall on the deal.  Wirecard told the *Financial Times* that it was "'not in a position to disclose the ultimate beneficial owner of EMIF 1A,'" the Mauritian middleman.

114.     The next day, December 19, 2019, Wirecard issued a press release denying the report and claiming it was unaware of how much Hermes sold for only weeks before Wirecard bought Hermes for €330 million:

> Today's article by the Financial Times only reiterates old allegations, which were the subject of multiple independent audits before and ***have proven to be unsubstantiated***.
>
> In October 2015, Wirecard made an acquisition in India, which included the acquisition of India's leading retail-assisted e-commerce network as well as a majority stake in India's number one domestic (IMPS) remittance service provider at the time, a licensed Prepaid Payment Instrument (PPI) issuer.
>
> ***Wirecard had conducted a stringent due diligence of the acquired assets***.
>
> *     *     *
>
> At the time of signing its acquisition in India in October 2015 Wirecard was not holding any information on the purchase prices paid to previous shareholders of the acquired assets in preceding share transactions not involving Wirecard.

115.     Securities analysts again accepted Wirecard's denial.  For example, analysts at Hauck & Aufhäuser Privatbankiers AG ("Hauck") wrote in a December 19, 2019 report titled "Strong 2020 ahead – press reports misleading," that the "Financial Times once more raised

concerns about Wirecard's business, which were cited also in the German press . . . . **We deem the claims unfounded** . . . ."

116.    Each of the Defendants' statements set forth above in ¶¶106, 108, 111, 114 were materially false and misleading when made as Defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)    Defendants were engaged in an ongoing fraudulent scheme in which they caused Wirecard to materially overstate the Company's reported revenue, earnings, assets, transaction volume and other financial results and key financial metrics;

(b)    revenue purportedly generated from transactions processed by the Third-Party Partners during the Class Period did not actually exist, resulting in more than half the revenue and nearly all the profit Wirecard reported in its financial statements being fictitious.  *See, e.g.*, ¶¶164, 167-69, 175, 179, 183, 203, 209, 237;

(c)    cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist.  *See, e.g.*, ¶¶203, 207-08, 228-29, 234, 236-37;

(d)    Wirecard's internal controls over its financial reporting, including over the third-party business and related transactions, were not adequate as represented, but rather so insufficient that they were later described by McKinsey as "non-existent."  *See, e.g.*, ¶¶133-34, 177-78, 207-08, 215-17, 275-77.   In fact, the Company failed to implement numerous basic internal controls, including recording board meeting minutes, formally documenting all agreements and amendments to agreements, maintaining an archive of contracts and recording transaction data.  *See, e.g.*, ¶¶215-17;

(e)     Wirecard's operations in the United States, including Wirecard North America, and in Europe lost money every year since 2016, leaving the Company unable to report a profit without relying on the falsified revenue from the Third-Party Partners.  *See, e.g.*, ¶278;

(f)     Wirecard's publicly reported financial statements, as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and results of operations and did not comply with IFRS, IAS or other applicable accounting standards.  *See, e.g.*, ¶¶179, 191, 214, 237; and

(g)     the reporting by the *Financial Times* regarding the questionable nature of the acquisitions of Hermes and GI in India was, despite Defendants' denials, an accurate portrayal of the truth concerning the acquisitions.

### 4.     Whistleblower Allegations of Forged Contracts, Round-Tripping and Money-Laundering in Asia

117.    On January 30, 2019, the *Financial Times* published an article titled "Executive at Wirecard suspected of using forged contracts," revealing that in early May 2018 – the same time Wirecard and Defendants were assuring investors that the Company's accounting was beyond question and the internal controls, particularly in Asia, were robust and effective – Braun, Ley, Marsalek and Steidl attended a presentation about numerous potential legal and accounting violations involving Wirecard's head of accounting in Asia, Edo Kurniawan ("Kurniawan").  At the May 7, 2018 meeting and in a corresponding document titled "Project Tiger Summary," Wirecard's head of compliance presented the preliminary findings of a law firm's investigation into whistleblower allegations of fraud and illegal conduct in Singapore, Wirecard's Asian headquarters.

118.    The prestigious Singapore law firm, Rajah & Tann, had discovered that about €37 million had been moved in and out of Wirecard businesses in several complex and suspicious

transactions.  For example, the presentation identified contracts dated in 2017 and 2018 amounting to about €13 million to sell Wirecard software to a hydraulics and piping company, but the company had never heard of Wirecard and did not use a payment company.  It also described potential "round-trip" transactions, which is a fraudulent accounting technique where money is moved between or among companies in illegitimate transactions to inflate revenue.  It is further found Wirecard's businesses in Hong Kong and Singapore routed millions of euros to Wirecard's businesses in India (the same companies at the heart of earlier accounting concerns) via external companies in transactions that appeared to have no legitimate basis.

119.    According to the *Financial Times*, the newspaper had been approached by a whistleblower who was motivated by concern that Wirecard had done nothing to remedy the known problems.  For instance, Kurniawan was still head of Wirecard's accounting in Asia despite the credible allegations of misconduct.

120.    Wirecard immediately denied wrongdoing and hit back at the *Financial Times*, claiming in a January 30, 2019 statement that the article was "false, inaccurate, misleading and defamatory" and "lacks any substance and is completely meaningless."

121.    Following the article, Wirecard shares fell precipitously.  WCAGY dropped $8.54 per share from the prior day's closing price of $95.20 (-8.97%) to close at $86.88 per share on January 30, 2019.  Shares of WRCDF fell $28.10 per share from the prior day's closing price of $190.00 per share (-14.79%) to close at $161.90 per share on January 30, 2019.

122.    On January 31, 2019, Wirecard issued another press release claiming the January 30, 2019 article was baseless "misinformation," blaming short sellers and boasting of its "continuously improve[d]" procedures and controls:

> Wirecard notes the recent **inaccurate, misleading and defamatory media coverage by the Financial Times**. This announcement is being made to communicate the following points, which were made to the journalist prior to publication, to investors.

- 35 -

Wirecard takes all compliance and regulatory obligations extremely seriously. *It has very strong governance procedures and controls and these are kept under continuous review, with any findings used to continuously improve them*. It also has stringent internal and external audits. Any concerns raised by audits or individuals are always thoroughly and appropriately investigated.

*No material compliance findings as to the governance and accounting practices of any Wirecard subsidiary nor the personal conduct of Mr. Kurniawan have resulted from our continuous internal and external audit activities*.

*It is clear that the journalist has been provided with misinformation* and that before the publication of the article there had been increased short activities on the capital market side. For example, Mr McCrum claims that "fraudulent transaction" concerned contracts between Wirecard and the company Flexi Flex. There cannot be any fraudulent transactions between Wirecard and Flexi Flex as Wirecard does not have and never has had any contractual or commercial relationship with this company. *The basis for the article and the allegations is factually flawed*.

123.     As with the Zatarra Report, German regulators were quick to validate Wirecard's claim of baseless attacks by short sellers. On January 31, 2019, the day after the *Financial Times* reported the whistleblower allegations and investigation, BaFin and criminal prosecutors in Munich announced that they would be investigating whether "yesterday's event constitutes potential market manipulation." The Munich prosecutor's office told the *Financial Times* it saw no reason to investigate Wirecard because the events described in the article occurred outside Germany.

124.     On February 1, 2019, the *Financial Times* revealed in an article titled "Wirecard's law firm found evidence of forgery and false accounts," that Rajah & Tann wrote the following in its preliminary investigation report of Wirecard's alleged misconduct in Singapore:

> "On the face of the evidence uncovered so far, these acts appear to bear out at the very least serious offences of forgery and/or of falsification of accounts/documents under section 477A of Singapore's Penal Code. As these acts were intentional, there are reasons to suspect that they may have been carried out to conceal other misdeeds, such as cheating, criminal breach of trust, corruption and/or money laundering."

- 36 -

125.    According to the article, the lawyers' report identified potential criminal or civil violations in Singapore, Hong Kong, India, Malaysia and Germany, including that Wirecard employees in Singapore "'worked together to create and backdate agreements in order to support invoices'" that had been billed up to three years before.  Some documents claiming to show €3 million in sales by Wirecard Hong Kong were backdated to 2017, which was before Wirecard Hong Kong even existed.  The report concluded that "'[i]n the best-case scenario, the purpose behind these deliberate acts may be limited to the false creation of revenue.'"  According to the article, the fabricated agreements were used to hit profit targets and mislead regulators, such as the Hong Kong Monetary Authority.

126.    Wirecard's share price dropped further on these revelations.  On February 1, 2019, shares of WCAGY fell $16.60 per share from the prior day's closing price of $83.24 (-19.94%) to close at $66.64 per share on February 1, 2019.  Shares of WRCDF fell $30.18 per share from the prior day's closing price of $164.05 (-18.39%) to close at $133.88 per share on February 1, 2019.

127.    On February 4, 2019, Wirecard issued yet another press release to "fundamentally contradict the reporting of Dan McCrum," the *Financial Times* journalist who reported on the whistleblower investigation at Wirecard.  The Company again called the articles "misleading coverage," but was forced to admit that Rajah & Tann was in fact investigating whistleblower allegations "related to potential compliance breaches in the area of accounting."  Wirecard again stressed that it had "has ***strong governance procedures and controls, which are subject to continuous reviews and improvement in line with the company's governance guidelines and regulatory requirements***," and played down the allegations by claiming only €6.9 million in revenue was at issue.  Wirecard also emphasized that the firm had not "made any conclusive findings of criminal misconduct."

- 37 -

128.    Following its press release, Wirecard held a conference call with investors and analysts on February 4, 2019, to discuss the articles and allegations.  On the call, Braun called the matter a "nonevent," said he expected a conclusion to the investigation "in the very near future" and told investors "we consider the whole issue as resolved."  Braun also cast doubt on the entire reason for the investigation, saying Wirecard had "substantial doubt about this whistleblowers story" and that the Company's own internal investigation had found no evidence to support the allegations and concluded that they were unfounded.  He added that the allegations were related to personal animosity between the employees involved, not accounting compliance:

> So I think here it probably has to take into account that there were ***personal animosities between employees involved.  So we think the whole issue is not so much an accounting compliance or whatever issue but an issue between people*** . . . .  I would really say this whole case has more to do with relationship between people and not so much processes . . . .

129.    Following Wirecard's press release and conference call denying the allegations, its stock price increased substantially.  On February 4, 2019, shares of WCAGY rose 7.52% and shares of WRCDF rose 6.22%.

130.    On February 7, 2019, the *Financial Times* published an article titled "Wirecard: inside an accounting scandal" that revealed more details of alleged accounting manipulation and unlawful acts at Wirecard.  The article revealed that in January 2018, Wirecard's head of accounting in Asia, Kurniawan, led a meeting in which he orchestrated a plan to "round trip" several million euros from Wirecard in Germany, through entities in Hong Kong and ultimately onto Wirecard's Indian business.  The article also revealed that two of Wirecard's executives in Germany – head of accounting Stephan von Erffa ("von Erffa") and head of treasury Thorsten Holten ("Holten") – were aware of the scheme and the unlawful plan was "part of a pattern of book-padding across Wirecard's Asian operations."

131.    According to the *Financial Times* article, in February 2018, Holten, whose signature was required for the money transfer, emailed Kurniawan telling him he "'need[ed] to know the whole cash flow.'"  Kurniawan responded minutes later and made clear that he planned to move millions from Germany to Hong Kong via an outside entity. Holten, copying von Erffa (whose signature was also required), responded "'[v]ery good, thx.'"  The scheme was devised to fool the Hong Kong Monetary Authority into issuing a license to Wirecard so it could sell prepaid credit cards in the region.  This regulatory approval was crucial to the Company's plan to take over Citigroup's business in Asia, which Wirecard agreed to buy from the United States bank in 2017.

132.    According to the article, which relied on Rajah & Tann's investigation report and documents provided by whistleblowers, two whistleblowers alerted Wirecard's compliance department about Kurniawan's scheme and the involvement of two other finance executives in Singapore.  The article also described emails between the implicated executives and E&Y, in which the hydraulics company that later said it had never heard of Wirecard was described as "'a new client engaged in 2017'" responsible for €4 million in revenue.

133.    The February 7, 2019 *Financial Times* article also revealed details about the "curious" response by Wirecard's Management Board (made up of Braun, Marsalek, von Knoop and Steidl) to the May 2018 presentation about potentially criminal accounting misconduct.  The Management Board appointed Marsalek to head the investigation in order, according to a May 2018 email from von Knoop, "'to get the necessary pressure on the investigation.'"  The investigators at Rajah & Tann explicitly warned Wirecard that Marsalek's role presented "'a perceived and potential conflict of interest'" and could result in the investigation being viewed as "'fatally flawed to begin with'" because Marsalek was a material witness in the investigation and had worked closely with Kurniawan for years.

134.     Documents reviewed by the investigating law firm revealed that Marsalek appeared to be involved in the scheme to backdate contracts from a company that one executive in Singapore believed also belonged to Marsalek.  The executive emailed a colleague: "'If not mistaken this agreement is something like the one with Wirecard Dubai, I think the company belong to Jan [Marsalek].'"  The colleague replied: "'Yup, is the additional "revenue" that was put in last Q [quarter].'"  Further, in the last days of 2015, Wirecard needed €3.3 million to meet its profit targets in Indonesia and did so thanks to what was described as "an 'additional project from Jan.'"  Rajah & Tann discovered that the contract associated with this last-minute, target-meeting revenue was backdated and did not appear to be legitimate.

135.     Following these revelations, Wirecard's share price declined significantly.  On February 7, 2019, shares of WCAGY fell $9.60 per share from the prior day's closing price of $73.99 (-12.97%) to close at $64.39 per share.  Shares of WRCDF fell $25.81 per share from the prior day's closing price of $150.91 (-17.1%) to close at $125.10 per share on February 7, 2019.

136.     On February 8, 2019, Wirecard issued a press release again denouncing the *Financial Times*' reporting and declared it was taking legal action against the news outlet:

> Wirecard notes yesterday's article in the Financial Times.  This is the third time that the same highly confidential documents from a compliance audit have been used as the basis for a defamatory media coverage.  These documents date from the beginning of May 2018 when an internal investigation was initiated and list the allegations of one employee against another employee (as described in both Wirecard's statement and conference call on Monday, February 4, 2019).

> Since then, these allegations have been investigated in a robust compliance process both by our internal compliance team and by an independent investigation conducted by a law firm specializing in compliance (Rajah & Tann).  Neither the internal investigation by our Compliance Department has found any confirmation for the allegations made, nor has the external investigation by Rajah & Tann to date produced any conclusive findings regarding criminal misconduct by employees or managers (we refer to the statement by Rajah & Tann at ir.wirecard.com).  The investigation by Rajah & Tann is about to be completed and we will announce the results in due course.  ***In the article published yesterday, Wirecard employees are slanderously prejudged with unproven and false allegations***.  We will use all available legal means to protect the company and in particular our employees and

- 40 -

their personal rights.  ***Wirecard is taking legal actions against FT and its unethical reporting***.

137.     On the same day, February 8, 2019, Singapore police raided Wirecard's offices and seized various electronics and computers.  As the *Financial Times* reported, about ten officers conducted the raid and questioned various employees and executives at Wirecard's Singapore offices.

138.     In a February 8, 2019 statement issued regarding the raid, Wirecard said it

> "met with Singapore law enforcement at Wirecard's headquarter[s] in Singapore and provided the police with comprehensive supporting material in regards to their enquiry into the defamatory allegations in the FT series of articles.  We would like to reconfirm that the accusations against employees of Wirecard are unfounded. We are working closely with the Singapore police to clear all allegations."

139.     Following news of the raid, Wirecard's share price fell further.  On February 8, 2019, shares of WCAGY fell $11.00 per share from the prior day's closing price of $64.39 (-17.08%) to close at $53.39 per share.  Shares of WRCDF fell $17.55 per share from the prior day's closing price of $125.10 (-14.03%) to close at $107.55 per share on February 8, 2019.

140.     On February 18, 2019, the German securities regulator, BaFin, announced that it was suspending short selling in Wirecard's shares until April 18, 2019.[19]  BaFin said it was doing so because of Wirecard's "importance for the economy" and the "serious threat to market confidence" following the share price decline following the recent *Financial Times* articles. According to the *Financial Times*, the dramatic decision was the first and only time BaFin had applied such a ban to a single stock.  Previously, the measure was used to protect 11 bank stocks during the 2008 financial crisis.  The European Securities and Markets Authority ("ESMA"), the European Union's financial regulator, approved of BaFin's ban, stating that "the current

---

[19]https://www.bafin.de/SharedDocs/Veroeffentlichungen/EN/Aufsichtsrecht/Verfuegung/vf_190 218_leerverkaufsmassnahme_en.html;jsessionid=9ADFB65701F3DDFE314E742F89D82C1D.1 _cid361.

circumstances related to Wirecard are adverse events or developments which constitute a serious threat to market confidence in Germany."

141.    On February 18, 2019, news media also reported that German prosecutors were investigating the *Financial Times* and its reporters over their articles about Wirecard.

142.    The investing public, including analysts, saw the moves as validation of Wirecard's denials, and following the announcement, the price of Wirecard shares dramatically increased, with WCAGY up approximately 20% and WRCDF up nearly 26% on February 21, 2019.  On February 18, 2019, securities analysts at Hauck wrote that the BaFin ban indicated that "market manipulation" could be the reason for the allegations.  The next day, Kepler noted that it was keeping its "buy" rating following the BaFin ban and the investigation into the *Financial Times*.

143.    Germany's auditor oversight body ("APAS"), also interpreted the ban as a refutation of the allegations.  The executive director eventually testified to the German Parliament: "My impression was: somebody is on the case, has been looking at the allegations and came to certain conclusions."

144.    On March 12, 2019, the *Financial Times* published an article titled "Wirecard 'loses contact' with executive at heart of accounting scandal," which reported on the ongoing court proceedings and investigation in Singapore.  According to court filings by prosecutors in Singapore, Wirecard had "'lost contact'" with Kurniawan beginning on February 9, 2019, shortly after the *Financial Times* began reporting on allegations about his role in accounting misconduct. According to Singapore prosecutors, Kurniawan was one of six Wirecard employees suspected of "'arrestable offences'" in their investigation, which was looking into forgeries, falsified documents, money laundering and round-tripping between 2014 and 2018 at Wirecard's businesses in Singapore, Indonesia, Hong Kong, Malaysia, India and the Philippines.  The article also reported that, despite Wirecard's February 8, 2018 claim that it was cooperating with the

Singaporean authorities, a court in Singapore had dismissed the Company's lawsuit seeking to force prosecutors to return documents seized by the police.

145.    Commenting on the case, Wirecard declared it was entirely normal, stating: "'This is a normal administrative process.  We are co-operating fully with the [Singapore police] and are convinced that the whole matter will be resolved very quickly.'"

146.    On this news, shares of WCAGY fell $6.34 per share from the prior day's closing price of $74.59 (-8.5%) to close trading at $71.18 per share on March 12, 2019.  Shares of WRCDF fell $11.01 per share from the previous day's closing price of $146.00 (-7.54%) to close trading at $134.99 per share on March 12, 2019.

147.    On March 20, 2019, in an article titled "Senior Wirecard executives approved transactions in fraud probe," the *Financial Times* reported specific details about Marsalek's and two other Wirecard executives' role in the scheme to round-trip money to Singapore.  On February 9, 2018, following a dinner the night before with Kurniawan, Wirecard head of treasury Holten texted six colleagues that Hong Kong "'needs the funds urgently!'"  Several minutes later, Kurniawan replied, "Merci!"  On February 14, 2018, Kurniawan and Holten exchanged emails outlining details of how the money would move from Germany to an intermediary company to Wirecard Hong Kong, where it would be used to fool regulators into granting a license, and then on to Hermes (Wirecard's company in India) to resolve an overdraft problem.  On February 26, 2018, the money had not been transferred because, as Kurniawan wrote to colleagues: "'Mr. Marsalek take longer time to arrange it.'"  On March 12, 2018, Kurniawan provided to Holten and head of accounting von Erffa, the bank details of the intermediary company that would serve as the go-between Wirecard Germany and Singapore to make the funds look like actual revenue.  The article also revealed that €2 million was wired from Wirecard Germany to the intermediary company in four transfers between March 16-21, 2018.

- 43 -

148.    Yet again, Wirecard accused the *Financial Times* of publishing "'issues which appear to be designed to attack the company with further insinuations and unjustified accusations'" and said a full report by the investigating law firm, Rajah & Tann, was forthcoming.

149.    Wirecard's share price dropped significantly on this news.  WCAGY fell $3.79 per share from the prior day's closing price of $61.78 (-6.14%) to close trading at $57.99 per share on March 21, 2019.  Shares of WRCDF fell $9.00 per share from the previous day's closing price of $124.25 (-7.24%) to close trading at $115.25 per share on March 21, 2019.

150.    On March 26, 2019, Wirecard published a summary of Rajah & Tann's findings from its investigations of allegations in Singapore.  Although Wirecard did not describe the scope of the investigation, it triumphantly concluded that:

> The independent review made no findings of round tripping or corruption.  No finding has a material implication on the financial results and financial positions.  The only restatement resulting from this investigation affects EUR 2.5 million revenue in 2017, which is compensated by other positive restatements identified for the same reporting period in the course of audit procedures outside of the scope of the Rajah & Tann investigation.

151.    Immediately after each finding, Wirecard published a "Comment" explaining away the negative implications.  For example, Rajah & Tann reported that it "could not correlate certain payments made between business partners and Wirecard entities with agreements between them."  Wirecard responded that "[n]either the P&L nor the balance sheet have been or are impacted by this finding" and it "has taken appropriate measures to improve the structure of ledgers to be able to track incoming funds against individual ledger entries on a more granular level."

