**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re WIRECARD AG SECURITIES LITIGATION _____ This Document Relates to: ALL ACTIONS | Civ. Action No. 2:20-cv-03326-AB CLASS ACTION |

**MEMORANDUM IN SUPPORT OF DEFENDANT
ERNST & YOUNG GMBH WIRTSCHAFTSPRÜFUNGSGESELLSCHAFT'S
MOTION TO DISMISS**

# Table of Contents

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................2

ARGUMENT ......................................................................................................9

I.      This Case Should Be Dismissed for Lack of Proper Service..................................9

II.     The Court Should Dismiss for Lack of Personal Jurisdiction...........................11

        A.      Plaintiffs Cannot Establish General Jurisdiction Over EY Germany. .................11

        B.      Plaintiffs Cannot Establish Specific Jurisdiction Over EY Germany...................13

                1.      EY Germany Did Not Purposefully Direct Its Activities at the U.S. ........14

                2.      This Case Does Not Relate to EY Germany's Contacts with the U.S. ..................................................................................16

                3.      Exercising Jurisdiction Would Not Comport with Fair Play and Substantial Justice. ...................................................................17

III.    The Court Should Dismiss the Complaint Under the Doctrine of *Forum Non Conveniens*...........................................................................................18

        A.      Germany Is an Adequate Alternative Forum. .......................................19

        B.      Plaintiffs' Decision to Sue in Pennsylvania Is Not Entitled to Deference............21

        C.      The Public and Private Interest Factors Favor Dismissal. ....................................21

                1.      Public Interest Factors Favor Dismissal. ...................................................21

                2.      Private Interest Factors Favor Dismissal. ..................................................22

IV.     The Complaint Fails to State a Claim. ...................................................................24

        A.      Plaintiffs' Claims Are Impermissibly Extraterritorial. ..........................................24

        B.      Plaintiffs' Claims Do Not Satisfy the In-Connection-with-Requirement.............28

        C.      Plaintiffs Do Not Allege Scienter Adequately.......................................................29

CONCLUSION....................................................................................................35

i

# Table of Authorities

**Cases**

*Abira Med. Lab'ys v. Johns Hopkins Healthcare LLC*,
  2020 WL 3791565 (E.D. Pa. July 7, 2020)............................................................. 11, 12, 13, 14

*Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ............................. 25

*Adam Techs. v. Well Shin Tech.*, 2021 WL 141371 (D.N.J. Jan. 15, 2021) ................................... 9

*Am. Bus. Lending Grp. v. Shainis*, 2011 WL 691580 (D.N.J. Feb. 14, 2011)............................ 17

*Anwar v. Fairfield Greenwich*, 728 F. Supp.2d 372 (S.D.N.Y. 2010) ......................................... 30

*Asahi Metal Indus. v. Superior Court*, 480 U.S. 102 (1987) ........................................................ 17

*Baez v. Marriott Int'l, Inc.*, 2018 WL 3801251 (D.N.J. Aug. 9, 2018) ........................................ 23

*Behrens v. Arconic, Inc.*, 487 F. Supp.3d 283 (E.D. Pa. 2020) ............................................. 18, 23

*BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549 (2017)......................................................................... 11

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ......................................................................... 17

*Chant Eng'g Co. v. Cumberland Sales Co.*, 2021 WL 848062 (E.D. Pa. Mar. 5, 2021)........ 12, 13

*Church v. Glencore PLC*, 2020 WL 4382280 (D.N.J. July 31, 2020)....................... 20, 21, 22, 23

*D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94 (3d Cir. 2009) ....... 14

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ............................................................................. 11

*Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124 (3d Cir. 2020) ................. 14

*Deirmenjian v. Deutsche Bank*, 2006 WL 4749756 (C.D. Cal. Sept. 25, 2006) ................... 21, 23

*Dsam Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002) ....................... 30

*Felix v. City of Poughkeepsie*, 2019 WL 5306981 (S.D.N.Y. Oct. 18, 2019)............................. 11

*Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015) .......................................... 20

*Garrett v. Wexford Health*, 938 F.3d 69 (3d Cir. 2019) ................................................................. 9

*GE Cap. Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993)...................................................... 15

*GoldenTree Asset Mgmt. v. BNP Paribas*, 64 F. Supp.3d 1179 (N.D. Ill. 2014) ........................ 19

*Goodway Grp. v. Sklerov*, 2018 WL 3870132 (E.D. Pa. Aug. 15, 2018) ..................................... 16

*Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915 (2011) ..................................... 13, 17

*In re Advanced Battery Techs. Sec. Litig.*, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) .......... 31

*In re DNTW Chartered Accts. Sec. Litig*, 172 F. Supp.3d 675 (S.D.N.Y. 2016) ........................ 31

*In re Eur. Aeronautic Defence & Space Co. Secs. Litig.*,
    703 F. Supp.2d 348 (S.D.N.Y. 2010)................................................................................ 24

*In re IKON Off. Sols.*, 277 F.3d 658 (3d Cir. 2002).................................................................. 29, 33

*In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 2021 WL3863372 (S.D.N.Y. Aug. 30, 2021) ...... 25

*In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp.3d 885 (S.D.N.Y. 2018)....... 25, 27

*In re Longtop Fin. Techs. Secs. Litig.*, 939 F. Supp.2d 360 (S.D.N.Y. 2013) .............................. 29

*In re Petrobras Sec. Litig.*, 2016 WL 3144395 (S.D.N.Y. May 5, 2016)..................................... 31

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ......................... 2, 30, 32

*Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ........................................... 29

*Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*,
    919 F. Supp.2d 321 (S.D.N.Y. 2013)................................................................................ 31

*Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869 (3d Cir. 2013) ............................. 19, 20, 22

*Klein v. Autek Corp.*, 147 F. App'x 270 (3d Cir. 2005)............................................................... 32

*Kornea v. J.S.D. Mgmt.*, 336 F. Supp.3d 505 (E.D. Pa. 2018) ...................................................... 9

*Leasco Data Processing v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972)........................................... 15

*Levien v. Hibu*, 475 F. Supp.3d 429 (E.D. Pa. 2020)............................................................. 21, 22

*Morrison v. National Australia Bank*, 561 U.S. 247 (2010)....................................................... 24

*Otor, S.A. v. Credit Lyonnais, S.A.*, 2006 WL 2613775 (S.D.N.Y. Sept. 11, 2006).................... 24

*Pac. Emps. Ins. Co. v. AXA Belg. S.A.*, 785 F. Supp.2d 457 (E.D. Pa. 2011).............................. 13

*Paraschos v. YBM Magnex Int'l*, 130 F. Supp.2d 642 (E.D. Pa. 2000) ........................................ 24

*Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) .................................................................................. 25, 26, 28

*Pinker v. Roche Holdings*, 292 F.3d 361 (3d Cir. 2002) ........................................................ 5, 11

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ................................................................ 18, 22

*Prevent USA Corp. v. Volkswagen AG*, 2021 WL 1087661 (E.D. Mich. Mar. 22, 2021) ........... 19

*Prime Int'l Trading v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019) .................................................... 27

*Pub. Emps. Ret. Ass'n v. Deloitte & Touche LLP*,  551 F.3d 305 (4th Cir. 2009) ..... 31, 33, 34, 35

*S. Cherry St. v. Hennessee Grp.*, 573 F.3d 98 (2d Cir. 2009) .................................................... 30

*SEC v. Morrone*, 997 F.3d 52 (1st Cir. 2021) ......................................................................... 28

*Seiden v. Schwartz, Levitsky, & Feldman LLP*, 2017 WL 2591785 (S.D.N.Y. Jun. 14, 2017) .... 13

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ........................................................ 28

*Shinde v. Nithyananda Found.*, 2014 WL 12597121 (C.D. Cal. Aug. 25, 2014) .......................... 9

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422 (2007) .................................... 18

*Spear v. Marriott Hotel Servs.*, 2016 WL 194071 (E.D. Pa. Jan. 15, 2016) ............................... 11

*Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp.2d 562 (S.D.N.Y. 2011) ................. 34

*Stoyas* v. *Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018) ............................................................. 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................ 29

*Traxcell Techs. v. Nokia Sols. & Networks US*,
  2019 WL 8137134 (E.D. Tex. Oct. 22, 2019) ..................................................................... 9, 10

*Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523 (10th Cir. 1996) ...................... 15

*Valle v. GDT Enters.*, 2020 WL 435295 (E.D.N.Y. Jan. 28, 2020) ........................................... 11

*Walden v. Fiore*, 571 U.S. 277 (2014) ..................................................................... 13, 14, 16

*Walker v. Collier*, 2020 WL 3493624 (E.D. Tex. May 15, 2020) ............................................... 10

*Warner Tech. & Inv. Corp. v. Hou*, 2014 WL 7409978 (D.N.J. Dec. 31, 2014).............. 18, 23, 24

*Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183 (3d Cir. 2008) ................................ 18, 19, 22

*Windt v. Qwest Comm'cns Int'l*, 544 F. Supp.2d 409 (D.N.J.)..................................................... 24

## Statutes

15 U.S.C. § 7216(a)(1)................................................................................................................ 12

15 U.S.C. § 78u–4(b)(2) ............................................................................................................ 29

## Other Authorities

Statement of SEC Official Steve Peikin, SEC Release 2018-215 (Sept. 27, 2018) .................... 31

Statement of SEC official Thomas Newkirk, SEC Release 2004-144 (Oct. 13, 2004)................ 30

## INTRODUCTION

The Wirecard scandal is uniquely and completely German.  Wirecard AG is a German company whose stock traded solely on German exchanges.  Its collapse has led to extensive criminal, civil, and legislative proceedings in Germany.  The role of Wirecard's German auditor, Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft ("EY Germany"), is a subject of many of those proceedings, including more than 500 lawsuits brought by investors in German courts seeking damages under German law.  EY Germany conducted its audits in Germany, pursuant to German and European accounting and auditing standards, and subject to scrutiny by German regulators.  EY Germany had no contacts with the United States relating to the Wirecard fraud. Despite all these facts, Plaintiffs—purchasers of securities that were not sponsored by Wirecard, but whose price mirrored the price of Wirecard stock trading in Germany—seek to hold EY Germany liable under U.S. securities laws.  That attempt must fail, for multiple reasons.

