**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re WIRECARD AG SECURITIES LITIGATION<br>_____<br><br>This Document Relates to:<br><br>ALL ACTIONS | Civ. Action No. 2:20-cv-03326-AB<br><br>CLASS ACTION |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
ERNST & YOUNG GMBH WIRTSCHAFTSPRÜFUNGSGESELLSCHAFT'S
MOTION TO DISMISS**

# Table of Contents

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

I.      THE COURT SHOULD DISMISS FOR LACK OF PROPER SERVICE........................2

II.     THE COURT SHOULD DISMISS FOR LACK OF PERSONAL
        JURISDICTION. ......................................................................................5

        A.      Wirecard's English-Language Annual Reports Do Not Render EY
                Germany Subject to Personal Jurisdiction. ...............................................5

        B.      EY Germany's Review of Reporting Packages from EY U.S. Does Not
                Render EY Germany Subject to Personal Jurisdiction. .........................11

III.    THE COURT SHOULD DISMISS PURSUANT TO *FORUM NON
        CONVENIENS*. .....................................................................................14

        A.      Germany Is an Adequate Alternative Forum. ........................................15

        B.      Plaintiffs' Decision To Sue in Pennsylvania Is Not Entitled to Deference. ..........16

        C.      The Public and Private Interest Factors Favor Dismissal. ....................................17

                1.      Public Interest Factors Favor Dismissal. ..................................................17

                2.      Private Interest Factors Favor Dismissal. ..................................................18

IV.     THE COMPLAINT FAILS TO STATE A CLAIM.........................................................21

        A.      Plaintiffs' Claims Are Impermissibly Extraterritorial. ..........................................21

                1.      Plaintiffs Have Not Pleaded That Their Purchases of F-Shares
                        Were Domestic Transactions. ......................................................................21

                2.      U.S. Securities Laws Do Not Apply to Plaintiffs' Claims Because
                        They Are Predominantly Foreign. .............................................................23

        B.      Plaintiffs' Claims Do Not Satisfy the "In Connection With" Requirement. .........26

        C.      Plaintiffs Do Not Allege Scienter Adequately.......................................................26

CONCLUSION....................................................................................................30

# Table of Authorities

**Cases**

*Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ...............................21

*Agha v. Jacobs*, 2008 WL 2051061 (N.D. Cal. May 13, 2008)..................................................4

*AGIS Software Dev. v. ZTE Corp.*, 2018 WL 4053897 (E.D. Tex. July 20, 2018) ....................3, 5

*Baliga ex rel. Link Motion Inc. v. Link Motion Inc.*, 385 F. Supp. 3d 212 (S.D.N.Y. 2019)...........5

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975) ....................................................24

*Birch Hill Real Estate, LLC v. Breslin*, 2019 WL 4278505 (E.D. Wis. Sept. 10, 2019)................3

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).................................................................6

*Chen v. China Green Agric. Inc.*, 2021 WL 4481045 (S.D.N.Y. Sept. 30, 2021)..................26, 28

*Church v. Glencore PLC*, 2020 WL 4382280 (D.N.J. July 31, 2020)..........................................16

*D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94 (3d Cir. 2009) .............7

*D'Onofrio v. Il Corriere Della Sera*, 373 F. Supp. 2d 555 (E.D. Pa. 2005)................................21

*Dahl v. United Techs. Corp.*, 632 F.2d 1027 (3d Cir. 1980) ......................................................19

*Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288 (3d Cir. 2010) ...........................................17

*Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174 (C.D. Cal. 1998)........................................................3

*Elobied v. Baylock*, 299 F.R.D. 105 (E.D. Pa. 2014)...................................................................4

*Ernst v. Ernst*, 722 F. Supp. 61 (S.D.N.Y. 1989) ......................................................................19

*Eurofins Pharma US Holdings v. BioAlliance Pharma*, 623 F.3d 147 (3d Cir. 2010)................31

*Flaccus v. Advanced Disposal Servs.*, 2018 WL 3731095 (E.D. Pa. Aug. 6, 2018) ......................6

*Fletcher-Harlee Corp. v. Pote Concrete Contractors*, 482 F.3d 247 (3d Cir. 2007) ..................31

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) ......................................14

*GE Cap. Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993)......................................................10

*GoldenTree Asset Mgmt. v. BNP Paribas*, 64 F. Supp. 3d 1179 (N.D. Ill. 2014) ........................15

*Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142 (2d Cir. 2000) ........................................16

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ................................................................21

*Habas Sinai Ve Tibbi Gazlar Istihsal A.S. v. Int'l Tech. & Knowledge Co.*,
  2019 WL 7049504 (W.D. Pa. Dec. 23, 2019) ............................................................4

*Hepp v. Facebook*, 14 F.4th 204 (3d Cir. 2021) ..........................................................14

*Howard v. Arconic Inc.*, 2021 WL 2561895 (W.D. Pa. June 23, 2021) .......................26

*In re Advanced Battery Techs. Sec. Litig.*,
  2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ...........................................27, 28, 29

*In re Corel Corp. Inc. Sec. Litig.,* 147 F. Supp. 2d 363 (E.D. Pa. 2001) .......................17

*In re DNTW Chartered Accts. Sec. Litig*, 172 F. Supp. 3d 675 (S.D.N.Y. 2016) .......27, 28, 29, 30

*In re iAnthus Cap. Holdings, Inc. Sec. Litig.,*
  2021 WL 3863372 (S.D.N.Y. Aug. 30, 2021) ..........................................................22

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561 (S.D.N.Y. 2012) .................29, 30

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005) .....................................9

*In re Petrobras Sec. Litig.*, 2016 WL 3144395 (S.D.N.Y. May 5, 2016) ...............27, 30

*In re Petrobras Sec. Litig.*, 862 F.3d 250 (2d Cir. 2017) ...............................................21

*In re Tower Grp. Int'l Ltd. Sec. Litig.*, 2015 WL 5813393 (S.D.N.Y. Sept. 18, 2015) ................29

*Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) ........................................17

*Kisano Trade & Inv. v. Lemster*, 737 F.3d 869 (3d Cir. 2013) ......................................18

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) .......................6

*Leetsch v. Freedman*, 260 F.3d 1100 (9th Cir. 2001) ...................................................15

*Levien v. Hibu PLC*, 2021 WL 5742664 (3d Cir. Dec. 2, 2021) ...................................17

*Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628 (3d Cir. 1989)................................18, 21

*Mable v. Navasota Indep. Sch. Dist.*, 2010 WL 11453632 (S.D. Tex. June 16, 2010) ...............3, 4

*Miller Inv. Tr. v. Morgan Stanley & Co.*, 308 F. Supp. 3d 411 (D. Mass. 2018) .........................28

*Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010) ...............................21, 23, 24, 25

*Mucha v. Volkswagen Aktiengesellschaft*, 2021 WL 2006079 (E.D.N.Y. May 20, 2021)..............8

*Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021) ............................................................................25

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007) .............................................9, 12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................................................26

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)......................................................................................23, 24, 25

*Patterson ex rel. Patterson v. FBI*, 893 F.2d 595 (3d Cir. 1990) ...................................................6

*Prem Sales, LLC v. Guangdong Chigo Heating & Ventilation Equip.*,
    494 F. Supp. 3d 404 (N.D. Tex. 2020) ..................................................................................4

*Prevent USA Corp. v. Volkswagen AG*, 17 F.4th 653 (6th Cir. 2021)....................................15, 19

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305 (4th Cir. 2009) ....27, 30

*Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241 (S.D.N.Y. 1984)..................................10

*Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321 (S.D.N.Y. 2013) ................................27

*RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016)................................................25

*Rocker Magmt. v. Lernout & Hauspie Speech Products*,
    2005 WL 3658006 (D.N.J. June 7, 2005) ...............................................................................9

*SEC v. Morrone*, 997 F.3d 52 (1st Cir. 2021)...............................................................................25

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) .........................................................26

*Special Situations Fund III QP v. Deloitte Touche Tohmatsu CPA*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014)......................................................................26, 28, 30

*Stoyas v. Toshiba Corp.*, 2022 WL 80469 (C.D. Cal. Jan. 7, 2022).............................................22

*Stoyas v. Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018) .......................................................8, 24, 25

*Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523 (10th Cir. 1996) ..............6, 10, 11

*Trotter v. 7R Holdings LLC*, 873 F.3d 435 (3d Cir. 2017) ....................................................16, 17

*United States ex rel. Goulooze v. Levitt*, 2006 WL 8441284 (D. Ariz. Oct. 25, 2006) ..................3

*United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017)............................31

*United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) ..............................................................21

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988) ............................................4

*Walden v. Fiore*, 571 U.S. 277 (2014) ..................................................................................6, 9, 12

*Windt v. Qwest Commc'ns Int'l*, 529 F.3d 183 (3d Cir. 2008) ........................................16, 17, 18

**Other Authorities**

42 Pa. Cons. Stat. § 5322(b) ..........................................................................................................12

*Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers*, 73 Fed. Reg. 52,751 (Sept. 10, 2008)...................................7

KPMG AG Wirtschaftsprüfungsgessellschaft, *Report Concerning the Independent Special Investigation* (Apr. 27, 2020) ...............................................................................27

Manek & Ors v Wirecard AG [2020] EWHC 1904, [59] (Comm) ................................................28

Olaf Storbeck, *Wirecard's Core Business Has Been Lossmaking for Years, Audit Shows*, Financial Times (July 5, 2020) ...............................................................................................13

U.S. Dep't of State, *Germany Judicial Assistance Information* (Nov. 15, 2013)............................4

## INTRODUCTION

Plaintiffs fail to show why their claims against EY Germany should proceed in this Court rather than in Germany.  EY Germany conducted its audits of Wirecard, a German company, in Germany, governed by German law and auditing standards.  EY Germany had no contacts with the United States that relate to the eventual collapse of Wirecard's German stock price.  While Plaintiffs reside in the United States, they purchased securities that were not domestically sponsored or registered by Wirecard and that mirrored the price of Wirecard stock trading solely on German exchanges.  These core facts doom Plaintiffs' attempt to litigate this case here.

