IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: WIRECARD AG SECURITIES LITIGATION | No. 2:20-cv-03326-AB<br><br>CLASS ACTION |
| THIS DOCUMENT RELATES TO:<br><br>ALL CASES | |

December 8, 2022                                                                  Anita B. Brody, J.

**MEMORANDUM**

Plaintiffs Thanh Sam and Lawrence Gallagher bring this securities class action against Defendant Wirecard AG ("Wirecard"), Defendant Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("EY Germany"), and Individual Defendants Markus Braun, Burkhard Ley, Alexander von Knoop, Jan Marsalek, Susanne Steidl, and Wulf Matthias for violations of § 10(b) of the 1934 Securities Exchange Act ("1934 Act"), 15 U.S.C. § 78j(b), and of Rule 10b-5, 17 C.F.R. § 240.10b-5.[1]  Plaintiffs claim that Wirecard and EY Germany made false and misleading statements in connection with over-the-counter ("OTC") stock transactions, and that Plaintiffs relied upon those statements as investors.

---

[1] Plaintiffs bring this action on behalf of themselves and similarly situated purchasers of unsponsored American Depositary Receipts ("ADRs") under the symbol WCAGY and F-shares of Wirecard common stock under the symbol WRCDF on the over-the-counter ("OTC") market from August 17, 2015 to June 26, 2020.  An entry of default was requested and entered as to Defendant Markus Braun.  ECF No. 85. Individual Defendants Jan Marsalek, Burkhard Ley, Susanne Steidl, Alexander Von Knoop, and Wulf Matthias were dismissed by this Court for lack of service.  ECF No. 86.

1

EY Germany moves to dismiss for lack of personal jurisdiction. In the alternative, EY Germany moves to dismiss for insufficient service of process, failure to state a claim, and *forum non conveniens*. I will grant EY Germany's motion to dismiss for lack of personal jurisdiction.[2]

## I. BACKGROUND[3]

EY Germany is a German accounting firm incorporated and operating in Germany. Consolidated Class Action Complaint ¶ 51, ECF No. 53 ("Compl."); Decl. Annedore Streyl ¶ 3, ECF No. 64-3 ("Streyl Decl.").[4] It is a member firm of Ernst & Young Global Limited. Streyl Decl. ¶¶ 3-4. Ernst & Young Global Limited is structured so that member firms are legally distinct from other member firms. *Id.* ¶ 4. EY Germany has no offices or employees in the United States. *Id.* ¶ 5. EY Germany was responsible for auditing the Group financial statements

---

[2] Because this Court does not exercise personal jurisdiction over EY Germany, I will not discuss EY Germany's alternative arguments for insufficient service of process, failure to state a claim, and *forum non conveniens*.

[3] "A Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual issues outside the pleadings . . . . Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence . . . . [T]herefore, at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations." *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 603-04 (3d Cir. 1990) (quoting *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)). Furthermore, plaintiffs "must present similar evidence in support of personal jurisdiction" when plaintiffs' allegations are challenged by affidavits and supporting evidence presented by defendants moving to dismiss under Rule 12(b)(2). *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 556 (M.D. Pa. 2009); *see also Williams v. Elliott*, 2021 WL 3128663, at *2 (E.D. Pa. 2021). "When plaintiff responds with affidavits or other evidence in support of its position, however, the court is bound to accept these representations . . . ." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 556. The facts are taken from the Complaint and the evidence presented by the parties. All factual disputes are resolved in favor of the Plaintiffs.

[4] Plaintiffs reference the Streyl Declaration throughout their brief responding to EY Germany's motion to dismiss as evidence in support of their argument for personal jurisdiction. *See* Pl. Opp. Br. 3-19. The facts from the Streyl Declaration are included as undisputed.

of Wirecard for over ten years;[5] these financial statements were used in Wirecard's annual reports. Pl. Opp. Brief 3, ECF No. 76; Compl. ¶ 51; Streyl Decl. ¶ 11.

