UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  WIRECARD AG,         .    Case No. 2:20-CV-03326-AB
SECURITIES LITIGATION        .
                             .
CAROL A. BROWN, et al.,      .
                             .
        Plaintiffs,          .
                             .    James A. Byrne U.S. Courthouse
            v.               .    601 Market Street
                             .    Philadelphia, PA 19106
WIRECARD AG, et al.,         .    (Held in the Courtroom)
                             .
        Defendants.          .    Tuesday, July 5, 2022
. . . . . . . . . . . . . .  .    10:35 a.m.


TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For Movant Thanh Sam:      Robbins Geller Rudman & Dowd LLP
                           By:  HADIYA K. DESHMUKH, ESQ.
                                SHAWN A. WILLIAMS, ESQ.
                           Post Montgomery Center
                           One Montgomery Street, Suite 1800
                           San Francisco, CA 94104


For Defendant              Williams & Connolly LLP
Ernst & Young GmbH:        By:  STEVEN M. FARINA, ESQ.
                           725 Twelfth Street NW
                           Washington, DC 20005


Audio Operator:            Joseph Walton


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-359**

THE COURT:  What?

MS. DESHMUKH:  Hadiya Deshmukh from Robbins Geller Rudman & Dowd.

THE COURT:  Okay.  And?

MR. FARINA:  Good morning, Your Honor.  Steven Farina from Williams & Connolly.

THE COURT:  Okay.  All right.  Since -- as I -- let me understand from both parties to make sure that I'm correct about this, is that the plaintiff has the burden of proof on this, is that correct, that they belong in this court, do you agree to that?

MS. DESHMUKH:  Yes, Your Honor.

THE COURT:  I'm never going to remember how to pronounce your name, Deshuma (sic).

MS. DESHMUKH:  Hadiya, and the last name is --

THE COURT:  No.

MS. DESHMUKH:  -- Deshmukh.

THE COURT:  What's your last name?

MS. DESHMUKH:  Deshmukh.

THE COURT:  Deshmukh.  All right.  And Mr. Farina.  Okay.  Okay.  Ms. Deshmukh, do you want to tell me -- start --

UNIDENTIFIED SPEAKER:  Judge, before we continue there's a party in California that wanted to listen on the phone.

THE COURT:  Oh, sure.

3

UNIDENTIFIED SPEAKER:  I just have to answer the number.

THE COURT:  Do you object to anyone listening?  It's an open -- I mean, it's an open --

MR. WILLIAMS:  No, Your Honor.

THE COURT:  -- courtroom.  I -- you have no --

MR. FARINA:  I have no objection, Your Honor.

(Connecting call)

MS. DESHMUKH:  Your Honor, do you prefer I move up there or --

THE COURT:  I don't care.

UNIDENTIFIED SPEAKER:  Nobody is on the line yet except for myself, so they may not have called in.

THE COURT:  Okay.  All right.  If they called in, you'll know, won't you?

UNIDENTIFIED SPEAKER:  Yes, Judge, it'll beep.

THE COURT:  Okay.  All right.  Good.  Okay.  All right.  Ms. Deshmukh, why don't you begin.

MS. DESHMUKH:  Sure.  The Supreme Court's analysis in Ford makes clear that when a defendant like --

THE COURT:  I don't hear you.  You either sit down and use the -- or you can come forward.

MS. DESHMUKH:  All right.  I'll come forward then.  Thank you.

THE COURT:  Okay.

4

MS. DESHMUKH:  Is this better?

THE COURT:  Yes.

MS. DESHMUKH:  Okay.  The Supreme Court's analysis in Ford makes clear that when a defendant like EY Germany exploits a market and when those contacts then relate to plaintiffs' claims, personal jurisdiction is appropriate.

While EY Germany has many contact with this forum, I'd like to first focus on the connection between EY Germany and Wirecard North America.  The complaint alleges that EY failed to audit the consolidated financial statements of Wirecard AG and its subsidiaries that includes Wirecard North America.

In support of its motion to dismiss, EY Germany submitted a declaration from Annedore Streyl.  She's a member of EY Germany's management board and was responsible for all legal matters relating to Wirecard.  She in her own words said that EY Germany instructed EY US to carry out the audit of Wirecard North America, and that this was for Wirecard's reporting requirements.  They've done so since 2017.  She put this in her declaration.

THE COURT:  All right.  How did you interpret that to mean?  What did you interpret that to mean?

