# EXHIBIT 18

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re WIRECARD AG SECURITIES LITIGATION | ) ) ) | Civ. Action No. 2:20-cv-03326-AB |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | LEAD PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF POINTS AND |
| ALL ACTIONS. | ) ) ) | AUTHORITIES IN SUPPORT OF PERSONAL JURISDICTION #64 |

**[UNDER SEAL]**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................1

II.     RELEVANT PROCEDURAL BACKGROUND .................................2

III.    FACTS DEVELOPED SINCE BRIEFING SUBMITTED.....................3

      A.      EY Germany Auditors Made an In-Person Site Visit to Pennsylvania in December 2017 to Direct the Audit for Wirecard North America ........................3

      B.      EY Germany Had a Direct Role in Auditing Wirecard North America .................7

      C.      February 2023 *The New Yorker* Article Concerning Suspicious Behavior at Wirecard North America's Prepaid Card Services ...........................10

IV.     LEGAL STANDARDS ........................................................10

V.      ARGUMENT ...................................................................11

      A.      EY Germany Purposefully Availed Itself of the Forum of the U.S......................11

            1.      EY Germany Made a Site Visit to Wirecard North America in December 2017 in Connection With Its Audit of Wirecard .....................12

            2.      EY Germany Engaged EY U.S. to Audit Wirecard North America..........14

            3.      EY Germany Controlled EY U.S.' Auditing Work of Wirecard North America ................................................................15

            4.      EY Germany Performed Auditing Work Directly on Wirecard North America ................................................................17

      B.      EY Germany's Contacts with the U.S. in Relation to Its Audit of Wirecard North America Have a Strong Relationship to Plaintiffs' Fraud Claims...............18

            1.      Discovery Regarding the 2017 Site Visit Confirms Plaintiffs' Allegations that Wirecard North America was Related to the Alleged Fraud........................................................19

            2.      The Acquisition of Wirecard North America Was Integral to Wirecard Group's Global Operations and Expansion Ambitious.............21

      C.      EY Germany Knew U.S. Investors Would Rely Upon Its Audit Opinions...........23

VI.     EXERCISING JURISDICTION OVER EY GERMANY PROMOTES THE POLICY OF PREVENTING FOREIGN ENTITIES FROM CONDUCTING FRAUD ON U.S. SOIL ........................................................25

VII.    CONCLUSION................................................................26

4882-1278-5512.v3

# TABLE OF AUTHORITIES

Page

## CASES

*Action Mfg. Co. v. Simon Wrecking Co.*,
   375 F. Supp. 2d 411 (E.D. Pa. 2005) ....................................................................11

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).........................................................................10, 12, 17

*Carteret Sav. Bank, FA v. Shushan*,
   954 F.2d 141 (3d Cir. 1992).......................................................................12

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
   683 F. Supp. 1463 (S.D.N.Y. 1988)..........................................................12

*Dole v. Arco Chem. Co.*,
   921 F.2d 484 (3d Cir. 1990)..........................................................................4

*First Am. Corp. v. Price Waterhouse LLP*,
   988 F. Supp. 353 (S.D.N.Y. 1997),
   *aff'd*, 154 F.3d 16 (2d Cir. 1998)................................................................15

*Foman v. Davis*,
   371 U.S. 178 (1962)........................................................................................4

*Ford Motor Co. v. Mont. Eighth Jud. D. Ct.*,
   _ U.S. _, 141 S. Ct. 1017 (2021)............................................................ *passim*

*Gen. Elec. Co. v. Deutz AG*,
   270 F.3d 144 (3d Cir. 2001).................................................................13, 18

*Hepp v. Facebook*,
   14 F.4th 204 (3d Cir. 2021) ..................................................................... *passim*

*In re Isostatic Graphite Antitrust Litig.*,
   2002 WL 31421920 (E.D. Pa. Sept. 19, 2002) ......................................16

*In re Magnetic Audiotape Antitrust Litig.*,
   334 F.3d 204 (2d Cir. 2003).......................................................................11

*Laurel Gardens, LLC v. Mckenna*,
   948 F.3d 105 (3d Cir. 2020).......................................................................25

*Leasco Data Processing Equip. Co. v. Maxwell*,
   468 F.2d 1326 (2d Cir. 1976).....................................................................12

*Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*,
   960 F.2d 1217 (3d Cir. 1992)...............................................................11, 14

- ii -

*Metcalfe v. Renaissance Marine, Inc.*,
  566 F.3d 324 (3d Cir. 2009)........................................................................................11

*Mucha v. Volkswagen Aktiengesellschaft*,
  540 F. Supp. 3d 269 (E.D.N.Y. 2021),
  *aff'd sub nom. Mucha v. Winterkorn*, 2022 WL 774877 (2d Cir. Mar. 15, 2022)..................25

*O'Connor v. Sandy Lane Hotel Co., Ltd.*,
  496 F.3d 312 (3d Cir. 2007)....................................................................................14, 17

*OmniWind Energy Sys., Inc. v. Redo*,
  2015 WL 790101 (E.D. Pa. Feb. 24, 2015) ...............................................................25

*Pinker v. Roche Holdings Ltd.*,
  292 F.3d 361 (3d Cir. 2002)........................................................................................24

*Rivera v. Bally's Park Place, Inc.*,
  798 F. Supp. 2d 611 (E.D. Pa. 2011) .........................................................................17

*Rogers v. Smith Volkswagen*,
  2020 WL 1676400 (E.D. Pa. Apr. 6, 2020) ...............................................................11

*Victaulic Co. v. HiTherm, LLC*,
  2022 WL 2953690 (E.D. Pa. July 26, 2022)..............................................................12

*Walden v. Fiore*,
  571 U.S. 277 (2014)....................................................................................................12

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
  Rule 54(b) ...................................................................................................................1

## I.    INTRODUCTION[1]

Pursuant to the Court's February 9, 2023 Order (ECF 95) granting Plaintiffs' motion for reconsideration and request for jurisdictional discovery (ECF 90), Plaintiffs submit this supplemental brief in support of their opposition to EY Germany's motion to dismiss the Complaint for lack of personal jurisdiction (ECF 76) ("Opposition" or "Opp.").  Since filing the Complaint and submitting their Opposition, Plaintiffs have uncovered numerous additional facts and documents that further support Plaintiffs' position that this Court can and should exercise jurisdiction over EY Germany.  These new facts show not only EY Germany's **physical presence** in the U.S., in connection with audit work it did on behalf of Wirecard, but also that EY Germany in fact directed substantive auditing activities toward the U.S. – and further that those activities are related to Plaintiffs' alleged fraud.

First, in 2017, in its capacity as group auditor of Wirecard AG, EY Germany auditors conducted an in-person site visit at Wirecard North America Inc.'s ("Wirecard North America" or "WNA") offices in Pennsylvania as part of the full scope audit of Wirecard North America, to discuss significant auditing and accounting topics (like revenue recognition), and learn more about Wirecard North America's business.  Second, the facts now in the record confirm that EY Germany's work on the Wirecard North America audit went far beyond mere critical review of EY U.S.'s audit: EY Germany performed its own independent audit work on Wirecard North America and also directed and controlled the manner in which EY U.S. conducted its audit work. Moreover, the evidence uncovered makes clear that there is a strong relationship between Wirecard AG's acquisition of Wirecard North America and Wirecard's businesses in Asia and EY

---

[1]    All terms not defined herein have the same meaning as in Lead Plaintiffs' Motion for Reconsideration of Order #88 (Granting Motion to Dismiss for Lack of Personal Jurisdiction) or, in the Alternative, for Entry of Judgment Pursuant to Fed. R. Civ. P. 54(b) (ECF 90).