152.    The firm also found that: "It is not clear why revenue from third parties, with whom a Wirecard entity has existing relationships, was booked into a different Wirecard entity's accounts.  Not all of the revenue recorded has been received.  There is evidence of contracts being created for IFRS audit purposes."  Wirecard again said that the balance sheets were unaffected by this finding and explained away the creation of contracts by claiming "[c]ertain commercial

- 44 -

agreements were re-drafted by the finance department in Singapore in order to include specific clauses required for IFRS 15 compliance."

153.    The investigators also found, despite Wirecard's prior claims that the allegations were "unfounded," that "[c]riminal liability may be attributable to a few local employees in Singapore according to local law in relation to some of the above mentioned circumstances."  The investigators also noted that their "review has not revealed findings of criminal liability under Singapore law in respect of the headquarters of Wirecard in Munich/Aschheim."

154.    Wirecard closed its press release with a boast about its "best-in-class global compliance and corporate governance systems" and an announcement that it would postpone its annual report by three weeks, to April 25, 2019, "[i]n order to be able to take into account the results of Rajah & Tann's investigation as part of the ongoing preparation and review of the annual financial statements."

155.    The market reacted favorably to this news, with WCAGY up approximately 26% and WRCDF up just over 24%.  Analysts also cheered the summary and Wirecard's description of it.  For example, on March 26, 2019, analysts at Warburg wrote that the investigation "did not reveal any substantial misconduct" and "should bring back much investor's confidence."

156.    Unbeknownst to investors, the supposed good news was exceptionally misleading as it merely papered over the fact – which Defendants did not disclose – that the Company's entire "business" in Singapore and across Asia was fictitious and generated almost no actual revenue or profit.

157.    On March 28, 2019, Wirecard sued the *Financial Times* and its reporter, Dan McCrum, in Munich, Germany over the recent reporting.  Wirecard claimed the two made use of, and misrepresented, business secrets and said in a statement that their "objective is to seek a halt to the incorrect use of business secrets for the purposes of reporting, as well as damages."

158. Each of the Defendants' statements set forth above in ¶¶120, 122, 127-28, 136, 138, 145, 148, 150-52, 154 were materially false and misleading when made as Defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)    Defendants were engaged in an ongoing fraudulent scheme in which they caused Wirecard to materially overstate the Company's reported revenue, earnings, assets, transaction volume and other financial results and key financial metrics;

(b)    revenue purportedly generated from transactions processed by the Third-Party Partners during the Class Period did not actually exist, resulting in more than half the revenue and nearly all the profit Wirecard reported in its financial statements being fictitious. *See, e.g.*, ¶¶164, 167-69, 175, 179, 183, 203, 209, 237;

(c)    cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist. *See, e.g.*, ¶¶203, 207-08, 228-29, 234, 236-37;

(d)    Wirecard's internal controls over its financial reporting, including over the third-party business and related transactions, were not adequate as represented, but rather so insufficient that they were later described by McKinsey as "non-existent." *See, e.g.*, ¶¶133-34, 177-78, 207-08, 215-17, 275-77.   In fact, the Company failed to implement numerous basic internal controls, including recording board meeting minutes, formally documenting all agreements and amendments to agreements, maintaining an archive of contracts and recording transaction data. *See, e.g.*, ¶¶215-17;

(e)    Wirecard's operations in the United States, including Wirecard North America, and in Europe lost money every year since 2016, leaving the Company unable to report a profit without relying on the falsified revenue from the Third-Party Partners. *See, e.g.*, ¶278;

- 46 -

(f)     Wirecard's publicly reported financial statements, as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and results of operations and did not comply with IFRS, IAS or other applicable accounting standards.  *See, e.g.*, ¶¶179, 191, 214, 237; and

(g)     the reporting by the *Financial Times* regarding whistleblower allegations of fraudulent accounting in Singapore, the Rajah & Tann investigation into those allegations and Defendants' role in the fraudulent accounting and response to the allegations, was, despite Defendants' denials, an accurate portrayal of the truth concerning Wirecard's improper accounting, the resulting investigation and Defendants' role and response.

### 5.     Wirecard's Falsification of Revenue and Cash Reserves from Third-Party Acquirers in Several Countries

159.    On March 28, 2019, in an article titled "Wirecard's problem partners," the *Financial Times* reported on the "vivid mismatch" between the supposed scale of several third-party acquirers (companies that processed payments on Wirecard's behalf where it did not have a license to do so, or where the payments were seen as too risky), and the "modest reality on the ground."  The article noted that large outstanding debts owed to Wirecard by these companies "raise questions about the robustness of the sales and profits attributed to them."

160.    For example, a company named ConePay International ("ConePay") was, according to documents reviewed by the *Financial Times*, responsible for millions of euros of income accrued at Wirecard Singapore over several years, but when reporters visited the address listed for ConePay outside Manila, they discovered the single-family home of a retired Filipino sailor who had no idea why his address was listed as ConePay's.  The sailor had only ever heard of the company when he received a bank statement mailed from Wirecard Bank in Germany that was addressed to ConePay at his address.  When reporters visited the last listed address for

Maxcone, a predecessor of ConePay, they discovered an empty warehouse that had previously been occupied by an auto mechanic and a bar. The local government permitting office was unaware of a payment company operating in the district.

161.    Two other Filipino third-party acquirers with outstanding bills owed to Wirecard, PayEasy and Centurion Online Payment International ("Centurion"), were found to be located in a Manila building that also housed a bus rental company. According to Company filings, both PayEasy and the bus company were owned by Christopher Bauer ("Bauer"), who identified himself online as a the CEO of the bus company, but told the *Financial Times* he was merely an investor and also claimed not to have a management role at PayEasy. The same Bauer had, years earlier, been involved with a Bahraini company that supposedly paid millions of euros to Wirecard, despite never having any apparent operations or revenue.

162.    The article revealed that, according to a February 12, 2018 email sent by a senior finance executive at Wirecard Singapore, the Company had referred payments to "'Maxcone (ConePay) and Centurion'" because "'their merchants are all porn and gambling company Wirecard cannot process.'" She added: "'Better keep it a secret'" and another executive directed the finance team to not show "'"special" customers such as Maxcone'" in an investor presentation, despite the fact that purported revenue from Maxcone and Centurion placed them among Singapore's largest customers. PayEasy also appeared to process payments connected to online pornography, with one client listed in Wirecard documents as a company in the Docler Group, which operates a popular adult website. ConePay, Centurion and PayEasy all appeared as "'special items'" on 2017 documents, one of which was sent to Wirecard head of accounting von Erffa, listing €210 million in commercial debts owed by 12 companies to Wirecard. PayEasy alone was responsible for €123 million of the outstanding debt.

163.    According to whistleblowers interviewed by the *Financial Times*, Wirecard's

Singapore business did not have paperwork required to justify supposed debts owed by ConePay

and Centurion, neither of which paid the debts to Wirecard.  The *Financial Times* reported that

PayEasy's and Centurion's websites had a "striking resemblance" to each other and listed identical

clients.  When contacted, each of the companies listed as clients told the *Financial Times* that they

had not done business with PayEasy or Centurion.  But, most had done business with Bauer's bus

company.

164.    The March 28, 2019 *Financial Times* article also revealed a fact previously

undisclosed to investors.  Wirecard's "2018 revenues attributed to 'referring', involving third

parties such as ConePay and Centurion, were expected to be €931m, **half of Wirecard's forecast**

**for worldwide sales**."

165.    On March 29, 2019, in response to the *Financial Times* article, Wirecard issued a

press release falsely claiming the information reported was "part of a larger package of incorrect

and misleading information" which the news outlet had repeatedly misquoted and stressed the

revenue contributions from the United States and other regions outside Asia:

> Today's FT reporting is part of a larger package of **incorrect and**
> **misleading information which has been published by the FT** since January 2019.
> We have already commenced legal proceedings against Dan McCrum and the
> Financial Times in the Munich Court in relation to the repeated and continuing
> disclosure and false representation of confidential information and/or company
> secrets as well as misquoting of documents.
>
> **The inaccurate information published today has been deliberately**
> **misquoted by the FT to further distort fact and fiction**.
>
> To clarify our international business model in general, more than 50% of
> Wirecard's transaction volumes originate from geographies like **USA**, Latin
> America and Asia where Wirecard currently does not hold its own acquiring or
> issuing license but is working with partners such as local financial institutions and
> service providers.

- 49 -

166.   Following the March 28, 2019 revelations in the *Financial Times*, the price of Wirecard's shares dramatically fell.  WCAGY fell $6.11 per share from the prior day's closing price of $68.65 (-8.89%) to close trading at $62.55 per share on March 29, 2019.  Shares of WRCDF fell $11.88 per share from the previous closing price of $137.88 (-8.61%) to close trading at $126.00 per share on March 29, 2019.

167.   On April 24, 2019, the *Financial Times* published an article titled "Wirecard relied on three opaque partners for almost all its profit" that revealed, based on internal documents and whistleblower testimony, that three third-party acquirers contributed ***more than half of Wirecard's total reported revenue*** in 2016 and ***approximately 95% (€290 million) of the Company's reported profit*** that year.  Wirecard never disclosed to investors the overwhelming contributions to Wirecard's financial results from the Third-Party Partners – Al Alam in Dubai, PayEasy in the Philippines and Senjo in Singapore.

168.   The *Financial Times* article reported that, in 2016, according to internal documents, Al Alam was responsible for contributing nearly €265 million to Wirecard's €1 billion of reported revenue.[20]  The Dubai-based company was described by a former employee as having just six or seven employees and being run by a current Wirecard executive, Oliver Bellenhaus ("Bellenhaus").  Over the course of several visits to Al Alam's office during business hours in 2019, reporters found an empty office on one occasion and just one or two people on the others.  In a spreadsheet Wirecard prepared for auditors at E&Y that was intended to justify Wirecard's €485 million valuation for "'customer relationships,'" Al Alam was listed as having between €3

---

[20]   PayEasy, the Philippines third-party acquirer run out of the office of a bus tour company by former Wirecard employee Bauer was responsible for nearly €111 million of Wirecard's revenue in 2016.  Senjo, whose executives in 2016 helped a Wirecard employee create a backdated contract for software sales, contributed almost €165 million in 2016.

and €7 million of payment transactions every month of 2017, from an online gambling entity that was shut down by United States regulators in the first two months of 2017.

169. Al Alam's revenue, which came from payment processing transaction fees, was provided to Wirecard through two Wirecard subsidiaries, CardSystems Middle East ("CardSystems") and Wirecard UK & Ireland.  From 2012 through 2017, CardSystems contributed more than €600 million in earnings to Wirecard, represented more than one third of all earnings during that period.  But, according to a whistleblower who spoke to the *Financial Times*, revenue from CardSystems "'never passed through [CardSystems'] accounts'" at Wirecard Bank or banks in the Middle East.  Further, the substantial annual expenses for CardSystems recorded on Wirecard's books – €250 million – did not appear to match the reality of its operations.  According to a whistleblower, the same Bellenhaus who ran Al Alam also ran CardSystems out of his apartment.

170. The same day, April 24, 2019, Wirecard announced that the Japanese bank, Softbank, had agreed to invest €900 million in the Company, which analysts viewed as a very positive development.  On April 24, 2019, analysts at Morgan Stanley wrote that "[w]e see this as a positive for Wirecard's shares today, primarily due to a vote of confidence in the company following recent controversies."

171. Even with the positive influence on the stock price from the Softbank deal, on April 25, 2019, shares of WCAGY fell $4.72 per share from the prior day's closing price of $75.90 (-6.22%) to close trading at $71.18 per share.  Shares of WRCDF fell $6.00 per share from the previous day's closing price of $146.25 (-4.1%) to close trading at $140.25 per share.

172. On April 25, 2019, Wirecard published its annual report and financial results for FY18, which reported substantial growth in key metrics such as revenue, net earnings and the total amount of payments processed.  Crucially, E&Y provided an unqualified audit that said there was

- 51 -

no evidence that the FY18 annual results needed correction due to the whistleblower allegations regarding Singapore.

173.     The same day, Wirecard held a conference call for investors and analysts to discuss its FY18 results.  When asked about the April 24, 2019 *Financial Times* article regarding overwhelming profits and revenue from just three previously undisclosed third-party acquirers, Braun unequivocally denied it, stating that "***[t]his is simply not true***" and that the contribution to profits from the three partners was not significant.  He also pointed to E&Y's unqualified audit and said: "***Everything was checked.  So the auditor has an obligation to go into all major relationships and also . . . [into] all significant partnerships . . . and we have here a clear and strong result***."

174.     Investors and analysts took great comfort in E&Y's unqualified audit and saw it as validation of the Company's denials.  For example, Morgan Stanley noted that "[t]he key for investors is that it has received an unqualified opinion from auditors E&Y, and we expect to see a positive reaction to the share price today."  Following Braun's denials and the clean audit, the price of WCAGY rose 3.6%, and WRCDF was up 4.8% on April 26, 2019.

175.     On May 19, 2019, the *Financial Times* published an article titled "Wirecard document points to reliance on 3 partners," which made public the internal Wirecard spreadsheet that formed the basis of its reporting that most revenue and nearly all the Company profits came from Al Alam, PayEasy and Senjo.  The spreadsheet was created and updated by Wirecard's head of corporate accounting and internal reporting, Kai Oliver Zitzmann ("Zitzmann"), who sent the spreadsheet to Kurniawan on July 24, 2017.  Zitzmann explained that "'[i]n the excel file you see the numbers of third party acquirers – splitted [sic] into the different companies.'"  According to the spreadsheet, for the first quarter of 2017, Al Alam accounted for nearly 45% of Wirecard's first quarter earnings before interest, tax, depreciation and amortization.

176.    In its article, the *Financial Times* published a response from Wirecard's lawyers at Herbert Smith Freehills, a large international law firm.  According to Wirecard's lawyers, the *Financial Times* questions to Wirecard regarding the source of revenue and profit were based on a "'number of misunderstandings.'"   Wirecard's lawyers wrote, among other things, that CardSystems "'has always been fully audited by EY and operates in full compliance with local and international governance rules,'" and that "'[t]he local financial results of a subsidiary are in no way representative of the business performance and overall financial contribution of a regional market to Wirecard's financials since most costs and revenues will not accrue locally and are hence not reflected in the local books.'"

177.    Following the articles about the Third-Party Partners, Wirecard hired McKinsey, the United States-based management consulting company, to audit the Company's internal controls and compliance.  According to the *Financial Times* article titled "McKinsey warned Wirecard a year ago to take 'immediate action' on controls," the review was complete by June 2019, and was presented to Defendants by a senior partner of McKinsey's global risk practice in August 2019.[21]  McKinsey found numerous deficiencies creating a "significant risk," including:

- Compliance policies, oversight and controls over Wirecard's third-party business were "non-existent";

- There was no formal process for acquisitions and post-merger integration; and

- Controls over the enforcement of state sanctions and embargoes were "non-existent."

178.    According to the *Financial Times* article, in August 2019, McKinsey directly warned Defendants that such failures could lead to employees in the third-party partner business "'cutting corners illicitly'" to meet internal sales targets and the many internal controls

---

[21]   The article was published by the *Financial Times* on July 13, 2020, but revealed events in 2019.

shortcomings had a "'high probability of reputational, economic and legal risks to the organisation,'" including financial risks from a falling share price.  McKinsey recommended a "'substantial change'" to the entire compliance culture of the organization.  Wirecard's two boards had a "heated discussion" about the findings and considered hiring McKinsey to implement the changes, but the Individual Defendants successfully pushed for PricewaterhouseCoopers ("PwC") to set up the new compliance regime in spite of PwC's apparent conflict as Wirecard Bank's auditor.  While PwC implemented certain changes, they did not apply to Wirecard's third-party partner business – the ostensible reason for hiring McKinsey and the area with "non-existent" controls.

179.    On October 14, 2019, the *Financial Times* published an article titled "Wirecard's suspect accounting practices revealed" that reported on internal spreadsheets and communications between senior members of Wirecard's finance team that indicated a "concerted effort to fraudulently inflate sales and profits at Wirecard businesses in Dubai and Ireland, as well as to potentially mislead EY."  According to the article and underlying documents, much of the revenue at Al Alam, which accounted for half of Wirecard's reported profits in 2016, did not appear to be legitimate.  For example, the *Financial Times* reported that Visa and MasterCard do not have any record of a relationship with Al Alam, calling into question its legitimacy as a third-party acquirer, which are licensed by the large payments networks, such as Visa and MasterCard, to allow retailers to accept credit card transactions.

180.    According to internal financial reports from 2016 and 2017, which the *Financial Times* posted on its website, Al Alam purportedly processed approximately €350 million in payments for 34 key clients each month in 2016 and 2017.  But, much of that payment processing could not have taken place because of the 34 clients, 15 said they had never heard of Al Alam and

eight had shut down operations at the time their payments were supposedly being processed by Al Alam.

181.     Wirecard's documents also showed that Al Alam purportedly processed €46 million in payments every 30 days in early 2017 for Cymix Prepaid ("Cymix"), an Irish prepaid card provider.  But, Cymix was liquidated in 2012, and thus could not have been sending payments to Al Alam for processing.  CCBill LLC ("CCBill"), a United States payments processor, was reported in Wirecard's documents as the source of €24 million in payments for processing each month, but CCBill's COO told the *Financial Times* that the company had no connection to Al Alam "'of any kind'" and, as a payment professional, he knew where CCBill's payments were routed.  Al Alam also supposedly processed €2 million in payments each month of 2017 from a Philippines gambling business.  The owner of the business said that this was impossible because the company switched from gambling with money to games played with points after June 2016, when Rodrigo Duterte was sworn in as President and vowed to crack down on gambling.  The *Financial Times* noted several other companies that were defunct at the time they were showing up as the source of payments in Wirecard's spreadsheets.

182.     The article also provided further details from the documents and correspondence that "cast doubt on EY's oversight."  For example, the supposed revenue from Al Alam was routed to Wirecard through "two thinly-staffed" subsidiaries in Dubai (CardSystems) and Ireland (Wirecard UK & Ireland), which are among Wirecard's most profitable and largest financially.  According to the article, CardSystems had no auditor until at least September 2019.

183.     Based on the spreadsheets, which purported to show that Al Alam was responsible for more than half (€173 million) of Wirecard's earnings before taxes in 2016, the €4.2 billion in payments processed by Al Alam in 2016, somehow produced more profit for Wirecard than the remaining €62 billion processed by Wirecard itself and every other third-party.  Moreover,

correspondence between Wirecard finance executives in April 2018, show that the E&Y partner in charge of Wirecard's audits, Andreas Loetscher ("Loetscher"), specifically requested and was provided one of the spreadsheets showing the underlying Al Alam customer data that the *Financial Times* determined could not have been legitimate.

184.    As the *Financial Times* noted, "EY's reputation as one of the Big Four worldwide accountancy and auditing firms has helped to rebuff criticism of Wirecard's accounts and business practices."  The esteemed auditor's signature on the 2018 financial results in April 2019, "helped to convince many investors that Mr Braun's decision to minimise the Singapore accounting scandal . . . was credible."

185.    As with previous articles questioning its accounting, Wirecard denied the new accusations and tried to explain away the reporting.  According to the article, "Wirecard rejected any allegation that financial data were invented by its staff" and "said all customer relationships were subject to regular audits, and that customers usually connect and contract only to Wirecard, which integrates the services of various parties."  Wirecard also "initially responded to the [*Financial Times*] questions about earnings attributed to Al Alam by dismissing documents described in this article as fake."  The Company later amended its position, claiming financial reports "'usually only present an aggregated view across clusters of clients,'" so the names of Al Alam's "clients" on the spreadsheet may not reflect individual clients.  According to Wirecard, customer information "'is rarely represented in internal financial reporting or is masked by aliases.'"

186.    On these revelations about the Third-Party Partners' business, the price of Wirecard shares significantly declined.  The price of WCAGY fell $9.83 per share (-12.73%) to close trading at $67.37 per share on October 15, 2019.  Shares of WRCDF fell $17.25 per share (-11.36%) to close trading at $134.54 per share on October 15, 2019.

- 56 -

187.   On October 15, 2019, Wirecard issued a press release issuing false and misleading denials of the article's findings, stating:

> ***Wirecard categorically rejects these allegations of impropriety***.  Today's article by the Financial Times is a ***compilation of a number of false and misleading allegations***, which Dan McCrum had raised before in a series of defamatory articles, and which were ***already fully refuted before***.

> It is regrettable that the Financial Times should still choose to publish such an irresponsible article, particularly in circumstances where we have provided to the FT, via its lawyers, prima facie evidence of ***collusion with short sellers which casts doubt upon its motivation in publishing its articles***.

188.   On October 16, 2019, Wirecard issued a press release repeating the previous day's false and misleading denial and further explaining away the allegations:

> Wirecard categorically rejects the Financial Times' allegations of impropriety. Yesterday's article by the Financial Times is a compilation of a number of false and misleading allegations, which the Financial Times had raised before in a series of defamatory articles, and which were already fully refuted before.

> *       *       *

> As part of the audit of the consolidated financial statements of Wirecard AG the reporting of the two subsidiaries in Dubai [CardSystems and Wirecard Processing FZ] is ***subject to audit procedures which are defined and performed by the group auditor Ernst & Young*** GmbH, Germany.

> *       *       *

> Al Alam is one of multiple such independent partners Wirecard is working with in the United Arab Emirates.  It is a mid-size payment technology and services company, providing access to a multitude of payment methods.  Wirecard relies on such partners for the processing of transactions requiring particular payment methods or the involvement of locally licensed financial institutions.

> Wirecard acts as a platform integrating the services of the various partners involved in the payment value chain.  Often those service providers are active in the background.  This approach is a standard industry practice.