First, Plaintiffs failed to effect proper service.  Instead of properly serving EY Germany with the operative complaint and a German translation of it, as required under the Hague Convention, Plaintiffs instead served a superseded complaint filed by a different plaintiff, signed by different lawyers, that was substantially different from the then-operative consolidated complaint.  That failure alone mandates dismissal under Rule 12(b)(5).

Second, the Court lacks personal jurisdiction over EY Germany.  EY Germany has no significant contacts with the United States, and none that relate to Plaintiffs' claims.  EY Germany's conduct—the alleged failure to meet German auditing standards in auditing a German company—has no connection to the United States.

Third, even if the Court could hear the case, it should dismiss under the doctrine of *forum non conveniens*.  These claims should be adjudicated in Germany.  The witnesses and evidence are located there; and the audits were governed by German law and auditing standards.  Germany

1

is a perfectly adequate forum for these claims, as established by the Declaration of German law expert Professor Alexander Hellgardt.

Finally, neither the superseded complaint served on EY Germany nor the operative Consolidated Class Action Complaint ("Consolidated Complaint" or "CCAC") states a claim against EY Germany.  Plaintiffs seek an impermissible extraterritorial application of the U.S. securities laws, which is barred under governing Supreme Court precedent.  And in any event, Plaintiffs fail to meet the high burden of pleading scienter.  Pleading scienter as to an audit firm requires that the work "amounted at best to a pretended audit."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006).[1]  The allegations here fall far short of that, and instead demonstrate that EY Germany was another victim of the Wirecard fraud.

For all these reasons, the claims against EY Germany should be dismissed.

## BACKGROUND

Most of the following facts are taken from the Consolidated Complaint and the documents incorporated therein and are assumed true for purposes of this Motion only.[2]  Additional facts relevant to EY Germany's improper service, personal jurisdiction, *forum non conveniens*, and extraterritoriality arguments are drawn from the Declarations of Professor Alexander Hellgardt (Ex. A), Dr. Annedore Streyl (Ex. B), and Steven Farina (Ex. C).

**Wirecard and the Wirecard Scandal**

Wirecard AG is a German company based in Aschheim, Germany.  CCAC ¶ 34.  It acted as an "acquirer," which is the entity that "collects money from . . . the bank that issued a customer's

---

[1] Unless otherwise indicated, all internal citations are omitted and all emphasis is added.

[2] EY Germany addresses the Consolidated Complaint here, even though it was never served with that pleading, because the allegations therein are recited primarily in connection with EY Germany's alternative arguments under Rule 12(b)(6), which the Court should reach only if it has determined that service was proper.

credit card" and "distributes it to the merchant that charged the customer's card."  *Id*. ¶ 35. Wirecard common stock traded on the Frankfurt Stock Exchange, the Börse Stuttgart, and the Tradegate Exchange, all in Germany, under the ticker symbol "WDI."  *Id*. ¶ 34.

In June 2020, Wirecard admitted that €1.9 billion it previously claimed had been safely deposited in Philippines bank accounts "do[es] not exist."  *Id*. ¶ 4.  Within days, Wirecard's CEO, Markus Braun, was arrested in Germany, and the company's COO, Jan Marsalek, fled the country. *Id*. ¶¶ 5, 17, 270.  By June 25, 2020, Wirecard entered insolvency proceedings in Germany.  *Id.* ¶ 4.  On July 6, 2020, Munich prosecutors arrested and charged Oliver Bellenhaus, the head of Wirecard's unit in Dubai, with aggravated fraud.  *Id.* ¶ 264.  A few weeks later, German prosecutors re-arrested and charged Braun (who had been released on bail) and arrested and charged former Wirecard CFO Burkhard Ley and head of accounting Stephan von Erffa.  *Id*.  The scandal has been "described as the largest fraud in German postwar history."  *Id.* ¶ 263.

In addition to criminal investigations, German regulators and lawmakers also launched investigations into the Wirecard fraud.  Germany's Parliament announced that it would conduct a full inquiry into Wirecard's collapse, CCAC ¶ 273, and it set up a special committee of inquiry to examine, among other things, the role of EY Germany, Hellgardt Decl. ¶ 61.  The committee appointed a team of four auditors to investigate EY Germany's auditors.  The committee questioned 110 people and submitted a final report on June 22, 2021, which is more than 2,000 pages long and written in German.  *Id*.  The Auditor Oversight Authority ("APAS"), a German government agency that regulates German auditors, also is investigating EY Germany in connection with the Wirecard audits.  *Id*.  APAS has stated the Wirecard investigations are being conducted "with the highest priority."  Hellgardt Decl. ¶ 62.

Much of the scrutiny focuses on Wirecard's relationship with certain "third-party acquirers," or TPAs. Wirecard did not have a license to process payments in some countries, so Wirecard contracted with TPAs, which were licensed, to process payments on its behalf. *Id.* ¶ 35. Three TPAs in particular—in Dubai, the Philippines, and Singapore—are at the core of the fraud. *Id.* ¶ 167. Wirecard received commissions on the transactions processed by these TPAs, but it also was potentially responsible for refunding the entirety of any credit-card charges that were reversed. *Id.* ¶ 191. Accordingly, Wirecard agreed to the establishment of an escrow account to hold funds, to ensure that it could pay these "chargeback" amounts. *Id.* It was this escrow account that purportedly held the €1.9 billion found to be missing in 2020. *See id.* ¶¶ 4, 16, 236.

**EY Germany**

EY Germany is a German accounting firm. CCAC ¶ 51. It is organized and maintains its principal place of business in Germany. Streyl Decl. ¶ 3. It has no office, employees, property, bank accounts, or registered agents in the United States. *Id.* ¶¶ 5-7. Its contacts with the U.S. are minimal; contrary to Plaintiffs' allegations, to the extent that EY Germany played a role in audits for multinational companies, that participation was restricted to the German subsidiaries. *Id.* ¶ 10.

EY Germany audited the Group financial statements of Wirecard AG, which were prepared pursuant to German law and International Financial Reporting Standards. *Id.* ¶ 11. EY Germany's audit work for Wirecard was conducted primarily in Germany pursuant to German auditing standards. *Id.* EY Germany conducted additional audit work related to certain Wirecard entities located in Europe and Asia solely for the purpose of the Group financial statements. *Id.* EY Germany did not conduct any audit work for Wirecard in the United States. *Id.*

EY Germany's work in connection with Wirecard is the subject of more than 500 civil suits brought by investors. *Id.* ¶ 18.

**Plaintiffs and Their Securities Purchases**

Lead Plaintiffs Thanh Sam and Lawrence Gallagher are purchasers of two types of securities in the over-the-counter ("OTC") market.  CCAC ¶¶ 27, 31.  These securities are: (1) unsponsored American Depositary Receipts ("ADRs") that reference Wirecard common stock (ticker: WCAGY), and (2) Wirecard common stock sold as so-called "F-shares" (ticker: WRCDF).  "An ADR is a negotiable certificate that evidences an ownership interest in American Depositary Shares ('ADSs') which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank."  *Id.* ¶ 55 (quoting SEC Office of Investor Education & Advocacy, *Investor Bulletin: American Depository Receipts* at 1 (Aug. 2012)).  "ADRs may be either sponsored or unsponsored."  *Pinker v. Roche Holdings*, 292 F.3d 361, 367 (3d Cir. 2002).  "An unsponsored ADR is established with little or no involvement of the issuer of the underlying security."  *Id.*  Similarly, an F-share is created when a U.S. broker-dealer creates a U.S. ticker symbol to facilitate trading in the U.S. in a foreign company's security, but the shares are typically settled, cleared and custodized in the local market (here, Germany).  CCAC ¶ 74.[3]

According to sworn statements filed by Wirecard in this litigation, three depositary banks purchased Wirecard's stock and then issued the unsponsored ADRs without any involvement from Wirecard.  Stoeckl Decl. ¶¶ 10–12, *DalPoggetto v. Wirecard AG*, 19-cv-986 (C.D. Cal. Mar. 13, 2020), ECF No. 64-9.  Wirecard did not consent to the creation of these unsponsored ADRs, and it took no steps to help facilitate the trading of these securities in the U.S.  *Id.* ¶¶ 12-13.  Similarly, Wirecard did not consent to the establishment of a secondary market for its common stock to trade as F-shares in the U.S., and it was not involved in creating or facilitating the trading of these F-

---

[3] *See also* OTC Markets: FAQ on F Shares, available at https://www.otcmarkets.com/files/FAQ-F-Shares.pdf.

shares on the U.S. OTC market.  *Id.* ¶ 14.  Wirecard also never solicited the purchase of any unsponsored ADRs or F-shares that trade OTC in the U.S.  *Id.* ¶ 15.  EY Germany was not involved with these securities and had no direct interaction with U.S. investors.  Streyl Decl. ¶ 13.