At the threshold, the case should be dismissed because Plaintiffs have failed to serve the operative complaint under the Hague Convention.  Plaintiffs offer no excuse for this failure, and their request that they be permitted to serve the operative complaint by email on EY Germany's U.S. counsel, without the required translation, would impermissibly evade the Hague Convention.

Concerning personal jurisdiction, Plaintiffs attempt to satisfy the minimum-contacts inquiry by pointing to English translations of EY Germany's audit opinions.  But as the Supreme Court consistently has held, the mere foreseeability that an out-of-forum act may have effects in the forum is insufficient to constitute purposeful availment of the privilege of conducting business in the forum.  Changing tack, Plaintiffs emphasize Wirecard's North American subsidiary.  But EY Germany did not conduct the U.S.-based portion of the audit.  More fundamentally, despite Plaintiffs' attempt to ignore their own Complaint to focus on Wirecard North America, the Wirecard fraud did not involve that subsidiary, and thus Plaintiffs' claims do not arise from or relate to any auditing of Wirecard North America.

In the alternative, the Court should dismiss pursuant to the doctrine of *forum non conveniens*; indeed, it may do so without reaching the other grounds for dismissal.  Plaintiffs have not submitted an expert declaration rebutting Professor Hellgardt's conclusion that Germany is an

adequate alternative forum.   Moreover, two recent appellate opinions in Germany buttress Professor Hellgardt's conclusions, including that German courts would not recognize a judgment of a United States court in this case, as Professor Hellgardt explains in his supplemental declaration (Exhibit A).   Plaintiffs also offer no meaningful response to the fact that all evidence of EY Germany's conduct will be located in Germany and written almost entirely in German.   The balance of interests shows that Germany is the appropriate forum for this dispute.

Beyond those threshold issues, Plaintiffs have failed to state a claim.   As to their transactions in F-shares, they have not alleged that the purchases were domestic, and foreign transactions are not regulated by Section 10(b).   Whether their transactions were in F-shares or ADRs, Plaintiffs seek an impermissible extraterritorial application of U.S. law because all of the relevant conduct occurred in Germany and was subject to German law.   For similar reasons, Plaintiffs cannot show that EY Germany's conduct occurred in connection with U.S. securities purchases.   Finally, Plaintiffs fail to satisfy the particularly stringent standard for pleading auditor scienter.   Allegations that an auditor failed to detect a large fraud are insufficient.

## **ARGUMENT**

## I.      **THE COURT SHOULD DISMISS FOR LACK OF PROPER SERVICE.**

The Opposition makes clear that dismissal should be granted for improper service, as Plaintiffs' arguments are factually and legally untenable.   With respect to the facts, Plaintiffs concede that the complaint they served was no longer operative—it having been filed by a prior law firm for a prior plaintiff.   Plaintiffs' factual recitation confirms that when they filed the CCAC on December 22, 2020, they made no effort to have it translated, did not provide it to the third-party process server that the Court had appointed just six days earlier (ECF No. 51), and did not

request a certified copy of it when they succeeded in contacting the clerk's office in January 2021.[1]

Nor do Plaintiffs dispute that they had multiple opportunities to address the issue, including when

counsel for EY Germany alerted them to the problem.  Plaintiffs offer no excuse for not even

attempting to serve the operative complaint and translation, and there is none.

As for the law, Plaintiffs rely principally on *Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174

(C.D. Cal. 1998), an outlier decision which held that an amended complaint does not supersede an

earlier complaint until the amended complaint is served.  *Id.* at 1180.  That flawed reasoning has

been universally rejected by other courts.  In *United States ex rel. Goulooze v. Levitt*, 2006 WL

8441284 (D. Ariz. Oct. 25, 2006), the court found *Doe*'s reasoning "unpersuasive" and declined

to follow it.  *Id.* at *3 n.4.[2]  Similarly, in *AGIS Software Development v. ZTE Corp.*, 2018 WL

4053897 (E.D. Tex. July 20, 2018), the court found cases holding that the filing of an amended

complaint renders the earlier complaint "of no effect" to be "more persuasive" than *Doe*.  *Id.* at *3

n.3.  We are aware of no case that has followed *Doe*'s reasoning.[3]

---

[1] Plaintiffs' assertion that the Court instructed the prior Plaintiff to serve the initial complaint in a telephonic conference on October 14, 2020 (Opp'n 5) is irrelevant, since that was the operative complaint at that time.  Also, Plaintiffs strain credulity by asserting that they informed the Court, in their April 2021 motion for an extension of time, that they were still seeking to serve the initial complaint, Opp'n 6 n.6.  Although Plaintiffs' brief mentioned the initial complaint, their motion asked only for additional time "to complete service" (ECF No. 58), and the Court's order granting the motion similarly said only that Plaintiffs "must serve Defendants," without mentioning the then-inoperative initial complaint (ECF No. 59).

[2] Unless otherwise indicated, when language quoted from a decision contains material quoted from another source, all brackets, ellipses, footnote call numbers, internal quotation marks and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.  Citations to "Opp'n" are to Plaintiffs' Opposition, ECF No. 76.  Citations to "Br." are to EY Germany's opening brief in support of its motion to dismiss, ECF No. 64-1.

[3] Plaintiffs also cite *Birch Hill Real Estate, LLC v. Breslin*, 2019 WL 4278505 (E.D. Wis. Sept. 10, 2019), but the issue there was whether the consent of a party served with an initial complaint was required for removal to federal court, and turned on application of Wisconsin law, which is not involved here.  *Id.* at *2-4.  In *Mable v. Navasota Indep. Sch. Dist.*, 2010 WL 11453632 (S.D. Tex. June 16, 2010), because dismissal would have resulted in the plaintiff's claim being time-

Finally, Plaintiffs' audacious alternative suggestion that they be permitted to evade the Hague Convention by emailing the CCAC to EY Germany's U.S. counsel is a non-starter. Compliance with the Hague Convention is mandatory where it applies. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988). Although some courts have allowed email service, the correct view is that this expedient cannot be allowed where (as here) the country in question has objected to Article 10 of the Convention,[4] which permits service by "postal channels" only when "the State of destination does not object." Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents art. 10, Nov. 15, 1965, 20 U.S.T. 361, 68 U.N.T.S. 163. Although Article 10 (drafted in the 1960s) does not expressly mention email, its logic clearly extends to email, so that a country's objection to Article 10 precludes service by email. *See, e.g.*, *Prem Sales, LLC v. Guangdong Chigo Heating & Ventilation Equip.*, 494 F. Supp. 3d 404, 416-17 (N.D. Tex. 2020); *Habas Sinai Ve Tibbi Gazlar Istihsal A.S. v. Int'l Tech. & Knowledge Co.*, 2019 WL 7049504, at *4 (W.D. Pa. Dec. 23, 2019); *Elobied v. Baylock*, 299 F.R.D. 105, 108 (E.D. Pa. 2014); *Agha v. Jacobs*, 2008 WL 2051061, at *1-2 (N.D. Cal. May 13, 2008) (rejecting email service because Germany has objected to Article 10).

In any event, even courts that have allowed email service have required some good reason that plaintiffs should be permitted to sidestep the Hague Convention. "[W]hether to exercise discretion and grant alternative service requires courts to evaluate (1) a showing that the plaintiff

---

barred, Fifth Circuit law required a showing of bad faith to justify dismissal. *Id*. at *1. That standard does not apply here.