Plaintiffs filed this class action on behalf of purchasers of Wirecard unsponsored ADRs and F-shares[6] from August 17, 2015 through June 26, 2020. Compl. ¶ 368. Plaintiffs allege that EY Germany's audits of Wirecard constituted misrepresentations in violation of federal securities laws, that American investors relied upon these representations when purchasing Wirecard shares on the OTC market, and that those shares dropped significantly in value after Wirecard's allegedly fraudulent representations of its financial health came to light. *Id.* ¶¶ 51, 246. Plaintiffs allege that "Wirecard was only able to successfully perpetrate its massive accounting scheme because of [EY Germany's] knowing complicity or egregious refusal to see the obvious or to investigate the doubtful." *Id.* ¶ 246.

The Wirecard scandal and EY Germany's alleged connection to it gave rise to this lawsuit. Wirecard was a company headquartered in Aschheim, Germany that processed credit card payments as an "acquirer," meaning that it collected money from an "issuer" of a credit card

---

[5] EY Germany's audits of Wirecard were Group audits. A Group audit is "[t]he audit of group financial statements." INTERNATIONAL STANDARD ON AUDITING 600 (REVISED), Final Pronouncement: Definitions ¶¶ 14, 15 (Int'l Auditing & Assurance Standards Bd. 2022). Group financial statements include "the financial information or more than one entity or business unit through a consolidation process." *Id.*

[6] ADRs are financial instruments that allow American investors to trade in foreign stock without trading directly in foreign markets. A U.S. depositary bank holds the title of the foreign stock, and each individual owner purchases ADRs directly from the bank. ADRs are traded in the same manner as other registered American securities, can be listed on major exchanges in the United States or the OTC market, and are subject to the 1934 Act. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002). There are two kinds of ADRs: sponsored and unsponsored. An unsponsored ADR is traded without the guaranteed involvement of the company whose stock is traded in foreign markets. *See id.* at 367. A sponsored ADR requires "the active participation of the issuer of the underlying security." *Id.* To trade on the OTC market, the sponsor of a sponsored ADR or depositary bank issuing the receipts for an unsponsored ADR must file the registration Form F-6 with the SEC and conform with reporting requirements. *Id.*

3

and distributed those funds to the merchant who charged the credit card.[7] Compl. ¶¶ 34-35. Wirecard went public in 2005 on the Frankfurt Stock Exchange and its stock price subsequently increased following a series of acquisitions of "11 companies and numerous portfolios of customers from other payment companies." *Id.* ¶ 87. At the same time, *Financial Times* reporting revealed mischaracterizations of Wirecard's finances in its annual reports, fueling investor concerns that Wirecard's success was too good to be true. *Id.* ¶ 92.

Amidst those growing concerns, EY Germany, as Wirecard's auditor, issued audits that Wirecard relied upon during this period to "claim[] its business was healthy and growing." Compl. ¶ 108. Each of EY Germany's audit opinions were published with Wirecard's annual reports and would begin with: "We have audited the consolidated financial statements prepared by Wirecard AG . . . ." *Id.* ¶ 314. EY Germany's audits of Wirecard's Group financial statements "were prepared pursuant to German commercial laws" and the work "was conducted primarily in Germany pursuant to German auditing standards." Streyl Decl. ¶ 11. As Wirecard's primary auditor, EY Germany interacted with Ernst & Young US LLP ("EY U.S.") by "instruct[ing] EY US through Interoffice Instructions to conduct audit work for Wirecard Group reporting purposes on the reporting packages of Wirecard North America Inc. in the United States." *Id.* ¶ 12. This was one of "those procedures required for the primary auditor in the course of a Group audit. i.e. critical review of the interoffice reporting to EY Germany." *Id.* ¶ 12.