MS. DESHMUKH:  I -- so --

THE COURT:  So how does it -- what -- I mean, what

happened?

MS. DESHMUKH:  So the direction -- EY Germany directed EY US to conduct the audit here in Pennsylvania of Wirecard North America, and so that was a directing of an activity to the forum.

THE COURT:  I'm going to ask you, do you agree with that?

MR. FARINA:  Not exactly, Your Honor.  The audit work was performed by Ernst & Young US, which is a separate legal entity.  That audit work was received in Germany by the German firm, EY Germany, and it was reviewed.  We don't believe that that constitutes a contact, a purposeful availment by --

THE COURT:  Okay.

MR. FARINA:  -- EY Germany.

THE COURT:  I understand your position. Okay. And you tell me -- okay.  Now, we know what the issue is.  Tell me what your position is.

MS. DESHMUKH:  Well, EY Germany had to -- has under oath has declared that it instructed EY US to carry out that audit.  So it's not like EY US was doing this on its own accord, or that Wirecard was asking EY US to conduct this audit.  It was EY Germany directing that instruction to this forum.

THE COURT:  So you're saying to me the -- that the instruction itself is purposely availing EY Germany of use of

this forum, is that right?

MS. DESHMUKH:  Yes, Your Honor, and contrary to EY Germany's attempts to minimize any connection that it has to Wirecard North America, in its 2017 audit opinion of Wirecard, EY Germany called the acquisition of Wirecard North America a "key audit matter."  That was EY Germany.

This was a deliberate targeting of the US through the Wirecard North America audit, and that is enough to satisfy jurisdiction, and while that one contact is enough to justify jurisdiction, EY Germany has additional contacts to support jurisdiction.  For example, EY Germany regularly contributes to audits of US companies, PCAOB records show as much.  In 2019 --

THE COURT:  Say that again.

MS. DESHMUKH:  PCAOB records show as much.

THE COURT:  What's PCAO?

MS. DESHMUKH:  It's the Public Accounting Board, the federal commission -- I forget the actual --

THE COURT:  All right.

MS. DESHMUKH:  Yeah.

THE COURT:  I don't care about that, but --

MS. DESHMUKH:  It's a federal board that monitors the auditing activities of auditors and that contribute to SEC filings.

THE COURT:  But that has nothing to do with this particular case, does it?

7

MS. DESHMUKH:  Yes, but Ford changes the landscape of how a court should address the contacts when looking at personal jurisdiction, and the fact that the PCAOB noted that EY Germany contributed to 87 other issue or audits in this forum, in addition to its own clients, that means these are instances in which EY Germany has contributed to audits even when it's not the primary auditor of an audit.  Each individual audit counts as its own contact.

And so what Ford says is that it's this kind of exploiting of a market in a forum state that the Supreme Court said that is one way for a defendant to deliberately reach out beyond its home.  And, again, that's another instance of how this is enough for purposeful availment.  EY Germany ignores the substantial benefits that it receives from all these auditing activities.

Additionally, EY also expected that its audit opinions would be published in connection with --

THE COURT:  EY Germany you're talking --

MS. DESHMUKH:  EY Germany expected its audit opinions to be published in connection with Wirecard's annual reports, and they expected that they would reach US investors.  They haven't denied this.

Wirecard markets itself as a global enterprise operating through a worldwide network of subsidiaries, including Wirecard North America, and Wirecard considered

8

Wirecard North America as one of its five key locations.  In its annual reports, Wirecard specifically touted its Anglo American investor base.

These facts, in addition to the fact that Wirecard also published its annual reports and EY Germany's audit opinions in English, strongly supports a showing that EY expected that US investors would be reading its audit opinions.

THE COURT:  Well, I mean, you know -- you have to admit that English is the universal language of business.  I mean, I don't think -- I think -- I practically can take judicial notice of that.  I mean, that's the language that's used, isn't that true?

MS. DESHMUKH:  Yes, Your Honor, but that in -- it's one factor in the analysis.  When the company is also touting that it has Anglo American investors and that it makes up a large part of its investor base, those factors have to be viewed together when determining whether the -- whether EY Germany expected --

THE COURT:  And where's the evidence of that?

MS. DESHMUKH:  It's in the annual reports of Wirecard AG.

THE COURT:  AG?

MS. DESHMUKH:  Yes.

THE COURT:  Not Germany?  Is that -- you're talking about Germany?