Germany's audit thereof.  Specifically, at least one key player in Wirecard AG's allegedly fraudulent business activities in Asia, Edo Kurniawan ("Kurniawan"), attended the 2017 site visit in Pennsylvania and authored Wirecard North America's presentation to its auditors, including EY Germany, providing compelling circumstantial evidence that the Citigroup customer portfolio that was acquired with the purchase of Wirecard North America and its prepaid card services was being used in connection with Wirecard's alleged fraudulent activities in Asia.  EY Germany's contacts with and conduct in the U.S. in its capacity as group auditor of Wirecard, in conjunction with EY Germany's contemporaneous knowledge of American investors in Wirecard securities, including that Wirecard's largest shareholders were based out of the U.S. (making it more likely that U.S. investors would rely upon EY Germany's audit opinions), renders exercise of jurisdiction entirely appropriate.

## II.    RELEVANT PROCEDURAL BACKGROUND

On December 8, 2022, the Court issued an Order granting EY Germany's motion to dismiss for lack of personal jurisdiction.  ECFs 86-87.  The Court found Plaintiffs had not demonstrated EY Germany's purposeful availment of the forum (*i.e.*, the U.S.).  ECF 87 at 11.  Specifically, based on the then-current record, the Court first found that "EY Germany auditors could not have known about the use of their audits by American investors simply because their audits were later placed on Wirecard's website in English, where they might be read by American investors."  *Id.* at 16-18.  The Court then found, based on the facts before it, that EY Germany "was not involved in the direct auditing of Wirecard North America – that was the work of EY U.S., which EY Germany assisted in reviewing one step further removed."  *Id.* at 18.  The Court concluded: "The fact that EY Germany reviewed work by EY U.S. in the course of conducting Group audits pursuant to German and international auditing standards still does not sufficiently constitute

purposeful availment such that EY Germany would expect to be haled into a United States court." *Id.*

On December 22, 2022, Plaintiffs moved for reconsideration of the Court's motion to dismiss Order, and, specifically, the denial of Plaintiffs' request for jurisdictional discovery. ECF 90. On February 9, 2023, the Court granted Plaintiffs' motion for reconsideration and vacated the order granting EY Germany's motion to dismiss for lack of personal jurisdiction. ECF 95 at 1. Further, the Court granted "Plaintiffs' request to seek jurisdictional discovery from EY Germany" and ordered supplemental briefing "on the issue of personal jurisdiction." *Id.* at 2.

## III.    FACTS DEVELOPED SINCE BRIEFING SUBMITTED

### A.    EY Germany Auditors Made an In-Person Site Visit to Pennsylvania in December 2017 to Direct the Audit for Wirecard North America

On June 29, 2016, Wirecard agreed "to purchase the prepaid credit card portfolio of Citigroup in North America and various other countries in Latin America, Australia, Europe, Asia and Africa." Ex. 1 at 1053.[2] On March 9, 2017, Wirecard gained control of the acquired company, which was rebranded as Wirecard North America. *Id.*

In December 2017, EY Germany auditors made an ***in-person***, two-day site visit to the Wirecard North America location in Pennsylvania. Ex. 2 at 4; Ex. 3. The "main focus of the site visit" was for members of Wirecard North America, EY U.S., and EY Germany to discuss auditing matters such as revenue recognition and the "most significant balance sheet items." Ex. 3 at 267. Employees from Wirecard North America, EY U.S., Wirecard AG, and EY Germany were all in

---

[2]    All "Ex. _" citations herein are to the Declaration of Shawn A. Williams in Support of Lead Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of Personal Jurisdiction #64, filed concurrently herewith, unless otherwise indicated. All "¶_" references herein are to the Complaint unless otherwise indicated.

attendance, including Kurniawan, Wirecard AG's Head of Accounting in Asia, and former Individual Defendant ███████. ¶117[3]; Ex. 2 at 4; Ex. 3 at 267; Ex. 4. Specifically, ████████████████, an EY Germany partner and the head of the Wirecard audit, also attended and gave a presentation to the attendees about the relationship between EY U.S. and EY Germany. Ex. 3 at 267-269; Ex. 5 at 154[4]; ¶183. ███████████, Senior Manager at EY Germany and primary contact for EY U.S. on the Wirecard account, explained EY Germany's audit procedures for the Wirecard Group audit to the attendees. Ex. 3 at 267-268; Ex. 6 at 431.

During the in-person site visit to Wirecard North America, one of the presentation slides asked "Why is EY as Group Auditor of Wirecard here?"; and EY Germany explicitly explained to Wirecard North America employees and others in attendance that it was in the U.S. for the "[f]ull scope audit of Wirecard NA[.]"  Ex. 3 at 270.   EY Germany explained that as the group auditor, it "has the overall audit responsibility" and "has to demonstrate an understanding over all significant auditing and accounting matters" of Wirecard North America, and that "[W]NA Management and EY USA" supported EY Germany's audit.  Ex. 3 at 269-271.  Accordingly,

---

[3]    While Plaintiffs named Susanne Steidl ("Steidl") as one of the Individual Defendants in the Complaint, she, and Individual Defendants Jan Marselek, Burkhard Ley, Alexander von Knoop, and Wulf Matthias were dismissed for lack of service.  ECF 86.

[4]    After the parties submitted their initial round of briefing on EY Germany's motion to dismiss, *Financial Times* reporter, Dan McCrum, who broke news of the Wirecard fraud to the public and whose reporting the Complaint extensively cites, published a book titled "Money Men: A Hot Startup, a Billion-Dollar Fraud, a Fight for the Truth" (2022) ("Money Men"), which further details his investigation and findings into Wirecard and EY Germany.  This Supplemental Memorandum submits additional facts from the book, as well as from other reports subsequently published, to support the Court's exercise of jurisdiction.  To the extent the Court finds it necessary, Plaintiffs respectfully request leave to amend the Complaint to plead these facts.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (liberal granting of leave to amend "ensures that a particular claim will be decided on the merits rather than on technicalities").  All citations and footnotes omitted and emphasis added unless otherwise indicated.

during the site visit, EY Germany made numerous detailed inquiries of Wirecard North America, including requests for supporting documents, about the "[b]usiness model and development of [W]NA," as well as its accounting and auditing.  *Id.* at 272-291.  EY Germany also explained that "[t]he (preliminary) PPA [Purchase Price Allocation for WNA][5] was prepared centrally by Wirecard and ***audited centrally by EY Germany*** – Wirecard Group Accounting communicated the (preliminary) PPA results to Wirecard [North America] management ***and EY Germany provides EY USA with reliance on the PPA amount***."  *Id.* at 284, 287.  Internally, EY Germany and EY U.S. discussed planning for the Wirecard North America audit process; specifically, they "identified risks and audit response[s], [the] subsequent audit of PPA assets, [and] documentation and reporting," as well as the "[s]tatus quo of interim audit procedures."  *Id.* at 267.