> ***The 34 company names mentioned by the Financial Times refer to labels of customer clusters created for reporting and reconciliation purposes, each containing hundreds of individual genuine merchants.  The conclusions drawn by the Financial Times are therefore not correct***.

- 57 -

> *Wirecard's group auditor Ernst & Young GmbH, Germany, confirmed that they have complied and will comply with all statutory and professional audit standards*.

189.    As with prior denials following news reports of accounting misconduct, analysts largely sided with Wirecard and accepted its version of events.  For example, on October 16, 2019, analysts at Kepler wrote about "[a]nother negative article from [the *Financial Times*]," and concluded "the allegations seem unfounded.  Buy."  On October 17, 2019, HSBC, restated each of Wirecard's explanations from its press release and concluded "it is no surprise" the customers contacted by the reporter had not heard of Wirecard.

190.    On October 21, 2019, Wirecard announced in a press release that its Management and Supervisory Boards had "decided to commission the audit firm KPMG to conduct an additional independent audit to clarify fully and independently all accusations raised by the British newspaper 'Financial Times.'"  The audit, according to Wirecard, would "begin immediately" and KPMG "will receive unrestricted access to all information on all levels of the Group."  Defendant Matthias was quoted in the release as saying: "'We have complete confidence in the audit procedures performed to date and their results.  We assume this renewed independent review will lead to a final end to all further speculation.'"  This was a far cry from his declaration just a few days earlier on October 18, 2019, when he dismissed the allegations as "an annoyance" and rejected an independent audit, claiming that "EY is evaluating the matters sufficiently."

191.    On December 8, 2019, in an article titled "Wirecard's singular approach to counting cash," the *Financial Times* revealed that in 2017, Wirecard had increased the amount of cash it reported by including cash held in "trust accounts."  As Kurniawan explained in an April 1, 2017 memo to von Erffa, the trust accounts held reserves, *i.e.*, money that Wirecard owed to merchants but held for a period of time before distributing to provide for potential refunds, known as "chargebacks."  Despite there being reserves, Kurniawan wrote to von Erffa that "'management

believe that trust accounts held in third-party acquiring business is cash equivalent, part of operating cash flow and not restricted.'"  Documents reviewed by the *Financial Times* show that Al Alam was associated with €334 million held in "trust accounts" as of March 2017, but that it was not clear if the same amount was included in Wirecard's cash reserves.

192.    As the December 8, 2019 *Financial Times* article noted, "[c]ash flow is a key metric of financial health" and "Wirecard's substantial net cash balance has also offered reassurance to some this year, in the face of criminal investigations" and other allegations of financial impropriety.  For example, in September 2019, analysts at JP Morgan wrote that "'Wirecard has been a target of accounting-related allegations over the past several years,'" but as a counterweight, highlighted the Company's "'strong free cash flow conversion and net-cash position.'"

193.    The article also included Wirecard's statement and responses to the reporter's questions.  Wirecard refused to identify the trustees for Al Alam's accounts, but claimed "'[a]ll funds are held with reputable financial institutions.'"  The Company also said "'[t]rust accounts are only used to segregate our own cash from the operating cash of partner acquirers'" and that the "'trust accounts are held in the name of Wirecard and the funds can be accessed at any time.'"  Wirecard also said that "'[n]o ebitda . . . or revenue is generated by Al Alam'" – a remarkable claim considering the amounts reported in numerous internal documents.

194.    On December 10, 2019, Wirecard issued a press release restating many of the same denials and explanations supposedly countering the *Financial Times* article.

195.    Each of the Defendants' statements set forth above in ¶¶165, 170, 172-73, 176, 185, 187-88, 190, 193-94 were materially false and misleading when made as Defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)    Defendants were engaged in an ongoing fraudulent scheme in which they caused Wirecard to materially overstate the Company's reported revenue, earnings, assets, transaction volume and other financial results and key financial metrics;

(b)    revenue purportedly generated from transactions processed by the Third-Party Partners during the Class Period did not actually exist, resulting in more than half the revenue and nearly all the profit Wirecard reported in its financial statements being fictitious.  *See, e.g.*, ¶¶164, 167-69, 175, 179, 183, 203, 209, 237;

(c)    cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist.  *See, e.g.*, ¶¶203, 207-08, 228-29, 234, 236-37;

(d)    Wirecard's internal controls over its financial reporting, including over the third-party business and related transactions, were not adequate as represented, but rather so insufficient that they were later described by McKinsey as "non-existent."  *See, e.g.*, ¶¶133-34, 177-78, 207-08, 215-17, 275-77.   In fact, the Company failed to implement numerous basic internal controls, including recording board meeting minutes, formally documenting all agreements and amendments to agreements, maintaining an archive of contracts and recording transaction data.  *See, e.g.*, ¶¶215-17;

(e)    Wirecard's operations in the United States, including Wirecard North America, and in Europe lost money every year since 2016, leaving the Company unable to report a profit without relying on the falsified revenue from the Third-Party Partners.  *See, e.g.*, ¶278;

(f)    Wirecard's publicly reported financial statements, as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and results of

operations and did not comply with IFRS, IAS or other applicable accounting standards. *See, e.g.*, ¶¶179, 191, 214, 237; and

(g)     the reporting by the *Financial Times* regarding the Third Party Partners, including their overwhelming contributions to Wirecard's financial results, sparse operations and seemingly non-existent customers, was, despite Defendants' denials, an accurate portrayal of the truth.

### B.     KPMG's Investigation Verifies Certain Allegations and Raises Further Questions About Wirecard's Accounting and Operations

196.    Following the October 2019 *Financial Times* article regarding potentially nonexistent revenue from the Third-Party Partners, KPMG began its special investigation into four main areas and the public allegations underlying each: (1) the amount and existence of revenues from the Third-Party Partners; (2) Wirecard's merchant cash-advance business;[22] (3) round-tripping and other misconduct in Singapore; and (4) potential overpayment for Hermes and GI, Wirecard's businesses in India.

197.    On March 12, 2020, after the market closed, Wirecard issued a press release announcing that KPMG's investigation into the allegations regarding the Third-Party Partners "is still ongoing and is expected to be completed by 22 April 2020 at the latest."  The "timeframe of the special investigation" was being extended, Wirecard explained, because the investigation "necessitates a more comprehensive inspection of relevant internal documents of the Wirecard Group and external companies" and also "due to current corona virus-related travel restrictions, especially in Asian countries."  The Company also announced that it was delaying publication of its 2019 annual report and financial results from April 8 to April 30, "[i]n order to be able to take

---

[22] Wirecard's practice of issuing short-term loans to merchants had been questioned by short sellers who alleged the practice was illegal in Turkey and not accurately reported in Brazil.

due account of KPMG's audit findings within the context of the ongoing preparation and audit of the annual and consolidated financial statements for fiscal 2019." Wirecard also claimed that KPMG's audit had exonerated the Company with respect to "public allegations concerning Wirecard AG's business activities in India and Singapore and the Merchant Cash Advance (MCA) / Digital Lending division" because "these parts of the special investigation have not produced any substantial findings."

198. On April 22, 2020, the day Wirecard had previously said would be "the latest" that KPMG would complete its special investigation, Wirecard announced yet another delay. In a press release, Wirecard announced it "has just been informed by KPMG that the auditing company will present the results of the ongoing special audit on Monday, April 27, 2020." The reason given for the delay was that "data inventories still received are to be processed and taken into account." Despite the ongoing investigation, Wirecard falsely stated that "no evidence" had been uncovered that would confirm allegations of potential wrongdoing:

> *[T]o date no substantial findings have been made in all four areas of the audit . . . . No evidence was found for the publicly raised allegations of balance sheet manipulation.*
>
> *       *       *
>
> As announced, the publication of the annual financial statements and the annual press conference will take place on April 30, 2020.

199. Following Wirecard's total mischaracterization of the KPMG investigation, which did anything but find "no evidence" for the allegations, the price of Wirecard's share rose significantly on April 22, 2020, with WCAGY up approximately 5% and WRCDF up 11%.

200. On April 28, 2020, Wirecard issued a press release announcing that KPMG had concluded its investigation and had provided its report to the Company, which would be published as soon as possible. In an exceptionally misleading description of the KPMG Report and

- 62 -

investigation, the Company again claimed it was vindicated and there was no evidence supporting

the allegations against it:

> **No incriminating evidence was found for the publicly raised accusations of balance sheet manipulation. In all four areas of the audit** – third-party partner business (TPA) and Merchant Cash Advance (MCA) / Digital Lending as well as the business activities in India and Singapore – **no substantial findings were found** which would have led to a need for corrections to the annual financial statements for the investigation period 2016, 2017 and 2018.

> **In the course of the audits of the annual financial statements for the years 2016 to 2018, the available evidence and audit procedures were sufficient to provide evidence of the revenues from third-party partner business** (TPA). However, due to the increased forensic requirements of the investigation by KPMG, it was not possible to obtain all of the requested data that would have fulfilled the requirement to provide evidence of sales revenues in these years, as these documents are mostly in the third-party partner's access area.  As Wirecard now maintains the necessary data itself, more than 200 million data records were made available to KPMG for a forensic examination for the period December 2019.  This did not give rise to any indications of discrepancies between the sales revenues reported and the account balances.

> KPMG identified documentation and organizational weaknesses in the period under review, which have already been identified by Wirecard.  Since 2019, these have been remedied by setting up the Global Compliance Organization and with the support of external consultants.

> KPMG sees no further need for an audit of Wirecard's business activities in Singapore beyond that already carried out as part of the audit of the 2018 annual financial statements.

> With regard to the structure of the "Merchant Cash Advance" business of the Wirecard companies in Turkey and Brazil, there were no indications of legal inadmissibility.

> According to Wirecard AG, the purchase price for the acquisition of the "payment business" of an Indian group of companies was determined on the basis of strategic considerations and plausibly verified by means of various objective factors, such as a company valuation of the payment business based on the results of the financial due diligence, corporate transactions by third parties, avoidance of minority companies and the strategic interest in entering the Indian market within the framework of the Group's globalization strategy.  KPMG has not been able to identify any other evidence in the documents submitted or the investigation activities carried out that would indicate factors in pricing that are not objectively justified.

Wirecard AG made all payments in connection with the takeover of the Indian Group's "payment business" exclusively to the seller, whose beneficial owner could not be finally verified by KPMG on the basis of public registers. KPMG has found no indications in interviews, documents submitted and the investigative activities conducted that members of Wirecard's management were involved in this seller.

The sale of individual assets in the wake of the acquisition of the payment business from a company acquired by the Wirecard Group in the course of this transaction to a company associated with the seller was fully comprehensible by KPMG, both in terms of the contract and the settlement. According to the documents submitted by KPMG and the investigation activities carried out, there were no indications of "roundtripping".

Since October 2019, KPMG has been conducting a special investigation on behalf of the Supervisory Board of Wirecard AG in order to clarify the accusations of balance sheet manipulation made against the company by the media.

The publication of the annual financial statements and the annual press conference will not take place on April 30, 2020. Wirecard will coordinate with the auditors E&Y as quickly as possible when the audit work can be completed, taking into account the Corona-related restrictions and the KPMG [R]eport.

201. Following the press release, Wirecard published the KPMG Report in German on its website on April 28, 2020. Soon after, the Company published an English translation. The publicly available portion of the KPMG Report approached 60 pages, but according to the *Financial Times*, it also contained a confidential appendix and addendum that together were almost three times as long as the public section.

202. On April 28, 2020, Wirecard held a conference call for investors and analysts to discuss the KPMG Report and investigation. On the call, Braun reiterated the false and misleading claims that the investigation cleared Wirecard of the allegations and that Wirecard had fully cooperated:

- "I would say India and Singapore and also for Merchant Cash Advance, ***we have here a clear proof that*** . . . ***the allegations were not true, full stop***, for a third party acquiring business."

- "[A]ll documents and evidences were provided [to KPMG]."

- "And I – of course, for the 2019 numbers *I can fully confirm our preliminary numbers and I can fully confirm our guidance for 2020*."

- "So, the question was is the business with third parties in terms of revenue recognition and in terms of authenticity forensically justifiable and the answer is yes."

203.   In fact, KPMG's investigation, which was actively obstructed by Wirecard and the other parties implicated, was anything but a vindication of Wirecard's accounting, and certainly did not establish that there was a lack of evidence for the allegations.  Far from Wirecard's rosy portrait, the KPMG Report published on April 28, 2020, described numerous negative findings, including:[23]

- KPMG was *unable to verify the existence of €1 billion* of payments supposedly made by the Third-Party Partners that Wirecard claimed was held in a trust account.

- Because Wirecard did not have, and the Third-Party Partners refused to provide, documents verifying the existence and amounts of 2016-2018 revenues from the partners, KPMG *could not "make a statement that the revenues exist and are correct in terms of their amount*."

- Contrary to Wirecard's many denials about the size or even existence of revenue and profits from the Third-Party Partners, they "*accounted for the lion's share*" of Wirecard's earnings for fiscal years 2016-2018.

- Contrary to Wirecard's boasts about the strength of its internal controls, KPMG concluded that "*the internal controls in place are not fully sufficient to fully ascertain the amount and existence of the revenues*" from the Third-Party Partners.

- Contrary to Wirecard's and Defendant Braun's claims for the delayed report (coronavirus, slow data analysis), KPMG's report was *delayed by Wirecard's obstruction and failure to provide requested documents necessary to the audit*.

- Despite the minimal documents provided, KPMG found evidence to support many of the allegations made against Wirecard, including that *several of Al Alam's "customers" did not exist in 2017* and Wirecard's reporting of cash from the trust

---

[23] In the non-public addendum to the published report, KPMG also recounted E&Y's total failure to properly follow up on whistleblower evidence from its own employee and serval "red flags," including that Wirecard executives were the true owners of the Mauritius middleman that made more than €250 million on Wirecard's purchase of Hermes.

accounts on its own books was questionable and potentially violated accounting rules.

204.   <u>Wirecard's and Defendants Obstruction</u>: In the report, KPMG laid out a long list of examples of obstruction it faced from Wirecard and others, including the failure or refusal to provide critical documents and information:

> With respect to the execution of the assignment, the following circumstances must be reported:
>
> - Wirecard AG did not supply some of the documents requested by KPMG in the course of the investigation, or supplied some of those documents only several months after they had been requested, as a result of which the investigation as a whole was delayed.
>
> - Wirecard AG repeatedly postponed individual agreed upon interview appointments with key Wirecard internal contacts, which also resulted in considerable delays in the investigation activities.
>
> - Some of the investigation activities that were originally brought to the attention of the client at the beginning of the investigation could not be carried out or could not be carried out in the originally planned manner due to a lack of available documentation or IT system accesses.
>
> - The documents submitted to KPMG were almost exclusively electronic copies the authenticity of which could not be verified.
>
> - The transfer of transaction data at least for the years 2016 and 2017 required the support of the TPA partners, which has so far been lacking.
>
> - In addition, with regard to specific aspects relevant to the execution of the assignment, we refer to the contents of the relevant sections on the individual areas of investigation.

205.   Wirecard's delays and failure to provide documents and information so hindered the KPMG auditors that they were compelled to "inform[] the Supervisory Board in a letter about a considerable delay in Wirecard AG's submission of the documents we had requested" and, as noted in the report, were unable to determine whether allegations were true or false because of a lack of critical information.  Even for the documents KPMG did receive, the report concluded that "it was not possible for [KPMG] to verify the completeness and authenticity of the documents and

documentations provided."   KPMG requested a final representation letter from Wirecard management, but management did not provide one.

206.   In addition to delays, Wirecard provided misleading and inaccurate information to KPMG.  For example, KPMG requested the minutes of Wirecard's quarterly meetings with the Third-Party Partners for 2016 and 2017 and was told by Wirecard that they did not exist.  But, on April 23, 2020, just days before the audit report was issued, E&Y provided the 2016-2017 minutes to KPMG.

207.   KPMG Unable to Verify Accounts with €1 Billion: Among KPMG's most significant findings was its conclusion that it could not verify the existence of approximately €1 billion supposedly held for Wirecard in a trust account.  KPMG determined that while some of the revenue reported from the Third-Party Partners was paid to Wirecard Bank, the vast majority was paid to a trust account.   During the investigation, KPMG was informed that the first trustee terminated its relationship with Wirecard in late 2019, and the trust accounts were supposedly transferred to a new trustee and two new banks.  KPMG also discovered several irregularities regarding the trust accounts.  For example, Wirecard did not consider the economic situation or reliability of the trustees and did not perform conflict checks or consider alternative trustees. Further, although the trustee relationship was transferred in November 2019, the contract between Wirecard and the second trustee was dated February 20, 2020.

208.   KPMG, which only received scans of the account statements from E&Y and was not able to confirm the existence of the trust accounts directly with the banks or trustee, could thus not verify the existence of €1 billion in cash from the Third-Party Partners supposedly held for Wirecard in the accounts.  According to KPMG, none of the account statements referred to or even mentioned Wirecard or its companies.  As KPMG explained, "due to the existing doubts about the

amount and existence of the revenues – as raised by the accusations in the press – this evidence is not sufficient for the purposes of our forensic investigation."

209.    <u>KPMG Unable to Verify the Existence of Third-Party Partner Revenues</u>: KPMG was also unable to verify the existence of the revenue Wirecard claimed to have received from the Third-Party Partners.  KPMG determined that the "vast majority of the [reported] revenues" of three of Wirecard's most profitable subsidiaries – CardSystems, Wirecard UK & Ireland and Wirecard Technologies – came almost exclusively from the Third-Party Partners in 2016-2018. Contrary to Wirecard's denial that it had substantial revenue and earnings from sources other than the Third-Party Partners and its claim that Al Alam contributed no revenue, KPMG found that the "lion's share" of Wirecard's earnings in 2016-2018 came from the Third-Party Partners via the three subsidiaries.

210.    In order to verify the existence of the purported revenue, KPMG sought documents demonstrating the "entire transaction chain" – *i.e.*, the individual credit card transactions that were supposedly processed by the Third-Party Partners for Wirecard.  As KPMG noted, "due to deficiencies in the internal organization" at Wirecard and the Third-Party Partners' "unwillingness . . . to participate in this special investigation in a comprehensive and transparent manner," it was unable to "forensically trace the existence of the transaction volumes during the investigation period 2016 to 2018."

211.    Wirecard did provide individual transaction data for payments processed by third-party partners for the month of December 2019, but KPMG noted that this data, representing more than 200 million transactions, was only provided on April 15, 2020, and had not been fully analyzed.  Based on its analysis as of the time the report was published, KPMG had found no discrepancies between the reported transactions for December and those represented in the data,

but drew no conclusions about the Third-Party Partners 2016-2018 transactions or the 2019 payment transactions from the single month of data that Wirecard provided.

212.    <u>KPMG Confirms Al Alam Customers Likely Do Not Exist</u>: KPMG also examined and confirmed several of the allegation made in the *Financial Times* articles.  With respect to the allegation that eight of the 34 listed customers for Al Alam did not exist in 2017, KPMG was unable to determine whether this was true or false because neither Wirecard nor Al Alam provided the actual customer names to KPMG.  However, using the names on the spreadsheet that the *Financial Times* relied on, KPMG came to a similar conclusion that as of 2017, seven of the customers did not exist and one was merged into another company in late 2017.

213.    <u>KPMG Confirms Risks Not Well Disclosed</u>: With respect to the allegation that Wirecard failed to disclose fundamental information about the Company by not revealing the extent to which it relied on the Third-Party Partners' revenue, KPMG "had doubts" about Wirecard's risk disclosures.  Specifically, KPMG found that the risks to Wirecard associated with losing one of the Third-Party Partners, as well as from "chargebacks" that could affect Wirecard's claimed cash in the trust accounts, were likely not well disclosed.

214.    <u>KPMG Doubts Wirecard's Cash Reporting Method</u>: KPMG also examined the reporting regarding Wirecard's "gross accounting" – *i.e.*, including the Third-Party Partners' revenues and costs as its own – and inclusion of the cash held in the trust accounts on Wirecard's balance sheet.  KPMG concluded that it was "not able to fully understand the appropriateness of the 'gross accounting'" because it had not received the necessary documents, such as contracts or Wirecard's instructions to the Third-Party Partners regarding customer relationships.  KPMG did, however, have substantial doubts about the propriety of Wirecard reporting the trust account balances as its own cash.  KPMG concluded on the facts it was presented that Wirecard should not have reported the trust balance as cash because "there are doubts as to whether the IFRS

- 69 -

requirements of 'availability at all times without penalty' were met."  Because Wirecard could not unilaterally access the money in the trust account in 2016-2018 without financial penalty, it should not have been recorded as Wirecard's cash.

215.   <u>KPMG Confirms Internal Controls Failures</u>: In the course of its investigation, KPMG noted numerous internal control problems at Wirecard.  For example, KPMG found that "no minutes were taken at Board of Management meetings."   When attempting to review Wirecard's contracts with the Third-Party Partners, the investigators discovered that many agreements were not formally documented and there was no contracts archive.  According to KPMG, the lack of written agreements "does not meet the requirements of proper documentation" and "it is absolutely necessary to have a contractual documentation covering all ancillary agreements."  KPMG further concluded that "[t]he completeness of the documents relevant for accounting purposes, as well as their correct representation in the external accounting cannot be guaranteed without an appropriate contract archive or contract management."

216.   KPMG also probed Wirecard's and its subsidiaries' internal controls regarding revenue from the Third-Party Partners.  The investigators discovered that Wirecard limited its control activities to "plausibility assessments."  CardSystems, Wirecard UK & Ireland and Wirecard Technologies told KPMG they reconciled the payment transaction volumes reported by the Third-Party Partners with the original transaction data from the Third-Party Partners' "payment platforms."  The only record of this supposed reconciliation was quarterly meeting minutes that contained screenshots of transaction volumes, but no original transaction data.[24]  KPMG concluded that Wirecard's "***internal controls in place are not fully sufficient to fully ascertain the amount and existence of the revenues***" from the Third-Party Partners.