**Plaintiffs' Claims**

Plaintiffs seek to represent a class of purchasers of the WCAGY and WRCDF securities on the OTC market in the United States between August 17, 2015 and June 26, 2020.  CCAC ¶ 2. They allege that Wirecard,[4] six Wirecard officers, and EY Germany violated section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  As to EY Germany, the Consolidated Complaint focuses on the firm's audit opinions on Wirecard's financial statements for 2015, 2016, 2017, and 2018; these audits were conducted under German law and German auditing standards, and they opined that Wirecard's financial statements "comply with IFRSs [International Financial Reporting Standards] as adopted by the EU as well as the additional requirements of German commercial law."  CCAC ¶ 314-16.  Plaintiffs allege that these statements were false and misleading because "for years, the Wirecard Defendants engaged in a scheme in which they materially overstated Wirecard's revenue, earnings, assets and other financial results and key metrics by reporting financial contributions from the three Third-Party Partners that did not actually exist." CCAC ¶ 323.  Plaintiffs further allege that "Wirecard's financial statements, which were purportedly audited by [EY Germany], as a result of the fictitious revenue associated with the Third-Party Partners and other misconduct alleged herein, did not present a true and fair view of the assets, liabilities, financial position and results of operations and did not comply with IFRS, IAS [International Accounting Standards] or other applicable accounting standards."  *Id.*

---

[4] The claim against Wirecard is stayed due to its bankruptcy.  ECF No. 60.

**The Defective Service on EY Germany**

The first complaint filed in this Court was filed on July 7, 2020, by the Rosen Law Firm on behalf of Carol Brown.  ECF No. 1.  Ms. Brown did not file a motion for appointment as lead plaintiff under the Private Securities Litigation Reform Act ("PSLRA"), and on September 10, 2020, she informed the Court that she and her counsel "will no longer prosecute this action as they expect the Court will select a lead plaintiff and approve its selection of lead counsel from the remaining lead plaintiff motions."  ECF No. 15, at 3 n.2.  On October 13, 2020, the Court appointed Thanh Sam as Lead Plaintiff and her counsel, Robbins Geller, as Lead Counsel; the Court specified that Lead Counsel was responsible for, among other things, the preparation and filing of all pleadings.  ECF No. 31.  On October 19, 2020, the Court ordered consolidation of this case with the earlier-filed action (*DalPoggetto v. Wirecard AG et al.*, 2:19-cv-986), which had been transferred to this Court from the Northern District of California.  ECF No. 36.

On October 23, 2020, the Court ordered Lead Plaintiff to serve Defendants in Germany under the Hague Convention by April 19, 2021.  ECF No. 44.  But just three days later, Lead Plaintiff and the Plaintiff in the *DalPoggetto* action filed a stipulation that called for the filing of a consolidated complaint.  ECF No. 45.  The Court entered that stipulation the following day, ordering that "Lead Plaintiffs must file a consolidated class action complaint on or before December 22, 2020," and that "[u]pon the appearance of counsel for Defendants, Lead Counsel will meet and confer with counsel for Defendants on an appropriate schedule for the filing of the motion to dismiss or answer to ***the consolidated complaint***."  ECF No. 46.  As ordered, on December 22, 2020, Lead Plaintiffs filed the Consolidated Complaint.  ECF No. 53.  As expected, original Plaintiff Brown had no role in the CCAC; her counsel, the Rosen Law Firm, did not sign it; and the CCAC expanded the initial *Brown* complaint's 31 pages to 137 pages.

The Hague Convention requires service of a certified copy of the complaint and a translation.  Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, Nov. 15, 1965, 20 U.S.T. 361, 68 U.N.T.S. 163, art. 5.  There is no indication in the record that Lead Counsel made any effort to comply with these requirements until January 2021, a month after they had filed the CCAC that superseded the *Brown* complaint.  *See* ECF No. 58-2.  Although the CCAC was then the operative complaint, Lead Counsel apparently requested and obtained a certified copy of the already-superseded *Brown* complaint instead.

In April 2021, not having accomplished service, Lead Plaintiffs moved to extend the time for service to August 19, 2021.  ECF No. 58.  They did not inform the Court that they were attempting to serve the superseded *Brown* complaint, nor apparently did they request a certified copy or German translation of the operative Consolidated Complaint.  The Court granted the extension on April 15.  ECF No. 59.

On June 28, 2021, EY Germany was served with a copy of the superseded *Brown* complaint and a German translation of it.  That complaint listed Brown as the Plaintiff, despite the fact that she was no longer involved in the case; did not bear the *In re Wirecard* caption; was signed by the Rosen Law Firm, even though it was no longer involved, rather than by Lead Counsel, who was responsible for all pleadings in the case under the Court's order; and was 31 pages long and contained almost no substantive allegations about EY Germany's conduct.  On July 7, 2021, counsel for EY Germany informed Lead Counsel of the defective service and asked if they intended to correct the error.  Farina Decl. ¶¶ 3-4.  Counsel made clear that EY Germany would move to dismiss for lack of proper service.  *Id.*  Plaintiffs declined to cure the defect.

<u>**ARGUMENT**</u>

**I.    THIS CASE SHOULD BE DISMISSED FOR LACK OF PROPER SERVICE.**

Plaintiffs have never served EY Germany with the operative complaint in this case or the required translation.  Rather, they served the earlier *Brown* complaint that already had been superseded by their own filing of the Consolidated Complaint.  Because service of a superseded complaint is not effective service, the claims against EY Germany should be dismissed.

It is well-settled that "an amended pleading supersedes the original pleading and renders the original pleading a nullity."  *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019).[5] Because "a superseded complaint is a mere scrap of paper," "service of a superseded complaint . . . does not fulfill the requirements of" Rule 4 or the Hague Convention.  *Traxcell Techs. v. Nokia Sols. & Networks US*, 2019 WL 8137134, at *4 (E.D. Tex. Oct. 22, 2019).  Courts have quashed service and dismissed cases after plaintiffs served superseded complaints.  *See, e.g.*, *Adam Techs. v. Well Shin Tech.*, 2021 WL 141371, at *6 (D.N.J. Jan. 15, 2021) (quashing service where defendant was served with original complaint instead of operative amended complaint); *Shinde v. Nithyananda Found.*, 2014 WL 12597121, at *3 (C.D. Cal. Aug. 25, 2014) (defendants were "not . . . properly served under the Hague Convention" where plaintiffs "did not submit a Request for Service of the operative complaint . . . to India's Central Authority").  That is the right result here.[6]

---

[5] The same rule applies to "consolidated" complaints.  *See, e.g.*, *Bird v. Borough of Moosic*, 2020 WL 6930106, at *4 (M.D. Pa. Nov. 11, 2020) (filing of "comprehensive second amended complaint" that "consolidates the operative claims" "superseded" the prior complaints, "rendering each a legal nullity").

[6] "'Notice to a defendant that he has been sued does not cure defective service. . . .'"  *Kornea v. J.S.D. Mgmt.*, 336 F. Supp.3d 505, 510 (E.D. Pa. 2018) (quoting *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 492 (3d Cir. 1993)).

Dismissal is an especially appropriate response to Plaintiffs' defective service because Plaintiffs have no excuse for failing to serve the operative complaint.  By the time they reached the clerk's office to request a certified copy in January 2021, the original *Brown* complaint was no longer operative.  It had been filed on behalf of a plaintiff who was no longer involved; signed by a law firm that had no further role; was more than 100 pages shorter than the operative complaint; and contained almost no allegations about EY Germany other than that it audited Wirecard's financial statements.  Yet Lead Counsel apparently made no effort to obtain a certified copy and a German translation of the actual, operative consolidated complaint, which they themselves had filed a month before, and instead inexplicably requested a certified copy and translation of the inoperative *Brown* complaint.  And several months later, when they again successfully moved to extend the time for service, they made no effort to correct the error and failed to inform the Court that they were attempting to serve EY Germany with the superseded complaint.  Nor do Plaintiffs have any excuse for failing to correct the defect.  EY Germany's counsel advised Lead Counsel of the defective attempt at service and made clear that EY Germany would seek dismissal on this basis, yet Plaintiffs declined to cure the problem.