[4] Germany has objected to Article 10. *See* U.S. Dep't of State, *Germany Judicial Assistance Information* (Nov. 15, 2013), https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Germany.html ("Germany formally objected to service under Article 10, and does not permit service via postal channels. Any other methods of service, including attempts at service by mail, are considered illegal in Germany and an affront to its judicial sovereignty.").

has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary." *See Baliga ex rel. Link Motion Inc. v. Link Motion Inc*., 385 F. Supp. 3d 212, 220 (S.D.N.Y. 2019) (denying request for alternative service by email). Here, Plaintiffs have made no effort to serve the CCAC and have pointed to no good reason they should be excused from doing so under the Hague Convention.

Plaintiffs committed a "procedural misstep" that was "entirely of [their] own making," and it is "deeply concerning" that they have made no attempt to rectify it despite multiple opportunities. *AGIS*, 2018 WL 4053897, at *2-3. Accordingly, there is no basis to allow the "Hague Convention to be short-changed for the mere convenience of the Plaintiff." *Id*. at *3.

## II.     THE COURT SHOULD DISMISS FOR LACK OF PERSONAL JURISDICTION.

Plaintiffs abandon any claim that EY Germany is subject to general jurisdiction, *see* Opp'n 7, instead offering two untenable theories under which they contend EY Germany is subject to specific jurisdiction. The first theory—that EY Germany is subject to specific jurisdiction because Wirecard issued English-language versions of its annual reports—disregards controlling law and would require U.S. courts to adjudicate complaints against foreign auditors who have taken no action to purposefully avail themselves of the U.S. market. The second theory attempts rewriting the complaint to place Wirecard North America at the center of the alleged fraud, but the CCAC does not allege any claim that arises from or relates to Wirecard's U.S. operations, much less from any auditing conducted by EY Germany.

### A.     Wirecard's English-Language Annual Reports Do Not Render EY Germany Subject to Personal Jurisdiction.

Plaintiffs contend that because Wirecard published its annual reports on the Internet in English (in addition to German), EY Germany has purposefully availed itself of the U.S. market. That is wrong. EY Germany performed its audit of Wirecard wholly outside of the United States.

Streyl Decl. ¶ 11.[5]  Even assuming that EY Germany knew its German audit opinions might be translated into English by Wirecard and made available on the Internet, CCAC ¶¶ 23, 37; *see also* Opp'n 7-8, the mere foreseeability that an out-of-forum act may have effects within the forum is insufficient to support personal jurisdiction, as the Supreme Court has "consistently held."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  Courts have applied that principle to foreign auditors, holding that the mere foreseeability of potential investor reliance is insufficient to support personal jurisdiction.  *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1342 (2d Cir. 1972) ("Although . . . worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process."); *accord Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1535 (10th Cir. 1996).

Plaintiffs' argument would subject EY Germany to personal jurisdiction in the United States based on the unilateral actions of third parties: Wirecard's English-language publication of its annual reports, CCAC ¶ 37, American banks' issuance of ADRs, CCAC ¶¶ 56-61, American broker-dealers' establishment of F-shares, CCAC ¶ 74, and investors' purchase of these unsponsored securities, CCAC ¶¶ 26-32.  But the minimum-contacts inquiry is "defendant-focused" and cannot be satisfied based on "contacts between the plaintiff (or third parties) and the forum."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  The defendant's contacts "must amount to a

---

[5] Plaintiffs erroneously assert that the Court "must construe factual disputes in their favor."  Opp'n 8 n.8.  In fact, "[a] Rule 12(b)(2) motion . . . is inherently a matter which requires resolution of factual issues outside the pleadings . . . .  Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence."  *Patterson ex rel. Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990).  Thus, "[o]nce the plaintiff's allegations are contradicted by an opposing affidavit he or she must present similar evidence in support of personal jurisdiction."  *Flaccus v. Advanced Disposal Servs.*, 2018 WL 3731095, at *2 (E.D. Pa. Aug. 6, 2018).  Plaintiffs have the standard exactly backwards: Where the declarations filed on behalf of EY Germany contradict the CCAC for purposes of EY Germany's 12(b)(2) motion, this Court should credit the sworn declarations, not Plaintiffs' unsupported allegations.

deliberate targeting of the forum," and "[t]he unilateral activity of those who claim some relationship with a nonresident defendant is insufficient." *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103 (3d Cir. 2009). EY Germany did not, by providing auditing services to a German company, deliberately target the United States; rather, Plaintiffs' investments resulted from the actions of third parties.

The situation here is as if a Pennsylvania casino offered wagers on the Bundesliga (Germany's premier soccer league), without the participation of the league or its teams, and then losing bettors sued in U.S. court for alleged fraud in match results. Even if it is foreseeable that Pennsylvania bettors might like to gamble on the Bundesliga, the German teams would not have deliberately targeted the forum simply by, say, publishing their rosters and match write-ups in English. And of course, in this analogy EY Germany would not even be one of the teams wagered on, but rather a distinct entity like a referee. The unilateral actions of third parties cannot support personal jurisdiction in this manner.

Moreover, Plaintiffs misunderstand the function and structure of SEC Rule 12g3-2(b); they suggest that Wirecard purposefully availed itself of the U.S. market by obtaining an "exemption" under the rule that allowed the foreign issuer to "trade its equity securities" in the United States. Opp'n 8. In fact, the rule's principal function is to facilitate the establishment of ADRs by entities (typically depositary banks) that are not themselves the issuer of the underlying securities, as happened here. Prior to a 2008 rule amendment, foreign issuers were required to affirmatively submit an application to the SEC to obtain an exemption under Rule 12g3-2(b). *Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers*, 73 Fed. Reg. 52,751, 52,753 (Sept. 10, 2008). But since that amendment took effect, the exemption is extended automatically; a foreign issuer like Wirecard need take no action in the

United States to obtain it. *Id.* at 52,759. The SEC has declined to require that issuers give their consent for establishment of ADRs or even that depositary banks give notice to the issuer. *Id.* at 52,762. Thus, the banks' independent establishment of ADRs does not indicate that Wirecard "aimed" its disclosures at potential U.S. investors, Opp'n 8, much less that EY Germany did so.

Plaintiffs' position would subject all foreign auditors to personal jurisdiction in the United States whenever their foreign audit clients decide to publish financial information in English. This distorts the concept of purposeful availment beyond recognition; an audit client's English-language disclosures do not show that a foreign auditor has deliberately targeted the U.S. market. The English language is not uniquely American; it is the international language of finance. Therefore, "there are many plausible reasons for a company to provide English materials," and publishing such materials does not justify an inference that their purpose was to support unsponsored ADRs. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 952 n.24 (9th Cir. 2018).

Plaintiffs rely on cases involving very different facts from those presented here, or ignore the central legal principles at work in those cases. In *Mucha v. Volkswagen Aktiengesellschaft*, 2021 WL 2006079 (E.D.N.Y. May 20, 2021), the defendant was the issuer itself, which had sponsored the ADRs at issue by entering into an agreement with a U.S. bank. *Id.* at *1, *9. Indeed, the foreign issuer did not even argue that personal jurisdiction was absent; only the individual signatories to financial statements raised such an argument. *Id.* at *4. The district court exercised personal jurisdiction over those defendants based on statements in the issuer's annual reports that "reference[d] the fact that its ADRs trade in New York" and listed U.S. contact information for the issuer's investor relations office. *Id.* at *5. Plaintiffs allege no such statements here; and even if they had so alleged, those would be the statements of Wirecard, not EY Germany, and thus furnish no basis for exercising jurisdiction over EY Germany.

*Rocker Management v. Lernout & Hauspie Speech Products*, 2005 WL 3658006 (D.N.J. June 7, 2005), is equally inapposite.  The issuer's stock in *Rocker Management* traded directly on the NASDAQ, *id.* at \*5, and the auditor that was resisting U.S. jurisdiction had performed work on the issuer's required SEC filings, *id.* at \*6.  Wirecard made no such filings.  Plaintiffs lift one line from *Rocker Management* out of context to suggest that jurisdiction lies whenever a foreign auditor "should have known" its work would be relied on by U.S. investors.  Opp'n 9.  But *Rocker Management* holds no such thing, and Plaintiffs' contention is flatly contradicted by controlling law.  *See, e.g.*, *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) ("[W]hat is necessary is a deliberate targeting of the forum."); *Walden*, 571 U.S. at 289 (rejecting "foreseeable harm" approach to the minimum-contacts inquiry).

Plaintiffs' reliance on *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005), is also misplaced.  The defendant there was a representative on the issuer's Board of Statutory Auditors, and during the defendant's tenure the issuer had obtained loans from U.S. investors, via U.S. note offerings, thus purposefully availing itself of the U.S. market.  *Id.* at 454 & n.29.  More importantly, the *Parmalat* decision relied heavily on the proposition "that effects in the United States attributable to conduct abroad may be sufficient predicate for the exercise of personal jurisdiction over the actor."  *Id.* at 454.  The Supreme Court later clarified that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *Walden*, 571 U.S. at 290.  Whether or not the issuer's note offerings in *Parmalat* would be sufficient to support jurisdiction under present law, EY Germany did not engage in "intentional conduct . . . that creates the necessary contacts with the forum."  *Id.* at 286.