---

[7] In 2021, Wirecard filed a notice of bankruptcy, and the case has been placed in suspense as to Wirecard alone since that filing. ECF No. 60; ECF No. 61. Wirecard's securities are traded in Germany on "the Frankfurt Stock Exchange, the Borse Stuttgart and the Tradegate Exchange under the ticker symbol 'WDI,'" unsponsored ADRs based on Wirecard common stock are traded in the United States on the OTC market under the symbol "WCAGY," and F-shares of Wirecard common stock are traded in the United States under the symbol "WRCDF." Compl. ¶ 34. Wirecard's subsidiary Wirecard North America was headquartered in Conshohocken, Pennsylvania. *Id.* ¶¶ 36, 88.

In 2019, whistleblowers told the *Financial Times* that Wirecard Singapore's reported revenues for 2018 likely reflected sham financial transactions; afterwards, EY Germany issued an "unqualified audit that said there was no evidence that the FY18 annual results needed correction due to the whistleblower allegations regarding Singapore." *Id.* ¶¶ 163, 172, 320. Defendant Braun, the former Chief Executive Officer of Wirecard, pointed to the unqualified audit by EY Germany in a conference call with investors to quell fears that Wirecard did not have the funds it claimed to have in its annual reports. *Id.* ¶ 173. Forecasters wrote that the unqualified opinion from EY Germany was "key for investors" and would bolster Wirecard's share price. *Id.* ¶ 174. Later the same year, the *Financial Times* reported that Wirecard's submissions to EY Germany were meant "to potentially mislead EY." *Id.* ¶ 179.

During this period, Plaintiffs purchased unsponsored ADRs and F-shares; these instruments were set at prices that largely mirrored market prices of the Wirecard stock listed on German stock exchanges. Compl. ¶ 76. In the wake of reporting beginning in 2019 by the *Financial Times* about Wirecard's suspected faulty accounting practices, Wirecard's share prices dropped steadily. *Id.* ¶¶ 263-279. In October 2019, Wirecard hired KMPG, another accounting firm, to conduct an independent audit in response to the reporting. *Id.* ¶ 190. Among other conclusions, KPMG suggested that the database underlying EY Germany's review of whistleblower allegations regarding Wirecard Singapore was flawed and that EY Germany "would have come to a different conclusion if a complete database had been available." *Id.* ¶ 218. The report also noted that Wirecard North America "had lost money every year since 2016." *Id.* ¶ 278. The KPMG investigation concluded on April 28, 2020 and it was published on Wirecard's website in German that same day; Wirecard's shares then dropped again as a result of KPMG's inconclusive findings. *Id.* ¶¶ 201-221.

Additionally, KPMG found that EY Germany had received a whistleblower complaint in 2016 that "senior Wirecard executives may have committed fraud and one executive had tried to bribe an [EY] employee" in connection with Wirecard's acquisition of an Indian company from a Mauritian company. Compl. ¶ 250. EY Forensic & Integrity Services, a division of EY U.S., was called in to investigate the complaint and issued a memorandum in 2018 detailing "red-flag indicators" at Wirecard. *Id.* ¶ 251. The *Financial Times* reported that this memorandum was provided to EY partners and Wirecard executives. Shortly after receiving this memorandum, however, EY Germany issued an internal note claiming that "nothing has come to our attention that causes us to believe that any of the items raised in the whistleblower letter are of such substance that further extended procedures are required." *Id.* ¶¶ 252-253. In its independent investigation, KPMG determined that EY Germany's handling of the whistleblower complaint would have warranted a range of responses, including further investigation by a third party. *Id.* ¶ 254. But EY Germany did not pursue any of them. *Id.* Finally, the *Financial Times* also reported that EY Germany issued an unqualified audit opinion covering Wirecard's 2016 finances even after expressing concern about accounting malpractice in India and originally stating it would publish a qualified audit opinion due to these concerns.[8] *Id.* ¶ 255.