MS. DESHMUKH:  Yes, Wirecard Group, the defendant --

THE COURT:  Okay.

MS. DESHMUKH:  -- in this action.

THE COURT:  Okay.

MS. DESHMUKH:  Yes, and it's the annual reports that EY Germany reviewed as part of its audit in connection with this case.

THE COURT:  Okay, okay.

MS. DESHMUKH:  And so all of these activities demonstrate that EY Germany purposely availed itself of the privileges of conducting business in the US.

THE COURT:  Okay.  Thank you.  I'm glad you came in. I understand what your argument is a little better from having you come in and talk to me about it.

MS. DESHMUKH:  Okay.

THE COURT:  Okay.

MS. DESHMUKH:  Yes.

THE COURT:  Thank you.  Okay.  Let me hear about your motion.

MR. FARINA:  Thank you, Your Honor.  Steven Farina on behalf of Ernst & Young, GmbH Wirtschaftspruefungsgesellschaft, and I'm just going to just refer to them as EY Germany throughout my argument.

Ford does not change the landscape of jurisdiction. Jurisdiction case law is well established in the Supreme Court

10

and in this Circuit, and Your Honor has issued numerous opinions, including the --

THE COURT:  Don't (indiscernible) that I'm consistent, so please.

MR. FARINA:  Well, I would --

THE COURT:  Like give me more authority than that.

MR. FARINA:  We're relying on your Abira (phonetic) decision as well as the Ford decision and the Walden decision in the Supreme Court.

There are two bases potentially for jurisdiction over a defendant, one is general jurisdiction.

THE COURT:  Well, we know that's out of the --

MR. FARINA:  That's out of it.  They're not incorporated here.  It's a German limited liability company, Ernst & Young Germany.  They have no offices in the United States.  They have no employees in the United States.  They do not perform audit work in the United States.

It is precisely because Ernst & Young Germany has no presence in the United States that the audit work on Wirecard North America was performed by Ernst & Young US, LLP, an entirely separate legal entity.  They're not affiliated with one another.  They're both members of a UK membership group, but they are not -- there's no common ownership.  They're not affiliates.  One doesn't own the other.  It's not a subsidiary of the other.  They're separate legal entities.

THE COURT:  But did they authorize the American company that was mentioned by the plaintiff to do this audit?

MR. FARINA:  Yes, the US firm was authorized by EY Germany to perform the audit work on Wirecard North America because EY Germany had not purposely availed itself of the United States.  The work was performed by the US firm.  The word was then transmitted to Germany where EY Germany did its work.  The work was received.  It was reviewed, and EY Germany issued its opinion applying Germany accounting standards, German auditing standards, and German law.

The work performed by EY US and the review of that work by EY Germany is not purposeful availment by EY Germany of the United States.  It's the opposite.  It's because they don't have a presence here that they're relying upon Ernst & Young US to perform that work.

The other work that EY Germany performs with respect to US companies that counsel referenced, that is not work that is performed in the United States.  Multinational companies may have operations in Germany, and the Streyl affidavit clearly states that work on those engagements is work performed by EY Germany on those portions of the companies that are in Germany.

So EY Germany is doing work in Germany where it is at home.  So it has nothing to do with this case.  Those are not contacts relevant to plaintiffs' claim, which is the second critical point.  Not only is there an absence of purposeful

availment, which alone is sufficient to defeat an assertion of specific jurisdiction, under controlling law of the Third Circuit, Supreme Court, Your Honor's own decisions, there has to be a substantial connection, a strong connection between the defendants' contacts with the forum and the plaintiffs' claims, and that's critical here because there's no strong connection between EY Germany's activities in the United States, whatever the plaintiff alleges those are, and the claims.

The claims here is of a massive fraud, which the plaintiffs specify in some detail based on published reports, and it talks about the acquisition of businesses in India from a Mauritian middleman.  It talks about third party acquirers doing business in Dubai, and Singapore, and the Philippines, and that those revenues are completely made up.  It talks about 1.9 billion in euros allegedly deposited in a trust account in the Philippines that doesn't exist.  That's the core of the fraud.  It's all throughout the complaint.  It's all throughout the documents cited in the complaint.