Notably, Kurniawan – Wirecard's Head of Accounting in ***Asia***, and a key player in the fraud alleged by Plaintiffs – attended the Wirecard North America site visit and in fact created the PowerPoint presentation that Wirecard North America presented to EY U.S. and EY Germany regarding Wirecard North America's history and future development.  Ex. 2 at 4; ¶¶117-122, 130-134, 144-148, 175, 191, 334; Ex. 7; Ex. 8.  Kurniawan's attendance and participation in the Pennsylvania site visit is also notable because he was reportedly well known for his ability to appease the "auditors at Ernst & Young."  Ex. 5 at 154.  In Money Men, McCrum specifically referenced Kurniawan and EY Germany's visit to Philadelphia:

> [Kurniawan] had a knack for one of his most important jobs: charming the auditors at Ernst & Young.  In December [2017], the lead audit partner from EY Germany, Andreas Loetscher, flew into Chennai for a two-day site visit at Hermes to better understand what was going on.  Afterwards, he wrote to Kurniawan to thank him for the 'preparation, discussions, explanation and entertainment', while a colleague requested 'local cuisine' ***for their trip to the Wirecard office in Philadelphia*** the

---

[5]    The PPA is an application of goodwill accounting whereby one company (the acquirer), when purchasing a second company, allocates the purchase price into various assets and liabilities acquired from the transaction.

> following week. The ever-present Kurniawan made it to there as well, taking the auditors to a tourist trap where the waiting staff dressed as pilgrims. Whether it was the food or the company, the EY men once again flew home happy.

*Id.*[6] Thus, key players from Wirecard AG and EY Germany in the fraud that Plaintiffs have alleged were together on U.S. soil.

In addition to EY Germany explaining its role in Wirecard North America's audits, at the site visit, EY Germany also conveyed its understanding of Wirecard North America's future growth and role in the greater Wirecard Group. For example, in its site visit presentation, EY Germany noted: "Plan for future periods: Use [Wirecard] technology to expand business in the US (e.g., use [Wirecard] Germany issuing platform, offer acquiring business in the US)." Ex. 3 at 273.

The documents produced in discovery demonstrate that EY Germany understood Wirecard's expectations for Wirecard North America, both in the U.S. and abroad.[7] In the Wirecard site visit presentation prepared by Kurniawan and presented to EY Germany and EY U.S., Wirecard and its subsidiary's representatives made clear that Wirecard North America would

---

[6]    During the jurisdictional discovery period, on April 3, 2023, the German accounting regulator, Apas, issued an unprecedented ruling against EY Germany, banning it from taking on new public company clients for two years, due to its "'violations of professional duties during the audits of Wirecard.'" Ex. 9. Apas also fined EY Germany €500,000, and five current and former employees between €23,000 and €300,000. *Id.* An internal email in the wake of the Apas decision from Andy Baldwin, EY Global Managing Partner, explained: "'This has been a deeply challenging chapter for our organization, and for EY Germany in particular . . . . It is not an audit EY Germany is proud of.'" *Id.*

[7]    According to McCrum's account in Money Men, there is reason to believe that EY Germany knew of these expectations earlier than December 2017: "***By early 2017***, [Kurniawan] was marked out for promotion and showing his dedication by jetting back and forth across the globe while his heavily pregnant wife waited at home: to Chennai; ***the US, where Wirecard was buying the prepaid card operations of Citigroup***; and Singapore, where Kurniawan joked there was no need to pay for a hotel given the amount of time he spent in the office." Ex. 5 at 136-37.

not solely offer prepaid card services, but would also serve as a key launching pad for expanding Wirecard's business in North America and globally.[8] ████████████████████ ████████████████, was appointed to the Wirecard AG Management Board beginning January 1, 2018, and gave a presentation titled "Wirecard Global Issuing." ¶45; Ex. 4 (agenda); Ex. 7 at 369; ECF 76-2 at 26. On a slide titled "AN EXPANDING FOOTPRINT," █████ explained that **"*Wirecard has extended our presence into North America*, emphasizing our commitment to global reach and scale." Ex. 7 at 371. Kevin Brown, V.P. of Marketing & Product at Wirecard North America (*id.* at 342), presented on the "BUSINESS MODEL AND DEVELOPMENT OF WIRECARD NA," noting: "Our North American business imperatives are centered around the delivery of Wirecard's global strategy, in a key region of the world." *Id.* at 346. And those priorities for Wirecard North America included "[b]uild brand awareness of Wirecard in North America," "[m]igrate to Wirecard's global Issuing platform" and "[d]eliver upon Wirecard's value proposition of fully digitized, end-to-end solutions across the commerce value chain, *by launching acquiring*." Ex. 7 at 346.[9]

### B. EY Germany Had a Direct Role in Auditing Wirecard North America

EY Germany performed its own work on Wirecard North America, in addition to controlling, reviewing, and evaluating EY U.S.' work. As the group auditor, EY Germany engaged EY U.S. to conduct audit work on Wirecard North America for the purpose of the Group

---

[8]    The CEO of Wirecard North America, Deirdre L. Ives, also explained that Wirecard North America itself had had significant international business, particularly in the Philippines. Ex. 7 at 339.

[9]    Defendant Wirecard acted as an "acquirer," which is the entity that collects money from an "issuer" (the bank that issues a customer's credit card) and distributes it to the merchant that charged the customer's card. Payment processors like Wirecard make money by taking a relatively small portion of each transaction processed. ¶35.

audit of Wirecard AG.  Ex. 10; Ex. 11; Ex. 12 at 750.  Each year, EY Germany provided one or more sets of instructions ("Group Audit Instructions") to direct EY U.S., as the component auditor of Wirecard North America, as to the scope and manner of work EY Germany required EY U.S. to perform.  *See* Ex. 6 at 418; Ex. 13 at 578; Ex. 14 at 1012; *see also* Ex. 15 (supplemental instructions); Ex. 16 (supplemental instructions); Ex. 17 (supplemental instructions).  EY Germany alerted component auditors, like EY U.S., in the Group Audit Instructions that EY Germany would be involved in their component audits to the extent EY Germany considered necessary.  Ex. 6 at 443; Ex. 13 at 603; Ex. 14 at 1045.

EY Germany controlled numerous aspects of EY U.S.' audits.  For example, EY Germany instructed EY U.S. to use the materiality levels determined by EY Germany for the component audit conducted by EY U.S.[10]  *See* Ex. 6 at 443; Ex. 13 at 603; Ex. 14 at 1037.  EY U.S. noted each year in its audit conclusion letter to EY Germany that the materiality levels specified by EY Germany were "different from the materiality level that [EY U.S.] would have used, had [EY U.S.] been designing the audit to express an opinion on the financial statements of the component alone."  Ex. 18; Ex. 19; *see also* Ex. 20 at 762.

EY Germany's audit work of Wirecard North America went beyond mere review of EY U.S.' work.  As noted in its summary review memoranda, EY U.S. relied on EY Germany to audit, and/or EY Germany was responsible for, at least the following relative to Wirecard North America:

- Opening balances in 2017, including purchase price adjustments.

- Adjustment for net income from March 1, 2017 – March 8, 2017.

---

[10]  Audit "materiality level," "component materiality," and "tolerable error" generally refer to the threshold amounts used by auditors above which the auditor determines there would be a substantial likelihood that misstatements or omissions could reasonably be expected to influence the economic decisions of users taken on the basis of the financial statements.  Ex. 18; Ex. 10 at 312.