---

[24]   The original transaction data was exactly the information that Wirecard said it did not have and the Third-Party Partners refused to give to KPMG.

217.     The KPMG special investigation also discovered that Wirecard left all know-your-customer ("KYC") compliance to the Third-Party Partners and did not perform its own checks or review the Partners' KYC compliance:

> According to the information provided to us, corresponding checks on the existence of customers are carried out by the TPA partners as part of the compliance checks (KYC) during the onboarding of the respective customers. However, Wirecard companies would neither retrace nor monitor these KYC compliance checks carried out by the TPA partners on the basis of the information provided to us, nor would they request corresponding evidence of the existence of customers within the framework of the onboarding of customers, since the respective TPA partner is responsible for this.

KYC compliance is critical for ensuring not only that customers exist, but also for preventing money-laundering and other illegal activity.  Thus, despite Wirecard's repeated and false claims of effective and robust controls, it had not even bothered to ensure KYC compliance for the source of more than half its revenue.  Moreover, Wirecard's decision to treat the Third-Party Partners as fully separate entities for KYC compliance purposes is in stark contrast to its claim that it had such extensive control over the entities that, for IFRS accounting purposes, their revenues and expenses were reported on Wirecard's books.

218.     <u>KPMG Criticizes Singapore Investigation</u>: KPMG concluded that, although the Singapore whistleblower accusations had been investigated by two law firms and eventually were reviewed by E&Y, the basis for all the investigations was flawed because critical data, "in particular consisting of accounting data and e-mail traffic, was not completely saved."  This "incompleteness of the data basis" could not be remedied by subsequent reviews because the documents no longer existed.  Accordingly, KPMG saw no reason to re-review what E&Y and the law firms had done and concluded:

> [I]t cannot be ruled out that the investigation activities of Law Firms 1 and 2 and the auditing activities of EY Audit within the framework of the extended audit procedures would have come to a different conclusion if a complete database had been available.

- 71 -

219.    <u>KPMG Criticizes E&Y's Audit Regarding India Allegations</u>: In its public report,

KPMG, as with many other allegations, could come to no conclusion about who owned the

Mauritius middleman company or whether Wirecard overpaid for Hermes because Wirecard and

others refused to provide the necessary documentation.  KPMG did conclude that due diligence

documents for Wirecard's India acquisitions made clear that Hermes was sold for nearly €300

million less than Wirecard paid just weeks earlier.  As reported after Wirecard's collapse, in a non-

public addendum to its report, KPMG did make a number of findings about E&Y's deficient audits

relating to allegations in India.

220.    On the news of KPMG's findings, the price of Wirecard's shares sharply declined.

WCAGY fell $17.13 from the prior day's closing price of $71.71 (-23.89%) to close trading at

$54.58 per share on April 28, 2020, and another $4.91 per share (-9.00%) to close trading at $49.67

per share on April 29, 2020.  Shares of WRCDF fell $35.75 from the prior day's closing price of

$140.79 (-25.39%) to close trading at $105.04 per share on April 28, 2020, and another $5.04 per

share (-4.80%) to close trading at $100.00 per share on April 29, 2020.

221.    According to analysts, KPMG's findings and report did not clearly refute the

allegations or conclusively prove them either.  On April 30, 2020, Morgan Stanley wrote: "In our

view, the report did not yield a clear outcome. Combined with a delay in audited 2019 financials,

we lack the information to make reliable forecasts."

222.    In their April 29, 2020 report, analysts at JP Morgan wrote that Wirecard was

literally correct that "'[n]o incriminating evidence was found,'" but "most troubling for us, KPMG

felt aggrieved enough to state that they did not receive full cooperation from the company which

is a troubling allegation" and "transaction data that was needed to disprove the main allegation

was not made available to KPMG and thus the primary allegation was not even investigated."

223.    Given the report's length and initial availability only in German, investors did not immediately digest the KPMG Report.  For example, on April 28, 2020, analysts at Kepler published a report titled "KPMG special audit finally largely exculpates Wirecard," which repeated many of Wirecard's false claims from its April 28, 2020 press release.  By May 4, 2020, the same analysts had changed their tune, writing that "[w]e have reviewed in detail the KPMG special audit report, and *the outcome is concerning, as it could not put an end to all allegations and has raised new questions*."  As a result, Kepler removed their recommendation to buy Wirecard's shares.

### C.    Wirecard's Non-existent €1.9 Billion and its Swift Descent into Insolvency

224.    On May 8, 2020, following several calls for Braun's resignation by prominent investors in the wake of the KPMG Report, Wirecard announced in a press release several changes to its management structure, including the addition of a Chief Compliance Officer, a Chief Commercial Officer and a new COO to the Management Board.  While some duties and responsibilities would change, the Individual Defendants and other senior management stayed in place and the release noted that "[t]he Supervisory Board expresses its confidence in the Management Board and its Chairman."

225.    In early May 2020, the German authorities' history of investigating those who questioned Wirecard while refusing to investigate the Company came to an end.  On May 8, 2020, BaFin announced that its was investigating whether Wirecard misled investors prior to the KPMG Report's publication.  On May 11, 2020, *Reuters* reported that, according to a spokesperson for the Munich court, the court was dropping the case against the author of the Zatarra Report that was brought a few years earlier.  And on May 18, 2020, the *Financial Times* revealed that "Germany's accountancy watchdog," the Financial Reporting Enforcement Panel, opened an investigation into Wirecard in 2019, following whistleblower accusations of accounting fraud.  A few weeks later, on June 5, 2020, Wirecard announced by press release that its headquarters in Munich had been

- 73 -

searched by investigators.   The Company emphasized that "'[t]he investigations [were] not targeting the company, but the members of its [M]anagement [B]oard,'" and that Wirecard was "fully cooperating."

226.   Soon after the KPMG Report was published, some of the companies at the center of the allegations began to be dissolved.   For example, on May 15, 2020, Wirecard announced that Al Alam, the third-party partner at the center of allegations of inflated revenues, would be closed, noting that the closure was a reaction "to 'the damage to its reputation caused by its integrity being publicly called into question.'"   The news was quickly picked up by news outlets, including the *Financial Times*, which reported that the Company had actually been liquidated on May 2, 2020, but was only now being widely reported and considered by investors and analysts.   The news of Al Alam's liquidation followed Wirecard's May 6, 2020 announcement that it was closing CardSystems, its Dubai-based subsidiary that acted as the conduit for nearly all the claimed revenue associated with Al Alam.

227.   As investigations into Wirecard and its executives began ramping up following the release of KPMG's report, E&Y began to look more closely at Wirecard's accounting and on May 25, 2020, after the market closed, Wirecard announced in a press release that "the audit of the annual financial statements and consolidated financial statements for 2019 will not be completed by June 4, 2020, as planned."   The audited financials, according to the Company, would now be published on June 18, 2020.   Despite this further delay, the Company projected confidence, stating that it "***expects an unqualified audit opinion***" and "assumes that there will be no significant deviations" from the preliminary, unaudited 2020 results the Company published in February

228.   On June 18, 2020, instead of the "unqualified audit opinion" Wirecard expected, the Company announced that E&Y was unable to obtain "***sufficient audit evidence***" ***for €1.9 billion*** of "cash balances on trust accounts."   As a result, the Company was unable to provide a

- 74 -

publication date for the audited financial results, which had to be issued by June 19, 2020 to avoid €2 billion in loans being immediately due to lenders.

229.    On June 18, 2020, Wirecard issued two press releases regarding the missing €1.9 billion.  In the first, it revealed that E&Y had been presented "spurious balance confirmations" by the trustee "in order to deceive the auditor":

> **Date for publication of annual and consolidated financial statements 2019 delayed due to indications of presentation of spurious balance confirmations**
>
> Wirecard AG's auditor Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Munich, informed Wirecard AG that **no sufficient audit evidence could be obtained so far of cash balances on trust accounts to be consolidated in the consolidated financial statements in the amount of EUR 1.9 billion (approximately a quarter of the consolidated balance sheet total)**.
>
> There are indications that **spurious balance confirmations** had been provided from the side of the trustee respectively of the trustee's account holding banks to the auditor **in order to deceive the auditor and create a wrong perception of the existence of such cash balances** or the holding of the accounts for to the benefit of Wirecard group companies. The Wirecard [M]anagement [B]oard is working intensively together with the auditor towards a clarification of the situation.
>
> In light of the above the audit of the annual and the consolidated financial statements 2019 will not be concluded as planned by June 18, 2020. A new date will be announced. **If certified annual and consolidated financial statements cannot be made available until June 19, 2020, loans made to Wirecard AG amounting to approximately EUR 2 billion can be terminated**.

230.    In the second June 18, 2020 release, which does not mention that €1.9 billion is missing or that fake balance confirmations were sent to E&Y, Wirecard and Braun struck a very different tone, painting the Company as the potential victim of fraud and announcing it was in constant contact with the trustee, stressing the sterling credentials of the banks and the trustee:

> Wirecard AG has been informed by the auditor EY that an audit certificate for the annual financial statements for the past fiscal year 2019 requires additional audits. This is due to recent communications from the two banks that have been managing the escrow accounts since 2019, according to which the account numbers in question could not be assigned. **The responsible trustee is in continuous contact with the banks and Wirecard AG**.

The respective subsidiaries of Wirecard AG have paid substantial security deposits totaling 1.9 billion euros into these escrow accounts in order to guarantee risk management for participating merchants. The banks managing the escrow accounts are two Asian banks. **Both institutions have investment grade ratings. The trustee, who has been in office since 2019, holds numerous mandates in Asia**.

Markus Braun, CEO Wirecard AG: "We are in contact with the trustee present on site. Previously issued confirmations by the banks were no longer recognised by the auditor. All parties involved are endeavouring to clarify the matter as quickly as possible. It is currently unclear **whether fraudulent transactions to the detriment of Wirecard AG have occurred. Wirecard AG will file a complaint against unknown persons**."

231.    On this news, the price of Wirecard shares collapsed.  WCAGY fell $38.30 per share from the prior day's closing price of $58.50 (-65.47%) to close trading at $20.20 per share on June 18, 2020.  Shares of WRCDF fell $71.47 per share from the previous day's closing price of $113.29 (-63.09%) to close trading at $41.82 per share on June 18, 2020.

232.    Following the June 18, 2020 revelation that nearly €2 billion could not be accounted for and another €2 billion in debts could come due immediately due to the failure to file audited financials, Wirecard's Supervisory Board announced late on June 18, 2020, that it was immediately suspending Marsalek until June 30, 2020.

233.    On June 19, 2020, Braun resigned "[i]n mutual consent with the Supervisory Board."

234.    On June 19, 2020, the *Financial Times* identified the two Philippines banks where Wirecard's trust accounts were supposedly located, BDO Unibank and Bank of the Philippine Islands, and reported that "both lenders told the Financial Times that documents showing that Wirecard was the banks' client were 'spurious.'"  The CEO of BDO Unibank said "'[i]t appears that a rogue employee . . . generated the false confirmation, with no money flowing in or flowing out. . . . *These accounts do not exist – that's it*.'"

235.    Upon these revelations, Wirecard's share price dropped even further.  WCAGY fell $6.45 per share from the prior day's closing price of $20.20 (-31.93%) to close trading at $13.75

per share on June 19, 2020. Shares of WRCDF fell $14.22 per share from the previous day's closing price of $41.82 (-34.00%) to close trading at $27.60 per share on June 19, 2020

236.    On June 21, 2020, in an article titled "Wirecard's €1.9bn never entered Philippine financial system, bank governor says," the *Financial Times* revealed that, according to the head of the central bank of the Philippines, "'[n]one of the missing [€1.9bn] of German firm Wirecard entered the Philippine financial system'" and the banks' names had been used "'in an attempt to cover the perpetrators' track.'"

237.    The following day, June 22, 2020, Wirecard admitted that the €1.9 billion in cash that Wirecard reported on its books, was not missing, but in fact does "***not exist***."  In the same press release, Wirecard admitted that its prior statements regarding the third-party acquiring business were false, withdrew its 2019 and 2020 preliminary financial results and was examining how it could remain a going concern:

> The Management Board of Wirecard assesses on the basis of further examination that ***there is a prevailing likelihood that the bank trust account balances in the amount of 1.9 billion EUR do not exist***. The company previously assumed that these trust accounts have been established for the benefit of the company in connection with the so called Third Party Acquiring business and has reported them as an asset in its financial accounts. The foregoing also causes the company to question the previous assumptions regarding the reliability of the trustee relationships.

> The Management Board further assesses that ***previous descriptions of the so called Third Party Acquiring business by the company are not correct***. The Company continues to examine, whether, in which manner and to what extent such business ***has actually been conducted for the benefit of the company***.

> ***Wirecard withdraws the assessment of (i) the preliminary results of the financial year 2019*** (revenue and earnings before interest, taxes, depreciation and amortization (EBITDA)) of 14 February 2020 (last confirmed on 18 June 2020), (ii) ***the preliminary results of the first quarter of 2020*** (revenue and EBITDA) of 14 May 2020, (iii) the EBITDA prognosis for the financial year 2020 of 6 November 2019 (last confirmed on 14 May 2020) and (iv) the Vision 2025 prognosis for the financial year 2025 on transaction volume, revenue and EBITDA of 8 October 2019. Potential effects on the annual financial accounts of previous years cannot be excluded.

Wirecard continues to be in constructive discussions with its lending banks with regard to the continuation of credit lines and the further business relationship, including the continuation of the current drawing coming due at the end of June. Together with the renowned and internationally active investment bank Houlihan Lokey, Wirecard is assessing options for a sustainable financing strategy for the company.

In addition, the Company is ***examining a broad range of possible further measures to ensure continuation of its business operations***, including cost reductions as well as restructuring, disposal or termination of business units and products segments.

238.   The same day, the Supervisory Board announced that it had fired Marsalek "with immediate effect."

239.   Wirecard's share price dropped precipitously on these admissions.  WCAGY fell $6.35 per share from the prior day's closing price of $13.75 (-46.18%) to close trading at $7.40 per share on June 22, 2020. Shares of WRCDF fell $12.45 per share from the previous day's closing price of $27.60 (-45.11%) to close trading at $15.15 per share on June 22, 2020.

240.   On June 23, 2020, Braun was arrested on suspicion of false accounting and market manipulation and released on €5 million bail.

241.   On June 24, 2020, the *Financial Times* reported that authorities in the Philippines were searching for Marsalek, who was said to have gone to the country following his suspension. The Philippine's secretary of justice told the newspaper:

"I have ordered our National Bureau of Investigation to investigate certain persons here who are allegedly involved in the Wirecard fraud. We are also trying to find out if the Wirecard COO, Jan Marsalek, is in the Philippines. If he is found here, we shall include him in the investigation."

242.   On this news, shares of WCAGY fell $3.21 per share from the prior day's closing price of $10.06 (-31.91%) to close trading at $6.85 per share on June 24, 2020.  Shares of WRCDF fell $6.14 per share from the previous day's closing price of $20.00 (-30.70%) to close trading at $13.86 per share on June 24, 2020.

243.    On June 25, 2020, Wirecard issued a press release announcing it had failed to reach an agreement with its lenders over the €2 billion in outstanding loans in default and was filing for insolvency:  "The Management Board of Wirecard AG decided today to file an application for the opening of insolvency proceedings on behalf of Wirecard AG at the competent Munich Local Court due to the threat of insolvency and over-indebtedness."

244.    The same day, E&Y told *Reuters* that: "'There are clear indications that this was an elaborate and sophisticated fraud involving multiple parties around the world in different institutions with a deliberate aim of deception.'"

245.    On this news, shares of WCAGY fell $5.11 per share from the prior day's closing price of $6.85 (-74.60%) to close trading at $1.74 per share on June 25, 2020.  Shares of WRCDF fell $10.26 per share from the previous day's closing price of $13.86 (-74.03%) to close trading at $3.60 per share on June 25, 2020.

**D.    E&Y's Years of Complicity in Wirecard's Fraud and Deficient Audits**

246.    Wirecard was only able to successfully perpetrate its massive accounting scheme because of E&Y's knowing complicity or egregious refusal to see the obvious or to investigate the doubtful.  As described by the *Financial Times*, E&Y's prestige and reputation was instrumental in convincing investors that Wirecard's reported financial results were legitimate:

> For a decade, EY's reputation as one of the Big Four worldwide accountancy and auditing firms has helped to rebuff criticism of Wirecard's accounts and business practices. Its signature on the financial statements in April this year helped to convince many investors that Mr Braun's decision to minimise the Singapore accounting scandal — first reported by the FT — was credible.

247.    E&Y's audit procedures and practices were either intentionally or at a minimum recklessly deficient.  Among other failures, E&Y:

- failed to even ***request*** information from a Singapore bank where Wirecard supposedly held €1 billion (the same "money" that was "transferred" to the Philippines in late 2019);

- *ignored numerous "red flags"* from its own internal fraud-detection team;

- ignored whistleblower allegations from an E&Y employee who reported egregious misconduct, including Wirecard's attempts to bribe the auditor;

- allowed Wirecard and its executives, including Marsalek, to shut down its investigation into red flags;

- *switched a qualified opinion to an unqualified one with no justification*; and

- failed to uncover a fraud that KPMG testified "was not rocket science" to uncover and was partially discovered by journalists with far less access to Wirecard and its documents than E&Y had.

248.    From 2016 through 2018, E&Y never requested any documentation or verification from OCBC Bank in Singapore, which supposedly held more than €1 billion in a trust account for Wirecard, according to reporting by the *Financial Times*.  Wirecard claimed to have eventually "transferred" the "money" from OCBC Bank to the two Philippines banks that later confirmed they never had the money and which Wirecard ultimately admitted "do[es] not exist."  Instead of relying on verification from OCBC Bank, E&Y relied on screenshots provided by Wirecard and the trustee who supposedly controlled the account.

249.    A senior auditor at another firm said confirming bank balances with the bank was "'*equivalent to day-one training at audit school*.'"  Another senior auditor told the newspaper that: "'*It is beyond the realms of reality that EY wouldn't have had [the bank balance confirmations] unless they did a very poor audit. Cash is easy to audit*.  If investors can't trust the cash number, what can they trust?'"  An accounting professor noted that it was "'not sufficient'" to rely on confirmations from third parties and doing so was a violation of the auditor's requirement to "'have full control over the delivery of account confirmations.'"  Had E&Y checked with OCBC Bank, it would have discovered that no account existed and the bank had no relationship with Wirecard or the supposed trustee.

250.    In 2016, according to a non-public addendum to the KPMG investigation report, an E&Y employee working on the Wirecard audit warned the auditor that senior Wirecard executives may have committed fraud and one executive had tried to bribe an E&Y employee.  Following Wirecard's acquisition of the Indian company Hermes from a Mauritius company for nearly €300 million more than Hermes sold for a few weeks earlier, an E&Y whistleblower informed E&Y that "'Wirecard Germany senior management'" owned shares of the Mauritius company and thus had a major conflict of interest.  The whistleblower also informed E&Y that Wirecard had inflated sales at Hermes to increase post-sale payments, known as "earn-outs," to the Mauritius entity (and thus Wirecard executives) and that a senior Wirecard executive had offered a bribe to an E&Y auditor in India to sign off on Hermes' accounts.

251.    Following the whistleblower's allegations, E&Y's fraud-detection team, E&Y Forensic & Integrity Services,[25] launched an investigation called "Project Ring" that, based on just a preliminary investigation, discovered several "red-flags" at Wirecard that required further examination.  In a 63-page, March 2018 "status memorandum," the fraud-detection team identified several red flags, including that profits were recorded without any justification and interest income was added to financial metrics that explicitly excluded interest.  They also discovered that for the same purported transaction, two copies of the invoice existed – each on different letterhead and showing different corporate logos and amounts.  The memorandum concluded that these and other "'red-flag indicators . . . could potentially sustain'" the allegations of inflated profits and recommended "'comprehensive additional investigation steps.'"

---

[25]   Based on publicly available information, it appears the United States E&Y entity, Ernst & Young LLP, was involved in the investigation.  Ernst & Young LLP has a prominent division named "EY Forensic & Integrity Services" and the public version of KPMG's report refers once to E&Y LLP in the "directory of abbreviations," but not in the public version of the report itself.  According to news reports, E&Y Forensic & Integrity Services' "Project Ring" investigation is discussed in the non-public addendum to the KPMG Report.

252.    The E&Y fraud-detection team provided the memorandum to the E&Y partners auditing Wirecard and noted that its investigation was at an early stage and had not yet done a forensic analysis or interviews, which it recommended should be done.

253.    According to the *Financial Times*, the memorandum was provided to Braun, Marsalek, von Knoop and Steidl in early 2018, just a few weeks before E&Y issued its unqualified audit opinion on the 2017 Annual Report.   Just a few days after receiving the "status memorandum," Marsalek reportedly influenced E&Y to terminate the investigation.   E&Y complied, stating in an internal note, which fully ignored its own anti-fraud team's preliminary findings and recommendation for a full investigation, that "'nothing has come to our attention that causes us to believe that any of the items raised in the whistleblower letter are of such substance that further extended procedures are required.'"   Just a few weeks later, E&Y issued an unqualified audit of Wirecard's 2017 financial results.

254.    KPMG reviewed the circumstances surrounding the E&Y whistleblower investigation and its abrupt end and found that "'key questions were left unanswered,'" the allegation of bribery "was not investigated" by E&Y, the allegations were not "'conclusively processed'" and the investigation was terminated at Wirecard's request.   According to KPMG, because the situation involved allegations of attempted bribery of E&Y's own employee, "'the appropriate step is an independent and comprehensive investigation by an independent third party.'"