Given Plaintiffs' multiple opportunities to serve the operative complaint, and the required German translation, dismissal is appropriate.  *See Traxcell*, 2019 WL 8137134, at *4 (dismissing complaint where plaintiff purported to serve superseded complaint and had "not demonstrated reasonable diligence in attempting service" because service attempts did not "comply[] with the Hague Convention"); *Walker v. Collier*, 2020 WL 3493624, at *4 (E.D. Tex. May 15, 2020) ("Given that: (1) Plaintiff waited eight months after his lawsuit was filed to attempt service …, (2) was on notice that [t]he service was defective, and (3) did not attempt to cure the defective summonses, this Court is not inclined to extend the time for Plaintiff to attempt service again.");

*Valle v. GDT Enters.*, 2020 WL 435295, at *4 (E.D.N.Y. Jan. 28, 2020) (dismissing where "plaintiff has not presented a colorable excuse for his neglect"); *Felix v. City of Poughkeepsie*, 2019 WL 5306981, at *7 (S.D.N.Y. Oct. 18, 2019) (plaintiff's "failure to attempt to cure his defective service . . . warrants dismissal of the Complaint").

## II.     THE COURT SHOULD DISMISS FOR LACK OF PERSONAL JURISDICTION.

Even if service had been properly effected, the Court does not have personal jurisdiction over EY Germany.  No aspect of the allegations in this case involves the United States, and EY Germany directed no suit-related conduct at this country.

Plaintiffs "bear[] the burden of demonstrating the facts that establish jurisdiction" over EY Germany.  *Abira Med. Lab'ys v. Johns Hopkins Healthcare LLC*, 2020 WL 3791565, at *2 (E.D. Pa. July 7, 2020) (Brody, J.).  Where, as here, the plaintiff's claim is based on a federal statute authorizing nationwide service of process, *see* section 27 of the Exchange Act, 15 U.S.C. § 78aa, "the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole."  *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002).  "Consistent with due process, personal jurisdiction can be 'exercised under two distinct theories, a defendant's general or claim-specific contacts with the forum.'"  *Spear v. Marriott Hotel Servs.*, 2016 WL 194071, at *2 (E.D. Pa. Jan. 15, 2016).  Neither type of jurisdiction exists here.

### A.     Plaintiffs Cannot Establish General Jurisdiction Over EY Germany.

A court may exercise general jurisdiction only where the defendant's contacts with the forum are "so continuous and systematic as to render [the defendant] essentially at home in the forum State."  *Daimler AG v. Bauman*, 571 U.S. 117, 128 (2014).  "The paradigm forums in which a corporate defendant is at home are the corporation's place of incorporation and its principal place of business."  *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).  General jurisdiction

theoretically could arise in a forum other than these paradigmatic locations, but after *Daimler*, "the Third Circuit . . . has held that it is incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Chant Eng'g Co. v. Cumberland Sales Co.*, 2021 WL 848062, at *3 (E.D. Pa. Mar. 5, 2021).  "[I]n the post-*Daimler* legal landscape, the mere fact that an out-of-state entity transacts business in [the forum], even *substantial* business, is insufficient to establish that the entity is 'at home' in [the forum]." *Chant Eng'g Co.*, 2021 WL 848062, at *4.

Plaintiffs cannot clear the high bar for establishing general jurisdiction.  EY Germany is organized and maintains its principal place of business in Germany.  Streyl Decl. ¶ 3.  Nor can Plaintiffs show "that this is an exceptional case in which [EY Germany's] operations in [the United States] are so substantial and important as to render it at home in [the United States]." *Abira Med. Lab'ys*, 2020 WL 3791565, at *3.  EY Germany has no offices, employees, property, or bank accounts in the United States.  Streyl Decl. ¶¶ 5-7.  Plaintiffs rely on EY Germany's "registration with the Public Company Accounting Oversight Board," CCAC ¶ 22, but by federal statute, registration with the PCAOB "shall not by itself provide a basis for subjecting such a foreign public accounting firm to the jurisdiction of the Federal or State courts," except for matters between the auditor and the PCAOB, 15 U.S.C. § 7216(a)(1).

Plaintiffs' remaining allegations fare no better.  Their assertion that EY Germany signed audit opinions for four "United States exchange-listed companies" identified in paragraph 22 of the Consolidated Complaint is partly false and wholly irrelevant; EY Germany signed audit opinions for only two of those German companies, and the audits were in Germany.  *See* Streyl Decl. ¶ 10.  The allegation that EY Germany "substantially participate[d] in the audits of at least 30 United States multinational corporations," CCAC ¶ 22, is misleading at best, since any such

participation was limited to auditing German subsidiaries, Streyl Decl. ¶ 10.  But even if the allegations were true, they would not show that EY Germany is "at home" in the United States, as required by *Daimler*.  The Supreme Court has rejected far more extensive contacts as grounds for general jurisdiction—"'tens of thousands' of a foreign manufacturer's tires entering the forum" in *Goodyear* and "ten percent of a nonresident defendant's sales" occurring within the forum in *Daimler*.  *Chant Eng'g Co.*, 2021 WL 848062, at *4.  Courts have also rejected attempts to establish general jurisdiction over auditors based on vague allegations.  *See Seiden v. Schwartz, Levitsky, & Feldman LLP*, 2017 WL 2591785, at *2 (S.D.N.Y. Jun. 14, 2017) (no general jurisdiction over Canadian auditor with "no offices in New York" where plaintiff alleged auditor had "done business with multiple New York companies"); *see also Pac. Emps. Ins. Co. v. AXA Belg. S.A.*, 785 F. Supp.2d 457, 470 (E.D. Pa. 2011) (no general jurisdiction over Belgian reinsurer based on "allegations of five audits, an unspecified number of in person meetings and 'numerous' contacts over ten years").  There is no general jurisdiction over EY Germany.

### B.    Plaintiffs Cannot Establish Specific Jurisdiction Over EY Germany.

Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 919 (2011).  The Court may exercise specific jurisdiction over EY Germany if Plaintiffs establish a "substantial connection" between EY Germany's "suit-related conduct" and "the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  There is no such substantial connection here— indeed, there is ***no connection whatsoever*** between the alleged suit-related conduct and the United States.

"A plaintiff must establish three key elements to show that a court has specific personal jurisdiction over a defendant."  *Abira Med. Lab'ys*, 2020 WL 3791565, at *4.  First, the plaintiff

must show that the defendant "purposefully directed [its] activities" at the forum.  *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020).  "Second, the plaintiff's claims 'must arise out of or relate to' the defendant's activities."  *Id.*  "And third, exercising personal jurisdiction must not 'offend traditional notions of fair play and substantial justice.'"  *Danziger*, 948 F.3d at 130.  Here, the conduct from which Plaintiffs' claims arise—EY Germany's audits of Wirecard AG in Germany—fails the first test because that conduct was not "purposefully directed" at the United States.  Other activities Plaintiffs allege, such as EY Germany's alleged work relating to Wirecard's North American subsidiary, even if true (which they are not), fail the second test—that conduct has no connection to Plaintiffs' claims.  And for these reasons and others, exercising jurisdiction over EY Germany here would not comport with "fair play and substantial justice."

### 1.    EY Germany Did Not Purposefully Direct Its Activities at the U.S.

Plaintiffs cannot satisfy the first prong of specific jurisdiction because EY Germany did not purposefully direct any relevant conduct at the United States.  To satisfy the threshold requirement of purposeful availment, "[a] defendant's contacts . . . must amount to 'a deliberate targeting of the forum,'" and "[t]he 'unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient."  *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103 (3d Cir. 2009).  Notably, specific jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State."  *Walden*, 571 U.S. at 284 (emphasis in original).  "The contacts must not be 'based on the random, fortuitous, or attenuated contacts [the defendant] makes by interacting with other persons affiliated with the State.'"  *Abira Med. Lab'ys.*, 2020 WL 3791565, at *3.

Here, Plaintiffs allege that EY Germany purposefully directed its conduct at the United States because it prepared audit opinions, in German, under German accounting standards, for a

German company's annual reports, that they say "would be relied upon by [] United States investors in deciding whether to purchase" securities in the United States.  CCAC ¶ 23.  Three circuits have correctly rejected versions of this argument in cases involving auditors.  The Second Circuit declined to exercise jurisdiction over an accounting firm that purportedly "'knew or had good reason to know' that the allegedly false and misleading financial reports it had prepared" would be relied on by "prospective purchasers."  *Leasco Data Processing v. Maxwell*, 468 F.2d 1326, 1341-42 (2d Cir. 1972) (Friendly, J.), *abrogated on other grounds*, *Morrison v. Nat'l Austl. Bank*, 561 U.S. 257 (2010).  Under that "worldwide reliance" theory, the court reasoned, "accountants operating solely in London could be subjected to personal jurisdiction in any country whose citizen had purchased stock of a company they had audited; the same would be true, of course, of accountants operating solely in the United States."  *Id.* at 1342.