9

Plaintiffs miss the mark in their attempt to distinguish *GE Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993).  Contrary to Plaintiffs' description, the "critical transaction" in that case, Opp'n 10, was not a purchase of an airline in Canada; rather, the plaintiff (GE) claimed it was defrauded in its purchase of an American company (Gelco) in Minnesota.  *Grossman*, 991 F.2d at 1379, 1388.  GE contended that the Canadian auditors of Gelco's Canadian subsidiary (Gelco Express) were subject to personal jurisdiction in Minnesota because the results of their work were incorporated into Gelco's financial statements, which were filed with the SEC.  *Id.* at 1378-79, 1387.  The Eighth Circuit rejected that argument, noting it was "not convinced that the sending of financial statements into the United States establishes minimum contacts."  *Id.* at 1388. Rather, the dispositive fact was that the auditor had "performed its audit work in Canada under Canadian accounting principles and auditing standards for its Canadian client."  *Id.*  So too here: EY Germany performed its audit work in Germany, under German accounting principles and auditing standards, for its German client.  That third parties later effected a transaction in securities related to the audit client is no basis for subjecting EY Germany to personal jurisdiction.  *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241 (S.D.N.Y. 1984), is not to the contrary.  There, the court found that the auditor knew its opinions were being incorporated into SEC filings that, under the pre-2008 regime, were necessary prerequisites to trading in ADRs.  *Id.* at 1256-57, 1259-61. No similar U.S. filing of EY Germany's audit opinions is alleged here.

Finally, Plaintiffs suggest the dispositive factor in *Trierweiler*, 90 F.3d 1523, was the absence of an allegation that the auditor "knew" its audit would be accessed in the forum, Opp'n 10.  As discussed above, and as recognized by the Tenth Circuit in *Trierweiler*, "the mere foreseeability of consequences within the forum state, without more, is insufficient as a basis for jurisdiction."  *Id.* at 1535 (citing *Burger King*, 471 U.S. at 474).  Plaintiffs' proposed approach, in

which conclusory allegations of knowledge could support personal jurisdiction, collapses any distinction between mere foreseeability and purposeful availment.  If it were enough for plaintiffs to allege that auditors "know" there will be foreign reliance on their opinions, then all auditors are subject to U.S. jurisdiction whenever Americans find a way to acquire securities related somehow to the audited companies.  Plaintiffs' reading of *Trierweiler* is therefore untenable.  Rather, the law is that where an auditor does not "act[] affirmatively to allow or promote business" in the forum, and "has no office, employees or agents" in the forum, the auditor is not subject to personal jurisdiction simply because plaintiffs allege the auditor's opinions were available.  *Id.* at 1535.

**B.**    **EY Germany's Review of Reporting Packages from EY U.S. Does Not Render EY Germany Subject to Personal Jurisdiction.**

Plaintiffs' second theory of personal jurisdiction turns on the statement in EY Germany's audit reports that it had audited the financial statements of Wirecard and its subsidiaries.  Opp'n 11.  Because Wirecard had a subsidiary based in Pennsylvania (Wirecard North America), Plaintiffs contend that EY Germany must have purposefully availed itself of the U.S. market.  But EY Germany did not conduct any auditing in the United States; rather EY U.S. prepared auditing packages on Wirecard North America, and EY Germany reviewed those packages in Germany.  Streyl Decl. ¶ 12.  Plaintiffs inaccurately describe EY Germany as part of a single "global professional services firm."  Opp'n 14.  On that basis, Plaintiffs would impute the actions of every other EY member firm, including EY U.S., to EY Germany.  But this ignores the fact that the member firms are distinct legal entities.  *See* Streyl Decl. ¶ 4.  For example, EY Germany is a German limited liability company, while EY U.S. is an American limited liability partnership.  *Id.* ¶¶ 3-4.  Contrary to Plaintiffs' unsupported assertion, Opp'n 1, neither EY Germany nor EY U.S. is a subsidiary of EY Global.  Rather, both are member firms of the global organization.  Streyl Decl. ¶ 4.  Nor is EY U.S. an "agent" of EY Germany; Plaintiffs nowhere allege that EY Germany

holds legal power to control or direct the actions of EY U.S.[6]  Accordingly, the auditing activities conducted by EY U.S. cannot constitute purposeful availment of the U.S. market by EY Germany.

Even if EY Germany's review of the findings by EY U.S. concerning Wirecard North America were to constitute purposeful availment (which it does not), Plaintiffs' claims do not arise from or relate to that review in the manner necessary to support specific jurisdiction.  As the Third Circuit has explained, "[t]he relatedness requirement[] . . . must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations." *O'Connor*, 496 F.3d at 323.  Plaintiffs' theory is anything but tailored: They seek U.S. adjudication of an alleged global fraud centered in Germany based on an unrelated audit of a minor subsidiary. Plaintiffs highlight statements from Wirecard's annual reports indicating that Wirecard North America was expected to play a useful role in Wirecard's operations.  Opp'n 11.  But these statements have nothing to do with the alleged fraud; Plaintiffs offer no allegation that these statements were inaccurate.  The components of the fraudulent scheme that Plaintiffs allege— valuation of subsidiaries in Asia, CCAC ¶¶ 93-96; acquisitions of businesses in India, *id.* ¶¶ 105-14; suspicious transactions in Singapore, Hong Kong, and India, *id.* ¶¶ 117-47; inflation of revenues from third-party partners in Dubai, the Philippines, and Singapore, *id.* ¶¶ 159-83; and €1.9 billion missing from banks in the Philippines, *id.* ¶¶ 229-37—have no connection to the United States.  One may search the CCAC in vain for any allegation connecting this alleged scheme to Wirecard North America.[7]

---

[6] Plaintiffs' invocation of subsection (a) of the Pennsylvania long-arm statute, Opp'n 11, is beside the point because purposeful availment is a constitutional requirement, and "must arise out of contacts that the 'defendant *himself*' creates with the forum State."  *Walden*, 571 U.S. at 284 (emphasis in original) (quoting *Burger King*, 471 U.S. at 475); *see also* 42 Pa. Cons. Stat. § 5322(b) (extending personal jurisdiction to the constitutional maximum).

[7] The absence of any connection between Wirecard North America and the alleged fraud is further demonstrated by the fact that Plaintiffs seek a class period starting in August 2015, CCAC ¶ 2, but

Instead, Plaintiffs shift their focus to a July 5, 2020 *Financial Times* article, which Plaintiffs read to assert that Wirecard North America had lost money every year since 2016. As the article itself notes, Wirecard North America was "*not directly affected by its accounting scandal.*"[8] Further, contrary to Plaintiffs' reading, the article does not actually say that Wirecard North America was unprofitable. In fact, it asserts that Wirecard's "core business," which the article describes as "mainly payments processing in Europe and issuing credit cards in Europe and North America," had become "increasingly lossmaking in recent years, despite accounting for half of the company's reported revenue and almost two-thirds of the transaction volume." *Id.* According to the article, these "activities outside Asia . . . failed to generate profit since 2016." *Id.* As is apparent, the article is addressing the combined activities outside Asia (or at least the combination of Europe and North America). Plaintiffs' preferred gloss, that Wirecard North America in isolation was unprofitable, is found nowhere in the source upon which they rely.

Even more problematically for Plaintiffs, they identify no statement from Wirecard or EY Germany that asserts Wirecard North America was profitable. Instead, they point to a Wirecard press release saying that the company had substantial "*transaction volumes . . .* from *geographies like* USA, Latin America and Asia where Wirecard currently does not hold its own acquiring or issuing license . . . ." CCAC ¶ 165. Plaintiffs cannot successfully leap from that press release (not even a document audited by EY Germany) to their conclusion that Wirecard "misrepresented the

the acquisition of Wirecard North America did not even occur until 2017, *id.* ¶ 88, and the key Wirecard statement that Plaintiffs allege was misleading concerning that subsidiary was not made until 2019, *id.* ¶ 165.

[8] Olaf Storbeck, *Wirecard's Core Business Has Been Lossmaking for Years, Audit Shows*, Financial Times (July 5, 2020), https://www.ft.com/content/f697a093-4e1b-4ef4-9b16-820198e4a67f.

success of its U.S. business," Opp'n 13.  Plaintiffs have utterly failed to show that their claims arise from or relate to EY Germany's review of auditing materials sent to it by EY U.S.

Plaintiffs' attempted analogy to *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), is misplaced.  There, the plaintiffs alleged injuries "because of defective products that Ford extensively promoted, sold, and serviced in" the forum states.  *Id.* at 1032.  The company also maintained a "network of dealers offer[ing] an array of maintenance and repair services, thus fostering an ongoing relationship between Ford and its customers."  *Id.* at 1023.  EY Germany is nothing like this.  It maintains no facilities in the United States, and has sought no relationship of any kind with the allegedly injured Plaintiffs.  *See Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (finding no personal jurisdiction under *Ford Motor*, in the absence of a "strong connection" between alleged forum contacts and plaintiff's claims).