In June 2020, Wirecard admitted that €1.9 billion that it claimed was deposited in escrow accounts in the Philippines[9] "do[es] not exist." Compl. ¶ 4. Wirecard announced on June 18,

---

[8] An unqualified audit opinion is an independent auditor's determination that a company's financial statements are fairly presented and in compliance with generally accepted accounting principles. An unqualified opinion is distinguished from a "qualified opinion," indicating that the auditor has identified an issue regarding accounting policies that is material but does not rise to the level of misrepresenting the company's financial position. *See* PRACTICAL LAW CORPORATE & SECURITIES, PRACTICE NOTE: AUDITING: AN OVERVIEW (2022), Westlaw Practical Law (accessed November 23, 2022).

[9] Because Wirecard itself did not hold a license to process payments in every country in which it operated, it partnered with "third-party acquirers" (TPAs) who could process payments in its place. Compl. ¶ 35. The partnership between Wirecard and these TPAs made it so Wirecard profited off the

6

2020 that EY Germany was not able to gather "sufficient audit evidence" for the €1.9 billion said to be held as "cash balances on trust accounts." *Id.* ¶ 228. After that announcement, Wirecard's shares fell significantly and the two Philippines banks verified that the trust accounts did not exist. In response, EY Germany publicly stated: "There are clear indications that this was an elaborate and sophisticated fraud involving multiple parties around the world in different institutions with a deliberate aim of deception." *Id.* ¶ 244. By the end of the month, Wirecard was insolvent and the price of its shares fell by over 99 percent. *Id.* Defendant Braun was arrested and Wirecard's former Chief Operating Officer, Defendant Marsalek, fled Germany. *Id.* ¶ 5. Ultimately, German prosecutors charged former Wirecard officials with aggravated fraud. *Id.* ¶ 264.

The Wirecard scandal was described as "the largest fraud in German postwar history." Compl. ¶ 264. The events led to a series of investigations and charges by German regulators and government authorities and Germany ultimately changed its regulatory environment by enhancing company accounting standards and empowering its primary financial regulator, BaFin. *Id.* Authorities across the European Union, and specifically in Germany, continue to investigate the events giving rise to the scandal and the actions of regulators. *Id.* ¶ 274.

Plaintiffs allege that EY Germany's auditing of Wirecard "failed to comply with numerous applicable accounting standards" and enabled Wirecard to dupe investors. Compl. ¶ 258. Plaintiffs claim that Defendants, including EY Germany, violated § 10(b) of the 1934 Act & Rule 10b-5 because they: "(a) employed devices, schemes, and artifices to defraud; (b) made

---

commissions from transactions the TPAs processed, but Wirecard would be responsible for refunding any credit card charges that were reversed, known as "chargebacks." *Id.* ¶ 191. To pay back potential chargebacks, Wirecard established escrow accounts to hold those funds, which included the €1.9 billion amount found to be missing in June 2020. *Id.* ¶ 16.

7

untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and other similarly situated in connection with their purchases of Wirecard securities during the Class Period." *Id.* ¶ 379.

## II. DISCUSSION

EY Germany moves to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). In the alternative, EY Germany moves to dismiss for insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(5), failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and *forum non conveniens*.

### A. Personal Jurisdiction

If a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of demonstrating the facts that establish jurisdiction. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). "[W]hen the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). "In deciding a motion to dismiss for lack of personal jurisdiction, we take the allegations of the complaint as true. But once a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996) (citation omitted); *see also Metcalfe*, 566 F.3d at 330.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). Pennsylvania's long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 5322(b). Accordingly, "[t]he Due Process Clause of the Fourteenth Amendment sets the outer boundaries of [Pennsylvania's] authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011). For a court to exercise personal jurisdiction over an out-of-state defendant, due process requires that the defendant "have certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). Plaintiffs contend that this Court has specific jurisdiction over EY Germany.[10] EY Germany disagrees.

### 1. Specific Jurisdiction

The analysis of whether a forum state has sufficient minimum contacts to exercise specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). "For a State to exercise

---

[10] Although Plaintiffs' Consolidated Class Action Complaint suggests that this Court may have general jurisdiction over EY Germany, Plaintiffs abandoned general jurisdiction arguments in their response brief and at oral argument. As such, the Court must solely determine if it has specific jurisdiction over EY Germany.