It has nothing to do with the United States.  The fraud does not have a strong connection with the United States, and the Third Circuit after Ford decided the Hepp case, Hepp v. Facebook, and in the Hepp case the Third Circuit says there has to be a strong connection, those are the words used by the Third Circuit, a strong connection between the defendant's contacts and the plaintiff's claims.  It's not enough that they

13

can simply point to some connection. There has to be a strong connection.

Now, the Court in Ford rejected the notion that the claims have to arise out of the contacts. We agree with that, but it still says that there has to be a substantial connection between the defendant's contacts with the forum and the plaintiff's claims.

That is absent here because the defendants' contacts -- first of all, we don't believe that there are contacts specific to Wirecard because the work was performed by the US firm, but even if you were to accept the argument that somehow we should consider the work performed by the US firm as purposeful availment by the German firm, the fraud doesn't have a strong connection to those contacts because it's not the fraud, and it's the plaintiffs' own complaint that establishes that.

The other thing that counsel is --

THE COURT: Let me hear --

MR. FARINA: Sure.

THE COURT: I'm going to ask you to rebut that.

MS. DESHMUKH: Sure. Your Honor, Ford makes clear that causality is not required, and it does not need to --

THE COURT: What is not required?

MS. DESHMUKH: Causality, Your Honor --

THE COURT: Oh.

14

MS. DESHMUKH: -- is not required, and here we have -- plaintiffs have multiple allegations connecting Wirecard North America to the fraud.

The audit of Wirecard -- or pardon me, the complaint alleges that EY Germany issued audit opinions that stated its reviews of Wirecard financials included the review of Wirecard subsidiaries, including Wirecard North America. And EY Germany said, based on this review of the subsidiaries, Wirecard had given an accurate view of its financial position.

EY Germany considered the acquisition of Wirecard North America a key audit matter, and EY Germany said that it had examined the valuation of the newly acquired business. These are allegations in the complaint.

According to Wirecard's 2017 annual report, Wirecard said Wirecard North America would be used in connection with its Asian subsidiaries. That's an allegation in the complaint.

When the Financial Times started to question the legitimacy of Wirecard's activities related to the third party partners in Asia, Wirecard assured investors that it had other sources of revenue as well, one of which was its business in the US. Specifically, as alleged, Wirecard said, "More than 50 percent of Wirecard's transaction volumes originated from geographies like the USA, Latin America and Asia." These are all part of the fraud that plaintiffs have alleged.

THE COURT: Okay.

MS. DESHMUKH:  And it need not be the center of the fraud, but Ford makes clear that it's relatedness, not causality.

Additionally, I'd like to push back a little and highlight that there's --

THE COURT:  I'd like to --

MS. DESHMUKH:  Okay.

THE COURT:  No, I'd like to hear Mr. Farina's response.

MR. FARINA:  Sure.  The Financial Times article that counsel just referenced, if you look at the Financial Times article, and we've included a link to it in our brief, it specifically says that North America and Europe were areas that were not affected by the fraud.  That is in the Financial Times article.  The point was that those areas might not have been profitable, but it says that those were not affected by the fraud.

And the complaint, again, the complaint goes into significant detail about the fraud, and the fraud is in Dubai, and Singapore, and India.  It's not in the United States.  And you can scour the plaintiffs' complaint.

THE COURT:  But I don't understand.  The fraud is generated in Germany, isn't it?

MR. FARINA:  Correct.  It is directed at Germany, but it relates to principally revenues generated from transactions

16

involving third party acquirers in Dubai, Singapore, and the Philippines.  That's the core allegation.

The second core allegation is there was 1.9 billion euros supposedly deposited in a trust account associated with transactions.

THE COURT:  That's the fraud itself.

MR. FARINA:  Right, and that's not the United States. So the notion that there are financial results that report into the consolidated financial statements of Wirecard, that's true of virtually every company.  It's true of every company -- country in which Wirecard operates.  They operate in Africa, and North America, and Central America, and Asia, and -- but that doesn't mean that the plaintiffs' claims have a strong connection to EY Germany's contacts with the United States; they simply don't.

And in terms of what the Supreme Court said in Ford, the Third Circuit in Hepp is quoting Ford, and it says, for the contacts to satisfy the second prong, which is substantial relationship, there must be a strong relationship among the defendant, the forum, and the litigation.

The plaintiffs' claims here are spelled out in the plaintiffs' complaint.  Plaintiffs are master of their own complaint.  They've alleged what the fraud is.  The fraud is not the United States.  The fraud is not EY Germany's work in the United States.  EY Germany didn't do any work in the United

States.