- The propriety of the revenue recognition and lease policies in accordance with International Financial Reporting Standards ("IFRS").

- Goodwill and other intangible assets.

- Amortization of intangibles – useful lives and amortization period/method.

- SAD ("Summary of Audit Differences") items which EY Germany indicated would be adjusted at Wirecard AG level.

- Estimation SCOTs ("Significant Class of Transactions").

- Currency translation processes.

- Material intercompany balances.

Ex. 10 at 315, 318, 321; Ex. 11 at 527-529; Ex. 12 at 754-756; *see also* Ex. 21 at 400 (audit strategies memorandum).

Because EY Germany controlled EY U.S.' audit of Wirecard North America, frequent communication regarding Wirecard North America between EY Germany and EY U.S. was required.  As stated in the Group Audit Instructions, EY Germany "plan[ned] to hold regular conference calls and visits" with its component auditors, like EY U.S., and substantive audit work was conducted via e-mail communications.  Ex. 6 at 435; *see, e.g.*, Ex. 11 at 531.  For example, the Group Audit Instructions explicitly mention that planned "(Pre-)Closing Call[s]" were to be scheduled between foreign engagement teams, like EY U.S. and EY Germany for the FY18 and FY19 audits of Wirecard North America and at least one such call occurred on February 28, 2020.  Ex. 13 at 592; Ex. 14 at 1028; *see also* Ex. 22 at 777.  Additionally, while EY Germany's notes indicate that there was no classic (Pre-)Closing Call for FY18 due to the postponement of reporting and the group audit opinion date, EY Germany and EY U.S. had regular email coordination on open or critical points up to closing.  Ex. 23 at 1160.

### C. February 2023 *The New Yorker* Article Concerning Suspicious Behavior at Wirecard North America's Prepaid Card Services

Beyond discovery from EY Germany, a February 2023 article in *The New Yorker* reported on questionable activities related to the sale of prepaid cards occurring at Wirecard's Pennsylvania location. *The New Yorker* article recounts a story from a hedge fund manager, Fahmi Quadir ("Quadir"), who visited the Pennsylvania site in early 2019. Ex. 24. Quadir first noted that acquiring Citigroup's North American prepaid card services "was a reckless move: if [Wirecard] was committing crimes, they would now be taking place on American soil." *Id.* Quadir also told *The New Yorker* that upon her arrival at the Pennsylvania site, a Wirecard North America representative "offered to sell them prepaid cards loaded with up to a hundred and fifty thousand dollars, and added that it would be perfectly acceptable for them to distribute the cards to other people." *Id.* Quadir told *The New Yorker* that she was shocked because generally: "'You can't find prepaid cards loaded with more than ten thousand dollars on the dark Web.'" *Id.* Quadir had a working theory that "the [C]ompany's primary business purpose was to serve organized criminal networks and Russian oligarchs . . . for 'large-scale money laundering operations.'" *Id.*

## IV. LEGAL STANDARDS

To establish specific jurisdiction over a defendant, "[t]here are two prongs." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021). "First, there must be purposeful availment: minimum contacts with the forum . . . that show the defendant took a deliberate act reaching out to do business in that state." *Id.* "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person'" and the defendant "'should reasonably anticipate being haled into court there.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985). "'[E]ven one contact with the forum may be enough to justify jurisdiction as

long as the other criteria are met.'" *Rogers v. Smith Volkswagen*, 2020 WL 1676400, at \*4 (E.D. Pa. Apr. 6, 2020). "Second, the contacts must give rise to – or relate to – plaintiff's claims." *Hepp*, 14 F.4th at 207. As the Supreme Court clarified in *Ford Motor Co. v. Mont. Eighth Jud. D. Ct.*, \_ U.S. \_, 141 S. Ct. 1017 (2021), the second prong is not a "causation" requirement, rather, it requires some "strong 'relationship among the defendant, the forum, and the litigation.'" *Id.* at 1028.

At the motion to dismiss stage, a "'plaintiff[] need only establish a *prima facie* case of personal jurisdiction'" and the "'court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff.'" *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). "Where plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, 'the plaintiff[s'] *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, ***if credited*** . . . would suffice to establish jurisdiction over the defendant.'" *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (alteration in original); *see also Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411 (E.D. Pa. 2005). "'Once the plaintiff has made out a *prima facie* case in favor of personal jurisdiction, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."'" *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1226 (3d Cir. 1992).

## V.    ARGUMENT

### A.    EY Germany Purposefully Availed Itself of the Forum of the U.S.

The evidence produced in jurisdictional discovery demonstrates that EY Germany made "minimum contacts with the forum . . . that show the defendant took a deliberate act reaching out to do business in" the U.S. *Hepp*, 14 F.4th at 207; ECF 87.

- 11 -

1.    **EY Germany Made a Site Visit to Wirecard North America in December 2017 in Connection With Its Audit of Wirecard**

Discovery has revealed that in December 2017, EY Germany made an in-person site visit to Wirecard North America.  Ex. 2 at 4; Ex. 3; Ex. 4; Ex. 7; Ex. 25.  "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the [forum] – either by the defendant in person or through an agent, goods, mail, or some other means – is certainly a relevant contact."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014); *see also Burger King*, 471 U.S. at 476.

In this case, EY Germany's site visit to the U.S. establishes the requisite minimum contacts for the Court's exercise of personal jurisdiction.  In  *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 683 F. Supp. 1463 (S.D.N.Y. 1988), like here, the court addressed claims under §10(b) of the Securities Exchange Act of 1934, and like here, against foreign auditors affiliated with a U.S. firm.  Specifically, in light of *Leasco Data Processing Equip. Co. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1976), the court found that because the foreign auditors traveled to the U.S. "to transact business related to the audit of the [client] entities, they are subject to this court's jurisdiction." *Econ. Dev.*, 683 F. Supp. at 1471 n.6; *see* ECF 87 at 11, 19.

As explained above, the EY Germany auditors, including the partner in charge of the Wirecard account ▮▮▮▮▮, the primary contact for EY U.S. on the Wirecard account ▮▮▮▮▮ ▮▮▮▮▮, and at least one other EY Germany employee ▮▮▮▮▮ traveled to Pennsylvania, for a multi-day site visit to Wirecard North America.  Ex. 3 at 267-268, Ex. 6 at 431 (▮▮▮▮▮ as primary contact); *see also* Ex. 5 at 154 (discussing site visit).  Courts in this District have found that similar business visits are sufficient to support personal jurisdiction over a foreign defendant under *Hepp* and *Ford*.  *See Victaulic Co. v. HiTherm, LLC*, 2022 WL 2953690, at *2 (E.D. Pa. July 26, 2022).  Even a single visit may suffice.  *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 147 (3d Cir. 1992).

The evidence produced shows that "[t]he visits by the [the German defendant company] officials were not casual or fortuitous events, but serious efforts aimed at furthering the joint commercial enterprise" and therefore support a finding of personal jurisdiction.  *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 152 (3d Cir. 2001).  In a presentation prepared for the visit, EY Germany posed the question: "Why is EY as Group Auditor of Wirecard here?" – and answered for the "[f]ull Scope Audit of Wirecard NA as of 31 December 2017," to discuss "[s]ignificant auditing and accounting topics," and to gather information and documentation about the "Wirecard NA business in the US."  Ex. 3 at 269-291.  It was these very kinds of full scope audits by EY Germany, including site visits, that Wirecard touted to investors in the U.S.