255.    In 2017, E&Y similarly changed tack at the last minute before issuing a clean audit opinion.  According to the *Financial Times*, on March 29, 2017, E&Y warned Wirecard that it was going to issue a qualified audit because of concerns related to the E&Y anti-fraud team's investigation of accounting manipulations in India, which suffered protracted delays due to the stonewalling by Wirecard's executives.  E&Y even shared a draft of the qualified audit opinion

with Wirecard.  In a move that the German audit regulator has since deemed unreasonable, E&Y reversed course just six days later when it issued an unqualified audit of Wirecard's 2016 financial results.

256.    E&Y also failed to discover, or disclose if discovered, that the vast majority of the revenue and profit supposedly originating from just three third-party partners was fabricated.  In addition to the "non-existent" internal controls relating to third-party partners, including documentation and reconciliation of transactions with revenue, that were readily discovered by McKinsey and KPMG, E&Y utterly failed to inquire into how Al Alam could legitimately generate more earnings for Wirecard on a claimed €4.2 billion in payments processed than the remaining €62 billion processed by Wirecard itself and every other third-party.  In fact, in 2018, Loetscher, the E&Y partner in charge of the Wirecard audit for several years, was provided the same spreadsheet showing Al Alam's customers which the *Financial Times* easily determined were fake.

257.    E&Y stated in each of its audit opinions published during the Class Period that its audits were conducted in accordance with §317 of the German Commercial Code (a/k/a "HGB") and Generally Accepted Standards for Financial Statement Audits.  Paragraph 5 of §317 HGB requires auditors to apply the international audit standards pursuant to Article 26 of Directive 2006/43/EC of the European Parliament and of the Council of May 17, 2006 on audits of annual accounts and consolidated accounts.  Article 26, *Auditing standards*, of Directive 2006/43 EC requires that auditors adhere to International Standards on Auditing ("ISA") and allows member states, including Germany, to impose audit procedures or requirements in addition to the ISA.

258.    As detailed herein, E&Y failed to comply with numerous applicable accounting standards, including but not limited to:

(a)    ISA 200, which requires an auditor to plan and perform an audit with an attitude of professional skepticism, which is necessary for the auditor to identify and properly

- 83 -

evaluate matters that increase the risk of material misstatements resulting from fraud or error.  The ISA defines professional skepticism as "[a]n attitude that includes a questioning mind, being alert to conditions which may indicate possible misstatement due to error or fraud, and a critical assessment of evidence."

(b)     ISA 240, which provides: "Maintaining professional skepticism requires an ongoing questioning of whether the information and audit evidence obtained suggests that a material misstatement due to fraud may exist.  It includes considering the reliability of the information to be used as audit evidence and the controls over its preparation and maintenance . . . ."

(c)     ISA 505, which states: "Audit evidence is more reliable when it is obtained from independent sources outside the entity.  Audit evidence obtained directly by the auditor is more reliable than audit evidence obtained indirectly or by inference."

(d)     ISA 330, which requires that the auditor obtain more persuasive audit evidence the higher the auditor's assessment of risk and that, regardless of the assessed risks of material misstatement, the auditor design and perform substantive procedures for each material class of transactions, account balance, and disclosure.

(e)     ISA 600, ¶26, which states: "For a component [*i.e.*, subsidiary] that is significant due to its individual financial significance to the group, the group engagement team, or a component auditor on its behalf, shall perform an audit of the financial information of the component using component materiality."

(f)     ISA 600, ¶27, which states: "For a component [*i.e.*, subsidiary] that is significant because it is likely to include significant risks of material misstatement of the group financial statements due to its specific nature or circumstances, the group engagement team, or a component auditor on its behalf, shall perform one or more of the following: (a) An audit of the

- 84 -

financial information of the component using component materiality; (b) An audit of one or more account balances, classes of transactions or disclosures relating to the likely significant risks of material misstatement of the group financial statements; [or] (c) Specified audit procedures relating to the likely significant risks of material misstatement of the group financial statements."

259.   Since Wirecard's spectacular implosion, which was preceded by a decade of clean audits by E&Y, the auditor has come under scrutiny and is facing several investigations in Germany and potential criminal charges.  On November 26, 2020, the *Financial Times* reported that the German regulator responsible for oversight of auditors sent a report to prosecutors that described E&Y's potential criminal violations.   On December 4, 2020, German prosecutors confirmed their criminal investigation into E&Y, stating "'[w]e comprehensively evaluated the multi-paged letter. As it refers to specific suspects and penal provisions, we have [started] a criminal investigation against those named.'"  One person under investigation is Loetscher, one of the audit partners who signed off on Wirecard's accounts until he became Deutsche Bank's head of accounting in 2018.  On December 8, 2020, the *Financial Times* reported that Loetscher was being temporarily replaced at Deutsche Bank while he was investigated.

260.   Following Wirecard's admission that €1.9 billion did not exist, E&Y quickly moved to exonerate itself in the press, but has refused to speak to the German Parliament.  On June 28, 2020, just days after Wirecard announced its insolvency, the *Financial Times* reported that E&Y Global (the parent entity to E&Y) sent all its senior partners a memo advising them to blame Wirecard and tell clients that "'[t]here are indications that this was an elaborate and sophisticated fraud with the deliberate aim of deceiving our audit team in Germany.'"  This explanation echoed the statement that E&Y provided on June 25, which claimed "'[t]here are clear indications that this was an elaborate and sophisticated fraud involving multiple parties around the world in different institutions with a deliberate aim of deception.'"

261.    E&Y, however, has refused to explain how it was deceived for so long because it has refused to testify to Germany's Parliamentary investigation.  E&Y has cited confidentiality rules, but, as one German lawmaker said, that was merely a "pretext" because the auditor had been given permission to testify by both Wirecard's court-appointed administrator and its Supervisory Board.

262.    KPMG's employees, by contrast, provided testimony to German Parliament regarding Wirecard and explained that "'*[w]hat we did [in the special audit] was not rocket science. It wasn't done*'" before by E&Y.  Describing the supposed trust accounts where Wirecard said it had billions in cash, a KPMG investigator testified: "'*There was no account information and no bank documents*.'"

### E.    Further Confirmation of Wirecard's Historic Fraud Following Its Collapse

263.    Following Wirecard's spectacular collapse into insolvency, prosecutors, regulators and lawmakers in jurisdictions around the world continued or launched investigations into what was described as the largest fraud in German postwar history.

264.    On July 6, 2020, in Germany, Munich prosecutors arrested and charged Bellenhaus, the head of Wirecard's CardSystems entity in Dubai, with aggravated fraud.  A few weeks later, on July 22, 2020, prosecutors re-arrested and charged Braun and arrested and charged Ley and von Erffa.

265.    According to the *Financial Times* article reporting on the July 22, 2020 arrests, Braun's bail was revoked, Bellenhaus was cooperating as a "chief witness" against the others and "*prosecutors now suspect Wirecard's accounting fraud began as early as 2015 when Mr Braun and other suspects allegedly agreed to inflate Wirecard's revenue in an attempt to deceive investors*."  According to a Munich prosecutor quoted in the article, Wirecard's fraud was orchestrated from the very top of the Company – "'In interrogations, we were told about a strictly

- 86 -

hierarchical system that was shaped by an esprit de corps and pledges of allegiance to the chief executive as a leader.'"

266.   According to the *Financial Times*, German prosecutors suspected that Braun and other Wirecard executives had looted the Company prior to its collapse.  Documents gathered as part of the investigation showed that Wirecard had made approximate €155 million in dubious loans in the first three months of 2020 – the same time KPMG was conducting the investigation Defendants were stonewalling.  The loans, which were unsecured and thus backed by zero collateral, were made to the same Third-Party Partners under investigation by KPMG (Al Alam, PayEasy and Senjo) and to at least two other entities in Singapore whose executives had previously worked for Wirecard.

267.   On September 3, 2020, in addition to bringing charges against Wirecard executives, German prosecutors ended their investigation and dropped the charges filed against the *Financial Times* and its reporters.  According to *Reuters*, and directly contradicting years of Wirecard's denials, "[t]he prosecutors said on Thursday that the newspaper's reporting ***had been fundamentally correct and they had not established direct contact with short sellers***."

268.   Law enforcement in other countries also launched or broadened their investigations of Wirecard and its executives.  On July 9, 2020, police in Ireland searched the offices of Wirecard UK & Ireland, the Wirecard entity responsible for funneling supposed revenue and earnings from third-party partners to Wirecard.  As the *Irish Times* reported on November 30, 2020, Irish police are investigating whether "a Wirecard UK and Ireland ***escrow account holding up to €405.2 million actually existed***" and, according to administrators overseeing Wirecard UK & Ireland's liquidation, the company's net assets were only €6.7 million – nearly €550 million below their book value before Wirecard's collapse.

269.    In July 2020, prosecutors in Singapore brought fraud and forgery charges against the man who acted as the trustee for Wirecard's fake bank accounts that the Company claimed were filled with nearly €2 billion.  According to the *Financial Times*, the trustee had also incorporated a company that received millions in loans from Wirecard, which prosecutors suspected were part of a scheme to loot Wirecard.  Singapore police and the Monetary Authority of Singapore (the country's central bank) also launched a joint investigation into Senjo, one of Wirecard's key third-party partners, for accounting fraud.

270.    On July 3, 2020, the ministry of justice in the Philippines confirmed that Marsalek, despite statements from people close to him, had not entered the Philippines in June 2020, and immigration records that stated otherwise were in fact falsified.

271.    On August 5, 2020, the *Financial Times* reported that Bauer, the owner of PayEasy who was under investigation by Philippines authorities, was "reported dead" in Manila and that investigators were looking into whether he was, in fact, dead.

272.    On September 30, 2020, the Monetary Authority of Singapore ordered Wirecard to cease all operations in the country and return all customers' money in what the *Financial Times* reported was "the most dramatic regulatory intervention in the German payment group's remaining operations since its collapse in June."

273.    In addition to criminal investigations and charges, regulators and lawmakers launched investigations into the Wirecard fraud and made numerous changes to avoid similar scandals.  In Germany, the government overhauled the way it regulates company accounting, including handing authority to investigate company accounts to the government, which was previously delegated to a non-governmental organization with limited authority.  The government also increased the powers of the main financial regulator, BaFin, and the agency responsible for overseeing auditors, APAS.  On September 1, 2020, Germany's Parliament announced that it

would conduct a full inquiry into Wirecard's fraud and collapse and the roles of auditors and regulators.

274.    On November 3, 2020, ESMA, the European Union's securities regulator, issued a nearly 200-page report analyzing in detail the Wirecard fraud and made a number of findings about BaFin's and other regulators' own investigations and regulatory decisions regarding Wirecard.

275.    Following Wirecard's insolvency, news media reported further details of Defendants' misdeeds.  For example, the *Financial Times* reported on July 15, 2020, that as Braun was scrambling to refinance his €150 million loan backed by his Wirecard shares, the CEO borrowed €35 million from Wirecard Bank in January 2020.  Wirecard's Supervisory Board, which only learned of the loan after it was made to Braun, was "furious" and had to pressure Braun to repay it before it was due.

276.    Marsalek was also involved in misconduct at Wirecard Bank, according to reporting by the *Financial Times* on December 6, 2020.  In mid-2018, Marsalek, who had no position at Wirecard Bank and thus no legitimate authority to make decisions for it, granted a loan deferral to one of the Singapore companies accused of fraud by the Singapore whistleblower.  According to a 2019 E&Y audit report presented to Wirecard's Supervisory Board, Marsalek's decision to defer the €11 million loan, which was not being paid by the borrower, was "'not in line with the internal authority of the bank.'"  In the report, E&Y expressed "'concerns regarding'" the bank's independence and controls, but issued an unqualified audit regardless.

277.    Former Wirecard Supervisory Board member Tina Kleingarn testified to the German Parliament that the loan was one of many with substandard risk assessments and justifications that she warned Braun about in 2017.  She also said she resigned in 2017 due to her concerns regarding Wirecard's poor internal controls and governance.

278.    On July 5, 2020, the *Financial Times* reported that a confidential appendix to the KPMG Report showed that Wirecard North America and the European operations had lost money every year since 2016.  Defendants had specifically touted the success of Wirecard North America and European operations when they denied the *Financial Times* reports that most of the revenue and nearly all earnings came from the three Third-Party Partners.

279.    According to a September 22, 2020 *Financial Times* article titled "Wirecard's deceit went beyond its fraudulent Asian operations," Wirecard's administrator wrote in his report on the Company that: "'***Only a few units of the group were actually involved in conducting operative business that was customer-facing and generated revenue***.'"  According to the report, which the newspaper reviewed, when Wirecard's fraudulent Asian operations were excluded from Wirecard's results, the administrator concluded that the Company in fact ***lost €740 million from 2015 through 1Q20***.  During the same period, Wirecard falsely told investors that it had made €1.9 billion in pre-tax profits.  The administrator also valued all of Wirecard's assets at €428 million, more than ***6.5 billion less*** than Wirecard reported to investors in late 2019.

F.    **Wirecard's False and Misleading Financial Statements and Compliance with Applicable Accounting Standards**

1.    **False and Misleading Financial Results and Statements**

280.    During the Class Period, Wirecard published, in English and on its website, its quarterly and annual financial results.  For each periodic publication, Wirecard issued a press release announcing the key financial results for the respective quarter or year and a much longer and more detailed report or statement for the period's results.  Wirecard did not publish independent results for the fourth quarter of each year, instead reporting the final quarter's results with the results for the full fiscal year.

281.    During the Class Period, each annual report was signed by the members of Wirecard's Management Board.  Braun, Ley and Marsalek signed the 2015 and 2016 Annual

Reports.  Braun, Marsalek, Steidl and von Knoop signed the 2017 and 2018 Annual Reports.  Each annual report also included a "Report of the Supervisory Board" that was signed by Matthias.

282.    Wirecard's quarterly reports for 2Q15 through and including 3Q17 were signed by Braun, Ley and Marsalek until the applicable regulations allowed for shorter quarterly filings and unsigned 1Q and 3Q reports.  Following the regulatory change, Braun, von Knoop, Marsalek and Steidl signed the 2Q18 and 2Q19 Quarterly Reports.

283.    During the Class Period, Wirecard reported the following financial results in its consolidated financial statements:

| Quarterly and Annual Financial Results (in thousands of EUR except per share amounts) | | | | | |
|---|---|---|---|---|---|
| Financial Period | Publication Date | Revenue | EBITDA | Earnings | Earnings Per Share |
| 2Q 2015 | 8/18/15 | 180,673 | 52,265 | 32,353 | € 0.26 |
| 3Q 2015 | 11/18/15 | 200,895 | 60,051 | 37,316 | € 0.31 |
| FY 2015 | 4/07/16 | 771,340 | 227,315 | 142,646 | € 1.16 |
| 1Q 2016 | 5/19/16 | 210,470 | 61,977 | 36,610 | € 0.30 |
| 2Q 2016 | 8/17/16 | 241,320 | 70,374 | 130,204 | € 1.05 |
| 3Q 2016 | 11/16/16 | 267,561 | 81,538 | 49,364 | € 0.40 |
| FY 2016 | 4/06/17 | 1,028,358 | 307,363 | 266,749 | € 2.16 |
| 1Q 2017 | 5/18/17 | 274,895 | 81,259 | 48,491 | € 0.39 |
| 2Q 2017 | 8/17/17 | 340,582 | 95,192 | 56,018 | € 0.46 |
| 3Q 2017 | 11/15/17 | 405,924 | 110,101 | 63,987 | € 0.51 |
| FY 2017 | 4/12/18 | 1,489,954 | 412,613 | 300,589 | € 2.10 |
| 1Q 2018 | 5/16/18 | 420,450 | 112,309 | 70,828 | € 0.57 |
| 2Q 2018 | 8/16/18 | 477,100 | 133,000 | 82,300 | € 0.67 |
| 3Q 2018 | 11/14/18 | 547,100 | 150,100 | 97,000 | € 0.78 |
| FY 2018 | 4/25/19 | 2,016,200 | 560,500 | 347,400 | € 2.81 |
| 1Q 2019 | 5/08/19 | 566,700 | 158,000 | 106,300 | € 0.86 |
| 2Q 2019 | 8/07/19 | 643,000 | 184,100 | 131,400 | € 1.06 |
| 3Q 2019 | 11/06/19 | 731,500 | 211,100 | 149,200 | € 1.21 |
| FY 2019* | 2/14/20 | 2,800,000 | 785,000 | n/a | n/a |
| 1Q 2020* | 5/14/20 | 700,200 | 199,200 | n/a | n/a |

* Preliminary Results.

284.    In addition to publishing an income statement for each reporting period during the Class Period, Wirecard published a balance sheet or statement of financial position for each period showing the Company's assets and liabilities.  In each, Wirecard reported the amount of "cash," which was defined as "[c]ash in hand, and demand deposits" and "cash equivalents," which it defined as "current, liquid, financial investments (in particular, fixed term deposits) that can be

converted at any time into certain amounts of cash and are only subject to negligible fluctuations in value."

285.    During the Class Period, Wirecard reported the following financial results in its consolidated statement of financial position showing the Company's assets:

| Quarterly and Annual Balance Sheet (in thousands of EUR) | | | | |
|---|---|---|---|---|
| Financial Period | Publication Date | Receivables | Cash and Cash Equivalents | Total Current Assets |
| 2Q 2015 | 8/18/15 | 373,450 | 724,495 | 1,283,102 |
| 3Q 2015 | 11/18/15 | 380,310 | 793,297 | 1,336,016 |
| 4Q 2015 | 4/07/16 | 447,259 | 1,062,968 | 1,655,240 |
| 1Q 2016 | 5/19/16 | 426,934 | 984,433 | 1,637,465 |
| 2Q 2016 | 8/17/16 | 467,425 | 1,172,609 | 1,869,408 |
| 3Q 2016 | 11/16/16 | 507,288 | 1,202,546 | 1,920,207 |
| 4Q 2016 | 4/06/17 | 592,608 | 1,332,631 | 2,095,624 |
| 1Q 2017 | 5/18/17 | 605,248 | 1,450,922 | 2,187,075 |
| 2Q 2017 | 8/17/17 | 641,066 | 1,596,669 | 2,374,911 |
| 3Q 2017 | 11/15/17 | 707,066 | 1,698,536 | 2,522,870 |
| 4Q 2017 | 4/12/18 | 711,681 | 1,901,334 | 2,746,420 |
| 1Q 2018 | 5/16/18 | 722,041 | 1,948,498 | 2,902,669 |
| 2Q 2018 | 8/16/18 | 802,200 | 2,060,400 | 3,148,900 |
| 3Q 2018 | 11/14/18 | 943,000 | 2,029,800 | 3,349,300 |
| 4Q 2018 | 4/25/19 | 1,042,300 | 2,719,800 | 3,925,400 |
| 1Q 2019 | 5/08/19 | 1,164,700 | 2,829,600 | 4,525,900 |
| 2Q 2019 | 8/07/19 | 1,179,800 | 3,047,700 | 4,774,900 |
| 3Q 2019 | 11/06/19 | 1,163,300 | 3,287,400 | 5,043,800 |

286.    During the Class Period, Wirecard also published a consolidated cash flow statement for each reporting period providing, among other financial results, the Company's cash flow from operations, investments and financing.

287.    During the Class Period, Wirecard reported the following financial results in its consolidated cash flow statements:

| Cash Flow Statement (in thousands of EUR) | | | | |
|---|---|---|---|---|
| Financial Period | Publication Date | Earnings After Tax | Cash Flow from Operating Activities | Cash and Cash Equivalents |
| 1/1/15-6/30/15 | 8/18/15 | 60,949 | 46,105 | 448,800 |
| 1/1/15-9/30/15 | 11/18/15 | 98,265 | 86,217 | 503,440 |
| FY 2015 | 4/07/16 | 142,646 | 178,285 | 633,690 |
| 1/1/16-3/31/16 | 5/19/16 | 36,610 | (8,086) | 579,285 |
| 1/1/16-6/30/16 | 8/17/16 | 166,814 | 58,140 | 701,603 |
| 1/1/16-9/30/16 | 11/16/16 | 216,177 | 114,342 | 753,373 |
| FY 2016 | 4/06/17 | 266,749 | 294,351 | 1,331,514 |

| | | | | |
|---|---|---|---|---|
| **1/1/17-3/31/17** | 5/18/17 | 48,491 | 96,568 | 1,448,368 |
| **1/1/17-6/30/17** | 8/17/17 | 104,509 | 210,140 | 1,592,965 |
| **1/1/17-9/30/17** | 11/15/17 | 168,496 | 365,703 | 1,691,922 |
| **FY 2017** | 4/12/18 | 259,719 | 563,486 | 1,895,861 |
| **1/1/18-3/31/18** | 5/16/18 | 70,828 | 28,872 | 1,941,480 |
| **1/1/18-6/30/18** | 8/16/18 | 153,300 | 223,700 | 2,054,300 |
| **1/1/18-9/30/18** | 11/14/18 | 250,200 | 49,300 | 2,018,500 |
| **FY 2018** | 4/25/19 | 347,400 | 749,600 | 2,702,500 |
| **1/1/19-3/31/19** | 5/08/19 | 106,300 | (1,300) | 2,817,500 |
| **1/1/19-6/30/19** | 8/07/19 | 237,500 | 177,600 | 3,026,100 |
| **1/1/19-9/30/19** | 11/06/19 | 386,700 | 389,000 | 3,260,000 |

288. During the Class Period, in each of its quarterly and annual reports, Wirecard published the "transaction volume," that is, the total volume of payments processed. In his shareholder letter attached to the 2016 Annual Report, Braun described transaction volume as "an important indicator of the successful growth of the company" and the Company highlighted the metric every time it announced quarterly and annual financial results during the Class Period.