Similarly, the Eighth Circuit held there was no jurisdiction over auditors where "the 'focal point' of the alleged wrongdoing and harm occurred in Canada"; the court was "not convinced that the sending of financial statements into the United States establishes minimum contacts"; and the auditor "performed its audit work in Canada under Canadian accounting principles and auditing standards for its Canadian client."  *GE Cap. Corp. v. Grossman*, 991 F.2d 1376, 1387-88 (8th Cir. 1993).  And the Tenth Circuit held there was no jurisdiction over an auditor with "no office, employees or agents" in the forum state, reasoning that even if the auditor "might have foreseen reliance" on its audit, its "activities were not enough to constitute purposeful availment" because "the mere foreseeability of consequences within the forum state, without more, is insufficient as a basis for jurisdiction."  *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1534-35 (10th Cir. 1996).

15

EY Germany's audits for Wirecard were even further removed from the forum than the activities of the defendants in these cases.  Plaintiffs do not allege that EY Germany sent its opinions into the United States, much less that it had any involvement in Plaintiffs' purchases.  Nor did EY Germany even audit an entity that sponsored the securities Plaintiffs purchased.  Rather, Plaintiffs allegedly purchased securities created by American broker-dealers that simply mirrored the performance of the stock of a German company, trading on German exchanges, that EY Germany audited in Germany.  Plaintiffs plead no basis to believe that EY Germany even had any knowledge of such purchases.  This case certainly is not about EY Germany "reaching out" into the United States.  *See Goodway Grp. v. Sklerov*, 2018 WL 3870132, at *4 (E.D. Pa. Aug. 15, 2018).  Finding purposeful availment here would thus contravene the Supreme Court's instruction that the minimum contacts necessary to exercise personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State," not "unilateral activity of another party or a third person."  *Walden*, 571 U.S. at 284.

### 2.    This Case Does Not Relate to EY Germany's Contacts with the U.S.

Perhaps recognizing that EY Germany's audits of Wirecard were not purposefully directed at the United States, Plaintiffs also insinuate that EY Germany audited Wirecard's North American subsidiary.  CCAC ¶ 23 (alleging that E&Y Germany "claimed in its audit reports published with Wirecard's annual reports to have audited the financial statements of Wirecard's subsidiaries, which include Wirecard North America.").  But the audit reports say only that EY Germany audited the "consolidated financial statements prepared by Wirecard AG."  CCAC ¶¶ 314–16.  In fact, EY Germany did not conduct any audit work in the U.S.  Streyl Decl. ¶ 11.

But even if Plaintiffs' allegations about EY Germany's work for Wirecard in the United States were true, those asserted contacts had nothing to do with Plaintiffs' claims and, therefore, they cannot satisfy the requirement for specific jurisdiction of "an affiliation between the forum

and the underlying controversy." *Goodyear*, 564 U.S. at 919. The Consolidated Complaint does not identify a single statement by EY Germany concerning Wirecard North America that Plaintiffs claim was materially false or misleading. *See* CCAC ¶¶ 314-23. Nor do Plaintiffs identify any aspect of the Wirecard fraud that took place in the United States. Indeed, they allege precisely the opposite: that "Wirecard's operations in the United States … lost money every year since 2016, leaving the Company unable to report a profit without relying on the falsified revenue from the Third-Party Partners" in Asia. *Id.* ¶ 116(e). The KPMG Report, on which Plaintiffs rely heavily for the substance of their allegations, does not even mention the United States.

### 3. Exercising Jurisdiction Would Not Comport with Fair Play and Substantial Justice.

The exercise of personal jurisdiction must "comport with fair play and substantial justice." *Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985). To determine whether jurisdiction is "reasonable," courts consider "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering substantive social policies." *Am. Bus. Lending Grp. v. Shainis*, 2011 WL 691580, at *3 (D.N.J. Feb. 14, 2011).

Requiring EY Germany to defend itself in the United States is not reasonable. This litigation will impose significant burdens on the parties and the Court. The key witnesses and documents are located in Germany, requiring extensive translation and Hague Convention procedures, and the governing standards of conduct are German and European auditing standards. Not only is adjudicating claims against EY Germany in Germany far more convenient, but Germany also has strong interests in resolving claims concerning a German company and a German auditor. *See Asahi Metal Indus. v. Superior Court*, 480 U.S. 102, 115 (1987) (courts must

"consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction"). The numerous proceedings underway in Germany reflect that interest. *See* Hellgardt Decl. ¶¶ 61-65. The United States, on the other hand, has very limited, if any, interest in hearing these claims. "Considering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff[s] and the forum State, the exercise of personal jurisdiction . . . would be unreasonable and unfair." *See Asahi*, 480 U.S. at 116.

## III. THE COURT SHOULD DISMISS THE COMPLAINT UNDER THE DOCTRINE OF *FORUM NON CONVENIENS.*

This action is also subject to dismissal in favor of a German court under the doctrine of *forum non conveniens*. "[A] federal district court may dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).[7] "The *forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

"The Third Circuit has articulated a three-part test for analyzing *forum non conveniens* motions." *Behrens v. Arconic, Inc.*, 487 F. Supp.3d 283, 309 (E.D. Pa. 2020). First, the court "must . . . determine whether an adequate alternative forum can entertain the case." *Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183, 189-90 (3d Cir. 2008). "[T]he satisfaction of this prong of the analysis does not require the Court to conduct complex exercises in comparative law." *Warner Tech. & Inv. Corp. v. Hou*, 2014 WL 7409978, at *3 (D.N.J. Dec. 31, 2014). Second, if an adequate forum exists, the court "determine[s] the appropriate amount of deference to be given the plaintiff's

---

[7] "A district court . . . may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant." *Sinochem Int'l*, 549 U.S. at 432.

choice of forum." *Windt*, 529 F.3d at 190.  Third, "the district court must balance the relevant public and private interest factors." *Id.*  Here, the three-part test mandates dismissal.

### A.       Germany Is an Adequate Alternative Forum.

Federal courts across the country routinely dismiss cases in favor of German courts. "Germany is among the 13 nations whose courts have been consistently deemed to be adequate alternative fora." *GoldenTree Asset Mgmt. v. BNP Paribas*, 64 F. Supp.3d 1179, 1193 (N.D. Ill. 2014) (declining to "reach the unprecedented conclusion that German courts are not an adequate alternative forum" and granting motion to dismiss); *see also Prevent USA Corp. v. Volkswagen AG*, 2021 WL 1087661, at *8 (E.D. Mich. Mar. 22, 2021) ("Germany has a well developed and sophisticated legal system that, as many other courts have recognized, provides an adequate forum for the resolution of a broad array of legal disputes") (collecting cases and granting motion to dismiss).  This case provides no reason to depart from that consensus.

In addition, Germany is an adequate alternative forum because EY Germany is "amenable to process" there.  *See Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013). In support of this Motion, EY Germany submits the expert declaration of Professor Alexander Hellgardt, an expert on German law.[8]  As set forth in the Hellgardt Declaration, German courts would have jurisdiction to hear claims brought by U.S. plaintiffs concerning EY Germany's audits of Wirecard.  Hellgardt Decl. ¶¶ 12-14.  Further, EY Germany has committed that it would accept service if sued in an appropriate German court.  Streyl Decl. ¶ 19.  And such claims would not be time-barred if brought between now and the end of 2023.  Hellgardt Decl. ¶¶ 36-37.

---

[8] "A motion to dismiss based on *forum non conveniens* 'may be resolved on affidavits presented by the parties.'"  *Behrens*, 487 F. Supp.3d at 304 n.19.

Moreover, German law should govern Plaintiffs' allegations against EY Germany,[9] and the claim Plaintiffs assert here is "cognizable" in Germany. *Kisano*, 737 F.3d at 873. As Professor Hellgardt explains, a German court must apply the law of the domicile of the issuer (Wirecard) or the auditor (EY Germany), which in both cases is Germany. Hellgardt Decl. ¶¶ 15-19. And German tort law, including section 826 of the German Civil Code, allows plaintiffs to recover damages for financial harm resulting from intentional conduct of another party that violates accepted principles of morality. *Id*. ¶¶ 20-35. The applicable intent standard is very similar to the scienter requirement of section 10(b). *Id*. ¶ 33. German courts regularly apply section 826 in cases of auditor liability. *Id*. ¶¶ 31-32. Indeed, more than 500 investors have already invoked that provision (and others) in civil suits against EY Germany in German courts. Streyl Decl. ¶ 18. *See Church v. Glencore PLC*, 2020 WL 4382280, at *4 (D.N.J. July 31, 2020) (dismissing case where "Switzerland's judicial system permits the adjudication of the subject matter of Plaintiffs' securities fraud claims").

German law also safeguards procedural fairness. As Professor Hellgardt explains, "Germany's civil practice shares the same central values and goals as US civil practice, i.e., the enforcement of valid claims by means of granting open access to courts and by establishing the true facts underlying the dispute in question." Hellgardt Decl. ¶ 5. To the extent Germany differs from the United States in the conduct of discovery or the availability of class actions, those differences are not relevant to whether Germany is an adequate alternative forum. *See, e.g.*, *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 861-62 (7th Cir. 2015) ("American-style class actions remain uncommon," and "[a] nation need not allow the relatively uncommon American-style class action to be considered an adequate forum."). In any event, although Germany (like

---

[9] *See* Section III.A *infra*.