EY Germany has not purposefully availed itself of the U.S. market, nor do Plaintiffs' claims arise from or relate to any activity in the United States.  Further, exercising jurisdiction over EY Germany in this suit would not comport with fair play and substantial justice.  *See* Br. 17-18.  Accordingly, the exercise of personal jurisdiction would violate due process.

## III.    THE COURT SHOULD DISMISS PURSUANT TO *FORUM NON CONVENIENS*.

Plaintiffs have offered no expert to rebut Professor Hellgardt's conclusion that Germany is an adequate alternative forum.  Further, the public and private interests at issue overwhelmingly support the conclusion that a German forum would be more convenient.  Plaintiffs do not identify any important witnesses or evidence located in Pennsylvania.  Nor have they rebutted Professor Hellgardt's assessment that a U.S. judgment in this matter likely would be unenforceable in Germany, and recent appellate opinions in Germany support that view.  Perhaps most importantly, Plaintiffs cannot deny that litigating this case in the United States would require the parties to translate essentially all the evidence from German and would require this Court (and potentially a

jury) to parse German law and accounting standards.   Accordingly, dismissal in favor of the German forum is appropriate.

A.      **Germany Is an Adequate Alternative Forum.**

Plaintiffs half-heartedly argue that Germany is not an adequate alternative forum, but Professor Hellgardt's opinion that Germany is an adequate forum is in line with the overwhelming weight of authority.  *See, e.g.*, *Prevent USA Corp. v. Volkswagen AG*, 17 F.4th 653, 663-64 (6th Cir. 2021); *Leetsch v. Freedman*, 260 F.3d 1100, 1103 (9th Cir. 2001).  As Plaintiffs have not submitted a countervailing expert declaration, they furnish no basis for the Court to "reach the unprecedented conclusion that German courts are not an adequate alternative forum." *GoldenTree Asset Mgmt. v. BNP Paribas*, 64 F. Supp. 3d 1179, 1193 (N.D. Ill. 2014).

Plaintiffs attempt to rely selectively on the Hellgardt declaration, emphasizing his statement that German courts had so far rejected investors' allegations that EY Germany acted with the requisite intent or recklessness.  *See* Opp'n 17 n.11.  From this observation, Plaintiffs offer unsupported speculation that German law imposes a "higher standard" to prove recklessness. *Id.*  But Professor Hellgardt in fact opined that the German standard of recklessness and unconscionability "seems quite comparable to the prerequisites of 'scienter'."  Hellgardt Decl. ¶ 52.  Moreover, as described in Professor Hellgardt's supplemental declaration, two recent appellate opinions in Germany call into question the first-instance court decisions finding intent inadequately pleaded under German law.[9]  But even if Plaintiffs had shown that German law were

---

[9] These opinions were issued on December 9 and December 13, 2021, by the Munich Higher Regional Court, and indicate that the court of first instance will likely need to take additional evidence in the German litigation against EY Germany brought by Wirecard investors.  Suppl. Hellgardt Decl. ¶¶ 2, 4, 11-12.  In addition, further contradicting Plaintiffs' suggestion that the German forum would be less hospitable to their claims, the opinions suggest that German courts may adopt a U.S.-style fraud-on-the-market theory of reliance and take evidence relating to EY Germany's alleged breach of duty.  *Id.* ¶¶ 8-11.  Additionally, these opinions considerably increase

less favorable to their claims, that would not render the foreign forum inadequate. Rather, a change in applicable law carries "substantial weight" in the *forum non conveniens* analysis only "if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Trotter v. 7R Holdings LLC*, 873 F.3d 435, 440 (3d Cir. 2017) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). The potential remedy afforded by section 826 of the German Civil Code, by contrast, offers an adequate means for Plaintiffs to pursue claims in a German court, as reflected by the fact that more than 500 claims have been brought there against EY Germany, principally alleging a violation of section 826. *See* Hellgardt Decl. ¶¶ 31-35.

## B.    Plaintiffs' Decision To Sue in Pennsylvania Is Not Entitled to Deference.

The appropriate level of deference to plaintiffs' chosen forum turns on "where: (i) the parties are from; (ii) the evidence is concentrated; and (iii) the relevant conduct occurred." *Church v. Glencore PLC*, 2020 WL 4382280, at *3 (D.N.J. July 31, 2020). Each of these factors supports according a low degree of deference to Plaintiffs' decision to sue in Pennsylvania. *See* Br. 21. Plaintiffs wrongly suggest that their choice of forum is entitled to deference simply because they reside in the United States. The Third Circuit has rejected this argument, explaining that "the relationship between the local federal court district and the case" should be considered—not just "the relationship between the United States and a case generally." *Windt v. Qwest Commc'ns Int'l*, 529 F.3d 183, 191 (3d Cir. 2008). For the contrary rule, Plaintiffs rely on *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000), Opp'n 19. But the *en banc* Second Circuit later rejected the mechanical approach of *Guidi*, explaining that, even as applied to U.S.-resident plaintiffs, "the more it appears that the plaintiff's choice of a U.S. forum was motivated

---

the likelihood that Wirecard investors will be able to litigate their claims against EY Germany via model case proceedings more similar to U.S class actions. *Id.* ¶¶ 3, 14-16.

by forum-shopping reasons . . . the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001); *see also id.* at 68-69 (addressing *Guidi*); *Levien v. Hibu PLC*, 2021 WL 5742664, at *2 (3d Cir. Dec. 2, 2021) ("The deference analysis . . . largely turns on the convenience of a plaintiff's chosen forum.").

### C.    The Public and Private Interest Factors Favor Dismissal.

Even if Plaintiffs had sued in their home forum (which they did not), dismissal would nonetheless be appropriate "if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court." *Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288, 296 (3d Cir. 2010) (quoting *Piper Aircraft Co.*, 454 U.S. at 255 n.23); *see also Trotter*, 873 F.3d at 444-45 (affirming *forum non conveniens* dismissal of suit brought by home-forum plaintiff where balance of other factors indicated comparative convenience of foreign forum). Here, "balanc[ing] the relevant public and private interest factors . . . favors dismissal of the case." *Windt*, 529 F.3d at 192.

### 1.    Public Interest Factors Favor Dismissal.

Plaintiffs contend that the United States has a substantial interest in this case because the putative class consists of U.S. residents and because the alleged misrepresentations were "published throughout the U.S." Opp'n 21. The mere fact that a statement has been made available on the Internet in English does not mean that it has been "published" in the United States. The case upon which Plaintiffs principally rely, *In re Corel Corp. Inc. Securities Litigation*, involved securities that the defendant had registered with the SEC and that were traded on the NASDAQ exchange. 147 F. Supp. 2d 363, 366 (E.D. Pa. 2001). Plaintiffs here chose to invest in securities for which no disclosures to the SEC were required. The securities were traded on the over-the-counter market without the involvement of the company whose stock the securities referenced. In

this context, the U.S. interest in imposing its securities laws on a foreign issuer is little to none. And of course, any U.S. regulatory interest in an auditor like EY Germany is even more attenuated.

On the other side of the ledger, Plaintiffs simply deny that Germany has any interest in adjudicating this dispute, Opp'n 21, which concerns a German accounting firm's audits of a German company pursuant to German and international standards. This cannot be taken seriously. As previously described, Br. 22, Germany has demonstrated its strong interest in addressing allegations arising from Wirecard's collapse, including those relating to auditors. Plaintiffs bizarrely suggest that because the potential German-law remedy against auditors arises under tort law rather than distinct securities legislation, Germany lacks an interest in the dispute. Opp'n 21-22. This unsupported and illogical proposition must be rejected. Germany's interest in regulating the conduct of EY Germany far outweighs that of the United States. That imbalance, in combination with the difficulties likely to flow from application of German law and accounting standards, decisively favors dismissal. *Cf. Windt*, 529 F.3d at 192-94.

### 2.  Private Interest Factors Favor Dismissal.

Plaintiffs massively understate the degree of inconvenience that will be occasioned by litigating this uniquely German dispute in a U.S. court. Plaintiffs suggest that "important evidence" will be located in both the United States and Germany. Opp'n 19. One might expect Plaintiffs to identify or describe what such important evidence will be found in the United States, but Plaintiffs provide no clue. In the case Plaintiffs cite, *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628 (3d Cir. 1989), the plaintiff had identified numerous witnesses and pieces of evidence that it believed could be found in the United States. *Id.* at 636-37; *see also Kisano Trade & Inv. v. Lemster*, 737 F.3d 869, 878 (3d Cir. 2013) (finding private interest factors favored foreign forum even where plaintiff "identifie[d] several witnesses located in the United States"). As discussed above, EY Germany performed no work in the United States that is relevant to Plaintiffs' claims.