9

jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The minimum contacts necessary to create specific jurisdiction "must arise out of contacts that the 'defendant himself' creates with the forum State." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The contacts must not be "based on the 'random, fortuitous, or attenuated' contacts [the defendant] makes by interacting with other persons affiliated with the State." *Id.* at 286 (quoting *Burger King*, 471 U.S. at 475). "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Id.* (citation omitted). Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (internal quotation marks omitted). In this case, where Plaintiffs' claims are based on the 1934 Act authorizing nationwide service of process, "the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002).

      A plaintiff must establish three key elements to show that a court has specific personal jurisdiction over a defendant. "First, the defendant must have 'purposefully directed [its] activities' at the forum." *O'Connor*, 496 F.3d at 317 (quoting *Burger King*, 471 U.S. at 472). "Second, the litigation must 'arise out of or relate to' at least one of those activities." *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Third, "a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with fair play and substantial justice.'" *Id.* (quoting *Burger King*, 471 U.S. at 476).

The inquiry in this case begins and ends with whether a defendant "purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).[11] Physical presence in the forum is not required, "[b]ut what is necessary is a deliberate targeting of the forum." *O'Connor*, 496 F.3d at 317. For this inquiry, a court should review "the extent to which the defendant 'availed himself of the privileges of American law and the extent to which he could reasonably anticipate being involved in litigation in the United States.'" *Pinker*, 292 F.3d at 370 (quoting *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 295 (3d Cir. 1985)).

### a. Purposeful Availment

Plaintiffs contend that EY Germany purposefully availed itself of the forum of the United States "through its numerous auditing activities, including its auditing of Wirecard and through its participation in EY Global's integrated network." Pl. Opp. Brief 7. EY Germany argues that it "did not purposefully direct any relevant conduct at the United States." Mot. to Dismiss 14, ECF No. 64.

*Leasco* is the landmark case on specific jurisdiction relating to a foreign auditor. *Leasco Data Processing Equipment Co. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). Chief Judge Henry J. Friendly of the Second Circuit Court of Appeals ruled that the district court lacked personal jurisdiction because a foreign auditor could not foresee its opinions being relied upon by American investors. *See id.* Chief Judge Friendly saw that unless an auditor specifically

---

[11] Purposeful availment is the first requirement for a court to exercise specific personal jurisdiction over a defendant. *See Burger King*, 471 U.S. at 476 ("Once it has been decided that a defendant purposefully established minimum contacts . . . these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'")

11

targeted the jurisdiction, it could be brought into court all over the world because of the way global finance is structured. *See id.* at 1342. In 1972, when the opinion was written, facing worldwide jurisdiction on these grounds was less probable than it is now. Even then, Chief Judge Friendly understood that it was unreasonable to make an auditor subject to a jurisdiction without specifically targeting that jurisdiction. Potential worldwide jurisdiction of this kind would violate due process. *Id.* Circuit courts have consistently followed this principle established in *Leasco*.

In *Leasco*, plaintiffs sued Chalmers, Impey & Co. ("Chalmers"), an English accounting firm, alleging that its false and misleading financial reports caused them to buy stock in Pergamon Press, an English company listed on the London Stock Exchange, at an inflated price. Plaintiffs alleged that Chalmers "knew or had good reason to know" that the allegedly false and misleading financial reports it had prepared "would be given by the defendants to plaintiffs as prospective purchasers . . . . and that plaintiffs would receive them and rely upon them." *Id.* at 1342. Chalmers moved to dismiss for lack of personal jurisdiction, arguing that it did not learn of the purchase negotiations until after most of the plaintiffs' purchases had been completed, and that there was no evidence that the Chalmers-certified financial statements caused any of the few subsequent purchases. *See id.*