If you look at the section of the complaint where they try to allege scienter, what did EY Germany do wrong, all of the things that they said EY Germany did wrong are outside of the United States.  Oh, they didn't do confirmations with the escrow company in the Philippines or Singapore.  They didn't adequately audit the revenue involving the third party providers in Singapore, and Dubai, and the Philippines.  It's not the United States.

And there's no substantial activity purposely directed by EY Germany into the United States, which is the first prong.  They fail that.

And even if you were to say that the work performed by a separate legal entity, Ernst & Young US was somehow imputed to EY Germany, which it's not, but even if you were, the fraud, the plaintiffs' claims about what EY Germany did wrong has nothing to do with the United States; it just doesn't.

And it has to be a strong connection.  We don't see that there's any connection, but it certainly isn't a strong connection.

And I will make one last point, Your Honor, the notion of foreseeability, that somehow it was foreseeable that EY Germany --

THE COURT:  I'm not -- that doesn't --

MR. FARINA:  -- that's not the law.

THE COURT:  That doesn't move me.

MR. FARINA:  Okay.

THE COURT:  I'm interested in the other part.  Okay.

MR. FARINA:  Yes.

THE COURT:  Okay.  Why don't you respond now?  You asked -- you certainly -- you can come up here and just you can respond.

MS. DESHMUKH:  Your Honor, EY Germany's alleged fraud was its audit of a consolidated financial book of the entirety of Wirecard Group.  That included Wirecard North America.  It cannot distance and it cannot ignore the fact that Wirecard North America, Wirecard US's business was a part of this fraud.

Wirecard purchased Wirecard North America as an attempt to provide legitimacy and point to another source of revenue when news reports started questioning its other Asian activities and the sources of revenue elsewhere that defense counsel raises here.  But EY's audit opinions --

THE COURT:  EY Germany?

MS. DESHMUKH:  Germany, pardon me, EY Germany's audit opinions relate to the entire Wirecard book of business, and I'd also like to emphasize physical presence is not required, and --

THE COURT:  Well, that's obvious.

MS. DESHMUKH:  Right.  And EY Germany tries to

distance itself from its own words and its declaration. It was not that EY US was just authorized to carry out this audit of Wirecard North America. EY Germany specifically, and I quote, instructed EY US through interoffice reporting or interoffice communication to carry out this audit. This was not EY US acting of its own accord. This was at EY Germany's direction into this forum.

THE COURT: Okay.

MS. DESHMUKH: And, again, Ford makes clear that a -- yes, a connection is required and that strong connection, even under Hepp is established here by the numerous, the numerous connections that EY Germany has with this forum, including not just through Wirecard America, but through its other auditing activities.

And Ford says you have to look at the role that the defendant plays and exploits out of a forum. EY conducts extensive auditing activities, and the fraud is precisely the kind of activity that EY was doing in this forum.

And then additionally, the audit reports themselves were going to US investors; EY Germany knew that.

All of these go together. All of these are clearly related to plaintiffs' claims, and defendants are trying to create a higher standard to meet that relatedness factor.

THE COURT: Okay. I'd like to hear from you again.

MR. FARINA: Sure.

THE COURT:  This is just easier for me to hear back and forth instead of -- I mean, address what's been said.

MR. FARINA:  Sure.  The comment about Ford, I mean, I think it's instructive to look at what the Third Circuit said about Ford when they identified the strong connection in Ford that was absent in Hepp.  In Hepp, you had the two defendants that had purposely availed themselves of conducting business in Pennsylvania, and the Third Circuit looked at that and said, that's the first prong, but the second prong is the claim has to arise out of those contacts.

That's the flaw in counsel's argument.  Counsel keeps saying, well, there's these contacts, but that's not the point of the second prong.  The second prong is that there has to be a strong connection between those contacts and the fraud and the claims, and as the Third Circuit found in Hepp, there wasn't, and there isn't here.

But discussing Ford, the Third Circuit said that the contacts between Ford and the States of Minnesota and Montana were legion.  By every means imaginable, Ford urged state residents to buy the types of cars in these accidents.  The company systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those states.

So there was the required strong relationship among the defendant, the forum, and the litigation.  That's Ford.  I

mean, it sort of common sense.  No one can say that <u>Ford</u> hasn't systematically targeted the States of Minnesota and the States of Montana.