For example, at Wirecard's Capital Markets Day in New York in 2019, Wirecard CFO von Knoop assured investors in the U.S. that they could feel confident investing in Wirecard securities because EY Germany conducts full scope audits of all of Wirecard's subsidiaries.  Specifically, he said: "that's the exact term, in a full scope audit *by our group auditors of EY*.  *These kind of full scope audits always include*, of course, *a comprehensive audit of all financials of a subsidiary, on-site visits* and a very close and comprehensive audit."  Ex. 26 at 31.[11]  Accordingly, the "main focus of the site visit" was for members of Wirecard North America, EY U.S., and EY Germany to discuss auditing topics like "[r]evenue recognition for different revenue streams" and the "[m]ost significant balance sheet items."  Ex. 3 at 267.

---

[11]   This evidence is in direct contrast to arguments EY Germany made in support of its motion to dismiss.  *See* ECF 64-3 at 4 ("EY Germany did not conduct any audit work for Wirecard in the United States."); ECF 91 at 23-24 ("[Plaintiffs'] Counsel said that EY Germany conducts auditing activities in the United States.  That's simply not true.")

       **2.**     **EY Germany Engaged EY U.S. to Audit Wirecard North America**

Documents produced in discovery demonstrate that EY Germany directly engaged and directed EY U.S.' audit of Wirecard North America. *See Hepp*, 14 F.4th at 207 (facts showing the "defendant took a deliberate act reaching out to do business in that state" sufficient to satisfy minimum contacts).

In its prior ruling, the Court found that Plaintiffs' allegations relating to EY Germany's relationship with EY U.S. were insufficient to establish purposeful availment and that "[w]ithout more, such allegations would subject foreign auditors to jurisdiction solely because of their role as a primary auditor of a company that has multinational subsidiaries that are audited by local auditors." ECF 87 at 18. In reaching this conclusion, the Court relied upon the sworn Streyl declaration that EY Germany did not "perform[] any audit procedures on Wirecard North America's accounts, except for those procedures required for the primary auditor in the course of a Group audit, *i.e.* critical review of the interoffice reporting to EY Germany" (ECF 64-3, ¶12) to conclude that "EY Germany was not ***directly*** involved in auditing Wirecard North America" (ECF 87 at 18).

EY Germany has now produced documents showing that EY Germany both engaged EY U.S. to conduct the Wirecard North America audit and was directly involved – beyond just an indirect review – in the audit of Wirecard North America in the United States. *See O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 318 (3d Cir. 2007) (communications leading to formation of agreement to render services constitute purposeful availment); *Mellon Bank*, 960 F.2d at 1225. For example, EY U.S. wrote to EY Germany that "we have been engaged by EY Germany (EY Primary Team) to perform a full scope audit for the period March 1, 2017 through December 31, 2017, with ***reliance on the EY [Germany] team for the adjustment record*** in the WNA

reporting package for the period March 1, 2017 through March 8, 2017," showing in one sentence both that EY Germany reached out to EY U.S. to conduct the audit of Wirecard North America and that EY Germany directly performed audit work on Wirecard North America.  Ex. 10 at 312; Ex. 18 at 397 (EY U.S. audited Wirecard North America at EY Germany's request); Ex. 19 at 649 (same); Ex. 21 at 399 (same); Ex. 28 at 740 (same); *see also* Ex. 18 at 398; Ex. 11 at 524, 750; Ex. 19 at 650; Ex. 27 at 954.

> ### 3.    EY Germany Controlled EY U.S.' Auditing Work of Wirecard North America

Not only did EY Germany engage EY U.S. to audit Wirecard North America, the work that EY U.S. did perform on the Wirecard North America audit was pursuant to EY Germany's instructions, which also supports a finding of purposeful availment.  Other courts have found that when a foreign auditor "conduct[s] the U.S. portion of its worldwide audit" through an affiliate and:

> [I]ssued detailed instructions on how the audit should be conducted, identified specific areas of inquiry and dictated the form and manner in which [the U.S. affiliate] would report its findings . . . it lends its weight to a determination that personal jurisdiction may be imposed over [the foreign auditor] based on its activities in the United States conducted through [the U.S. affiliate].

*First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 363 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 16 (2d Cir. 1998).  Similarly detailed instructions are present in this case, including, for example, EY Germany's specific instructions on the amount of tolerable error, revenue recognition polices, depreciation and amortization of intangibles, and other items.  Ex. 10 at 312, 318; Ex. 21 at 400; Ex. 11 at 524, 529-530; Ex. 27 at 954; *see, e.g.*, Ex. 6 (Wirecard AG Group audit instructions 2017 audit); Ex. 13 (Wirecard AG Group audit instructions 2018 audit); Ex. 14 (Wirecard AG group audit instructions 2019); Ex. 16 (supplement to Group audit instruction for implementing IFRS 16); Ex. 17 (supplement to the group instructions for implementing IFRS 15)  And EY U.S.

followed these instructions, meaning that EY Germany had direct involvement in the audit of Wirecard North America that was actually produced and used.  Ex. 11 at 527 (revenue recognition); *id.* at 528 ("We recalculated depreciation and amortization for these accounts in 2018 based on ***reliance on the EY Primary Team for the useful lives and depreciation/amortization method***, without exception."); Ex. 28 at 740 (EY U.S. adding additional staffing in response to EY Germany identified risk factors); *id.* at 744 (following adoption of international accounting standards provided by EY Germany); Ex. 12 at 754-755 (same); Ex. 27 at 955, 958 (EY U.S. discussing central testing by EY Germany).

EY Germany did more than simply review – it directed and controlled EY U.S.' auditing activities.  As EY Germany explained in the Group Audit Instructions, "As the Group Auditor, we will provide ***direct supervision, perform site visits, and/or review your audit workpapers***."  Ex. 6 at 442.  The fact that EY Germany directed, even if only in part, how EY U.S. conducted its audit supports a finding of personal jurisdiction.  *In re Isostatic Graphite Antitrust Litig.*, 2002 WL 31421920, at *3 (E.D. Pa. Sept. 19, 2002).  In acknowledging EY Germany's group audit instructions, EY U.S.' Katie Kummer, the partner in charge of the component audit of Wirecard North America, agreed that EY Germany would more than review EY U.S.' work and, in fact, would be "involved in the work you have requested us to perform as you consider necessary."  Ex. 29 at 261; *see also* Ex. 30.  For example, EY Germany requested that EY U.S. update its subsequent event procedures through April 15, 2019, which caused EY U.S. to make additional inquiries of Wirecard North America's V.P. of Finance.  Ex. 31.  EY Germany also sent emails to EY U.S. with detailed requests for information regarding the reporting packages and initiated phone calls to discuss the audit. Ex. 11 at 531; Ex. 22 at 776 (Pre-Closing Call).  That these kinds

of materials were "sent into Pennsylvania . . . provide[s] evidence of purposeful availment of the forum." *Rivera v. Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 616-17 (E.D. Pa. 2011).