289. During the Class Period, Wirecard reported the following transaction volume

| Transaction Volume (in billions of EUR) | | |
|---|---|---|
| **Financial Period** | Publication Date | Transaction Volume |
| **1/1/15-6/30/15** | 8/18/15 | 20.2 |
| **1/1/15-9/30/15** | 11/18/15 | 32.0 |
| **FY 2015** | 4/07/16 | 45.2 |
| **1/1/16-3/31/16** | 5/19/16 | 12.8 |
| **1/1/16-6/30/16** | 8/17/16 | 27.4 |
| **1/1/16-9/30/16** | 11/16/16 | 43.6 |
| **FY 2016** | 4/06/16 | 61.7 |
| **1/1/17-3/31/17** | 5/18/17 | 17.2 |
| **1/1/17-6/30/17** | 8/17/17 | 37.9 |
| **1/1/17-9/30/17** | 11/15/17 | 62.5 |
| **FY 2017** | 4/12/18 | 91.0 |
| **1/1/18-3/31/18** | 5/16/18 | 26.7 |
| **1/1/18-6/30/18** | 8/16/18 | 56.2 |
| **1/1/18-9/30/18** | 11/14/18 | 90.2 |
| **FY 2018** | 4/25/19 | 124.9 |
| **1/1/19-3/31/19** | 5/08/19 | 36.7 |
| **1/1/19-6/30/19** | 8/07/19 | 77.3 |
| **1/1/19-9/30/19** | 11/06/19 | 124.2 |

290. Each annual report issued during the Class Period also contained a sworn "responsibility statement" by the members of Wirecard's Management Board that the financial

results reported were accurate and in accordance with applicable accounting rules.  For example, in Wirecard's 2015 Annual Report, Braun, Ley and Marsalek signed the following attestation:

> To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and results of operations of the Group, and the group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group.

291.    Braun, Ley and Marsalek signed identical or substantially similar statements in connection with the 2016 Annual Report and Defendants Braun, Marsalek, von Knoop and Steidl signed identical or substantially similar statements in connection with the 2017 and 2018 Annual Reports.

292.    Each of the Defendants' statements set forth above in ¶¶283-290 were materially false and misleading when made as Defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)     Defendants were engaged in an ongoing fraudulent scheme in which they caused Wirecard to materially overstate the Company's reported revenue, earnings, assets, transaction volume and other financial results and key financial metrics;

(b)     revenue purportedly generated from transactions processed by the Third-Party Partners during the Class Period did not actually exist, resulting in more than half the revenue and nearly all the profit Wirecard reported in its financial statements being fictitious.  *See, e.g.*, ¶¶164, 167-69, 175, 179, 183, 203, 209, 237;

(c)     cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist.  *See, e.g.*, ¶¶203, 207-08, 228-29, 234, 236-37;

(d)     Wirecard's internal controls over its financial reporting, including over the third-party business and related transactions, were not adequate as represented, but rather so insufficient that they were ultimately described by McKinsey as "non-existent." *See, e.g.*, ¶¶133-34, 177-78, 207-08, 215-17, 275-77.  In fact, the Company failed to implement numerous basic internal controls, including recording board meeting minutes, formally documenting all agreements and amendments to agreements, maintaining an archive of contracts and recording transaction data. *See, e.g.*, ¶¶215-17;

(e)     Wirecard's operations in the United States, including Wirecard North America, and in Europe lost money every year since 2016, leaving the Company unable to report a profit without relying on the falsified revenue from the Third-Party Partners. *See, e.g.*, ¶278; and

(f)     Wirecard's publicly reported financial statements, as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and results of operations and did not comply with IFRS, IAS or other applicable accounting standards. *See, e.g.*, ¶¶179, 191, 214, 237.

## 2.     False and Misleading Statements About Compliance with Accounting Standards

293.     Throughout the Class Period, Defendants claimed that Wirecard's financial statements were prepared in accordance with specific accounting standards, including IFRS and International Accounting Standards ("IAS")

294.     On August 17, 2015, Wirecard claimed in its 2Q15 Report that the Company's financial statements were prepared in accordance with IFRS and IAS:

> The financial statements as of 30 June 2015 were prepared in accordance with IAS 34 (Interim Financial Reporting) with consideration to the International Financial Reporting Standards (IFRS) and the International Accounting Standards (IAS) as adopted by the EU.

295.     Wirecard repeated substantially the same statement regarding the preparation of its financial statements in accordance with IFRS and IAS in the Company's 3Q15 Report on November 18, 2015, 1Q16 Report on May 19, 2016, 2Q16 Report on August 17, 2016, 3Q16 Report on November 16, 2016, 2Q17 Report on August 17, 2017, 2Q18 Report on August 16, 2018 and 2Q19 Report on August 7, 2019.

296.     On April 7, 2016, Wirecard claimed in its 2015 Annual Report that the Company's financial statements and management report were prepared in accordance with IFRS, IAS and supplemental German regulations:

> The consolidated financial statements and the Group management report have been prepared in accordance with the International Financial Reporting Standards (IFRS) and International Accounting Standards (IAS) as adopted by the EU, as well as the supplementary regulations applicable in accordance with Section 315a (1) of the German Commercial Code (HGB).

297.     On April 6, 2017, in the Company's 2016 Annual Report, Wirecard repeated a nearly identical statement regarding preparation of its financial statements and management report in accordance with IFRS, IAS and German law:

> The consolidated financial statements and the Group management report have been prepared in accordance with the International Financial Reporting Standards (IFRS) and International Accounting Standards (IAS) as adopted by the EU, as well as the supplementary regulations applicable in accordance with Section 315a (1) of the HGB [German Commercial Code].

298.     In its 1Q17 Report issued on May 18, 2017, Wirecard noted the new regulations that allowed for a shorter quarterly statement and referred readers to its 2016 Annual Report for "detailed information" about the Company's "accounting policies." As stated above, the 2016 Annual Report stated Wirecard prepared its financial statements in accordance with IFRS, IAS and German law.

299.     On November 15, 2017, in its 3Q17 Report, Wirecard again directed readers to its 2016 Annual Report for "detailed information" about the Company's "accounting policies." As

stated above, the 2016 Annual Report stated Wirecard prepared its financial statements in accordance with IFRS, IAS and German law.

300.    On April 12, 2018, in the Company's 2017 Annual Report, Wirecard repeated a nearly identical statement regarding preparation of its financial statements and management report in accordance with IFRS, IAS and German law:

> The consolidated financial statements and the Group management report have been prepared in accordance with the International Financial Reporting Standards (IFRS) and International Accounting Standards (IAS) as adopted by the EU, as well as the supplementary regulations applicable in accordance with Section 315e (1) of the German Commercial Code (HGB).

301.    On April 25, 2019, in the Company's 2018 Annual Report, Wirecard stated that its financial statements and management report, as well as the financial statements in its half-year reports (*i.e.*, 2Q reports), were prepared in accordance with IFRS and German law:

> The consolidated financial statements and the Group management report of the company were prepared in accordance with the International Financial Reporting Standards (IFRS) as well as the additional requirements of German law pursuant to Section 315e (1) of the HGB.

> *         *         *

> The consolidated financial statements of the company and the six-monthly reports for the Group are prepared in accordance with the International Financial Reporting Standards (IFRS), as applicable in the European Union, as well as the additional regulations of German commercial law.

302.    Each of the Defendants' statements set forth above in ¶¶294-301 were materially false and misleading when made as Defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)    Defendants were engaged in an ongoing fraudulent scheme in which they caused Wirecard to materially overstate the Company's reported revenue, earnings, assets, transaction volume and other financial results and key financial metrics;

(b)      revenue purportedly generated from transactions processed by the Third-Party Partners during the Class Period did not actually exist, resulting in more than half the revenue and nearly all the profit Wirecard reported in its financial statements being fictitious. *See, e.g.*, ¶¶164, 167-69, 175, 179, 183, 203, 209, 237;

(c)      cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist. *See, e.g.*, ¶¶203, 207-08, 228-29, 234, 236-37;

(d)      Wirecard's internal controls over its financial reporting, including over the third-party business and related transactions, were not adequate as represented, but rather so insufficient that they were ultimately described by McKinsey as "non-existent." *See, e.g.*, ¶¶133-34, 177-78, 207-08, 215-17, 275-77.  In fact, the Company failed to implement numerous basic internal controls, including recording board meeting minutes, formally documenting all agreements and amendments to agreements, maintaining an archive of contracts and recording transaction data. *See, e.g.*, ¶¶215-17;

(e)      Wirecard's operations in the United States, including Wirecard North America, and in Europe lost money every year since 2016, leaving the Company unable to report a profit without relying on the falsified revenue from the Third-Party Partners. *See, e.g.*, ¶278; and

(f)      Wirecard's publicly reported financial statements, as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and results of operations and did not comply with IFRS, IAS or other applicable accounting standards. *See, e.g.*, ¶¶179, 191, 214, 237.

### 3.  False and Misleading Statements About Internal Controls

303.  Throughout the Class Period, Defendants assured investors that the Company had rigorous and effective internal controls at all levels within Wirecard and its various subsidiaries.

304.  On April 7, 2016, Wirecard published its 2015 Annual Report and told investors that the Supervisory Board had determined the Company's internal controls were appropriate and that the Management Board had audited the effectiveness of the internal controls, and provided extensive detail on the importance of internal controls and the many layers of controls and compliance that Wirecard employed and enforced:

**Report of the Supervisory Board**[26]

\*       \*       \*

The Board also concerned itself with the Group's financial accounting process, risk management system and internal control system. The Supervisory Board determined that the internal control systems and risk management system were appropriate.

\*       \*       \*

**Internal control and risk management system relating to the Group financial accounting process**

The Wirecard Group has an internal control and risk management system relating to the (Group) accounting process, in which suitable structures and processes are defined and then implemented within the organisation. This is designed to guarantee the timely, uniform and correct accounting of all business processes and transactions. It ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements. Any amendments to laws, accounting standards and other pronouncements are continuously analysed for their relevance to, and impact on, the consolidated financial statements, and the internal directives and systems within the Group are adjusted to take account of the resulting changes.

The foundations of the internal control system, in addition to defined control mechanisms such as technical and manual reconciliation and coordination processes, lie in the separation of functions and ensuring compliance with directives

---

[26]  Signed by Matthias.

and work instructions. The Group accounting process at Wirecard AG is managed by the Accounting and Controlling department.

The Group companies prepare their financial statements locally and forward them to Wirecard AG. They are responsible for compliance with the directives and processes applicable throughout the Group, as well as for the due and timely execution of their accounting-related processes and systems. The employees involved in the consolidated accounting process are trained regularly on this topic. The local companies are supported by central contacts throughout the entire accounting process. Within the scope of the accounting process, measures have been implemented to ensure the regulatory conformity of the consolidated financial statements. These include access rules that are established for Group accounting in the IT-based accounting systems (a range of read and write privileges), along with a system of simultaneous double checks (dual-control principle) and random checks by the local accounting departments, the Group Accounting department, Controlling, and the Management Board. These measures serve to identify and assess potential risks and to mitigate and review any risks identified.

The consolidated financial statements are prepared on a centralised basis, using data from the subsidiaries included in consolidation. The Accounting and Controlling department is responsible for consolidation measures, certain reconciliation work and for monitoring time and process-related parameters. Technical system controls are monitored by employees and augmented by manual audits. The principle of dual control is the minimum requirement at each level. Certain approval processes must be applied throughout the entire accounting process. In addition, a group of experts that is not involved in the preparation process is on hand for special functional questions and complex issues.

While reviewing the reliability of the accounting systems of the German and foreign companies, the following issues are taken into account:

– Compliance with statutory parameters and directives issued by the Management Board, as well as other guidelines and internal instructions

– Formal and substantive propriety of accounting and related reporting, including the IT systems deployed

– Functionality and effectiveness of internal control systems to avoid financial losses

– Propriety of task fulfilment and compliance with economic and business principles

Wirecard AG applies a Group-wide standardised method to monitor the effectiveness of the internal, accounting-related control system. This process is rigorously geared to the risks of possible erroneous reporting in the consolidated financial statements.

- 100 -

Wirecard AG's Management Board has audited the effectiveness of the accounting-related internal control system. The effectiveness of the internal control system is also monitored by the Supervisory Board of Wirecard AG, in accordance with the requirements of the German Accounting Law Modernisation Act (BilMoG), which came into force in May 2009.

305.    On April 6, 2017, in its 2016 Annual Report, Wirecard again assured investors

about the strength and effectiveness of its internal controls, providing detailed information about

compliance and noting that there were systems in place to ensure the effectiveness of such controls:

**Internal control and risk management system relating to the Group financial accounting process**

The Wirecard Group has an internal control and risk management system relating to the (Group) accounting process, in which appropriate structures and processes are defined and then implemented within the organisation. This is designed to guarantee the timely, uniform and correct accounting of business processes and transactions. It ensures compliance with statutory standards, accounting regulations and the internal Group accounting directive, which is binding for all companies included in the consolidated financial statements. Any amendments to laws, accounting standards and other pronouncements are analysed for their relevance to, and impact on, the consolidated financial statements, and the internal directives and systems within the Group are adjusted to take account of the resulting changes.

The foundations of the internal control system, in addition to defined control mechanisms such as technical and manual reconciliation and coordination processes, lie in the separation of functions and ensuring compliance with directives and work instructions. The Group accounting process at Wirecard AG is managed by the Accounting and Controlling departments.

The Group companies prepare their financial statements locally and forward them to Wirecard AG. They are responsible for compliance with the directives and processes applicable throughout the Group, as well as for the due and timely execution of their accounting-related processes and systems. The employees involved in the consolidated accounting process are trained regularly on this topic. The local companies are supported by central contacts throughout the accounting process. Within the scope of the accounting process, measures have been implemented to ensure the regulatory conformity of the consolidated financial statements. These include access rules that are established for Group accounting in the IT-based accounting systems (a range of read and write privileges), along with a system of simultaneous double checks (dual-control principle) and random checks by the local accounting departments, the Group Accounting department, Controlling, and the Management Board. These measures serve to identify and assess potential risks and to mitigate and review any risks identified.

- 101 -

The consolidated financial statements are prepared on a centralised basis, using data from the subsidiaries included in consolidation. The Accounting and Controlling departments are responsible for consolidation measures, certain reconciliation work and for monitoring time and process-related parameters. Technical system controls are monitored by employees and augmented by manual audits. The principle of dual control is the minimum requirement. Certain approval processes must be applied throughout the entire accounting process. In addition, a group of experts that is not involved in the preparation process, including external advisers, is on hand for special functional questions and complex issues.

While reviewing the propriety of the accounting systems of the German and foreign companies, the following issues are taken into account:

– Compliance with statutory parameters and directives issued by the Management Board, as well as other guidelines and internal instructions

– Formal and substantive propriety of accounting and related reporting, including the IT systems deployed

– Functionality and effectiveness of internal control systems to avoid financial losses

– Propriety of task fulfilment and compliance with economic and business principles

Wirecard AG applies a method to monitor the effectiveness of the internal, accounting-related control system. This process is geared to the risks of possible erroneous reporting in the consolidated financial statements.

The effectiveness of the internal control system is monitored by the Supervisory Board of Wirecard AG.

306.   On April 12, 2018, Wirecard published its 2017 Annual Report, which again assured investors that the Supervisory Board was in close contact with the Management Board to monitor the "effectiveness of the company's internal control and risk management system":

**Report of the Supervisory Board**[27]

\*          \*          \*

In order to exercise our monitoring function, we maintained intensive contact with the Management Board. The Management Board reported to us regularly, promptly and comprehensively in verbal and written form both during and outside of the Supervisory Board meetings about all relevant themes related to

---

[27]   Signed by Matthias.

the management of the business of Wirecard. This included, in particular, written monthly reports on . . . the accounting process and effectiveness of the company's internal control and risk management system . . . .

307.    Wirecard's 2017 Annual Report also repeated substantially the same detailed assurances about its internal controls and the systems in place to monitor their effectiveness contained in the Company's 2016 Annual Report.

308.    Following the *Financial Times* initial report revealing the investigation into whistleblower allegations of accounting misconduct in Singapore, on January 31, 2019, Wirecard issued a press release denying the reporting and touting the strength and continuous improvement of its internal controls:

> Wirecard takes all compliance and regulatory obligations extremely seriously. It has very strong governance procedures and controls and these are kept under continuous review, with any findings used to continuously improve them. It also has stringent internal and external audits. Any concerns raised by audits or individuals are always thoroughly and appropriately investigated.

309.    On February 4, 2019, following another article about the whistleblower allegations and resulting investigation, Wirecard repeated its claim that its internal controls were strong and continuously updated:

> Wirecard has strong governance procedures and controls, which are subject to continuous reviews and improvement in line with the company's governance guidelines and regulatory requirements. Wirecard continuously conducts stringent internal and external audits. Any concerns resulting from audits or raised by individuals are always thoroughly and appropriately investigated.

310.    On April 25, 2019, Wirecard published its 2018 Annual Report, which included the same assurances about the Supervisory Board's close monitoring of "the accounting process and effectiveness of the company's internal control and risk management system" through reports and communications from the Management Board.  The 2018 Annual Report also repeated the detailed information about Wirecard's internal controls and systems to ensure their effectiveness.  The 2018

- 103 -

Annual Report added that Wirecard's internal controls system was based on the criteria from the Committee of Sponsoring Organizations of the Treadway Commission:

> The aim of an appropriate and effective ICS is to guarantee the functionality and efficiency of business processes and ensure compliance with regulatory and legal requirements with respect to the individual processes. The ICS approach followed by Wirecard is based on the criteria defined in the Internal Control - Integrated Framework from the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

311.   On April 25, 2019, Defendants held a conference call for investors and analysts and presented a series of PowerPoint slides that were posted on the Company's website in English. During the call, which followed shortly after several months of revelations concerning the investigation into whistleblower allegations of fraudulent accounting in Singapore and the recent *Financial Times* article about the questionable nature of Wirecard's Third-Party Partners, Braun and von Knoop sought to impress upon investors that Wirecard's internal controls were robust and the Company was strengthening them to ensure the problems in Singapore "do not come up again":

> [Braun:] On the other side, **we are fully committed in investing in controlling processes, compliance processes, auditing processes** and our CFO later will give you an overview what we are doing there **that such quality issues do not come up again**.
>
> *          *          *
>
> [von Knoop:] I am normally – would focus in this call on just the financial data. But in this **very special case**, let me start with, of course, **a very important topic** to show how important that for us, of course, is and the **compliance**.
>
> So Markus already mentioned that we introduced a task force to optimize our – not only compliance, but our group structural processes. And of course, the structure of Wirecard group in itself. Therefore, we introduced a task force, not only after getting the results from all the investigations of the past months but long before, and always optimizing in our daily work structures and processes. This task force will consist of representatives of all relevant departments within Wirecard group. So of course, including administrative department, like legal, HR, compliance and others, but also, of course, including sales and IT. In addition, we will have experts focusing on the pure optimization of processes and structures. So I think we will have a strong and effective team to improve on our processes and structures, not only in our international subsidiaries of Wirecard group, but also, of course, the link of our international subsidiaries to – they have forces in Germany.

- 104 -

On the next slide, that's Slide 21, we just highlighted some actions. We already implemented in regards of our introduced actions plan, so focusing on organizational structure, operational structure, and additional focused actions. So I think that's a good overview of actions we already introduced. And of course, ***that's an ongoing process, and we will strongly take care to implement better structures and more effective control in different parts and departments of Wirecard group***.

312. During the call, von Knoop drew investors' attention to slide 21 in the presentation, which identified several "Measures to Improve Compliance within Wirecard Group" that the Company had taken, including "[m]ore stringent testing of underlying documentation," more involvement of the legal department in contracts and more training on know-your-customer compliance:



313. Each of the Defendants' statements set forth above in ¶¶304-312 were materially false and misleading when made as Defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)    Defendants were engaged in an ongoing fraudulent scheme in which they caused Wirecard to materially overstate the Company's reported revenue, earnings, assets, transaction volume and other financial results and key financial metrics;

- 105 -

(b)      revenue purportedly generated from transactions processed by the Third-Party Partners during the Class Period did not actually exist, resulting in more than half the revenue and nearly all the profit Wirecard reported in its financial statements being fictitious.  *See, e.g.*, ¶¶164, 167-69, 175, 179, 183, 203, 209, 237;

(c)      cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist.  *See, e.g.*, ¶¶203, 207-08, 228-29, 234, 236-37;

(d)      Wirecard's internal controls over its financial reporting, including over the third-party business and related transactions, were not adequate as represented, but rather so insufficient that they were ultimately described by McKinsey as "non-existent."  *See, e.g.*, ¶¶133-34, 177-78, 207-08, 215-17, 275-77.  In fact, the Company failed to implement numerous basic internal controls, including recording board meeting minutes, formally documenting all agreements and amendments to agreements, maintaining an archive of contracts and recording transaction data.  *See, e.g.*, ¶¶215-17;

(e)      Wirecard's operations in the United States, including Wirecard North America, and in Europe lost money every year since 2016, leaving the Company unable to report a profit without relying on the falsified revenue from the Third-Party Partners.  *See, e.g.*, ¶278; and

(f)      Wirecard's publicly reported financial statements, as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and results of operations and did not comply with IFRS, IAS or other applicable accounting standards.  *See, e.g.*, ¶¶179, 191, 214, 237.

###### 4.     E&Y's Materially False and Misleading Audit Opinions

314.    On April 7, 2016, Wirecard published its 2015 Annual Report with E&Y's audit opinion included.  E&Y certified that it had audited Wirecard's reported financial results pursuant to relevant professional auditing standards and based upon the audit, Wirecard's reported financial results complied with the applicable accounting standards and were "a true and fair view of [Wirecard's] net assets, financial position and results of operations":

> We have audited the consolidated financial statements prepared by Wirecard AG . . . .