20

most countries) does not allow American-style class actions, "it does have procedural mechanisms in place that would allow" plaintiffs to join with "similarly situated persons who come forward" and "prosecute a single lawsuit." *Deirmenjian v. Deutsche Bank*, 2006 WL 4749756, at *7 (C.D. Cal. Sept. 25, 2006).  For example, German procedural mechanisms, including model cases and declaratory proceedings, allow for the adjudication of complex cases that involve multiple plaintiffs.  Hellgardt Decl. ¶¶ 42-45.

For all these reasons, Germany is an adequate alternative forum.

### B.      Plaintiffs' Decision to Sue in Pennsylvania Is Not Entitled to Deference.

Plaintiffs' choice of forum is not entitled to any deference.  The appropriate level of deference to plaintiffs' chosen forum turns on "[w]here (i) the parties are from; (ii) the evidence is concentrated; and (iii) the relevant conduct occurred." *Church*, 2020 WL 4382280, at *3.  Here, Plaintiffs allege that they reside in Maryland and California.  CCAC ¶¶ 26, 30; *Church*, 2020 WL 4382280, at *3 (no deference where there was "no indication that Plaintiffs are connected to New Jersey").  EY Germany does not have "any offices or subsidiaries" in Pennsylvania.  *See Church*, 2020 WL 4382280, at *3.  And Germany is where the evidence is concentrated and the alleged conduct occurred.  *See Levien v. Hibu*, 475 F. Supp.3d 429, 443 (E.D. Pa. 2020) ("Much of the relevant evidence will be in England, which suggests that litigating there will be more convenient for the parties").  Under these circumstances, Plaintiffs' decision to sue in the Eastern District of Pennsylvania is not entitled to any deference.

### C.      The Public and Private Interest Factors Favor Dismissal.

#### 1.      Public Interest Factors Favor Dismissal.

Public interest factors include "the administrative difficulties flowing from court congestion," "the 'local interest in having localized controversies decided at home,'" "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and

the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper*, 454 U.S. at 241 n.6.  Here, the public-interest factors favor dismissal.

Germany has powerful reasons to have this case decided at home, and Pennsylvania has none.  This case concerns the alleged conduct of a German auditor and statements by a German company in disclosures prepared in Germany pursuant to German law and German auditing standards.  *See Windt*, 529 F.3d at 193 (affirming dismissal of complaint alleging "fraud and mismanagement perpetrated on a Dutch company by executives, board members and a corporate shareholder of that Dutch company").  This is no "local dispute" centered in Pennsylvania. "Rather, the center of [EY Germany's] purported securities violations appears to have occurred abroad in [Germany], where the alleged misstatements/omissions were drafted and approved." *Church*, 2020 WL 4382280, at *6; *Levien*, 475 F. Supp.3d at 445 (no local interest where "the alleged fraud concerns an English company listed on the London Stock Exchange").

Germany has already demonstrated its strong interest in addressing allegations against EY Germany arising out of Wirecard's collapse.  Hellgardt Decl. ¶¶ 57-69.  The ongoing proceedings in Germany include an investigation by the German parliament; an inquiry by APAS, a German government agency that regulates auditors; inquiries by German prosecutors; as well as more than 500 civil suits brought by investors.  *Id*. ¶¶ 61-62; Streyl Decl. ¶ 18.  Germany's strong interest "in regulating companies organized and operating under its laws and ensuring the proper application of its statutes indicates that dismissal is required."  *See Levien*, 475 F. Supp.3d at 444.

### 2.    Private Interest Factors Favor Dismissal.

Private interest factors include "the ease of access to sources of proof; ability to compel witness attendance if necessary; means to view relevant premises and objects; and any other potential obstacle impeding an otherwise easy, cost-effective, and expeditious trial." *Kisano*, 737 F.3d at 873.  Courts also consider plaintiffs' ability to enforce any judgment they may obtain.

*Deirmenjian*, 2006 WL 4749756, at *4.  "Under the private interest factors, dismissal is generally favored when a majority of the evidence and witnesses are located in a foreign forum and the alleged misconduct is centered there."  *Church*, 2020 WL 4382280, at *5.  "The Third Circuit has repeatedly held that, when the overwhelming majority of witnesses and evidence reside in a foreign forum, dismissal on the grounds of forum non conveniens is appropriate."  *Baez v. Marriott Int'l, Inc.*, 2018 WL 3801251, at *3 (D.N.J. Aug. 9, 2018).

Here, the key evidence and witnesses are located in Germany.  EY Germany's conduct occurred in Germany.  The documents relevant to the claims against EY Germany are in EY Germany's files, which are located in Germany and written in German.  Streyl Decl. ¶ 14.  German courts can compel the production of documents and the appearance of witnesses.  Hellgardt Decl. ¶ 48.  Accordingly, "[i]f the litigation proceeds in" Germany, "compliance with the Hague Convention would not be necessary," as a German court "would have procedural mechanisms at its disposal to secure the testimony of witnesses within its jurisdiction."  *Behrens*, 487 F. Supp.3d at 325.  Litigating this case in this Court, on the other hand, would require "discovery of evidence located abroad," which will be "subject to processes under the Hague Convention."  *Church*, 2020 WL 4382280, at *5 n.10.  It would require translation of many documents—a "critical concern when analyzing the private interest factors."  *Warner Tech*, 2014 WL 7409978, at *5.  And given that EY Germany's work was governed by German law and auditing standards, expert witnesses, too, will likely be located in Germany.

Finally, German courts likely have exclusive jurisdiction over claims against EY Germany, and would therefore not recognize or enforce judgments by a U.S. court against EY Germany.  Hellgardt Decl. ¶¶ 70-80.  Accordingly, even if Plaintiffs were to obtain a judgment against EY Germany from this Court, they would likely not be able to enforce that judgment in German courts.

*Id.* ¶ 80. The private interest factors, like the public interest factors, strongly favor dismissal in favor of a German court.

<div align="center">*          *          *</div>

Courts in this Circuit and elsewhere have dismissed numerous securities cases—including cases involving unsponsored ADRs—under *forum non conveniens*. *See, e.g.*, *Windt v. Qwest Comm'cns Int'l*, 544 F. Supp.2d 409, 424 (D.N.J.) (dismissing securities claim in favor of Netherlands), *aff'd*, 529 F.3d 183 (3d Cir. 2008); *Church*, 2020 WL 4382280, at \*3 (dismissing securities class action concerning unsponsored ADRs in favor of Switzerland); *Warner Tech.*, 2014 WL 7409978, at \*3 (dismissing securities fraud claims in favor of China); *Otor, S.A. v. Credit Lyonnais, S.A.*, 2006 WL 2613775, at \*3-5 (S.D.N.Y. Sept. 11, 2006) (dismissing securities fraud claims in favor of France); *see also In re Eur. Aeronautic Defence & Space Co. Secs. Litig.*, 703 F. Supp.2d 348, 360-62 (S.D.N.Y. 2010) (dismissing securities class action concerning unsponsored ADRs and indicating that *forum non conveniens* also supported dismissal); *Paraschos v. YBM Magnex Int'l*, 130 F. Supp.2d 642, 645 (E.D. Pa. 2000) (dismissing securities claims in favor of Canada based on international comity). For the reasons described above, that result should happen here.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM.

### A.    Plaintiffs' Claims Are Impermissibly Extraterritorial.

In *Morrison v. National Australia Bank*, 561 U.S. 247, 267 (2010), the Supreme Court ruled that section 10(b) of the Exchange Act does not apply outside the United States. Rather, the reach of the statute is limited to (1) "transactions in securities listed on domestic exchanges,"[10] and

---

[10] The OTC market on which Plaintiffs bought their securities is "not [a] national securities exchange[] within the scope of *Morrison*." *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015).

<div align="center">24</div>

(2) "domestic transactions" in unlisted securities.  Four years later, the Second Circuit, in *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014) (per curiam), applied *Morrison* and held that a domestic securities transaction is *necessary* but not *sufficient* "to state a properly domestic claim" under section 10(b) where "foreign elements" dominate. *Id*. at 215, 217.  The Second Circuit reasoned that "a rule making the statute applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine *Morrison*'s insistence that § 10(b) has no extraterritorial application." *Id*.  The Second Circuit added that *Morrison* "does not … permit" applying the Exchange Act to "conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges." *Id*. at 215–16.  Under these principles, Plaintiffs' claims fail.

The extraterritoriality analysis "has two parts: at step one the Court must determine whether the plaintiff's claim involves a 'domestic transaction.'  Assuming this requirement is satisfied, the Court must proceed to step two and consider whether the claims are so predominantly foreign as to be impermissibly extraterritorial." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp.3d 885, 915–16 (S.D.N.Y. 2018).  Even assuming that Plaintiffs can satisfy step one (which they have not),[11] their claims plainly fail step two.