18

The only U.S. documents likely to be of any relevance are records of the Plaintiffs' securities transactions, documents which are presumably already within their control.   Rather, any documents relevant to the claims against EY Germany are in EY Germany's files, which are located in Germany and written almost entirely in German.   Streyl Decl. ¶ 14; *see also* Br. 23. Even if, as Plaintiffs suggest, these documents can be photocopied and electronically transferred to the United States, that does nothing to address the fact that they will have to be translated in order to be used as evidence.   Translation necessarily entails the risk that nuance or meaning will be lost, especially given the highly technical nature of the documents at issue, to say nothing of the logistical difficulties and expense.   *Dahl v. United Techs. Corp.*, 632 F.2d 1027, 1031 (3d Cir. 1980) (translation can pose a "major practical problem"); *Prevent USA Corp.*, 17 F.4th at 660 ("[T]he imperative of translation into the language of an American forum favors dismissal."); *Ernst v. Ernst*, 722 F. Supp. 61, 65-66 (S.D.N.Y. 1989) (noting deficiencies of translations).

Another private interest factor supporting dismissal is the likelihood that a German court would not enforce a U.S. judgment rendered in this matter.   As Professor Hellgardt explains, German courts will only enforce a judgment from a non-E.U. country "if the courts of the issuing state would also have had international jurisdiction under German procedural law."   Hellgardt Decl. ¶ 72.   One of the German jurisdictional provisions that could potentially apply is German Code of Civil Procedure (ZPO) section 32b.   *Id.* ¶ 74.   Section 32b applies to claims of "false, misleading or omitted public capital market information."   *Id.*   Such a claim is within the exclusive jurisdiction of the court at the registered office of the issuer to whom the allegedly misleading information pertained.   *Id.* ¶ 75.   While German courts have not definitively resolved whether an audit opinion constitutes "public capital market information," *id.* ¶ 43 n.47, ¶ 75 & n.77, the recent opinions of the Munich Higher Regional Court take the position that EY Germany's audit reports

are indeed public capital market information.   Suppl. Hellgardt Decl. ¶¶ 3, 13-14.   If that interpretation prevails, then jurisdiction in this matter would lie only in Munich (the place of Wirecard's registered office), making it nearly certain that a U.S. judgment would be unenforceable.  *Id.* ¶¶ 17-18.

Plaintiffs accuse Professor Hellgardt of "blatantly contradicting himself," Opp'n 20, but that charge applies only to the second, alternative basis on which a German court would refuse to enforce a U.S. judgment—ZPO section 32—and in any event is mistaken.   The supposed contradiction is that Professor Hellgardt, in interpreting section 32, cites recent cases decided under Article 7 para. 2 Brussel Ia Regulation after having stated that this provision does not apply to judgments rendered by countries outside the European Union.   But there is no contradiction. Professor Hellgardt did not claim that these new cases literally would apply to a U.S. judgment against EY Germany; he cited them merely as a helpful analogy, because the provision at issue in those cases "has a similar structure to section 32 ZPO."  Hellgardt Decl. ¶ 77 n.83.  Under section 32, jurisdiction in tort actions lies in "the court in whose district the act was performed."  *Id.* ¶ 76. Because the recent cases hold that the place of the relevant act is "only in the country in which the issuer had to fulfill legal disclosure duties"—which, for Wirecard, was Germany—they support Professor Hellgardt's opinion that "it is extremely doubtful" that a U.S. judgment against EY Germany could satisfy section 32.  *Id.* ¶¶ 76-77.

As Plaintiffs have failed to present any opposing expert, the Court should credit Professor Hellgardt's conclusion that a judgment rendered in this action would likely be unenforceable in German courts.  *Id.* ¶ 80; Suppl. Hellgardt Decl. ¶¶ 17-18.  Plaintiffs oddly suggest that, even if a U.S. judgment is unlikely to be enforceable, the forum remains convenient unless the balance of *other* factors indicates otherwise.  Opp'n 21.   That is not what the cases say; rather, the

enforceability of the judgment is one of the factors to be considered in that overall balance. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947); *Lony*, 886 F.2d at 634-35; *D'Onofrio v. Il Corriere Della Sera*, 373 F. Supp. 2d 555, 558 (E.D. Pa. 2005) (Brody, J.). If a hypothetical plaintiffs' verdict cannot even be enforced, it is undeniable that—once the difficulty of litigating through translated documents and testimony is considered—the balance of private interests decisively supports the German forum.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM.

### A.    Plaintiffs' Claims Are Impermissibly Extraterritorial.

The Opposition fails to show that Plaintiffs' claims can survive application of *Morrison v. National Australia Bank*, 561 U.S. 247 (2010). Plaintiffs' purchases of F-shares fail because they have not established that those purchases were domestic transactions. In addition, even if all of Plaintiffs' purchases were domestic, the claims are predominantly foreign and therefore U.S. securities laws do not apply to them.

### 1.    Plaintiffs Have Not Pleaded That Their Purchases of F-Shares Were Domestic Transactions.

To establish that a transaction was domestic, Plaintiffs must show that "the parties incur[red] irrevocable liability to carry out the transaction within the United States or [that] title [was] passed within the United States." *Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012)*; accord United States v. Georgiou*, 777 F.3d 125, 136 (3d Cir. 2015). "The location or residency of the buyer, seller, or broker will not necessarily establish the situs of [a] transaction." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 262 (2d Cir. 2017). To state a legally sufficient claim, Plaintiffs must allege specific "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 70. They have not done so with respect to the F-shares they purchased.

Unlike ADRs, F-shares are not securities issued by American broker-dealers.  Rather, the F ticker symbol is merely a convenience to facilitate trading in actual Wirecard shares, which are not listed on any U.S. exchange.  Therefore, Plaintiffs' allegations that they were located in the United States when they placed orders with U.S.-based brokers to buy F-shares on the OTC market do not establish that the transactions were domestic.

The plaintiff in *In re iAnthus Capital Holdings, Inc. Securities Litigation*, like Plaintiffs here, asserted that he purchased F-shares of a foreign (Canadian) company on the OTC market by placing an order from his home in the United States with a U.S. broker, but the court found those assertions insufficient.  2021 WL 3863372, at *4-5 & n.45 (S.D.N.Y. Aug. 30, 2021).  Among other things, the court reasoned that the plaintiff did not address whether his broker "fulfilled his orders in the United States over-the-counter market, as opposed to trading on the [Canadian stock exchange] or referring trades to Canadian brokerages," nor did the plaintiff establish when his trades became binding.  *Id.* at n.45.[10]  The same conclusion applies here, because Plaintiffs' allegations do not establish whether their brokers fulfilled their orders for F-shares in a U.S. market or in Germany, and also do not address when and where the orders became binding.  Without those facts, the claims based on F-shares fail.[11]

_____

[10] Plaintiffs' argument that the *iAnthus* plaintiffs did not plead facts concerning domesticity in their complaint, Opp'n 24, is beside the point, because those plaintiffs submitted a declaration with the relevant facts, which the court considered.  *iAnthus*, 2021 WL 3863372, at *5 n.45.

[11] Although EY Germany does not contend on this motion that Plaintiffs have failed to allege that their purchases of unsponsored Wirecard ADRs were domestic transactions, those purchases likely were not domestic.  In *Stoyas v. Toshiba Corp.*, 2022 WL 80469 (C.D. Cal. Jan. 7, 2022), although the court had held earlier that the plaintiffs adequately alleged domestic purchases of unsponsored Toshiba ADRs, it later concluded that in fact the purchases were not domestic.  It reached that conclusion based on evidence that the transactions entailed first purchasing Toshiba common stock in Japan before the ADRs were created.  *Id.* at *4-5.  Notably, the court observed that "Plaintiffs have not identified a single case where the purchase or sale of *unsponsored* ADRs constituted or qualified as a domestic transaction."  *Id.* at *5 n.9 (emphasis in original).

 2. **U.S. Securities Laws Do Not Apply to Plaintiffs' Claims Because They Are Predominantly Foreign.**

Even if all of Plaintiffs' purchases were domestic, the Court should still dismiss the claims because the U.S. securities laws do not apply where all of the relevant conduct took place in Germany and is subject to German law.  Contrary to Plaintiffs' position, *Morrison* does not support application of U.S. law here.  *Morrison* held that Section 10(b) did not apply because the plaintiff there purchased the security outside the United States.  The *Morrison* court had no occasion to consider, and did not decide, that a domestic transaction was not only *necessary* but also by itself *sufficient* to make Section 10(b) applicable.  But as the Second Circuit explained in *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 214-16 (2d Cir. 2014), the reasoning of *Morrison* shows that Section 10(b) does not apply when the *only* fact that took place in the United States was the plaintiff's purchase, and all the relevant conduct took place in Germany.  Contrary to Plaintiffs' contention that *Parkcentral* is "outdated," it is the most faithful to the logic of *Morrison*, and this Court should follow it.