The Second Circuit sided with Chalmers, emphasizing that although it was foreseeable to an auditing firm that its opinions may be relied upon by buyers worldwide, such reliance was insufficient to confer personal jurisdiction when Pergamon's securities were only traded on the London Stock Exchange. *Id.* As a result, it was reasonable for Chalmers to believe the effects of its audits would have been contained to U.K. buyers in the U.K. market. *Leasco* established that a plaintiff must show that a foreign auditor engaged in activity "sufficiently extensive and

regular to make [the] possibility [of litigation in the United States] a foreseeable risk of the business" to satisfy the purposeful availment requirement. *Id.* at 1342 n.11. Otherwise, as Chief Judge Friendly famously remarked, "accountants operating solely in London could be subjected to personal jurisdiction in any country whose citizen had purchased stock of a company they had audited; the same would be true, of course, of accountants operating solely in the United States." *Id.* at 1342. Following *Leasco*, courts have limited their exercise of personal jurisdiction over foreign accounting firms conducting work under foreign standards to cases where the accountant would expect to be haled into the jurisdiction for his or her actions.

The Eighth Circuit followed *Leasco* in holding that two Canadian auditors whose work was done abroad, under foreign accounting principles and auditing standards, did not have minimum contacts. *General Elec. Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993). Air Canada purchased Express from Gelco in a Canadian merger, and General Electric then purchased Gelco in an American merger; General Electric sued Air Canada, Gelco, and two Canadian accounting firms who were responsible for auditing Express. *Id.* at 1378-79. General Electric argued that the court had personal jurisdiction over the auditors because the auditors had sent Express' financial reports to Gelco and its American auditors, which were then included in Gelco's reports to the SEC. *Id.* at 1387. The Eighth Circuit disagreed and wrote that the court was "not convinced that the sending of financial statements into the United States establishes minimum contacts." *Id.* at 1388. Because the auditors had provided their financial reporting to Gelco, and not to American investors directly, their actions failed to establish minimum contacts with the jurisdiction; they were one step removed from the conduct giving rise to the lawsuit and indirectly related to the fraud. *See id.*

The Tenth Circuit also followed *Leasco* in finding that an audit by Wenner, Silvestain & Company ("Wenner") and the Wenner Partners that was then filed with the SEC did not establish minimum contacts because Wenner "has not committed an act that would allow it to reasonably anticipate being haled into Michigan court." *Trierweiler v. Croxton and Trench Holding Corp.*, 90 F.3d 1523, 1534 (10th Cir. 1996). Wenner was an out-of-state partnership based in Colorado and its audit was brought into Michigan by a third-party. Wenner's consent to have Trierweiler use the audit in filing documents was not purposeful availment because "mere foreseeability of consequences within the forum state, without more, is insufficient as a basis for jurisdiction." *Id.* at 1535 (quoting *Burger King*, 471 U.S. at 474).

These three cases show that circuit courts have uniformly rejected the exercise of personal jurisdiction over foreign auditors where those auditors only interacted with the forum by exchanging documents with U.S. entities. The sole act of auditing a foreign entity who was later involved in U.S. markets was too attenuated to constitute purposeful availment; finding otherwise would expose every foreign auditor to worldwide jurisdiction. The only case in the Third Circuit involving a foreign entity challenging personal jurisdiction in the securities context involves a corporation, not an auditor. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361 (3d Cir. 2002). In that case, Roche sponsored an ADR in the United States to enable American investment in foreign companies through the OTC market. *See Pinker*, 292 F.3d at 366-67. The court found that Roche's sponsorship of an ADR amounted to purposeful availment of the United States because the act of sponsoring an ADR meant "Roche took affirmative steps purposefully directed at the American investing public." *Id.* at 371. By sponsoring the ADR, Roche engaged in "an active marketing of its equity interests to American investors." *Id.* at 372. Roche, the company-in-chief sponsoring ADRs sold in the American securities market, had

reached into the United States to conduct business and could expect to be haled into court in the forum.

The facts that gave rise to *Pinker* differ from those here in one crucial respect: the role of an auditor in connection with a fraud differs from the role of the company-in-chief perpetuating the fraud because an auditor is removed from the company's unilateral decisions or actions reaching investors. Even if a company-in-chief has taken affirmative steps to avail itself of the U.S. market, there is no guarantee that an auditor, a hired hand with far less agency, has done the same.