That's certainly nothing like Ernst & Young Germany requesting work to be performed by a separate legal entity, to have that work sent over to Germany and reviewed in Germany.  That wouldn't be enough even if the fraud were in North America, but it's not, and it's not according to the very documents that the plaintiffs are relying upon.

This is the Financial Times article.  It says that Wirecard's business, core business in Europe and the Americas, it says, were not directly affected by the accounting scandal.

There's no basis for the plaintiffs to allege that the fraud that is the predicate for their claims has anything to do with Wirecard North America.  The fact that the results of Wirecard North America rolled up into the consolidated financial statements and that EY Germany issued an opinion on the consolidated financial statements does not provide the required strong connection between the activities of EY Germany purposely directed at the United States and the plaintiffs' claims.  It does not exist.  It certainly isn't a strong relationship, which is what the Third Circuit and the Supreme Court require.

THE COURT:  Okay.  Do you want to respond again?

MS. DESHMUKH:  (No audible response).

22

THE COURT:  Okay.

MS. DESHMUKH:  Thank you.

THE COURT:  I used to do this in my chambers, and then just simply go back and forth, which I find very helpful.

MS. DESHMUKH:  While EY doesn't offer the same breadth of activities as described in Ford, EY also isn't a one-off mom-and-pop shop.

THE COURT:  EY Germany?

MS. DESHMUKH:  Germany.  Pardon me.

THE COURT:  Please be --

MS. DESHMUKH:  EY Germany is not a one-off mom-and-pop shop.  It regularly offers services concerning US security matters, and breadth is not the only question under Ford.  The question is whether EY Germany has deliberately reached out to the forum; here it has through its numerous contacts and through its auditing activities.

And while EY Germany markets itself as a global entity that can advise on matters concerning securities regulations, you'll see in the attachments to the opposition brief that in applications to the PCAOB, the Accounting Board here in the US, EY Germany says that it will use all of the firm's resources to carry out SEC -- or its services, including advising on securities matters.

And as far as the Hepp distinction goes, if you compare Ford to Hepp, the connections in Hepp were a lot more

attenuated that what is here.  The -- for example, there the plaintiff alleged that the defendant company sold merchandise into the forum, and that was one of the contacts alleged, but the plaintiff's misappropriation of likeness claim had nothing to do with the defendants just selling products in the forum.

Here, EY Germany is conducting auditing activities in the forum, and plaintiffs' claims are directly related to the same kinds of activities.  It's the -- that's what Ford says is that Ford says these companies, these car companies are investing all this marketing in the forum, and then when a car then malfunctions and gives rise to plaintiff's claims, it was cars that they were marketing in the forum that led to those claims.  It was cars generally, marketing of cars generally that then was connected enough to plaintiff's claims related to two specific cars.

And so here I think the EY Germany connections to plaintiffs' claims are a lot stronger.  They're strong enough under Ford to meet that relatedness requirement.

THE COURT:  Okay.  Thank you very much.

MS. DESHMUKH:  Thank you.

THE COURT:  Do you want hear -- do you want to be --

MR. FARINA:  Can I just have one last word?

THE COURT:  Yes, of course.

MR. FARINA:  Counsel said that EY Germany conducts auditing activities in the United States.  That's simply not

24

true.  There's an affidavit that's been submitted by Dr. Annedore Streyl.  There's no auditing activities in the United States.  To the extent --

THE COURT:  Well, the question is whether they authorized them to do -- to make --

MR. FARINA:  Yeah, but she's also pointing at work done for other companies, which again is insufficient to establish personal jurisdiction in this case under a specific jurisdiction basis.

But that work as set forth in the affidavit of Dr. Streyl relates to, again, subsidiaries of US companies in Germany, and EY Germany is doing the work related to those entities in Germany.  It's not EY Germany reaching out to the United States to perform audit work.  There's no evidence in the record that EY Germany itself performed any audit work in the United States.

THE COURT:  Okay.  Now that I've heard your argument, I'll read all the case, I promise you.

MR. FARINA:  Excellent.

THE COURT:  Okay.  And this was very helpful.  Thank you very much for coming in.

MR. FARINA:  Thank you, Your Honor.

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  Okay.  Court is adjourned.

*  *  *  *  *

25

# **C E R T I F I C A T I O N**

I, COLETTE MEHESKI, the court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Colette Meheski

COLETTE MEHESKI

J&J COURT TRANSCRIBERS, INC.        Date:  December 29, 2022