In its audit instructions, EY Germany strictly controlled the "tolerable error" or "[m]ateriality level[]" for misstatements in the component audits, like that of Wirecard North America. Ex. 6 at 440; Ex. 13 at 603; Ex. 14 at 1037; *see also* Ex. 10 at 312. EY U.S. made clear it would have set those levels differently if it had been operating independently: "As requested by you [EY Germany], we planned and performed our audit using the component materiality specified in your instructions . . . which is different from the materiality level that we would have used, had we been designing the audit to express an opinion on the financial statements of the component alone." Ex. 19 at 649; *see* Ex. 28 at 741; Ex. 12 at 750. EY Germany repeatedly communicated with EY U.S. regarding the required materiality level in phone calls and emails, in addition to the group audit instructions. Ex. 19 at 651 (email referencing phone call communication and reiterating required materiality level); Ex. 27 at 955-956. These communications "'count toward the minimum contacts that support jurisdiction.'" *O'Connor*, 496 F.3d at 317; *see also Burger King*, 471 U.S. at 476.

### 4. EY Germany Performed Auditing Work Directly on Wirecard North America

Despite engaging EY U.S. to conduct audit work for Wirecard North America, EY Germany itself was directly involved in auditing certain aspects of Wirecard North America. For example, EY Germany "audited" Wirecard's purchase of Wirecard North America. Ex. 10 at 315, 317; Ex. 21 at 400. In fact, EY U.S. relied on EY Germany's work in doing its own work on Wirecard North America. Ex. 10 at 315; Ex. 21 at 403. Both that EY Germany performed direct auditing work on Wirecard North America and that EY U.S. relied on this work is confirmed in a letter from EY Germany partner ███, explaining "the results of substantive testing performed

by the EY [Germany] team for the EY US team with respect to the <u>Purchase Price Allocation</u> <u>(PPA)</u>" and that "the[se] procedures were performed solely ***to assist [EY U.S.] in forming [its]*** ***opinion*** on the financial reporting of [Wirecard North America]."  Ex. 32 at 125-126.

The evidence also confirms EY Germany's responsibility for auditing Wirecard North America went beyond the initial purchase.  *See* Ex. 10 at 317.  "Parties who 'reach out beyond [their] state and create continuing relationships and obligations with citizens of another state' are subject to the regulations of their activity in that undertaking.  Courts are not reluctant to find personal jurisdiction in such instances."  *Deutz*, 270 F.3d at 150 (alteration in original).  For example, EY Germany continued to be responsible for reviewing the impairment of goodwill and other intangibles assets, both topics which EY Germany identified as significant fraud risks, and, accordingly, EY U.S. did not do that work.  Ex. 10 at 317; Ex. 21 at 401; Ex. 11 at 526 (same); Ex. 28 at 742-743, 746 (same); Ex. 12 at 750-751 (same); Ex. 27 at 956-958 (same).  Moreover, documents produced in discovery show that EY Germany reviewed Wirecard North America's deliverables.  Ex. 12 at 749.

> **B.    EY Germany's Contacts with the U.S. in Relation to Its Audit of Wirecard North America Have a Strong Relationship to Plaintiffs' Fraud Claims**

Contrary to EY Germany's conclusory assertion that "there is ***no connection whatsoever*** between the alleged suit-related conduct and the United States" (ECF 64 at 11 (emphasis in original)), Plaintiffs now have evidence of a strong relationship between EY Germany's U.S. contacts and Plaintiffs' fraud claims.  "The plaintiff's claims, [the Supreme Court has] often stated, 'must arise out of or relate to the defendant's contacts' with the forum."  *Ford*, 141 S. Ct. at 1025.  "Or put just a bit differently, 'there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.""  *Id.*

(alteration in original).  As the Supreme Court made clear in *Ford*, a causal relationship is not required.  *See id.* at 1026.

    In particular, the circumstances surrounding the acquisition of Citigroup's customer portfolio in the Asia-Pacific Region and the 2017 site visit provide strong support for Plaintiffs' allegations that Wirecard AG's acquisition from Citigroup of Wirecard North America and the customer portfolio in the Asia-Pacific Region was intended to be used in connection with the Company's Asian businesses, and is specifically connected to Plaintiffs' allegations of forged contracts, round-tripping and money-laundering in Asia.  Complaint, §VI.A.4., ¶¶88-89, 91.

       **1.**       **Discovery Regarding the 2017 Site Visit Confirms Plaintiffs' Allegations that Wirecard North America was Related to the Alleged Fraud**

    Kurniawan's (head of accounting in *Asia*) attendance at the auditor site visit for Wirecard ***North America*** sheds additional light on Wirecard's representation, as alleged by Plaintiffs, that the acquisition of Wirecard North America and Citigroup customer portfolios would be used in connection with its business in Asia.  ¶89.  At the outset, it is worth noting that Kurniawan was one of six Wirecard employees suspected in 2019 of arrestable offenses by Singapore prosecutors, who were looking into forgeries, falsified documents, money laundering, and round-tripping between 2014 and 2018 at Wirecard's business in Singapore, Indonesia, Hong Kong, Malaysia, India, and the Philippines.  ¶334.  In December 2017, just one week prior to the Wirecard North America site visit, EY Germany lead auditor Loetscher attended a two-day site visit in Chennai, India, to visit Kurniawan and Hermes – an acquisition for which Wirecard had overpaid by over $300 million.  Complaint, §VI.A.3.  Following the visit, "[Loetscher] wrote to Kurniawan to thank him for the 'preparation, discussions, explanation and entertainment', while a colleague requested 'local cuisine' for their trip to the Wirecard office in Philadelphia the following week."  Ex. 5 at 154.

The following week, Kurniawan and ████ both attended the two-day site visit in Pennsylvania, where they and other representatives from EY Germany, EY U.S., Wirecard AG, and Wirecard North America discussed the auditors' respective roles in the subsidiary's audit and their expectations for the future of Wirecard North America.  Ex. 3 at 267, 273; Ex. 2 at 4.[12]  This site visit alone establishes the required "'"affiliation between the forum and the underlying controversy, principally, [*an*] *activity or an occurrence that takes place in the forum State* and is therefore subject to the State's regulation."'"  *Ford*, 141 S. Ct. at 1025 (alteration in original).  Notably, Kurniawan, ***created*** the PowerPoint that representatives from North America presented to EY Germany to convey Wirecard's goals for Wirecard North America's future growth and role in the greater Wirecard Group.  Ex. 8.

Less than a month later, in January 2018, as alleged by Plaintiffs, Kurniawan led a meeting in which he orchestrated a plan to "round trip" several million euros from Wirecard Germany, through entities in Hong Kong and ultimately onto Wirecard's Indian business, which was part of a pattern of book-padding across Wirecard's Asian operations.  ¶130.  As further alleged, the scheme was devised to fool the Hong Kong Monetary Authority into issuing a license to Wirecard so it could sell prepaid credit cards in the region, which was crucial to Wirecard's plan to take over the Citigroup customer portfolio (*i.e.*, the customers to whom Wirecard would sell prepaid cards) associated with Wirecard North America and its purchase.  ¶131.  These activities were the center of the investigation led by Singapore law firm Rajah an Tann, which was presented to the Company in May 2018, including Individual Defendants Braun, Ley, Marsalek, and Wirecard North America

---

[12]  Beyond the auditing issues discussed at the site visit, and consistent with reports that Kurniawan had "a knack for . . . charming the auditors at Ernst & Young," Kurniawan and Loetscher enjoyed the local Pennsylvania sites, where they attended "a tourist trap where the waiting staff dressed as pilgrims."  Ex. 5 at 154.