> We conducted our audit of the consolidated financial statements in accordance with Sec. 317 HGB and German generally accepted standards for the audit of financial statements . . . .  Those standards require that we plan and perform the audit such that misstatements materially affecting the presentation of the net assets, financial position and results of operations in the consolidated financial statements in accordance with the applicable financial reporting framework and in the group management report are detected with reasonable assurance. . . .  We believe that our audit provides a reasonable basis for our opinion.

> Our audit has not led to any reservations.

> In our opinion, based on the findings of our audit, the consolidated financial statements comply with IFRSs as adopted by the EU as well as the additional requirements of German commercial law pursuant to Sec. 315a (1) HGB and give a true and fair view of the net assets, financial position and results of operations of the Group in accordance with these requirements. The group management report is consistent with the consolidated financial statements and as a whole provides a suitable view of the Group's position and suitably presents the opportunities and risks of future development.

315.    On April 6, 2017, Wirecard published its 2016 Annual Report with E&Y's audit opinion included.  As it did in 2016, E&Y certified that it had audited Wirecard's reported financial results pursuant to relevant professional auditing standards and based upon the audit, Wirecard's reported financial results complied with the applicable accounting standards and were "a true and fair view of [Wirecard's] net assets, financial position and results of operations":

> We have audited the consolidated financial statements prepared by Wirecard AG . . . .

- 107 -

We conducted our audit of the consolidated financial statements in accordance with Sec. 317 HGB and German generally accepted standards for the audit of financial statements . . . . Those standards require that we plan and perform the audit such that misstatements materially affecting the presentation of the net assets, financial position and results of operations in the consolidated financial statements in accordance with the applicable financial reporting framework and in the group management report are detected with reasonable assurance. . . . The effectiveness of the accounting-related internal control system and the evidence supporting the disclosures in the consolidated financial statements and the group management report are examined primarily on a test basis within the framework of the audit. . . . We believe that our audit provides a reasonable basis for our opinion.

Our audit has not led to any reservations.

In our opinion, based on the findings of our audit, the consolidated financial statements comply with IFRSs as adopted by the EU as well as the additional requirements of German commercial law pursuant to Sec. 315a (1) HGB and give a true and fair view of the net assets, financial position and results of operations of the Group in accordance with these requirements. The group management report is consistent with the consolidated financial statements, satsfy [sic] the legal requirements and as a whole provides a suitable view of the Group's position and suitably presents the opportunities and risks of future development.

316.   On April 12, 2018, Wirecard published its 2017 Annual Report with E&Y's "[i]ndependent auditor's report" included.  As it did in prior years, E&Y issued an unqualified audit that determined Wirecard had complied with IFRS and the additional German accounting requirements and, in compliance with those requirements, its financial statements "give a true and fair view of the assets, liabilities, and financial position":

We have audited the consolidated financial statements of Wirecard AG, Aschheim, and its subsidiaries (the Group), which comprise the consolidated statement of financial position as of 31 December 2017. . . .

In our opinion, on the basis of the knowledge obtained in the audit,

– the accompanying consolidated financial statements comply, in all material respects, with the IFRS as adopted by the EU, and the additional requirements of German commercial law . . . and, in compliance with these requirements, give a true and fair view of the assets, liabilities, and financial position of the Group as of 31 December 2017, and of its financial performance for the fiscal year from 1 January 2017 to 31 December 2017. . . .

**Basis for the opinions**

- 108 -

We conducted our audit of the consolidated financial statements and of the group management report in accordance with Section 317 HGB and the EU Audit Regulation (No 537/2014, referred to subsequently as "EU Audit Regulation") and in compliance with German Generally Accepted Standards for Financial Statement Audits . . . .  We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinions on the consolidated financial statements and on the group management report.

317.    Unlike the previous two audit opinions, which were just over a page long, the independent auditor's report included with the 2017 Annual Report is ten pages and includes E&Y's discussion of several "key audit matters," including the valuation of goodwill and customer relationships associated with Wirecard's acquisition of Citibank's U.S. prepaid card unit in Pennsylvania and Asian customers, as well as the "[r]ecoverability of receivables and recognition and presentation of revenues from acquiring partners":

**Key audit matters in the audit of the consolidated financial statements**

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements for the fiscal year from 1 January 2017 to 31 December 2017. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon; we do not provide a separate opinion on these matters.

Below, we describe what we consider to be the key audit matters:

\*        \*        \*

**Valuation of customer relationships**

\*        \*        \*

**Auditor's response:** To assess the appropriateness of the analysis performed by management for the existence of an indication of an impairment of the acquired customer relationships (triggering event analysis), we examined the underlying processes and controls and also performed substantive audit procedures. We particularly examined whether any indications for impairment arise from internal or external sources of information. The audit focus was on the assessment of the economic performance of the customer lists as well on the identification of significant customer losses. No indications of a material impairment were identified. . . .

There were no reservations regarding the valuation of customer relationships.

- 109 -

\*       \*       \*

**Recoverability of receivables and recognition and presentation of revenues from acquiring partners**

\*       \*       \*

**Auditor's response:** As part of our audit, we examined the procedures and control mechanisms of receivables measurement contractually agreed with the acquiring partners. We particularly assessed the initial selection, contractual agreements, assessment and ongoing monitoring of the acquiring partners by Wirecard as part of Wirecard's risk management process. We have also assessed the valuation of the receivables in light of the financial risks from transaction processing with the merchants. Furthermore, we obtained balance confirmations of the acquiring partners and verified payments received by the acquiring partners. In addition we assessed the identification and recognition of valuation allowances for the receivables from acquiring partners.

We assessed Wirecard's assessment of being the principal with regard to recognition and presentation of revenues. For the purpose of revenue recognition, we obtained invoices of the acquiring partner to Wirecard related to the transactions processed in connection with the acquiring business and the charges and commissions resulting therefrom. We tested the processes and controls regarding the acquiring partner's settlements. In addition, we assessed the posting of the invoices.

Furthermore, we assessed the completeness and appropriateness of the corresponding disclosures in the notes to the consolidated financial statements.

There were no reservations regarding the recoverability of receivables and the recognition and disclosure of revenue from Acquiring partners.

318.    E&Y's independent auditor's report attached to Wirecard's 2017 Annual Report also specified E&Y's responsibilities regarding its audit, including its objective to determine whether the financial statements were free from material misstatements due to fraud and its responsibility to maintain "professional skepticism":

**Auditor's responsibilities for the audit of the consolidated financial statements and of the group management report**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error . . . .

\*       \*       \*

- 110 -

We exercise professional judgment and maintain professional skepticism throughout the audit.

We also:

– Identify and assess the risks of material misstatement of the consolidated financial statements and of the group management report, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinions. . . .

– Obtain an understanding of internal control relevant to the audit of the consolidated financial statements and of arrangements and measures (systems) relevant to the audit of the group management report in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of these systems.

\*       \*       \*

– Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express opinions on the consolidated financial statements and on the group management report.

319.    On April 25, 2019, Wirecard published its 2018 Annual Report with E&Y's "independent auditor's report" included.  As it did in prior years, E&Y issued an unqualified audit that determined Wirecard had complied with IFRS and the additional German accounting requirements and, in compliance with those requirements, its financial statements "give a true and fair view of the assets, liabilities, and financial position":

We have audited the consolidated financial statements of Wirecard AG, Aschheim, and its subsidiaries (the Group), which comprise the consolidated statement of financial position as of 31 December 2018 . . .

In our opinion, on the basis of the knowledge obtained in the audit,

• the accompanying consolidated financial statements comply, in all material respects, with the IFRS as adopted by the EU, and the additional requirements of German commercial law . . . and, in compliance with these requirements, give a true and fair view of the assets, liabilities, and financial position of the Group as at 31 December 2018, and of its financial performance for the reporting year from 1 January 2018 to 31 December 2018 . . . .

**Basis for the opinions**

- 111 -

We conducted our audit of the consolidated financial statements and of the group management report in accordance with Sec. 317 HGB and the EU Audit Regulation (No 537/2014, referred to subsequently as "EU Audit Regulation") and in compliance with German Generally Accepted Standards for Financial Statement Audits. . . .  We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinions on the consolidated financial statements and on the group management report.

320.    E&Y also validated Wirecard's position that it did not need to take any further action regarding the Singapore whistleblower allegations and concluded that its audit opinion "ha[s] not been modified" as a result of the allegations or findings:

Emphasis of matter paragraph – accounting treatment of allegations of a whistleblower in Singapore

\*        \*        \*

On the basis of the matters presented in the consolidated financial statements and the group management report as well as the findings to date of the measures taken to clarify these matters, currently there is no confirmation that corrections or other disclosures need to be made in the notes to the consolidated financial statements and group management report for fiscal year 2018. The ongoing investigations by the authorities in Singapore may in the future yield findings, which may have effects on the assets, liabilities, financial position and financial performance of the Group and would have to be presented in the Group's accounting.

The findings made to date have been taken into account in the consolidated financial statements as of 31 December 2018 and 2017 and in the 2018 group management report. Due to the uncertainties regarding the current and/or any future legal disputes and the possible new findings of investigations being conducted due to the allegations, it cannot be ruled out that assessments of the effects of the presented matters may be different in the future.

Our opinions on the consolidated financial statements and the group management report have not been modified in this respect.

321.    Like the auditor's report issued with the 2017 Annual Report, E&Y's audit report discussed "key audit matters," including the valuation of customer relationships and the "[m]easurement of receivables and recognition and presentation of revenues from acquiring partners":

**Key audit matters in the audit of the consolidated financial statements**

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements for the fiscal year from 1 January 2018 to 31 December 2018. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon; we do not provide a separate opinion on these matters.

Below, we describe what we consider to be the key audit matters:

\*        \*        \*

**Valuation of acquired customer relationships**

\*        \*        \*

**Auditor's response:** To assess the appropriateness of the analysis performed by management for the existence of an indication of an impairment of the acquired customer relationships (triggering event analysis), as well as for the assessment of the values in use determined by management, we examined the underlying processes and also performed substantive audit procedures. We examined the management's assessment on the indications of an impairment by particularly taking into account Company-internal sources of information (e.g., for profitability of the customer base and identification of significant losses of individual customer relationships) and external sources of information (e.g., for economic environment). . . .

Our audit procedures did not lead to any reservations regarding the assessment of the valuation of the acquired customer relationships.

\*        \*        \*

**Measurement of receivables and recognition and presentation of revenues from acquiring partners**

\*        \*        \*

**Auditor's response:** As part of our audit, we examined the procedures contractually agreed with the acquiring partners and defined within the Company as well as the existing monitoring and control of acquiring partners by management as part of the risk management process, and tested the control mechanisms regarding receivables measurement. Furthermore, for the assessment of financial risks, we obtained confirmations from the acquiring partners for the existence of receivables and for chargebacks/fines and considered this information for the assessment of the measurement of receivables. We verified payments received by the acquiring partners as further evidence of the existence of receivables.

When assessing whether Wirecard is the principal or agent with regard to the presentation of revenues it is of particular importance whether Wirecard controls the performance from the payment transaction via the acquiring partners

before this is transferred to the merchant. We examined this assessment of management on the basis of the contractual arrangements and the risk management process. ***For the assessment of revenue recognition, we examined the invoices of the acquiring partner to Wirecard related to the transactions processed in connection with the acquiring business and the transaction fees and commissions resulting therefrom and compared them with the underlying transaction evidence***.

Furthermore, we assessed the corresponding disclosures in the consolidated financial statements regarding the information required by IFRS 15

Our audit procedures did not lead to any reservations regarding the measurement of receivables and the recognition and presentation of revenues from acquiring partners.

322.   E&Y's audit report attached to Wirecard's 2018 Annual Report also specified its responsibilities regarding its audit, including its objective to determine whether the financial statements were free from material misstatements due to fraud and its responsibility to maintain "professional skepticism":

**Auditor's responsibilities for the audit of the consolidated financial statements and of the group management report**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error . . . .

\*        \*        \*

We exercise professional judgment and maintain professional skepticism throughout the audit.  We also

- Identify and assess the risks of material misstatement of the consolidated financial statements and of the group management report, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinions. . . .

- Obtain an understanding of internal control relevant to the audit of the consolidated financial statements and of arrangements and measures (systems) relevant to the audit of the group management report in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of these systems.

\*        \*        \*

- 114 -

- Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express opinions on the consolidated financial statements and on the group management report.

323.    Each of the above-referenced statements in ¶¶314-322, were materially false and misleading when made as E&Y and Defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)    for years, the Wirecard Defendants engaged in a scheme in which they materially overstated Wirecard's revenue, earnings, assets and other financial results and key metrics by reporting financial contributions from the three Third-Party Partners that did not actually exist, resulting in more than half the revenue and nearly all the profit that Wirecard reported in its financial statements being fictitious;

(b)    cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist.  *See, e.g.*, ¶¶203, 207-08, 228-29, 234, 236-37;

(c)    Wirecard's internal controls over its financial reporting, including over the third-party business and related transactions, were not as represented, but rather so insufficient that they were ultimately described by McKinsey as "non-existent."  *See, e.g.*, ¶¶133-34, 177-78, 207-08, 215-17, 275-77.  In fact, the Company failed to implement numerous basic internal controls, including recording board meeting minutes, formally documenting all agreements and amendments to agreements, maintaining an archive of contracts and recording transaction data. *See, e.g.*, ¶¶215-17;

(d)    Wirecard's financial statements, which were purportedly audited by E&Y, as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and

- 115 -

results of operations and did not comply with IFRS, IAS or other applicable accounting standards. *See, e.g.*, ¶¶179, 191, 214, 237, 279;

(e) neither Wirecard nor E&Y actually possessed the documentation, including transaction data necessary to validate payments processed by third parties, that E&Y claimed to have reviewed as part of its audits of the Company's financial statements for which it provided unqualified audit opinions,. *See, e.g.*, ¶¶216, 247-48, 208, 262;

(f) E&Y ignored red flags concerning the unverified nature of third-party payment transactions and had not even requested documentation from OCBC Bank establishing the existence of Wirecard's supposed trust account in Singapore, which would have revealed that the account and the funds it purportedly held did not in fact exist. *See, e.g.*, ¶¶183, 247-48, 256, 279;

(g) E&Y had received a whistleblower report from an employee in India that reported that Wirecard executives were the beneficial owners of the Mauritius middleman entity that sold Hermes to Wirecard, that Wirecard's Indian partners were engaged in improper accounting and that a Wirecard executive offered a bribe to an E&Y employee. *See, e.g.*, ¶¶219, 250;

(h) E&Y, in 2017, intended to issue a qualified audit based on the accounting issues raised by its own whistleblower, but abruptly changed its audit to an unqualified opinion without legitimate justification just days before it was published. *See, e.g.*, ¶¶247, 255;

(i) E&Y's own fraud-detection team began an investigation into the whistleblower's allegations and informed E&Y of numerous red flags for which it recommended further investigation, but E&Y failed to make any further inquiries into the red flags and instead, at the urging of Marsalek and Wirecard, ended its investigation into the whistleblower's allegations. *See, e.g.*, ¶¶251-54; and

- 116 -

(j)      E&Y failed to audit Wirecard's significant subsidiaries, including CardSystems, Wirecard UK & Ireland and Wirecard Technology, or otherwise obtain sufficient appropriate audit evidence regarding the subsidiaries' financial information and operations.

## VII.   LOSS CAUSATION AND DAMAGES

324.    Lead Plaintiffs incorporate ¶¶1-323 by reference.

325.    As detailed herein, Defendants issued materially false and misleading statements and omissions concerning Wirecard's financial results, internal controls, compliance with accounting standards, audit reports and denials of allegations of misconduct. *See* ¶¶92-323. These material misrepresentations and omissions caused Wirecard's stock price to trade at artificially inflated prices throughout the Class Period, including a Class Period high of $113.47 per share of WCAGY on August 27, 2018, and $227.42 per share of WRCDF on August 28, 2018. When the truth regarding Defendants' misrepresentations and omissions became generally known, the price declined as the artificial inflation dissipated and Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. These disclosures of the truth include, but are not limited to, the following:

326.    On January 30, 2019, the *Financial Times* published an article titled "Executive at Wirecard suspected of using forged contract," revealing that investigators were looking into whistleblower allegations of accounting misconduct in Singapore and in May 2018, had presented their initial report to Wirecard and the Individual Defendants.

327.    As a result of this new information, Wirecard's stock price substantially declined. WCAGY dropped $8.54 per share from the prior day's closing price of $95.20 (-8.97%) to close at $86.88 per share on January 30, 2019. Shares of WRCDF fell $28.10 per share from the prior day's closing price of $190.00 per share (-14.79%) to close at $161.90 per share on January 30, 2019. However, the Company's stock price continued to trade at artificially inflated prices as

Defendants continued to deny allegations of impropriety and the truth concerning the Company's

financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

328.    On February 1, 2019, the *Financial Times* revealed in an article titled "Wirecard's

law firm found evidence of forgery and false accounts," that Rajah & Tann found in its preliminary

investigation report of Wirecard's alleged misconduct in Singapore that:

> "On the face of the evidence uncovered so far, these acts appear to bear out at the
> very least serious offences of forgery and/or of falsification of accounts/documents
> under section 477A of Singapore's Penal Code. As these acts were intentional, there
> are reasons to suspect that they may have been carried out to conceal other
> misdeeds, such as cheating, criminal breach of trust, corruption and/or money
> laundering."

329.    As a result of this new information, Wirecard's stock price significantly declined.

On February 1, 2019, shares of WCAGY fell $16.60 per share from the prior day's closing price

of $83.24 (-19.94%) to close at $66.64 per share.  Shares of WRCDF fell $30.18 per share from

the prior day's closing price of $164.05 (-18.39%) to close at $133.88 per share on February 1,

2019.  However, the Company's stock price continued to trade at artificially inflated prices as

Defendants continued to deny allegations of impropriety and the truth concerning the Company's

financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

330.    On February 7, 2019, the *Financial Times* published an article titled "Wirecard:

inside an accounting scandal" that revealed additional information about the alleged accounting

manipulation and unlawful acts at Wirecard, including the involvement of certain Wirecard

executives in Germany, including Marsalek, and the Individual Defendants' decision to appoint

Marsalek to oversee the investigation.

331.    As a result of this new information, Wirecard's stock price significantly declined.

On February 7, 2019, shares of WCAGY fell $9.60 per share from the prior day's closing price of

$73.99 (-12.97%) to close at $64.39 per share.  Shares of WRCDF fell $25.81 per share from the

prior day's closing price of $150.91 (-17.1%) to close at $125.10 per share on February 7, 2019.

- 118 -

However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

332.   On February 8, 2019, Singapore police raided Wirecard's offices and seized various electronics and computers.  As the *Financial Times* reported in a February 8, 2019 article titled "Police raid Wirecard's Singapore offices," approximately ten officers conducted the raid and also questioned various employees and executives at Wirecard's Singapore offices.

333.   As a result of this new information, Wirecard's stock price significantly declined. On February 8, 2019, shares of WCAGY fell $11.00 per share from the prior day's closing price of $64.39 (-17.08%) to close at $53.39 per share.  Shares of WRCDF fell $17.55 per share from the prior day's closing price of $125.10 (-14.03%) to close at $107.55 per share on February 8, 2019.  However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

334.   On March 12, 2019, the *Financial Times* published an article titled "Wirecard 'loses contact' with executive at heart of accounting scandal," which reported on the ongoing court proceedings and investigation in Singapore.  According to court filings by prosecutors in Singapore, Wirecard had "'lost contact'" with Kurniawan beginning on February 9, 2019, and Kurniawan was one of six Wirecard employees suspected of "'arrestable offences'" in their investigation, which was looking into forgeries, falsified documents, money laundering and round-tripping between 2014 and 2018 at Wirecard's businesses in Singapore, Indonesia, Hong Kong, Malaysia, India and the Philippines.  The article also reported that the court in Singapore had dismissed Wirecard's lawsuit seeking to force prosecutors to return documents seized by the police.

- 119 -

335.    As a result of this new information, Wirecard's stock price significantly declined. Shares of WCAGY fell $6.34 per share from the prior day's closing price of $74.59 (-8.5%) to close trading at $71.18 per share on March 12, 2019.  Shares of WRCDF fell $11.01 per share from the previous day's closing price of $146.00 (-7.54%) to close trading at $134.99 per share on March 12, 2019.  However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

336.    On March 20, 2019, in an article titled "Senior Wirecard executives approved transactions in fraud probe," the *Financial Times* reported that internal Wirecard documents showed Marsalek's and two other Wirecard executives' role in the accounting scheme in Singapore and showed that the money was actually sent from Germany to the Company's Asian business as the executives had planned.

337.    As a result of this new information, Wirecard's stock price significantly declined. WCAGY fell $3.79 per share from the prior day's closing price of $61.78 (-6.14%) to close trading at $57.99 per share on March 21, 2019.  Shares of WRCDF fell $9.00 per share from the previous day's closing price of $124.25 (-7.24%) to close trading at $115.25 per share on March 21, 2019. However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

338.    On March 28, 2019, the *Financial Times*, published an article titled "Wirecard's problem partners," reporting on the "vivid mismatch" between the supposed scale of several third-party acquirers (companies that process payments on Wirecard's behalf where it does not have a license to do so, or where the payments were seen as too risky), and the "modest reality on the

ground," including that companies contributing supposedly millions in revenue could not be located or had miniscule physical offices located in strange locations like the offices of a bus tour company. The article also revealed internal documents that showed the companies owed Wirecard hundreds of millions of dollars and appeared to be involved in risky payment transactions like gambling and pornography.