---

[11] In *Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012), the Second Circuit held that a transaction is domestic when "the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States."  The Third Circuit adopted this holding in *Georgiou*, 777 F.3d at 136.  In *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 2021 WL3863372 (S.D.N.Y. Aug. 30, 2021), the court held that a purchaser of F-shares who asserted, like Plaintiffs here, that he was in the United States when he placed his purchase order with a U.S. broker failed to establish a domestic transaction under the same standard that governs here. *Id*. at *5 n.45.

In *Parkcentral*, the Second Circuit held that *Morrison* barred application of section 10(b) to Volkswagen where the plaintiffs in the United States entered swap transactions linked to the prices of Volkswagen stock on European exchanges. Although the claims might have involved a "domestic transaction," the Second Circuit ruled that *Morrison* "unmistakably made a domestic securities transaction . . . necessary to a properly domestic invocation of § 10(b), [but] such a transaction is not alone sufficient to state a properly domestic claim under the statute." *Parkcentral*, 763 F.3d at 215.

Where, as here, the claim is "predominantly foreign"—that is, where liability would be imposed on "foreign defendants with no alleged involvement in plaintiffs' transactions, on the basis of the defendants' largely foreign conduct, for losses incurred by the plaintiffs in securities . . . based on the price movements of foreign securities"—imposing liability "would constitute an impermissibly extraterritorial extension of the statute." *Id.* at 201, 216. The court reasoned that holding otherwise "would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it." *Id.* at 215.

Each of the criteria found dispositive by the Second Circuit in *Parkcentral* applies equally to Plaintiffs' claims. Plaintiffs do not allege that EY Germany "was a party" to any domestic transactions in unsponsored ADRs or F-shares, *id.* at 207. Although the purchases of ADRs and F-shares "may have been concluded domestically, the [Wirecard] shares they referenced" traded exclusively on a foreign exchange in Europe, and not on U.S. exchanges, *id.* at 207. EY Germany is located in Germany, and the claims here only "concern statements made primarily in Germany with respect to stock in a German company traded only on exchanges in Europe," *id.* at 216. And

"the fraudulent acts alleged in the complaint" are "the subject of investigation by []German regulatory authorities," *id*., and EY Germany's conduct was concededly governed by German and European laws and standards, not U.S. law or GAAP.

All of these factors point to the conclusion that it should be up to Germany to determine EY Germany's responsibility to investors, if any. "[T]he motivating concern in *Morrison* was that application of U.S. securities laws to foreign conduct where it was not intended by Congress is likely to run the risk of incompatibility with foreign law and unduly intrude upon the sovereignty of foreign nations." *In re London Silver*, 332 F. Supp.3d at 918. "[P]otential 'unintended clashes between our laws and those of other nations could result in international discord'" if U.S. courts "adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Prime Int'l Trading v. BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019)*cert. denied sub nom. Atl. Trading USA v. BP P.L.C.*, 141 S. Ct. 113 (2020). That concern is very real here, where EY Germany's conduct was governed by German and European standards and is the subject of major investigations and proceedings in Germany.

The fact that some U.S. investors were allegedly injured at the very outer reaches of the fraud does not change the result. "Permitting a suit to go forward any time a domestic transaction is pleaded would turn the presumption against extraterritoriality into a 'craven watchdog,' and would fly in the face of the Supreme Court's clear guidance that the presumption against extraterritoriality cannot evaporate any time '*some* domestic activity is involved in the case.'" *Id.* (emphasis in original).

Although neither *Morrison* nor *Parkcentral* dealt with ADRs or F-shares, applying the Exchange Act to transactions in unsponsored ADRs or F-shares of a foreign issuer would raise exactly the same concerns that animated those decisions. If Plaintiffs' trades in these securities

27

could trigger application of section 10(b), "then it would subject to U.S. securities laws conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges, in the absence of any congressional provision addressing the incompatibility of U.S. and foreign law nearly certain to arise"—"a result *Morrison* plainly did not contemplate and that the Court's reasoning does not . . . permit." *Parkcentral*, 763 F.3d at 215-16.[12]

For all these reasons, Plaintiffs' claims would require extraterritorial application of the U.S. securities laws and must be dismissed.

### B.    Plaintiffs' Claims Do Not Satisfy the In-Connection-with-Requirement.

Even if section 10(b) applied here, Plaintiffs would nonetheless fail the bedrock requirement that the alleged conduct in question be "in connection with the purchase or sale" of the security in question.  15 U.S.C. § 78j.  In *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000), the Court of Appeals made clear that for an outside auditor's audit of a company's financial statement to meet the "in connection with" requirement, the auditor must have known, or had reason to know, that investors in the security might rely on the financial statements.  *Id*. at 177. "[A]n accountant is blameless where it could not reasonably have foreseen that its representations would be used in the purchase or the sale of securities." *Id*. Here, Plaintiffs have pleaded nothing

---

[12] Two circuits have disagreed with *Parkcentral*'s conclusion that a domestic transaction is necessary but not sufficient for section 10(b) to apply.  Those decisions are erroneous.  In *Stoyas* v. *Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018), the Ninth Circuit concluded that *Morrison* requires "examin[ing] the location of the transaction" and nothing else whatsoever. *Id*. at 949.  Its holding disregarded the predominance of foreign conduct, the effect on foreign exchanges, and the interference with securities regulation in foreign nations.  *Stoyas* misunderstood *Morrison*.  The only issue before the Court in *Morrison* was whether claims based on foreign purchases exceeded the territorial scope of section 10(b).  The Court thus had no occasion to decide that any other claims came within the statute's scope and constituted a permissible domestic application.  In other words, the Court decided only that a domestic transaction is necessary, not whether it is sufficient. The First Circuit repeated the Ninth Circuit's error in *SEC v. Morrone*, 997 F.3d 52 (1st Cir. 2021). This Court should follow *Parkcentral*.

to show that EY Germany's audits were in connection with their purchases of unsponsored ADRs and F-shares.  Not even Wirecard, much less EY Germany, had any involvement in establishing those securities.  Streyl Decl. ¶ 13.  Thus, there is no basis to conclude that EY Germany—working in Germany, auditing a German company's financial statements, under German auditing standards—knew or should have known that Plaintiffs would rely on those statements in purchasing unsponsored ADRs or F-shares.

### C.     Plaintiffs Do Not Allege Scienter Adequately.

To state a claim under section 10(b), Plaintiffs must plead scienter.  Under the PSLRA, that burden is substantial—the plaintiff must set forth "with particularity" facts giving rise to a "strong inference" of fraudulent intent.  15 U.S.C. § 78u–4(b)(2).  Under Third Circuit law, satisfying this "exacting" requirement "requires plaintiffs to allege facts giving rise to a strong inference of either reckless or conscious behavior."  *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253, 267 (3d Cir. 2009).  To qualify as "strong," the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  And pleading scienter as to an auditor is even a more daunting burden, as auditors are outside professionals who have no motive to aid a client's fraud.  *See, e.g.*, *In re IKON Off. Sols.*, 277 F.3d 658, 668-77 (3d Cir. 2002); *In re Longtop Fin. Techs. Secs. Litig.*, 939 F. Supp.2d 360, 377 (S.D.N.Y. 2013).  Plaintiffs fail to meet these high standards here, because their own allegations show that EY Germany acted conscientiously and was itself a victim of the Wirecard fraud.

One reason pleading scienter as to an auditor is difficult is that hindsight does not suffice; "the discovery of discrete errors after subjecting an audit to piercing scrutiny post-hoc does not, standing alone, support a finding of intentional deceit or of recklessness."  *IKON*, 277 F.3d at 673.  "An audit does not guarantee that a client's accounts and financial statements are correct any more

than a sanguine medical diagnosis guarantees well-being." *Id.* Even if the auditor failed to adhere to professional standards, "[v]iolations of professional auditing standards, without more," do not show scienter. *Anwar v. Fairfield Greenwich*, 728 F. Supp.2d 372, 450 (S.D.N.Y. 2010).

For these reasons, for "recklessness on the part of [an] . . . accountant to satisfy . . . requirement of scienter, it must approximate an actual intent to aid in the fraud being perpetrated by the audited company." *S. Cherry St. v. Hennessee Grp.*, 573 F.3d 98, 110 (2d Cir. 2009). Even allegations of a "seriously botched audit" which show negligence or gross negligence "do[] not give rise to a strong inference that the auditor acted with intent to defraud, conscious misconduct, or deliberate recklessness, as is required in a securities fraud case." *Dsam Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 387 (9th Cir. 2002). Rather, stating a claim for securities fraud against an auditor requires specific allegations of "auditing practices so shoddy that they amounted at best to a 'pretended audit.'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006).