*Morrison* reaffirmed the primacy of the presumption against extraterritoriality, and it highlighted the Supreme Court's concern about the "probability of incompatibility with the applicable laws of other countries."  561 U.S. at 269.  The Court noted that the law of other countries "often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable," and more.  *Id.*  As a result, as the *Parkcentral* court pointed out:

> a rule making the statute applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine *Morrison*'s insistence that § 10(b) has no extraterritorial application.  It would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it.  Such a rule would inevitably place § 10(b) in conflict with the regulatory laws of other nations.

763 F.3d at 215.  Dismissal is clearly the right answer here under *Morrison* because imposing U.S. law would undeniably threaten "incompatibility with the applicable laws" of Germany, *Morrison*, 561 U.S. at 269, which more than 500 plaintiffs have invoked and which German courts are in the process of applying.  Plaintiffs' assertion that German law is less favorable to them than U.S. law, Opp'n 17 & n.11, even if true, proves only that applying U.S. law would create exactly the kind of conflict—including as to "what constitutes fraud" and "what damages are recoverable," 561 U.S. at 269—the *Morrison* court sought to prevent.

Indeed, *Morrison* criticized prior lower-court cases that had applied Section 10(b) too broadly in cases that should have been governed by foreign law.  Notably, the Supreme Court criticized *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975), for "excis[ing] the presumption against extraterritoriality from the jurisprudence of § 10(b)."  *Morrison*, 561 U.S. at 257-58.  In *Bersch*, the Second Circuit had held, *inter alia*, that U.S. securities laws apply to purchases of securities in the United States "whether or not acts (or culpable failures to act) of material importance occurred in this country."  519 F.2d at 993.  If the location of the transaction were the only relevant factor, that holding of *Bersch* would have been completely beyond criticism by the Supreme Court.

Plaintiffs' reliance on *Stoyas v. Toshiba Corp.*, 896 F.3d 933 (9th Cir. 2018), is misplaced. *Stoyas* misread *Morrison* as holding that because domestic transactions are the "focus" of Section 10(b), 561 U.S. at 266, the site of the transaction is the *only* factor to be considered in the extraterritoriality analysis.  But *Morrison* did not so hold.  Moreover, the *Stoyas* court disregarded the reasoning of *Morrison*, leading it to extend the reach of the U.S. securities laws to domestic purchases of unsponsored ADRs based on allegedly fraudulent conduct that took place entirely in

Japan.[12]  That result could not have been what the Supreme Court intended in *Morrison*, and it would reduce the presumption of extraterritoriality to the "craven watchdog" *Morrison* decried.[13]

Subsequent Supreme Court case law confirms that *Parkcentral* is right and *Stoyas* is wrong. In *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337 (2016), the Court recognized that if "'all the relevant conduct' regarding th[e] [alleged] violations 'took place outside the United States,' we [do] not need to determine, as we did in *Morrison,* the statute's 'focus.'" (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013)).  And just last term, in *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), the Supreme Court again reaffirmed the importance of the presumption against extraterritoriality, reversing another Ninth Circuit decision that had inappropriately applied U.S. law extraterritorially.  *Id.* at 1936-37.

The Supreme Court's decisions mandate dismissal.  Even if conduct within the focus of the statute occurs in the United States, if that activity is minor compared to the liability-creating conduct abroad, the claim is improperly extraterritorial.  That reasoning applies with full force here, because nothing other than Plaintiffs' transactions occurred in the United States.

---

[12] The *Stoyas* court also apparently thought there was no risk of "incompatible U.S. and foreign law" in that case, 896 F.3d at 950, but there clearly was, as Toshiba's conduct took place entirely in Japan; the Japanese securities commission investigated Toshiba; and multiple investor suits under Japanese law were pending in Japanese courts.  *See* Pet. for Cert., *Toshiba Corp. v. Auto. Indus. Pension Tr. Fund*, 2018 WL 5078031, at *10 (Oct. 15, 2018).  In fact, the *Stoyas* complaint expressly included claims under U.S. law *and Japanese law* on behalf of purchasers of Toshiba's ADRs.  *See* First Amended Compl. ¶¶ 1, 295-304, *Stoyas v. Toshiba Corp*., No. 2:15-cv-04194 (C.D Cal. Dec. 17, 2015).

[13] Although the First Circuit repeated the Ninth Circuit's incorrect interpretation of *Morrison* in *SEC v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021), that discussion was dicta, because the court also stated that "even if we were to apply *Parkcentral*, the claims here are not so predominantly foreign as to be impermissibly extraterritorial." *Id*. at 61 (noting that much of the allegedly fraudulent activity occurred in the U.S.).

**B.      Plaintiffs' Claims Do Not Satisfy the "In Connection With" Requirement.**

Plaintiffs' claims also fail to satisfy the basic requirement that EY Germany's conduct was "in connection with" Plaintiffs' purchases of their securities.  Much of Plaintiffs' discussion of this issue—such as their allegation that Wirecard cited EY Germany's work in defending against various charges—might be relevant to whether EY Germany's conduct was in connection with purchases of Wirecard common stock on German exchanges, but is irrelevant to whether the alleged conduct was in connection with these Plaintiffs' purchases of these securities, which were not sponsored by Wirecard and which EY Germany had nothing to do with.  That Wirecard published its financial reports in English, Opp'n 25, does not suffice to show even that Wirecard "aimed" those statements at the United States (as discussed above at pp. 5-11), much less that EY Germany did so.  Under *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000), Plaintiffs' claims fail because they have not shown that EY Germany knew, or had reason to know, that investors in these securities might rely on its audits.  *Id.* at 177.[14]

**C.      Plaintiffs Do Not Allege Scienter Adequately.**

Plaintiffs fail to show that they have met the "particularly stringent" standard for pleading auditor scienter.  *Special Situations Fund III QP v. Deloitte Touche Tohmatsu CPA*, 33 F. Supp. 3d 401, 426 (S.D.N.Y. 2014).[15]  Even in the short time since EY Germany filed its motion, courts have continued to dismiss claims against auditors on this ground.  *See Chen v. China Green Agric. Inc.*, 2021 WL 4481045, at *6 (S.D.N.Y. Sept. 30, 2021).  The same result is mandated here.

---

[14] The single other case Plaintiffs cite, *Howard v. Arconic Inc.*, 2021 WL 2561895 (W.D. Pa. June 23, 2021), did not involve auditors, ADRs, or anything else that would make it remotely relevant.

[15] Although EY Germany has focused its Rule 12(b)(6) motion on particular elements that Plaintiffs have failed to plead, it does not concede that "EY's audit opinions . . . were materially false and misleading," Opp'n 22.  *Cf. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015).

The thrust of Plaintiffs' argument is that because Wirecard carried out a large-scale financial fraud, its auditors must have been either in on it or reckless. Countless cases have rejected that syllogism. *See, e.g.*, *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 306 (4th Cir. 2009); *In re Petrobras Sec. Litig.*, 2016 WL 3144395, at *2 (S.D.N.Y. May 5, 2016); *In re Advanced Battery Techs. Sec. Litig.*, 2012 WL 3758085, at *15 (S.D.N.Y. Aug. 29, 2012); *Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 334, 339 (S.D.N.Y. 2013); *In re DNTW Chartered Accts. Sec. Litig*, 172 F. Supp. 3d 675, 691 (S.D.N.Y. 2016).[16]

Plaintiffs focus first on allegations concerning Wirecard's acquisition of an Indian company (Hermes), allegedly at an inflated price. Opp'n 26-28. But Hermes was not a third-party acquirer ("TPA"), and Plaintiffs do not connect the acquisition to the revelation of the missing €1.9 billion in TPA revenue that triggered Wirecard's collapse. Moreover, despite allegations that "key questions were left unanswered" about this transaction in EY Germany's audits, the KPMG investigation on which the CCAC relies also was not able to answer the central question (whether Wirecard personnel had an interest in the entity that sold Hermes to Wirecard),[17] and there remains no definitive proof that the transaction was fraudulent.[18]

---

[16] Plaintiffs contend that KPMG "uncovered . . . Wirecard accounting irregularities" after a six-month forensic audit. Opp'n 1-2. In fact, KPMG conducted a "forensic investigation" that "differs significantly from an audit of annual financial statements in its nature and scope as well as the depth of detail." KPMG AG Wirtschaftsprüfungsgesellschaft, *Report Concerning the Independent Special Investigation* 7 (Apr. 27, 2020) [hereinafter KPMG Report], https://www.wirecard.com/uploads/Bericht_Sonderpruefung_KPMG_EN_200501_Disclaimer.pdf. Even though KPMG applied "higher standards . . . to the investigation activities and evidence" than would be called for in a standard audit, *id.*, it nonetheless found insufficient evidence to conclude whether Wirecard's stated TPA revenues were correct or incorrect, *id.* at 12.