Under this logic, courts will undertake a fact-intensive analysis to determine whether a foreign auditor knew or did enough to meet the purposeful availment requirement. For example, foreign auditors who know that the company-in-chief's stock will be publicly traded in the United States and that and its audits will be used to that end may be subject to U.S. jurisdiction under the logic of *Pinker*.[12] Furthermore, a foreign auditor serving on the company-in-chief's board of auditors reviewing audits and financial statements would know or have reason to know that the company's stocks were traded in the U.S. market and that reports would be made available to the American investing public.[13] But the case for purposeful availment is weaker in

---

[12] The court in *Rocker Management, L.L.C. v. Lernout & Hauspie Speech Products N.V.* denied a motion to dismiss for lack of personal jurisdiction because the accounting firm KPMG UK provided auditing services to Lernout & Hauspie whose materials were then "incorporated into a United States securities filing." No. 00-5965, 2005 WL 3658006, at *6 (D.N.J. June 7, 2005). Lernout & Hauspie was trading stock in the United States and its SEC filings, which incorporated the KPMG UK audit, were relied upon by American investors. *See id.* As a result, the court determined that "KPMG UK could reasonably expect to be haled into court to answer for its conduct with the L & H filings." *Id.*

[13] In *In re Parmalat Securities Litigation*, Judge Kaplan of the Southern District of New York determined that a foreign member of Parmalat's audit board had sufficient minimum contacts with the United States. 376 F. Supp. 2d 449, 456 (S.D.N.Y. 2005). In so holding, the court relied on the fact that Parmalat shares were actively traded in the United States, that there were many U.S. shareholders, that the company conducted note offerings to U.S. investors, and that the company posted the audit board's reports and filings on websites in English that were available to U.S. investors. *Id.* at 454. Defendant Maria Martellini served as a representative on Parmalat's holding company's Board of Statutory Auditors,

cases challenging personal jurisdiction over even the company-in-chief when the relevant securities were not publicly traded or reported to the SEC by the company.[14] Therefore, the inquiry of whether a foreign auditor of a foreign entity has subjected itself to this forum is rooted in the facts and actions taken by the auditor itself in connection with the entity—what the auditor knew and if the auditor could foresee being subjected to litigation in American courts.

Plaintiffs advance two theories to support its claim of specific jurisdiction: (1) that Wirecard's usage of EY Germany's audits constitutes purposeful availment simply because those audits reached American investors; and (2) that EY Germany's relationship with EY U.S. eventually reached into the U.S. Both theories fail.

### i. EY Germany's Auditing Activities

The first theory fails to establish that EY Germany purposefully availed itself of the United States because EY Germany's auditing activities were not directed toward the forum. The facts in this case fall under *Leasco*, *General Electric*, and *Trierweiler*. EY Germany, a German company, conducted its audits of a German company (Wirecard) in Germany under German accounting principles. As in *Leasco*, EY Germany auditors could not have known about the use of their audits by American investors simply because their audits were later placed on Wirecard's website in English, where they might be read by American investors making purchases of unsponsored Wirecard ADRs and F-shares on the OTC market. Finding otherwise

---

which reviewed "compliance with legal provisions concerning the drawing up and layout of the statutory and consolidated financial statements and the directors' report through direct checks and information received from' Deloitte." *Id.* at 452. Her role on the board and the company's extensive activities targeted at the forum were sufficient to establish purposeful availment. *Id.* at 455.

[14] See, for example, *Church v. Glencore PLC*, No. 18-11477, 2020 WL 4382280, at *7 n.12 (D.N.J. July 31, 2020) ("Furthermore, the issue of personal jurisdiction is not entirely clear where, as here, Plaintiffs purchased ADRs or foreign shares listed on an OTC market.").

would mean that any accounting firm around the world could expect to be haled into any jurisdiction in which a company audited by the firm might direct its financial products. *See Trierweiler*, 90 F.3d at 1535. The fact that Wirecard, acting on its own, used the audit materials in annual English language reports that were made available to potential American investors does not constitute deliberate contact with the forum by EY Germany.