4882-1278-5512.v3

managing director Steidl, and included the law firm's discovery of about 37 million euros that had been moved based on the suspicions transactions, and, as relevant for the personal jurisdictional inquiry, Plaintiffs' allegations. ¶¶117-118.

Accordingly, EY Germany's auditing of Wirecard North America, including the 2017 site visit in Pennsylvania with a current international fugitive who Plaintiffs have alleged committed accounting fraud to facilitate the acquisition of licenses for former Citigroup businesses in Asia has a "strong relationship" to the alleged fraud. *Hepp*, 14 F.4th at 208. Due to EY Germany's extensive activities in the U.S. and deliberate targeting of the U.S., "the connection between the plaintiffs' claims and [EY Germany's] activities in those States – or otherwise said, the 'relationship among the defendant, the forum[s], and the litigation' – is close enough to support specific jurisdiction." *Ford*, 141 S. Ct. at 1032.

### 2. The Acquisition of Wirecard North America Was Integral to Wirecard Group's Global Operations and Expansion Ambitious

Plaintiffs have alleged false and misleading statements in EY Germany's audit opinions arising out of, among others, Wirecard Group's acquisition of Citi Prepaid Card Services (later rebranded as Wirecard North America) and of Citigroup's customer portfolios in Asia. ¶¶317, 323; ECF 76-2 at 290. EY Germany considered these two acquisitions as a single, collective "key audit matter" for 2017. *Id.* ("Identification as a business combination, determination of the purchase price and purchase price allocation for the acquisition of the Citi Prepaid Card Services business and of Citigroup's customer portfolios in Asia."). "Key audit matters are those matters that, in [EY Germany's] professional judgment, were of most significance in [its] audit of the consolidated financial statements for the fiscal year." *Id.*

EY Germany's revelation of (and documents produced regarding) the 2017 site visit, demonstrate the strong relationship between Wirecard North America and Wirecard's allegedly

fraudulent operations in Asia.  At the time of the acquisition, in the Wirecard 2016 annual report, Wirecard touted that in addition to having acquired "a leading issuer . . . in the area of institutional prepaid credit cards" Wirecard North America also offered "a renowned customer portfolio" and "an existing sales network."  Ex. 33 at 55.  As presented at the 2017 site visit, priorities for the U.S. subsidiary (as drafted by Kurniawan) included "[b]uild[ing] brand awareness of Wirecard in North America," "[m]igrat[ing] to Wirecard's global Issuing platform" and "[d]eliver[ing] upon Wirecard's value proposition of fully digitized, end-to-end solutions across the commerce value chain, *by launching acquiring*."  Ex. 7 at 346; Ex. 8.  This vision is consistent with the one touted by Wirecard management to investors in Wirecard's 2017 annual report, which recognized that the combination of both Wirecard North America's prepaid card services and the Asian customer portfolio was an incremental step toward expanding their acquiring business to a key geographic region:

> As part of the global growth strategy, Wirecard is striving to establish a worldwide network of service and technology locations.  Through the acquisition of the prepaid card business of Citigroup in the USA and the customer portfolio for card acceptance of Citigroup in the AsiaPacific region (APAC), the Wirecard Group has come a significant step closer to realising this vision.  These two transactions significantly extend the company's geographical reach and also the available licensing framework.  In future, the goal is to further expand the existing licences for the issuing of card instruments and payment acceptance in selected countries and to push forward the expansion of our digital platform solution.

ECF 76-2 at 61.

While it remains unclear in which specific ways Wirecard used Wirecard North America and the Citigroup customer portfolio to expand its global operations, hedge fund manager Quadir's account of her encounter with the Wirecard North America salesperson, as reported in *The New Yorker*, as well Money Men and discussed *supra* at §III.C., raises questions about the manner in which the Company was using prepaid cards to perpetuate its fraudulent activities.  In Money Men, McCrum commented that "[w]hat the salesman was proposing would be a license for

[Quadir] to launder money, avoid taxes, run a drug gang – anything cash-rich and attention shy." Ex. 5 at 226.

Moreover, as the *Financial Times* reported in October 2021, during a 2019 investigation that EY Germany conducted on Wirecard's business in Dubai, using "prepaid cards supplied by Wirecard . . . enabled executives at the payments group to manipulate the transactions." Ex. 34 at 1. This activity appears to be related to the purchase of Wirecard North America, which included the purchase of prepaid card assets and operations in the United Arab Emirates ("UAE"). Ex. 1 at 1056, 1065 (depicting flag of the UAE). Similar circumstances appear to be present in the Philippines, as facilitated by the same purchase. Deirdre Ives, the CEO of Wirecard North America, explained that the company had a long history in the Philippines. Ex. 7 at 337, 339 (noting "deal in Philippines"); Ex. 1 at 1056, 1065 (depicting flag of the Philippines). The Philippines was where Wirecard claimed to have deposited the €1.9 billion that did not exist, where one of Wirecard's three major fraudulent third-party acquirers was located, and where Plaintiffs have alleged intentionally or recklessly deficient auditing practices. ¶¶4, 9, 16, 87, 144, 167 n.20, 234, 236, 247-248.

These reports, in addition to the circumstances concerning Kurniawan's involvement with both Wirecard North America and EY Germany in the U.S. provide compelling circumstantial evidence of a strong relationship between EY Germany's auditing activities of Wirecard North America and Plaintiffs' allegations of fraud.

## C.    EY Germany Knew U.S. Investors Would Rely Upon Its Audit Opinions

The evidence of contacts discussed above relating to EY Germany's auditing activities in the U.S. are sufficient to establish jurisdiction. Because the Court "should look at the extent to which [EY Germany] . . . 'could reasonably anticipate being involved in litigation in the United

- 23 -

States,'" the Court should also view the facts discovered in the context of EY Germany's knowledge that U.S. investors would rely upon its audit opinions. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 370 (3d Cir. 2002). As this Court recognized in its motion to dismiss Order, a foreign auditor may be subject to U.S. jurisdiction if the foreign auditor "reviewing audits and financial statements would know or have reason to know that the company's stocks were traded in the U.S. market and that reports would be made available to the American investing public." ECF 87 at 15 (citing cases). EY Germany has now admitted precisely these facts. More than a year prior to the close of the Class Period (June 26, 2020), and before EY Germany made its allegedly false and misleading April 25, 2019 statements, ¶¶319-322, EY Germany ***knew*** "ADRs and F-shares traded in the United States," and it knew that its reports were available on the Internet in English, and hence reliance by U.S. investors was foreseeable. Ex. 2 at 4-6.

Here, EY Germany knew not only that Wirecard AG had U.S.-based investors, but also that those investors held significant amounts of Wirecard shares and therefore, almost certainly would have relied upon the audit opinions issued in connection with the Company's annual reports.