339.    As a result of this new information, Wirecard's stock price significantly declined. WCAGY fell $6.11 per share from the prior day's closing price of $68.65 (-8.89%) to close trading at $62.55 per share on March 29, 2019. Shares of WRCDF fell $11.88 per share from the previous day's closing price of $137.88 (-8.61%) to close trading at $126.00 per share on March 29, 2019. However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

340.    On April 24, 2019, the *Financial Times* published an article titled "Wirecard relied on three opaque partners for almost all its profit" that revealed, based on internal documents and whistleblower testimony, that the three Third-Party Partners identified in the March 28, 2019 article contributed more than half of Wirecard's total reported revenue in 2016 and approximately 95% (€290 million) of the Company's reported profit that year.

341.    As a result of this new information, Wirecard's stock price significantly declined. On April 25, 2019, shares of WCAGY fell $4.72 per share from the prior day's closing price of $75.90 (-6.22%) to close trading at $71.18 per share. Shares of WRCDF fell $6.00 per share from the previous day's closing price of $146.25 (-4.1%) to close trading at $140.25 per share. However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

342.     On October 14, 2019, the *Financial Times* published an article titled "Wirecard's suspect accounting practices revealed" that revealed, based on internal spreadsheets and communications between senior members of Wirecard's finance team, that Wirecard and its executives had engaged in a "concerted effort to fraudulently inflate sales and profits at Wirecard businesses in Dubai and Ireland, as well as to potentially mislead EY," and that much of the revenue at Al Alam, which accounted for half of Wirecard's reported profits in 2016, did not appear to be legitimate.

343.     As a result of this new information, Wirecard's stock price significantly declined. The price of WCAGY fell $9.83 per share (-12.73%) to close trading at $67.37 per share on October 15, 2019.  Shares of WRCDF fell $17.25 per share (-11.36%) to close trading at $134.54 per share on October 15, 2019.  However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

344.     On April 28, 2020, Wirecard issued a press release announcing that KPMG had concluded its investigation and had provided its report to the Company, which Wirecard published the German-language original of on its website shortly after.  Among other conclusions, the KPMG report found:

- KPMG was unable to verify the existence of €1 billion of payments supposedly made by the Third-Party Partners that Wirecard claimed was held in a trust account;

- because Wirecard did not have, and the Third-Party Partners refused to provide, documents verifying the existence and amounts of 2016-2018 revenues from the partners, KPMG could not "make a statement that the revenues exist and are correct in terms of their amount";

- contrary to Wirecard's many denials about the size or even existence of revenue and profits from the Third-Party Partners, they "accounted for the lion's share" of Wirecard's earnings for fiscal years 2016-2018;

- contrary to Wirecard's boasts about the strength of its internal controls, KPMG concluded that "the internal controls in place are not fully sufficient to fully ascertain the amount and existence of the revenues" from the Third-Party Partners;

- contrary to Wirecard's and Braun's claims for the delayed report (coronavirus, slow data analysis), KPMG's report was delayed by Wirecard's obstruction, including its failure to provide requested documents necessary to the audit; and

- despite the minimal documents provided, KPMG found evidence to support many of the allegations made against Wirecard, including that several of Al Alam's "customers" did not exist in 2017 and Wirecard's reporting of cash from the trust accounts on its own books was questionable and potentially violated accounting rules.

345.    As a result of this new information, Wirecard's stock price significantly declined. WCAGY fell $17.13 from the prior day's closing price of $71.71 (-23.89%) to close trading at $54.58 per share on April 28, 2020 and another $4.91 per share (-9.00%) to close trading at $49.67 per share on April 29, 2020.  Shares of WRCDF fell $35.75 from the prior day's closing price of $140.79 (-25.39%) to close trading at $105.04 per share on April 28, 2020 and another $5.04 per share (-4.80%) to close trading at $100.00 per share on April 29, 2020.  However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

346.    On June 18, 2020, Wirecard issued press releases revealing that its annual results would be delayed again because E&Y had been presented "spurious balance confirmations" for accounts holding €1.9 billion by the trustee "in order to deceive the auditor":

**Date for publication of annual and consolidated financial statements 2019 delayed due to indications of presentation of spurious balance confirmations**

Wirecard AG's auditor Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft, Munich, informed Wirecard AG that *no sufficient audit evidence could be obtained so far of cash balances on trust accounts to be consolidated in the consolidated financial statements in the amount of EUR 1.9 billion (approximately a quarter of the consolidated balance sheet total).*

- 123 -

There are indications that ***spurious balance confirmations*** had been provided from the side of the trustee respectively of the trustee's account holding banks to the auditor ***in order to deceive the auditor and create a wrong perception of the existence of such cash balances*** or the holding of the accounts for to the benefit of Wirecard group companies. The Wirecard management board is working intensively together with the auditor towards a clarification of the situation.

In light of the above the audit of the annual and the consolidated financial statements 2019 will not be concluded as planned by June 18, 2020. A new date will be announced. If certified annual and consolidated financial statements cannot be made available until June 19, 2020, loans made to Wirecard AG amounting to approximately EUR 2 billion can be terminated.

347.    The same day, Wirecard's Supervisory Board announced late on June 18, 2020, that it was immediately suspending Marsalek until June 30, 2020.

348.    As a result of this new information, Wirecard's stock price significantly declined. WCAGY fell $38.30 per share from the prior day's closing price of $58.50 (-65.47%) to close trading at $20.20 per share on June 18, 2020.  Shares of WRCDF fell $71.47 per share from the previous day's closing price of $113.29 (-63.09%) to close trading at $41.82 per share on June 18, 2020. However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

349.    On June 19, 2020, Braun resigned his position as Wirecard CEO and the *Financial Times* revealed in an article titled "Wirecard chief quits as crisis deepens," that the two Philippines banks where Wirecard's trust accounts were supposedly located, BDO Unibank and Bank of the Philippine Islands, had no record of the accounts and that "'[i]t appears that a rogue employee . . . generated the false confirmation, with no money flowing in or flowing out. . . . These accounts do not exist — that's it.'"

350.    As a result of this new information, Wirecard's stock price significantly declined. WCAGY fell $6.45 per share from the prior day's closing price of $20.20 (-31.93%) to close trading at $13.75 per share on June 19, 2020. Shares of WRCDF fell $14.22 per share from the

previous day's closing price of $41.82 (-34.00%) to close trading at $27.60 per share on June 19, 2020.  However, the Company's stock price continued to trade at artificially inflated prices as Defendants continued to deny allegations of impropriety and the truth concerning the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

351.    On June 22, 2020, Wirecard admitted that the €1.9 billion in cash that the Company reported on its books, was not missing, but in fact did "not exist."   In the same press release, Wirecard admitted that its prior statements regarding the third-party acquiring business were false, withdrew preliminary financial results for FY19 and 1Q20 and 2Q20 and was examining how it could remain a going concern:

> The Management Board of Wirecard assesses on the basis of further examination that *there is a prevailing likelihood that the bank trust account balances in the amount of 1.9 billion EUR do not exist*. The company previously assumed that these trust accounts have been established for the benefit of the company in connection with the so called Third Party Acquiring business and has reported them as an asset in its financial accounts. The foregoing also causes the company to question the previous assumptions regarding the reliability of the trustee relationships.

> The Management Board further assesses that *previous descriptions of the so called Third Party Acquiring business by the company are not correct*. The Company continues to examine, whether, in which manner and to what extent such business has actually been conducted for the benefit of the company.

> Wirecard withdraws the assessment of (i) the preliminary results of the financial year 2019 (revenue and earnings before interest, taxes, depreciation and amortization (EBITDA)) of 14 February 2020 (last confirmed on 18 June 2020), (ii) the preliminary results of the first quarter of 2020 (revenue and EBITDA) of 14 May 2020, (iii) the EBITDA prognosis for the financial year 2020 of 6 November 2019 (last confirmed on 14 May 2020) and (iv) the Vision 2025 prognosis for the financial year 2025 on transaction volume, revenue and EBITDA of 8 October 2019. Potential effects on the annual financial accounts of previous years cannot be excluded.

> Wirecard continues to be in constructive discussions with its lending banks with regard to the continuation of credit lines and the further business relationship, including the continuation of the current drawing coming due at the end of June. Together with the renowned and internationally active investment bank Houlihan Lokey, Wirecard is assessing options for a sustainable financing strategy for the company.

In addition, the Company is ***examining a broad range of possible further measures to ensure continuation of its business operations***, including cost reductions as well as restructuring, disposal or termination of business units and products segments.

352.    The same day, the Supervisory Board announced that it had fired Marsalek "with immediate effect."

353.    As a result of this new information, Wirecard's stock price significantly declined. WCAGY fell $6.35 per share from the prior day's closing price of $13.75 (-46.18%) to close trading at $7.40 per share on June 22, 2020.  Shares of WRCDF fell $12.45 per share from the previous day's closing price of $27.6 (-45.11%) to close trading at $15.15 per share on June 22, 2020.  However, the Company's stock price continued to trade at artificially inflated prices as the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

354.    On June 23, 2020, Braun was arrested on suspicion of false accounting and market manipulation and released on €5 million bail.

355.    On June 24, 2020, the *Financial Times* reported that authorities in the Philippines were searching for Marsalek, who was said to have gone to the country following his suspension. The Philippines' secretary of justice told the newspaper: "'I have ordered our National Bureau of Investigation to investigate certain persons here who are allegedly involved in the Wirecard fraud. We are also trying to find out if the Wirecard COO, Jan Marsalek, is in the Philippines.  If he is found here, we shall include him in the investigation.'"

356.    As a result of this new information, Wirecard's stock price significantly declined. Shares of WCAGY fell $3.21 per share from the prior day's closing price of $10.06 (-31.91%) to close trading at $6.85 per share on June 24, 2020.  Shares of WRCDF fell $6.14 per share from the previous day's closing price of $20.00 (-30.70%) to close trading at $13.86 per share on June 24, 2020.  However, the Company's stock price continued to trade at artificially inflated prices as

- 126 -

the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

357.    On June 25, 2020, Wirecard issued a press release announcing it had failed to reach an agreement with its lenders over hundreds of millions of euros due in the coming months and was filing for insolvency:  "The Management Board of Wirecard AG decided today to file an application for the opening of insolvency proceedings on behalf of Wirecard AG at the competent Munich Local Court due to the threat of insolvency and over-indebtedness."

358.    The same day, *Reuters* reported in an article titled "Auditor EY says clear indications of fraud at Wirecard," that E&Y told the news outlet, "'[t]here are clear indications that this was an elaborate and sophisticated fraud involving multiple parties around the world in different institutions with a deliberate aim of deception.'"

359.    As a result of this new information, Wirecard's stock price significantly declined. Shares of WCAGY fell $5.11 per share from the prior day's closing price of $6.85 (-74.60%) to close trading at $1.74 per share on June 25, 2020.  Shares of WRCDF fell $10.26 per share from the previous day's closing price of $13.86 (-74.03%) to close trading at $3.60 per share on June 25, 2020.  However, the Company's stock price continued to trade at artificially inflated prices as the Company's financial condition and the extent and consequences of its misconduct were yet to be fully revealed.

360.    On June 26, 2020, media outlets reported that the United Kingdom's Financial Conduct Authority had ordered Wirecard's United Kingdom subsidiary to suspend operations and that Visa and MasterCard were considering revoking Wirecard's ability to process payments on their networks.

361.    As a result of this new information, Wirecard's stock price significantly declined. Shares of WCAGY fell $0.95 per share from the prior day's closing price of $1.74 (-54.60%) to

close trading at $0.79 per share on June 26, 2020.  Shares of WRCDF fell $2.00 per share from the previous day's closing price of $3.60 (-55.56%) to close trading at $1.60 per share on June 26, 2020.

362.    Lead Plaintiffs' and the Class members' losses were also caused by the risks that materialized as a result of Defendants' misconduct alleged herein, including their materially false and misleading statements.  It was foreseeable that the public revelation of Wirecard's falsified financial results, insufficient controls, non-compliance with accounting standards and false and misleading denials would lead to negative financial and legal consequences.  As the risks of criminal investigations and prosecutions, reputational harm, regulatory enforcement, employee resignations and firing, insolvency and other negative consequences materialized due to Defendants' misconduct alleged herein, Wirecard's stock price declined and Lead Plaintiffs and the Class suffered damages.

## VIII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE

363.    Through the efficient operation of the markets in which Wirecard's common stock was publicly traded, Lead Plaintiffs and other members of the Class may be presumed to have relied upon each of the false and misleading statements alleged herein.

364.    At all relevant times WDI, WCAGY and WRCDF traded in an efficient market. The efficiency of the market for these securities may be established by the following facts, among others:

(a)     Wirecard's common stock met the requirements for listing, and was listed and actively traded on the Frankfurt Stock Exchange, the Börse Stuttgart and the Tradegate Exchange in Germany, all highly efficient markets;

(b)      WCAGY and WRCDF were actively traded on the OTC Market in the United States at prices that matched and tracked the contemporaneous trading price of Wirecard common stock on the German markets;

(c)      as a regulated issuer, Wirecard filed periodic public reports with the regulatory authority in Germany and published its quarterly and annual reports, press releases, presentation materials, and other material information of significance to investors on its website, including contemporaneous English-language versions of materials submitted to regulators in German;

(d)      Wirecard regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the worldwide circuits of major news services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press, and other similar reporting services;

(e)      during the Class Period, Wirecard was followed by numerous securities analysts employed by major brokerage firms with worldwide influence.  Analysts employed by each of these firms regularly wrote reports based upon the publicly available information disseminated about Wirecard.  These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f)      during the Class Period, numerous institutional investors owned Wirecard's securities.  These institutional investors regularly analyzed the publicly available information about Wirecard and its operations.

365.   Information that affected the price of Wirecard's common stock affected the price of WCAGY and WRCDF in the same manner and to the same extent.  The price of Wirecard's common F-shares and ADRs traded on the OTC Market in the United States during the Class

Period, and was based upon and moved in tandem with the price of Wirecard's common stock traded in Germany.  The price of WRCDF shares generally tracks the currency-adjusted price of Wirecard common stock on the German exchanges.  The price of WCAGY shares, which reflect an ownership interest in one half of one Wirecard common share, is generally one-half the currency-adjusted price of Wirecard's common stock traded in Germany.  As a result, the same facts that support the finding that the market for Wirecard common stock sold on exchanges in Germany was efficient also support a finding that the market for Wirecard's securities sold on the OTC Market in the United States was efficient.

366.    Through the foregoing mechanisms, the information publicly disseminated by Defendants about the Company and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of its transactions in Wirecard stock and ADRs, the information disseminated by Defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of Wirecard securities.

367.    Under these circumstances, all purchasers of WCAGY and WRCDF during the Class Period are presumed to have relied upon the false and misleading statements and material omissions alleged herein.

## IX.    CLASS ACTION ALLEGATIONS

368.    Lead Plaintiffs bring this action as a Class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities other than Defendants who purchased shares of WCAGY and WRCDF on the OTC Market between August 17, 2015 through June 26, 2020, inclusive (the "Class Period").  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

369.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the OTC Market.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and/or the transfer records compiled by the Depositary Banks pursuant to the Forms of ADR and may be notified of the pendency of this action by United States mail, using the form of notice similar to that customarily used in securities class actions.

370.     Reliance on the alleged misrepresentations and material omissions is presumed. The market for Wirecard securities is efficient, as alleged above.  Public information regarding the Company is rapidly incorporated into and reflected by the market price for WDI common stock and thereby is also rapidly incorporated into the price of both WCAGY and WRCDF, both of which trade at prices that are set by reference to the contemporaneous trading price of WDI common stock in Germany.

371.     The omitted information described herein was not known to, and could not have been discovered through reasonable investigation by, members of the Class.  Investors who purchased Wirecard securities at the prices prevailing in the market during the Class Period therefore presumptively did so in reliance upon each of the false and misleading statements and material omissions alleged herein.

372.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether Defendants violated the Exchange Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether and to what extent the price of WCAGY and WRCDF was affected by the alleged misrepresentations; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

373.     All purchases of WCAGY and WRCDF on the OTC Market during the Class Period were the result of a domestic transaction in securities within the meaning of the Exchange Act, because, *inter alia*: (i) WCAGY and WRCDF were sold on the OTC Market, based in the United States; (ii) transactions on the OTC Market are arranged through electronic trading systems that are located in the United States, trade in United States dollars and clear through United States settlement systems; (iii) all WCAGY shares were issued and sold by one of the Depositary Banks, all of which are located in the United States; and (iv) the underlying shares of Wirecard common stock (WDI) sold as ADRs were deposited with Depositary Banks located in the United States which held and controlled them for the benefit of the WCAGY purchaser.  As a result of these and other facts alleged herein, Lead Plaintiffs and each of the other Class members who purchased WCAGY and WRCDF incurred irrevocable liability within the United States to take and pay for

- 132 -

those securities, or the seller of those securities incurred irrevocable liability within the United States to deliver the security, or both.

374.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the members of the Class both purchased Wirecard securities at the prices prevailing in the market during the Class Period and sustained damages from Defendants' wrongful conduct.  Damages under the Exchange Act will be calculated using common and reliable methodologies that are based on the movement of Wirecard's stock price during and after the Class Period, including calculations based on the price at which the Class member obtained Wirecard securities, the market price of Wirecard securities at the time corrective information was disclosed, and analysis of the public information that impacted the market price of Wirecard securities at those times.

375.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

376.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.    CLAIMS FOR RELIEF

### COUNT I

**For Violation of §10(b) of the Exchange Act & Rule 10b-5
Promulgated Thereunder Against All Defendants**

377.    Lead Plaintiffs incorporate ¶¶1-376 by reference.

378.    During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 133 -

379.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Wirecard securities during the Class Period.

380.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for WCAGY and WRCDF.  Lead Plaintiffs and the Class would not have purchased WCAGY and WRCDF at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by Defendants' misleading statements.

381.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of WCAGY and WRCDF during the Class Period.

## COUNT II

**For Violation of §20(a) of the Exchange Act
Against the Individual Defendants**

382.   Lead Plaintiffs incorporate ¶¶1-381 by reference.

383.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's false and misleading statements.

384.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by Wirecard which had become materially false or misleading.

385.    Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning Wirecard.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of §20(a) of the Exchange Act.  The Individual Defendants are therefore liable pursuant to §20(a) of the Exchange Act.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(i) determining that this action is a proper Class action, having designated plaintiffs as Lead Plaintiffs and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

(ii) awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(iii) awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(iv) awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XII.   JURY TRIAL DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  December 22, 2020          SAXTON & STUMP
                                            LAWRENCE F. STENGEL (P.A. Bar # 32809)


                                              s/ Lawrence F. Stengel
                                              LAWRENCE F. STENGEL

                                          280 Granite Run Drive, Suite 300
                                          Lancaster, PA  17601
                                          Telephone:  717/556-1000
                                          717/441-3810 (fax)
                                          lfs@saxtonstump.com

                                          *Local Counsel for Lead Plaintiffs*

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SHAWN A. WILLIAMS
                                          JOHN H. GEORGE
                                          HADIYA K. DESHMUKH
                                          Post Montgomery Center
                                          One Montgomery Street, Suite 1800
                                          San Francisco, CA  94104
                                          Telephone:  415/288-4545
                                          415/288-4534 (fax)
                                          shawnw@rgrdlaw.com
                                          jgeorge@rgrdlaw.com
                                          hdeshmukh@rgrdlaw.com

                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                          REED R. KATHREIN
                                          DANIELLE SMITH
                                          715 Hearst Avenue, Suite 202
                                          Berkeley, CA  94710
                                          Telephone:  510/725-3000
                                          510/725-3001 (fax)
                                          reed@hbsslaw.com
                                          danielles@hbsslaw.com

4835-1681-6085.v1

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVEN W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com

*Lead Counsel for Lead Plaintiffs Thanh Sam and
Lawrence Gallagher*

BRONSTEIN, GEWIRTZ & GROSSMAN,
LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Thanh Sam*

- 137 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 22, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Lawrence F. Stengel
LAWRENCE F. STENGEL

SAXTON & STUMP
280 Granite Run Drive, Suite 300
Lancaster, PA  17601
Telephone:  717/556-1000
717/441-3810 (fax)
E-mail:  lfs@saxtonstump.com

# Mailing Information for a Case 2:20-cv-03326-AB BROWN v. WIRECARD AG et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **LEE ALBERT**
  lalbert@glancylaw.com,lee-albert-5832@ecf.pacerpro.com,info@glancylaw.com

- **PERETZ BRONSTEIN**
  peretz@bgandg.com

- **VINCENT A COPPOLA**
  vcoppola@pribanic.com,gregory@pribanic.com

- **HADIYA K. DESHMUKH**
  hdeshmukh@rgrdlaw.com,hdeshmukh@ecf.courtdrive.com

- **JOHN H. GEORGE**
  jgeorge@rgrdlaw.com,jgeorge@ecf.courtdrive.com,smorris@ecf.courtdrive.com

- **JACOB A. GOLDBERG**
  jgoldberg@rosenlegal.com,etexidor@rosenlegal.com

- **REED KATHREIN**
  reed@hbsslaw.com,lisal@hbsslaw.com,sf_filings@hbsslaw.com

- **JEFFREY L. KODROFF**
  jkodroff@srkattorneys.com

- **WILLIAM S. NORTON**
  bnorton@motleyrice.com,mhickey@motleyrice.com

- **MICHAEL J. QUIRK**
  mquirk@motleyrice.com,hfonseca@motleyrice.com,lmandara@motleyrice.com

- **DANIELLE SMITH**
  danielles@hbsslaw.com,sf_filings@hbsslaw.com

- **LAWRENCE F. STENGEL**
  lfs@saxtonstump.com,gas@saxtonstump.com

- **DAVID A. STRAITE**
  dstraite@kaplanfox.com,jgriffin@kaplanfox.com

- **SHAWN A. WILLIAMS**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,shawnw@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)