Even when the auditor's client is found to have committed fraud, that fact itself does not show that the auditor acted with scienter. For example, Royal Ahold, the Dutch parent company of U.S Food Service, committed what the SEC described as "a massive, multifaceted fraud" that involved "fraudulently overstating sales by billions of dollars [and] fraudulently fabricating hundreds of millions of dollars of earnings."[13] Royal Ahold paid investors a $1.1 billion settlement. Despite these facts, the Fourth Circuit concluded that the securities claims against Ahold's auditor, Deloitte & Touche, failed as a matter of law. The court found "the inference that the Deloitte defendants lacked the necessary scienter more compelling than any competing

---

[13] Statement of SEC official Thomas Newkirk, SEC Release 2004-144 (Oct. 13, 2004).

inference that they knowingly or recklessly perpetrated a fraud on Ahold's investors." *Pub. Emps. Ret. Ass'n v. Deloitte & Touche LLP*, 551 F.3d 305, 306 (4th Cir. 2009).

Another case in point: Petrobras, a Brazilian oil company, was the perpetrator of another of the top corporate frauds of all time. The SEC stated that "Petrobras fraudulently raised billions of dollars from U.S. investors while its senior executives operated a massive, undisclosed bribery and corruption scheme."[14] Yet when investors attempted to sue Petrobras's auditor, PricewaterhouseCoopers, under section 10(b), the court rejected those claims. Even after the plaintiffs obtained PwC's work papers and sought leave to replead their failed claim, the court concluded that the documents "appear to show at most that PwC was foolish, but not that PwC's foolishness amounted to an intent to aid in any alleged fraud." *In re Petrobras Sec. Litig.*, 2016 WL 3144395, at *2 (S.D.N.Y. May 5, 2016).

There are many other examples. *See, e.g.*, *In re Advanced Battery Techs. Sec. Litig.*, 2012 WL 3758085, at *15 (S.D.N.Y. Aug. 29, 2012) (granting auditor's motion to dismiss despite finding claim validly stated against client); *Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp.2d 321, 334 (S.D.N.Y. 2013) ("The SEC may indeed have found the fraud easily discoverable but this fact does not necessarily reflect recklessness on the part of D & T."); *In re DNTW Chartered Accts. Sec. Litig*, 172 F. Supp.3d 675, 691 (S.D.N.Y. 2016) ("The inference that DNTW was engaged in deliberate illegal activity or acted with recklessness approximating an intent to aid Subaye's fraud is not as compelling as the competing inferences. It is more plausible that DNTW was itself fooled, or that it simply performed shoddy, negligent audits.").

The Consolidated Complaint does not clear the high hurdles set by these precedents. First, Plaintiffs plead no basis for concluding that EY Germany had a motive to aid the Wirecard fraud.

---

[14] Statement of SEC official Steven Peikin, SEC Release 2018-215 (Sept. 27, 2018).

EY Germany stood to gain nothing from its work for Wirecard other than normal professional fees, and "it is well-established that an allegation of motive based solely upon a desire to receive professional fees is insufficient." *Klein v. Autek Corp.*, 147 F. App'x 270, 277 (3d Cir. 2005).

Second, Plaintiffs' allegations show that, far from conducting a "pretended audit," *In re Suprema*, 438 F.3d at 279, EY Germany carried out its professional obligations conscientiously and was the victim of what now appears to have been a sophisticated, multifaceted fraud that fooled many others, including German securities regulators and investment analysts.

Plaintiffs' allegations center on Wirecard's relationship to certain third-party acquirors (TPAs). According to the Consolidated Complaint, "revenue purportedly generated from transactions processed by the Third-Party Partners during the Class Period did not actually exist," and "cash totaling approximately €1.9 billion that Defendants claimed had been deposited in trust accounts for the benefit of Wirecard and reported in Wirecard's financial statements did not actually exist." CCAC ¶ 292. Plaintiffs fault EY Germany for not identifying these problems, but as they themselves acknowledge, EY Germany carried out substantial audit steps with respect to the TPAs. For example, in its report on Wirecard's financial statements at year-end 2017, EY Germany identified "[r]ecoverability of receivables and recognition and presentation of revenues from acquiring partners" as a "key audit matter," and it stated that it:

> examined the procedures and control mechanisms of receivables measurement contractually agreed with the acquiring partners. We particularly assessed the initial selection, contractual agreements, assessment and ongoing monitoring of the acquiring partners by Wirecard as part of Wirecard's risk management process. We have also assessed the valuation of the receivables in light of the financial risks from transaction processing with the merchants. Furthermore, we obtained balance confirmations of the acquiring partners and verified payments received by the acquiring partners. In addition we assessed the identification and recognition of valuation allowances for the receivables from acquiring partners.

CCAC ¶ 317.

Similarly, the next year, EY Germany identified "[m]easurement of receivables and recognition and presentation of revenues from acquiring partners" as a "key audit matter." CCAC ¶ 321. It also stated that it:

> examined the procedures contractually agreed with the acquiring partners and defined within the Company as well as the existing monitoring and control of acquiring partners by management as part of the risk management process, and tested the control mechanisms regarding receivables measurement. Furthermore, for the assessment of financial risks, we obtained confirmations from the acquiring partners for the existence of receivables and for chargebacks/fines and considered this information for the assessment of the measurement of receivables. We verified payments received by the acquiring partners as further evidence of the existence of receivables.

*Id*.

Plaintiffs assert in conclusory fashion that these descriptions of EY Germany's work were false or misleading because of the existence of the fraud, CCAC ¶ 323, but that is circular. The Consolidated Complaint identifies no basis for believing that EY Germany did not carry out these audit steps. Rather, the claim is that EY Germany should have performed these steps ***better***, or should have undertaken ***more*** steps. But those assertions do not support a strong inference of scienter. That Plaintiffs now believe the audits were inadequate in light of "piercing scrutiny post-hoc" does not establish scienter on the part of EY Germany. *IKON*, 277 F.3d at 673.

That is particularly true because, as reflected in the Complaint, Wirecard admitted that the third parties with whom EY Germany checked supplied "spurious" information ***"in order to deceive the auditor."*** CCAC ¶ 346. "It is not an accountant's fault if its client actively conspires with others in order to deprive the accountant of accurate information about the client's finances," and "[i]t would be wrong and counter to the purposes of the PSLRA to find an accountant liable in such an instance." *Public Empl.*, 551 F.3d at 316.

The Royal Ahold case again is on point. There, Royal Ahold included the revenue from certain joint ventures in its financial statements and assured the auditors that Royal Ahold had sufficient control over the joint ventures to justify that accounting treatment. Ultimately, it became clear that Royal Ahold hid certain side letters showing lack of control. The court reasoned that "[t]he most plausible inference that one can draw from the fact that Ahold concealed the side letters from its accountants is that the accountants were uninvolved in the fraud." *Id*. at 314. It did not matter that "[w]ith perfect hindsight, one might posit that defendants should have required stronger evidence of control from Ahold," or that "it may have been negligent for [the auditors] to accept as the only evidence of control Ahold's repeated representations that it controlled" the joint venture. *Id*. In a conclusion that applies equally here, the court stated that the complaint gave rise to "the strong inference that defendants were deceived by their clients into approving" the accounting because "Ahold would not have needed to go out of its way to produce false evidence of control had [the auditors] been complicit in the fraud, or had they been so reckless in their duties that their audit amounted to no audit at all." *Id*. Similarly, here, that the wrongdoers went to extreme lengths to deceive EY Germany shows that EY Germany was not in on the fraud.

Moreover, EY Germany ultimately helped expose the fraud relating to the escrow account, which is another factor cutting against scienter. As described in the Complaint, on June 18, 2020, EY Germany "informed Wirecard that it could not issue a clean audit because it was provided 'spurious' account statements by the trustee and thus could not confirm the accounts or money existed." CCAC ¶ 15. That EY Germany acted promptly when it learned of these problems refutes any suggestion that it had an "intent to aid in the fraud." *See Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp.2d 562, 572 (S.D.N.Y. 2011).

34

In sum, based on the Consolidated Complaint, the only conclusion that can be reached here is that "the stronger and more plausible inference is that [EY Germany auditors] were, like the plaintiffs, victims of [Wirecard's] fraud rather than its enablers." *Publ. Emp.*, 551 F.3d at 316.

## **CONCLUSION**

For the foregoing reasons, dismissal of the Consolidated Complaint as against EY Germany is mandated.

Dated: September 20, 2021                              Respectfully submitted,

                                                       **WILLIAMS & CONNOLLY LLP**


                                                       _/s/_   Craig D. Singer
                                                       Craig D. Singer (PA State Bar No. 71394)
                                                       Steven M. Farina*
                                                       George A. Borden*
                                                       Amanda M. MacDonald*
                                                       WILLIAMS & CONNOLLY LLP
                                                       725 Twelfth Street, N.W.
                                                       Washington, DC 20005
                                                       (202) 434-5000
                                                       csinger@wc.com
                                                       sfarina@wc.com
                                                       gborden@wc.com
                                                       amacdonald@wc.com

                                                       * *pro hac vice application forthcoming*

                                                       *Attorneys for Defendant Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft*

## <u>CERTIFICATE OF SERVICE</u>

I, Craig D. Singer, hereby certify that on this 20th day of September, 2021, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system.  The foregoing is available for viewing and downloading from the CM/ECF system, which will also send email notification of such filing to all attorneys of record in this action.


 /s/   Craig D. Singer