[17] The KPMG report stated: "The auditors were unable to identify the beneficial owner of Fund 1 [the entity that sold Hermes to Wirecard]. The background research by KPMG also failed to identify the beneficial owner of Fund 1." KPMG Report, *supra* note 16, at 50.

[18] The CCAC mentions that minority owners of Hermes had initiated litigation concerning the transaction. *Id.* ¶ 110. In a decision rendered in July 2020, the English High Court of Justice

Plaintiffs next reiterate the allegations concerning the TPA revenues, Opp'n 28-31, including their central allegation that EY Germany should have asked the banks to confirm that they held the funds purportedly on deposit.  But courts considering similar allegations routinely reject such hindsight-driven, negligence-based theories of scienter.  *See, e.g.*, *Chen*, 2021 WL 4481045, at *6 (asking "why did the Auditor Defendants not . . . seriously check the bank statement" not sufficient); *Miller Inv. Tr. v. Morgan Stanley & Co.*, 308 F. Supp. 3d 411, 432, 436-37 (D. Mass. 2018) (allegation that auditor "should have confirmed transactions with the banks that processed payments" not sufficient); *In re DNTW*, 172 F. Supp. 3d at 681, 688-89 (allegation that auditor "relied solely on purported bank statements that were provided to [auditor] by [client] rather than testing [client's] cash through confirmations to banks" not sufficient), *aff'd*, 666 F. App'x 78 (2d Cir. 2016); *Special Situations Fund III*, 33 F. Supp. 3d at 421, 431-32 (rejecting allegation that a "simple review of account statements from the banks" by auditors would have revealed fraud).  Plaintiffs' bank-confirmation theory is simply a "classic 'should have, had they, must have' allegation" that does not suffice.  *Miller Inv. Tr.*, 308 F. Supp. 3d at 437.

Plaintiffs then deploy the well-worn strategy of listing supposed "red flags," Opp'n 31-33, but "[m]erely labeling allegations as red flags . . . is insufficient to make those allegations relevant to a defendant's scienter."  *In re Advanced Battery*, 2012 WL 3758085, at *18.  Many of these purported red flags relate to the Hermes transaction in India, *e.g.* CCAC ¶¶ 250-53, and fall short for the same reasons discussed above.  Others refer to alleged wrongdoing in Singapore, *e.g.*

---

granted summary judgment in favor of Wirecard.  It stated, among other things, that "Wirecard paid nearer what it had anticipated all along" for Hermes, and "crucially" the entity that sold Hermes to Wirecard (EMIF) was represented by Linklaters, "a reputable law firm [that] would have investigated EMIF's position and been satisfied as to matters such as EMIF's beneficial ownership, compliance with money-laundering and terrorist financing laws, and the absence of tax and other fraud."  Manek & Ors v Wirecard AG [2020] EWHC 1904, [59] (Comm), *available at* https://www.bailii.org/ew/cases/EWHC/Comm/2020/1904.html.

CCAC ¶¶ 125, 134, but the KPMG Report on which Plaintiffs rely concluded that "EY Audit has followed up on the accusations made in the press coverage" of the Singapore situation and "the extended audit procedures conducted by EY Audit to examine the accusations from the individual facts were appropriate."  KPMG Report, *supra* note 16, at 46.  Yet other "red flags" refer to alleged weaknesses of internal controls at Wirecard, *e.g.* CCAC ¶ 177, but "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b)."  *In re Tower Grp. Int'l Ltd. Sec. Litig*., 2015 WL 5813393, at *6 (S.D.N.Y. Sept. 18, 2015).

Finally, many of the "red flags" were reported by third parties (principally the *Financial Times*, KPMG, and McKinsey) *after* EY Germany's last audit opinion for Wirecard in April 2019, with no indication that EY Germany learned of these facts during its audits.  *See* CCAC ¶¶ 168, 177, 182-83, 203, 214-17, 219, 256, 276.  Auditors cannot be liable for failing to heed "red flags" of which they were not aware.  *See In re Advanced Battery*, 2012 WL 3758085, at *16 ("an unseen red flag cannot be heeded").  For that reason, allegations that the auditor could have discovered the fraud if it "had exercised greater skepticism or performed further procedures . . . are not sufficient to allege scienter under a 'red flags' theory."  *In re DNTW*, 172 F. Supp. 3d at 688.

Plaintiffs' assertion that EY Germany violated professional accounting standards, Opp'n 33-34, also fails.  It is well established that "[b]are allegations of disregarded auditing standards are insufficient to plead scienter against an outside auditor for the purposes of Section 10(b)."  *In re Longtop Fin. Techs. Ltd. Sec. Litig*., 910 F. Supp. 2d 561, 576 (S.D.N.Y. 2012).  A theory like Plaintiffs'—which posits that "had [the auditor] performed a higher quality audit, i.e., one that complied with [professional] standards, it would have unearthed red flags indicative of" fraud— falls short because "it is well-established that an accusation that a defendant merely ought to have

known is insufficient to allege recklessness." *Special Situations Fund III*, 33 F. Supp. 3d at 429. Even if Plaintiffs were correct that EY Germany did a "very poor audit," Opp'n 30, nowhere do they allege "conduct that approximates an actual intent to aid in the fraud being perpetrated by the audited company," *In re DNTW*, 172 F. Supp. 3d at 689.

The magnitude of the fraud, Opp'n 34-35, also cannot create the requisite strong inference of scienter.  "[A] fraud's large size, standing alone, is insufficient to show recklessness." *In re Longtop*, 910 F. Supp. 2d at 578; *accord Special Situations Fund III*, 33 F. Supp. 3d at 428.  Many cases have found allegations against auditors wanting despite historic frauds by their clients.  *See, e.g.*, *Pub. Emps.' Ret. Ass'n of Colo.*, 551 F.3d at 306; *In re Petrobras Sec. Litig.*, 2016 WL 3144395, at *2.

As in many other cases in which investors seek to hold accountants liable for their clients' frauds, the most compelling inference here is that EY Germany was a victim of the Wirecard fraud, not a perpetrator.  *See Pub. Emps.' Ret. Ass'n of Colo.*, 551 F.3d at 316 ("The strong inference to be drawn from [the concealment of the fraud] is that Deloitte U.S. and Deloitte Netherlands lacked the requisite scienter and instead were deceived by [their clients]."); *In re DNTW*, 172 F. Supp. 3d at 691 ("It is more plausible that DNTW was itself fooled, or that it simply performed shoddy, negligent audits."); *Special Situations Fund III*, 33 F. Supp. 3d at 434-35 ("[T]he more compelling inference is that Ron Chan deceived DTTC, or that DTTC was merely negligent in the exercise of professional duties . . . .").

## CONCLUSION

For the foregoing reasons, dismissal of the Consolidated Complaint as against EY Germany is mandated.  In addition, Plaintiffs' perfunctory suggestion that if the Court grants EY Germany's

motion to dismiss, it should also grant Plaintiffs leave to amend, Opp'n 35, is insufficient under

Third Circuit law.[19]

Dated: January 18, 2022                          Respectfully submitted,

                                                 **WILLIAMS & CONNOLLY LLP**


                                                  /s/ Craig D. Singer
                                                 Craig D. Singer (PA State Bar No. 71394)
                                                 Steven M. Farina (admitted *pro hac vice*)
                                                 George A. Borden (admitted *pro hac vice*)
                                                 Amanda M. MacDonald (admitted *pro hac vice*)
                                                 WILLIAMS & CONNOLLY LLP
                                                 725 Twelfth Street, N.W.
                                                 Washington, DC 20005
                                                 (202) 434-5000
                                                 csinger@wc.com
                                                 sfarina@wc.com
                                                 gborden@wc.com
                                                 amacdonald@wc.com

                                                 *Attorneys for Defendant Ernst & Young GmbH*
                                                 *Wirtschaftsprüfungsgesellschaft*

---

[19] *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017); *accord Fletcher-Harlee Corp. v. Pote Concrete Contractors*, 482 F.3d 247, 252 (3d Cir. 2007) ("[F]ailure to submit a draft amended complaint is fatal to a request for leave to amend.").  Plaintiffs' passing request for jurisdictional discovery is no more meritorious; the Opposition falls "woefully short of making factual allegations suggesting with 'reasonable particularity' the possible existence of contacts" that could support jurisdiction.  *Eurofins Pharma US Holdings v. BioAlliance Pharma*, 623 F.3d 147, 157 (3d Cir. 2010).

**<u>CERTIFICATE OF SERVICE</u>**

I, Craig D. Singer, hereby certify that on this 18th day of January, 2022, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system.  The foregoing is available for viewing and downloading from the CM/ECF system, which will also send email notification of such filing to all attorneys of record in this action.


  /s/   Craig D. Singer