In effect, Plaintiffs rely on the actions of a third party to establish EY Germany's minimum contacts. EY Germany's contacts with the United States are a result of the "unilateral activity of another party," Wirecard, and are "not an appropriate consideration." *Helicopteros*, 466 U.S. at 417. The cases where a court found personal jurisdiction over a foreign entity are (1) when the foreign auditor was directly appointed by the company issuing the stock, *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 449 (S.D.N.Y. 2005), (2) when the foreign company itself was the issuer of the ADRs, *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361 (3d Cir. 2002), or (3) when information from the foreign accounting firm was used in SEC filings, *Rocker Management, L.L.C. v. Lernout & Hauspie Speech Products N.V.*, No. 00-5965, 2005 WL 3658006 (D.N.J. June 7, 2005).

None of these facts are present in this case. EY Germany's involvement in auditing Wirecard falls short of the contacts in those cases and fails to show that EY Germany purposefully availed itself of this forum. EY Germany's audit opinions were not used in connection with any SEC filings by Wirecard. Wirecard did not sponsor the ADRs allegedly sold to Plaintiffs and so did not file Form F-6 with the SEC. This is unlike in *Rocker Management*, where the company traded its stock on the U.S. stock exchanges and filed its forms directly with the SEC, or in *Pinker*, where Roche itself sponsored an ADR in the United States. Wirecard did not offer a note in the United States or sponsor ADRs; its auditor EY Germany's

connection to the purchases of ADRs and F-Shares at issue in this case was even more attenuated.

### ii. EY Germany's Relationship with EY U.S.

As for the second theory, Plaintiffs argue that EY Germany was involved in auditing financial statements of Wirecard subsidiaries, including Pennsylvania-based Wirecard North America. Pl. Opp. Brief 11, 13. But EY Germany, a German entity separate from other EY firms and EY Global, was not involved in the direct auditing of Wirecard North America—that was the work of EY U.S., which EY Germany assisted in reviewing one step further removed. *See id.* at 11 (quoting Streyl Decl. ¶ 12) ("EY declares that it purposefully instructed EY US 'to conduct audit work for Wirecard Group reporting purposes on the reporting packages of Wirecard North America Inc. in the [U.S.] since 2017.'"). Plaintiffs attempt to rely on generalized activity undergone in a Group audit to presume that EY Germany would be subject to U.S. jurisdiction through EY U.S.' audits of Wirecard North America. EY Germany conducted audits of consolidated financial statements as would be typical for "a primary auditor in the course of a Group audit." Streyl Decl. ¶ 12. Though the "Group" had an American subsidiary, EY Germany was not directly involved in auditing Wirecard North America.

Without more, such allegations would subject foreign auditors to jurisdiction solely because of their role as a primary auditor of a company that has multinational subsidiaries that are audited by local auditors. To do so would reinstate the theory of "worldwide reliance" that was rejected as unreasonable by the Second Circuit in *Leasco*. The fact that EY Germany reviewed work by EY U.S. in the course of conducting Group audits pursuant to German and international auditing standards still does not sufficiently constitute purposeful availment such that EY Germany would expect to be haled into a United States court under *Leasco*. Therefore,

under either theory, EY Germany did not purposefully avail itself of the privileges of conducting activities within the United States and this Court cannot exercise specific jurisdiction over EY Germany.[15]

### III. CONCLUSION

I will grant EY Germany's motion to dismiss for lack of personal jurisdiction.

        ___s/ANITA B. BRODY, J._____
        ANITA B. BRODY, J.

COPIES VIA ECF

---

[15] Because EY Germany does not satisfy the threshold purposeful availment inquiry to establish personal jurisdiction, I will not discuss the remaining requirements.