Throughout the Class Period, Wirecard reported in its annual reports that most of its shares were held by "institutional investors from the Anglo-American region and Europe." ¶38; Ex. 35 at 44; Ex. 33 at 42; ECF 76-2 at 34; Ex. 36 at 27. Also, in each annual report during the Class Period, Wirecard reported which shareholders held more than 3% of the Company's voting rights, and then specified in which country that shareholder was based. For example, in the 2017 annual report, "BlackRock Inc (US)" is listed with 5.12% voting rights, "Artisan Partners LP (US)" with 4.99%, and "Citigroup Inc (US)" with 4.93%. ECF 76-2 at 35; *see also* Ex. 35 at 45 ("T. Row Price Group Inc. (US)"); Ex. 33 at 43 ("Citigroup Inc (US)," "Artisan Partners LP (US)"; "T. Rowe Price Group, Inc. (US)"); Ex. 36 at 28 ("BlackRock Inc (US)," "Citigroup Inc (US)," "Artisan

- 24 -

Partners Asset Management Inc. (US)").  U.S.-based investors consistently comprised the largest members of Wirecard's shareholder base.

And EY Germany, in its audit opinions, confirmed that it had reviewed these disclosures related to Wirecard's large U.S. shareholders; therefore, EY Germany knew that Wirecard had large U.S.-based investors.  ECF 76-2 at 295 (EY Germany audit letter explaining review of "Wirecard stock" disclosures that discussed U.S. investors at p. 35); *see also* Ex. 36 at 223 (EY Germany audit letter explaining review of "Wirecard stock" disclosures that discussed U.S. investors at p. 28).

EY Germany's recent admissions, along with the representations in the audit opinions discussed above "suggest[] [EY Germany] knew that U.S. investors would rely upon them," further supporting the Court's personal jurisdiction over Plaintiffs' claims.  *Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 285 (E.D.N.Y. 2021), *aff'd sub nom. Mucha v. Winterkorn*, 2022 WL 774877 (2d Cir. Mar. 15, 2022).

## VI.    EXERCISING JURISDICTION OVER EY GERMANY PROMOTES THE POLICY OF PREVENTING FOREIGN ENTITIES FROM CONDUCTING FRAUD ON U.S. SOIL

The Court's exercise of personal jurisdiction here comports with traditional notions of fair play and substantial justice because EY Germany "ha[s] had a course of dealing with" Wirecard North America, "a Pennsylvania corporation, such that the burden of defending here is not oppressive."  *OmniWind Energy Sys., Inc. v. Redo*, 2015 WL 790101, at *9 (E.D. Pa. Feb. 24, 2015).  The U.S., as the forum, "has an interest in adjudicating this dispute in which [U.S.] residents allege a non-resident person and corporation have . . . engaged in fraud.  Plaintiffs have an interest in obtaining convenient and effective relief as, according to their complaint, they have been defrauded by defendants and are owed substantial funds."  *Id.*; *see also Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 122 (3d Cir. 2020).

- 25 -

## VII.    CONCLUSION

For the foregoing reasons, in addition to those reasons set forth in Plaintiffs' Opposition,

Plaintiffs respectfully request that the Court deny EY Germany's motion to dismiss.

DATED:  June 7, 2023                    Respectfully submitted,

                                        SAXTON & STUMP
                                        LAWRENCE F. STENGEL (P.A. Bar # 32809)


                                              s/ Lawrence F. Stengel
                                        _____
                                            LAWRENCE F. STENGEL

                                        280 Granite Run Drive, Suite 300
                                        Lancaster, PA  17601
                                        Telephone:  717/556-1000
                                        717/441-3810 (fax)
                                        lfs@saxtonstump.com

                                        *Local Counsel for Lead Plaintiffs*

                                        SEEGER WEISS LLP
                                        CHRISTOPHER A. SEEGER
                                        55 Challenger Road, 6th Floor
                                        Ridgefield Park, NJ  07660
                                        Telephone:  212/584-0700
                                        212/584-0799 (fax)
                                        cseeger@seegerweiss.com

                                        *Additional Counsel for Plaintiff*

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SHAWN A. WILLIAMS
                                        HADIYA K. DESHMUKH
                                        JACOB G. GELMAN
                                        Post Montgomery Center
                                        One Montgomery Street, Suite 1800
                                        San Francisco, CA  94104
                                        Telephone:  415/288-4545
                                        415/288-4534 (fax)
                                        shawnw@rgrdlaw.com
                                        hdeshmukh@rgrdlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVEN W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com

*Lead Counsel for Lead Plaintiffs Thanh Sam and Lawrence Gallagher*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Thanh Sam*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 7, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Lawrence F. Stengel
LAWRENCE F. STENGEL
SAXTON & STUMP
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: 717/556-1000
717/441-3810 (fax)
E-mail: lfs@saxtonstump.com

4882-1278-5512.v3

# Mailing Information for a Case 2:20-cv-03326-AB IN RE: WIRECARD AG SECURITIES LITIGATION

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lee Albert**
  lalbert@glancylaw.com,lee-albert-5832@ecf.pacerpro.com,info@glancylaw.com

- **GEORGE A. BORDEN**
  gbprden@wc.com

- **PERETZ BRONSTEIN**
  peretz@bgandg.com

- **Vincent A. Coppola**
  vcoppola@pribanic.com,gregory@pribanic.com

- **HADIYA K. DESHMUKH**
  hdeshmukh@rgrdlaw.com,hdeshmukh@ecf.courtdrive.com

- **STEVEN M. FARINA**
  sfarina@wc.com

- **JACOB G. GELMAN**
  jgelman@rgrdlaw.com

- **JOHN H. GEORGE**
  jgeorge@rgrdlaw.com,jgeorge@ecf.courtdrive.com,smorris@ecf.courtdrive.com

- **JACOB A. GOLDBERG**
  jgoldberg@rosenlegal.com,etexidor@rosenlegal.com

- **REED KATHREIN**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **JEFFREY L. KODROFF**
  jkodroff@srkattorneys.com

- **AMANDA MACDONALD**
  amacdonald@wc.com

- **WILLIAM S. NORTON**
  bnorton@motleyrice.com,mhickey@motleyrice.com

- **MICHAEL J. QUIRK**
  mquirk@motleyrice.com,hfonseca@motleyrice.com,lmandara@motleyrice.com

- **LAURENCE MATTHEW ROSEN**
  LRosen@Rosenlegal.com

- **CHRISTOPHER A. SEEGER**
  cseeger@seegerweiss.com,styjer@seegerweiss.com,seegerweiss@myecfx.com,rbarreca@seegerweiss.com,sabrina-tyjer-1389@ecf.pacerpro.com,msheridan@seegerweiss.com,DKekatos@seegerweiss.com,dsparks@seegerweiss.com,abadaruzzaman@seegerweiss.com,dion--kekatos-1017@ecf.pacerpro.com

- **LAWRENCE F. STENGEL**
  lfs@saxtonstump.com,cag@saxtonstump.com,jss@saxtonstump.com

- **DAVID A. STRAITE**
  dstraite@kaplanfox.com

- **Craig Singer**
  csinger@wc.com

- **Danielle Smith**
  danielles@hbsslaw.com,sf_filings@hbsslaw.com

- **SHAWN A. WILLIAMS**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,jgelman@rgrdlaw.com,shawnw@ecf.courtdrive.com,JGelman@ecf.courtdrive.com

- **WESLEY A. WONG**
  wesleyw@hbsslaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Lucas              E Gilmore**
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue    Suite 202
Berkeley, CA 94710