**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re WIRECARD AG SECURITIES
LITIGATION

This Document Relates to:

ALL ACTIONS

Civ. Action No. 2:20-cv-03326-AB

<u>CLASS ACTION</u>

**DEFENDANT ERNST & YOUNG GMBH
WIRTSCHAFTSPRÜFUNGSGESELLSCHAFT'S
SUPPLEMENTAL  MEMORANDUM REGARDING PERSONAL JURISDICTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

    Relevant Procedural History ...........................................................................................2

    Information Produced in Jurisdictional Discovery ..........................................................4

ARGUMENT ......................................................................................................................11

I.     EY Germany Did Not Purposefully Avail Itself of the Forum. ........................................11

    A.    The Single Informational Site Visit to Wirecard North America Does Not Establish Purposeful Availment..................................................................12

    B.    EY Germany's Instructions to and Review of Work Product from EY U.S. Do Not Establish Purposeful Availment.................................................16

    C.    EY Germany Did Not Directly Perform Any Work in the United States..............17

II.    Plaintiffs' Allegations Have No Connection to the EY U.S. Component Audit of Wirecard North America...........................................................................................20

    A.    Kurniawan's Presence at the Site Visit Does Not Connect the Alleged Misstatements and the Wirecard North America Component Audit. ....................21

    B.    Plaintiffs Offer Only Conclusory Speculation, and No Well-Pleaded Facts, Regarding Any Connection Between the Wirecard North America Component Audit and the Alleged Misstatements. ..............................................22

III.   Wirecard's English-Language Annual Reports Do Not Render EY Germany Subject to Personal Jurisdiction. .........................................................................24

IV.   Exercising Jurisdiction Over EY Germany Would Be Unreasonable. ..............................26

CONCLUSION....................................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aldossari on Behalf of Aldossari v. Ripp*,
  49 F.4th 236 (3d Cir. 2022) ...................................................................................20

*Allaham v. Naddaf*,
  635 F. App'x 32 (3d Cir. 2015) ..............................................................................12

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
  480 U.S. 102 (1987).................................................................................................27

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)............................................................................................12, 24

*Carteret Sav. Bank, FA v. Shushan*,
  954 F.2d 141 (3d Cir. 1992)....................................................................................14

*D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*,
  566 F.3d 94 (3d Cir. 2009)......................................................................................11

*Dayhoff Inc. v. H.J. Heinz Co.*,
  86 F.3d 1287 (3d Cir. 1996)......................................................................................2

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
  683 F. Supp. 1463 (S.D.N.Y. 1988).......................................................................13

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021)............................................................................................24

*GCIU-Emp. Ret. Fund v. Coleridge Fine Arts*,
  700 F. App'x 865 (10th Cir. 2017) .........................................................................12

*Gen. Elec. Co. v. Deutz AG*,
  270 F.3d 144 (3d Cir. 2001)....................................................................................19

*Hanson v. Denckla*,
  357 U.S. 235 (1958).................................................................................................17

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984).................................................................................................13

*Hepp v. Facebook*,
  14 F.4th 204 (3d Cir. 2021) ....................................................................................20

*In re Chocolate Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538 (M.D. Pa. 2009) ......................................................................2

*In re Hertz Glob. Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018)....................................................................................21

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945).................................................................................................27

*Leasco Data Processing Equip. Corp. v. Maxwell*,
   468 F.2d 1326 (2d Cir. 1972),
   *abrogated on other grounds*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010).........24

*O'Connor v. Sandy Lane Hotel Co.*,
   496 F.3d 312 (3d Cir. 2007)....................................................................................27

*Patterson v. F.B.I.*,
   893 F.2d 595 (3d Cir. 1990)......................................................................................2

*Pearce v. Karpeles*,
   2019 WL 3409495 (E.D. Pa. July 26, 2019)..........................................................12

*Pinker v. Roche Holdings Ltd.*,
   292 F.3d 361 (3d Cir. 2002)...............................................................................12, 17

*Pinto v. St. Paul Fire & Marine Ins. Co.*,
   2023 WL 3667610 (E.D. Pa. May 26, 2023) ...........................................................6

*Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*,
   911 F.3d 192 (4th Cir. 2018) ..................................................................................12

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014)........................................................................21

*Thompson Hine, LLP v. Taieb*,
   734 F.3d 1187 (D.C. Cir. 2013)...............................................................................12

*Toys "R" Us, Inc. v. Step Two, S.A.*,
   318 F.3d 446 (3d Cir. 2003).......................................................................................4

*Travers v. FedEx Corp.*,
   584 F. Supp. 3d 1 (E.D. Pa. 2022) ..........................................................................20

*Trierweiler v. Croxton & Trench Holding Corp.*,
   90 F.3d 1523 (10th Cir. 1996) .................................................................................25

*Victaulic Co. v. HiTHerm, LLC*,
   2022 WL 2953690 (E.D. Pa. July 26, 2022)...........................................................14

*Walden v. Fiore*,
   571 U.S. 277 (2014).............................................................................6, 12, 15, 20, 25

**OTHER AUTHORITIES**

International Financial Reporting Standard ("IFRS") 3: Business Combinations (last
visited June 22, 2023), https://www.ifrs.org/issued-standards/list-of-standards/ifrs-3-
business-combinations/#about ...............................................................................18

International Standard on Accounting ("ISA") 600 (Revised), *Special Considerations—
Audits of Group Financial Statements (Including the Work of Component Auditors)*
(Apr. 2022), https://www.iaasb.org/_flysystem/azure-private/publications/files/
IAASB-ISA-600-Revised.pdf...........................................................................8, 17

**INTRODUCTION**

Facts developed during jurisdictional discovery confirm that the Court's conclusion in its December 8, 2022 Opinion was correct: Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft ("EY Germany") is not subject to personal jurisdiction in this forum. First, the documents produced confirm the accuracy of the Declaration of Annedore Streyl, which the Court previously relied upon: EY Germany did not directly perform audit work on Wirecard North America ("WNA"); rather, it relied upon the audit procedures performed and conclusions reached by Ernst & Young LLP ("EY U.S."). Second, after jurisdictional discovery it remains abundantly clear that the component audit of WNA had no relationship to either the fraudulent conduct by Wirecard or the alleged auditing errors by EY Germany. Finally, Plaintiffs' theory that EY Germany is subject to personal jurisdiction based on the mere foreseeability that American investors might access Wirecard's English-language annual reports remains just as legally deficient as before.

Wirecard Aktiengesellschaft ("Wirecard AG") was a German company whose stock traded solely on German exchanges. EY Germany conducted its audit of the group financial statements in Germany, pursuant to German and international accounting and auditing standards, and subject to oversight by German regulators. Plaintiffs allege that EY Germany should have detected Wirecard AG's fraud by confirming bank balances in Singapore and the Philippines, CCAC ¶ 248; based on whistleblower allegations about Wirecard AG's Indian subsidiary, *id.* ¶ 250; based on suspicious transactions by third-party acquirers in Dubai, the Philippines, and Singapore, *id.* ¶¶ 159–183, 256; or by better following international accounting standards, *id.* ¶¶ 257–258. This conduct, the alleged basis for Plaintiffs' claims, has no connection to WNA or the United States, let alone anything EY Germany did in the United States. The component audit of WNA (by the U.S. firm) thus cannot support specific jurisdiction over EY Germany in connection with Plaintiffs' claims.

## BACKGROUND

**Relevant Procedural History**

Plaintiffs filed the operative Consolidated Class Action Complaint ("CCAC") in December 2020. ECF No. 53. In September 2021, EY Germany moved to dismiss the CCAC, for lack of proper service, lack of personal jurisdiction, under the doctrine of *forum non conveniens*, and for failure to state a claim. ECF No. 64-1, at 1–2. In July 2021, the Court held argument regarding personal jurisdiction. ECF Nos. 81, 91.

In December 2022, the Court granted EY Germany's motion to dismiss for lack of personal jurisdiction. ECF No. 88. As the Court explained, once a defendant moves to dismiss under Rule 12(b)(2), "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." Op. 2 n.3, ECF No. 87 (quoting *Patterson v. F.B.I.*, 893 F.2d 595, 603–04 (3d Cir. 1990)).[1] Further, once a plaintiff's "allegations are challenged by affidavits and supporting evidence presented by defendants moving to dismiss under Rule 12(b)(2)," the plaintiff "must present similar evidence." *Id.* (quoting *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 556 (M.D. Pa. 2009)); *see also id.* at 8 ("[O]nce a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." (quoting *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996))). As Plaintiffs did not present competent evidence to contradict the Streyl Declaration, ECF No. 64-3, the facts stated therein were treated as undisputed. Op. 2 n.4. In particular, the Court noted that "EY Germany's audits of Wirecard's

---

[1] Unless otherwise indicated, when language quoted from a decision contains material quoted from another source, all brackets, ellipses, footnote call numbers, internal quotation marks and citations have been omitted for readability. All emphasis is added unless otherwise indicated. Citations to "Br." are to Plaintiffs' Supplemental Memorandum in Support of Personal Jurisdiction, ECF No. 100.

Group financial statements 'were prepared pursuant to German commercial laws' and the work 'was conducted primarily in Germany pursuant to German auditing standards.'" *Id.* at 4 (quoting Streyl Decl. ¶ 11). Regarding WNA, EY Germany issued instructions to EY U.S., and reviewed the reporting packages provided by EY U.S. *Id.* (citing Streyl Decl. ¶ 12).

As the Court noted, Plaintiffs have abandoned any general jurisdiction argument, so only specific jurisdiction is at issue. *Id.* at 9 & n.10. The Court surveyed cases addressing personal jurisdiction over foreign auditors, finding that "courts have uniformly rejected the exercise of personal jurisdiction over foreign auditors where those auditors only interacted with the forum by exchanging documents with U.S. entities." *Id.* at 14. Further, even when an auditor's client "has taken affirmative steps to avail itself of the U.S. market, there is no guarantee that an auditor, a hired hand with far less agency, has done the same." *Id.* at 15. Applying these standards, the Court first rejected Plaintiffs' theory that Wirecard AG's English-language publication of EY Germany's audit opinions would subject the auditor to personal jurisdiction in the United States. *Id.* at 16–18. As the Court explained, "The fact that Wirecard, acting on its own, used the audit materials in annual English language reports that were made available to potential American investors does not constitute deliberate contact with the forum by EY Germany." *Id.* at 17.

The Court also rejected Plaintiffs' specific jurisdiction theory based on the component audit of WNA. As the Court noted, "direct auditing of Wirecard North America . . . was the work of EY U.S., which EY Germany assisted in reviewing one step further removed." *Id.* at 18. EY Germany's review of "work by EY U.S. in the course of conducting Group audits pursuant to German and international auditing standards . . . does not sufficiently constitute purposeful availment." *Id.* To hold otherwise would subject group auditors of multinational companies to worldwide jurisdiction, even when the "subsidiaries . . . are audited by local auditors." *Id.*

3

Accordingly, the Court ruled that Plaintiffs had not carried their burden to establish purposeful availment, and did not need to reach the remaining requirements of specific jurisdiction. *Id.* at 19 & n.15. Nor did the Court reach EY Germany's arguments based on improper service, *forum non conveniens*, or failure to state a claim.

Plaintiffs sought reconsideration on the grounds that they should be permitted jurisdictional discovery unless their claims are "clearly frivolous." Pls.' Mem. ISO Mot. Recons. at 3, ECF No. 90-1 (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)). The Court granted the motion for reconsideration, allowing Plaintiffs to follow up on "the interaction between EY Germany and EY U.S." Order at 1 n.1, ECF No. 95. During jurisdictional discovery, Plaintiffs served requests for production of documents and requests for admissions, to which EY Germany responded. Plaintiffs also noticed a 30(b)(6) deposition of an EY Germany representative, but decided days before the deposition not to move forward.

**Information Produced in Jurisdictional Discovery**

The documents produced in jurisdictional discovery confirm the points from the Streyl Declaration, and the additional details they provide do not change the nature of the interaction between EY Germany and EY U.S. as described in the Court's prior Opinion. Wirecard AG acquired WNA as of March 9, 2017. Pls.' Ex. 1, at 2.[2] Accordingly, the first audit year for which WNA was a subsidiary of Wirecard AG was 2017. *See* Wirecard AG, *2017 Annual Report* at 290–91 (Apr. 2018), ECF No. 76-2; CCAC ¶¶ 316–318. The only subsequent year for which EY Germany issued an opinion was 2018; for the fiscal year 2019, EY Germany disclaimed an opinion. *See id.* ¶¶ 319–323; 346.

---

[2] Citations in the form of "Pls.' Ex. __" are to the exhibits attached to the Declaration of Shawn A. Williams, ECF No. 100-1. Citations in the form of "Ex. __" are to the exhibits attached to the Declaration of Steven M. Farina, filed contemporaneously with this supplemental memorandum.

4

For each of the 2017–2019 audit years, EY Germany issued instructions to the firms that were conducting component audits of Wirecard AG subsidiaries. *See, e.g.*, Pls.' Ex. 6, at 1, 24–25 (describing 2017 component audits to be carried out by non-EY engagement teams, by foreign EY member firms including EY U.S., and by EY Germany). The instructions defined the deliverables that the component audit teams needed to provide, but made clear that it was the component team that was responsible for actually "perform[ing] [the] audit of the financial information of the component." *Id.* at 28; *id.* at 19 (providing timetable for deliverables); *see also* Ex. 1 (EY U.S. confirming receipt of 2017 instructions); Ex. 2 (similar for 2018). The component auditors reported back on the work they had performed pursuant to the instructions.[3] The engagement team at EY Germany then reviewed the deliverables provided by the component teams. *See, e.g.*, Pls.' Ex. 11 (reflecting EY Germany team notes on Final Summary Memorandum provided by the EY U.S. team for the 2018 audit year). Plaintiffs attempt to cast these facts as some sort of revelation, Br. 7–8, but this is the process described in the Streyl Declaration.

Plaintiffs also focus on a December 2017 site visit to WNA made by three EY Germany personnel. Br. 3–7. In particular, Plaintiffs misleadingly suggest that the purpose of the site visit was to perform the "[f]ull scope audit of Wirecard NA." Br. 4. But the documents themselves show that the site visit was a meet-and-greet event, to allow the EY Germany team to meet the EY

---

[3] *Compare* Pls.' Ex. 13, at 603 (instructing full-scope component auditors to perform "an audit of the financial information of the [component] in accordance with the auditing standards applicable in Germany and ISAs" (emphasis omitted)), *and id.* at 604 ("[P]lease perform the following procedures to identify impairment indicators for acquired customer relationships / portfolios . . . ."), *with* Pls.' Ex. 11, at 530 (reporting opinion of EY U.S. "that the financial statements at the Wirecard North America component level [have] been prepared, in all material respects, in accordance with International Financial Reporting Standards as adopted by the EU and the supplementary commercial regulations to be applied in accordance with . . . the German Commercial Code"), *and id.* at 526 ("[P]er discussion with management and our audit procedure, we [EY U.S.] didn't note any factors that would indicate any impairment concerns on customer relationships.").

U.S. team, and to learn about the basics of the WNA business so that it would be better able to understand the reporting from the U.S. team. *See* Pls.' Ex. 3, at 267, 269. Notably, EY Germany did not perform a similar site visit in 2018 or any subsequent year, illustrating that it was not a necessary element of an audit. The documents also demonstrate that the site visit was entirely consistent with the overall process in which EY Germany instructed and then reviewed the work of EY U.S. For example, the agenda included an explanation of "audit procedures for the Wirecard Group Audit," and "[d]iscussion about the audit process," including "documentation and reporting." *Id.* at 267.

While Plaintiffs make much of the fact that Edo Kurniawan was in Pennsylvania at the time of the site visit, he was not one of the presenters at the meetings. *See* Declaration of Andreas Loetscher ("Loetscher Decl.") ¶ 16; *see also* Pls.' Ex. 7, at 337, 345, 357, 362, 365, 369 (identifying presenters for each section). Mr. Kurniawan's presence in the United States cannot support a finding of purposeful availment by EY Germany. He was not an employee of EY Germany, and the "defendant-focused 'minimum contacts' inquiry" cannot be satisfied based on contacts between third parties and the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *accord Pinto v. St. Paul Fire & Marine Ins. Co.*, 2023 WL 3667610, at *6 (E.D. Pa. May 26, 2023). Further, Plaintiffs point to no facts that suggest Kurniawan took action to further any fraud while in Pennsylvania. Even if one were to assume that Kurniawan was involved in some aspect of the Wirecard fraud elsewhere, it does not follow that every place he visited is connected to the fraud. Plaintiffs repeatedly invoke a report that Kurniawan and employees of EY Germany visited a restaurant with staff dressed as pilgrims. Br. 5–6, 20 n.12. Reliance on this substance-free anecdote only underscores that Plaintiffs have no factual basis to allege any connection between

6

Kurniawan's presence in Pennsylvania and the statements they contend inflated the price of the ADRs and F-shares they purchased.

The evidence developed in jurisdictional discovery also does not support Plaintiffs' characterization that EY Germany had a "direct role" in auditing WNA. Br. 7. First, Plaintiffs assert that EY Germany audited "[o]pening balances in 2017, including purchase price adjustments." Br. 8. This is an oversimplification to the point of inaccuracy. First, PricewaterhouseCoopers GmbH Wirtschaftsprüfungsgesellschaft ("PwC Germany") audited the closing balances of Ecount, Inc. ("Ecount"), the entity that was later renamed Wirecard North America after Wirecard AG acquired it from Citibank. Ex. 3, PwC Germany, *Independent Auditor's Report* (Oct. 26, 2017), EYGMBH_0001093, at 1093, 1099. Those closing balances were audited as of February 28, 2017. *Id.* at 1093.

Then, Baker Tilly GmbH & Co. KG Wirtschaftsprüfungsgesellschaft ("Baker Tilly Germany"), another separate auditing firm, performed the purchase price allocation for the transaction in which Wirecard AG acquired WNA. Pls.' Ex. 1, at 1056. The purpose of a purchase price allocation ("PPA") is to determine how the amount that an acquiring entity paid for an acquired company should be allocated on the books of the acquirer. Loetscher Decl. ¶ 20. Performing a PPA involves first identifying and valuing, in accordance with the accounting standards applicable to the group, the tangible and intangible assets of the acquired company (*e.g.*, physical equipment or customer contracts and relationships). Then, the amount of the purchase price that exceeds the identifiable assets is allocated to "goodwill," an accounting concept that simply represents the amount that the acquiring company paid beyond the value attributable to identifiable assets. *See* Pls.' Ex. 1, at 1053 (summarizing PPA for WNA); *id.* at 1060–63 (summarizing approach to PPA). EY Germany audited Baker Tilly Germany's PPA in Germany,

based on information that EY Germany received directly from Wirecard AG in Germany. Loetscher Decl. ¶¶ 21–22.

In March 2018, EY Germany provided the PPA and opening balance sheet for WNA to EY U.S., so that the U.S. firm had an opening balance to work from. Ex. 4, EY Germany, *Acquisition of Kestrel: Audit of the Purchase Price Allocation According to IFRS 3* (Mar. 5, 2018), EYGMBH_0001123), at 1125–26. Plaintiffs have not suggested that there was anything fraudulent or even inaccurate about these opening balances, which reflected the value of the company that Wirecard AG had just acquired from Citibank. EY U.S. then verified the opening balances with information it received from WNA. Pls.' Ex. 10, at 315; Ex. 5, EY U.S., *Audit Strategies Memorandum* (FY 2017), EYGMBH_0000399, at 400 (summarizing plan for performing procedures on WNA opening balances).

The other auditing work that Plaintiffs assert EY Germany "directly" performed on WNA, Br. 8–9, similarly reflects centralized procedures that were performed in Germany. For example, when Wirecard AG adopted certain new International Financial Reporting Standards ("IFRS"), EY Germany verified that Wirecard AG had policies that complied with IFRS, and instructed component audit teams to apply those policies as part of their audits. *See* Pls.' Ex. 15, at 501 (noting that the primary team had "verified the correct application of IFRS 15 from a conceptional perspective," but that the component teams were responsible for performing the procedures); Pls.' Ex. 16 (similar).[4]

---

[4] The group audit was conducted in accordance with International Standard on Accounting 600 ("ISA 600"), which provides guidance for auditing group financial statements. Loetscher Decl. ¶¶ 7–8; *see also* ISA 600 (Revised), *Special Considerations—Audits of Group Financial Statements (Including the Work of Component Auditors)* at 7, 11, 29–30 (Apr. 2022), https:// www.iaasb.org/_flysystem/azure-private/publications/files/IAASB-ISA-600-Revised.pdf (noting that group auditors may "may involve component auditors to provide information, or to perform

Plaintiffs point to a few other details from the documents, but none is relevant to purposeful availment. Plaintiffs do not at all explain how adjusting "at the Wirecard AG level" an item from the Summary of Audit Differences would constitute direct work in North America. Br. 9. Plaintiffs similarly fail to explain why "[e]stimation SCOTs" or "[c]urrency translation processes" would entail work in North America. *Id.* Finally, in audit years 2017 and 2018, EY U.S. indicated that "intercompany balances [had] been confirmed with the EY Primary Team." Pls.' Ex. 10, at 315; Pls.' Ex. 11, at 527. This statement indicates that when WNA owed or was owed money by another Wirecard Group entity, EY U.S. confirmed the balance on the WNA books and the Primary Team was responsible for confirming it with the other Wirecard entity elsewhere. This again in no way indicates that EY Germany was performing work in the United States. *See* Loetscher Decl. ¶ 23.

Plaintiffs sought jurisdictional discovery in part to investigate "Wirecard North America's connection to the alleged fraud," ECF No. 90-1, at 1, and discovery has made it even more clear that there is no such connection. In particular, the fraud as described in the CCAC was allegedly in Wirecard AG's "acquiring" business. CCAC ¶¶ 9, 159–195. In that business, Wirecard or its third-party partners "collect[ed] money from an 'issuer' (the bank that issues a customer's credit card) and distribute[d] it to the merchant that charged the customer's card." *Id.* ¶ 35. By contrast, WNA was in the "issuing" business. Pls.' Ex. 3, at 273. In particular, WNA issued prepaid cards to mostly corporate clients, for functions such as consumer incentives, refunds, and payroll. Pls.' Ex. 7, at 339–41, 349. Indeed, prior to the acquisition, WNA was part of Citi Prepaid Card Services. *Id.* at 339; ECF No. 76-2, at 188. WNA thus operated in an entirely different segment

---

audit work, to fulfill the requirements of this ISA," and describing considerations for how to determine the level or component at which work will be performed).

of Wirecard AG's business than the one in which Plaintiffs allege EY Germany should have detected fraud.

Plaintiffs rely on a story from Fahmi Quadir, who allegedly visited WNA in early 2019, a fiscal year for which EY Germany disclaimed an audit opinion. Quadir, who had a large short position against Wirecard AG, opined that "if [Wirecard] was committing crimes," the WNA acquisition would be a "reckless" move because of the effectiveness of U.S. regulators. Pls.' Ex. 24. To EY Germany's knowledge, there notably has never been any investigation by the Securities and Exchange Commission, the Department of Justice, or any other U.S. enforcement agency into the activities of Wirecard North America. *See* Pls.' Ex. 2, at 6 (noting that EY Germany has never communicated with any such agency concerning WNA). Furthermore, WNA was ultimately sold by Wirecard AG's German insolvency administrator, in a transaction that he described as "an important milestone in our sales efforts in the best interest of the creditors of Wirecard AG." Ex. 6, Michael Jaffé, *Press Release: Successful Sale of Wirecard North America* (Oct. 22, 2020), https://www.wirecard.com/2020/10/22/successful-sale-of-wirecard-north-america ("Wirecard North America is one of the market leaders in the US for the issuing of compensation, disbursement, consumer incentive and refund cards.").[5] Such a sale underscores the total lack of connection between WNA and the fraud Plaintiffs describe in the CCAC. *See* Ex. 8, *Wirecard North America Inc. Pursues Acquisition*, Business Wire (June 29, 2020), https://www.businesswire.com/news/home/20200629005897/en/Wirecard-North-America-Inc.-Pursues-Acquisition ("Wirecard North America is a self-sustaining entity that is substantially autonomous from Wirecard AG.").

---

[5] *See also* Ex. 7, *Wirecard North America Sold to Syncapay In Deal Backed by Centerbridge, Bain*, Reuters (Oct. 22, 2020), https://www.reuters.com/article/us-wirecard-m-a-syncapay/wirecard-north-america-sold-to-syncapay-in-deal-backed-by-centerbridge-bain-idUSKBN2772ZW.

**ARGUMENT**

The information produced in discovery confirms that EY Germany is not subject to specific jurisdiction in this forum for the claims that Plaintiffs allege.  *First*, jurisdictional discovery has confirmed that EY U.S. conducted the component audit of WNA.  EY Germany's initial site visit and review in Germany of the deliverables produced by EY U.S. did not constitute purposeful availment of the forum.  *Second*, even if the Court were to conclude that EY Germany had forum contacts that could constitute purposeful availment, specific jurisdiction is absent because Plaintiffs' claims do not arise from or relate to those contacts.  The fraud as alleged by Plaintiffs took place outside the United States, and culminated in funds missing from banks in the Philippines.  No contact EY Germany had with the United States is related to the procedures that Plaintiffs contend EY Germany should have performed to detect Wirecard's fraud, such as obtaining additional documentation from foreign banks.  EY Germany's instructions to EY U.S. and the site visit to WNA have no connection to the securities fraud claims that Plaintiffs assert against EY Germany.  *Finally*, Plaintiffs attempt to repackage the worldwide reliance argument that the Court previously rejected, noting statements in Wirecard AG's annual reports that disclosed the existence of US investors.  But the fact that U.S. investors reached out to acquire interests in a German corporation, whose shares traded on the Frankfurt Stock Exchange, *see* ECF No. 76-2, at 35; Pls.' Ex. 11, at 524, in no way supports a finding that EY Germany purposefully availed itself of the U.S. market.

I.     **EY Germany Did Not Purposefully Avail Itself of the Forum.**

The threshold inquiry for specific jurisdiction is whether the defendant has "purposefully directed its activities at the forum."  *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009).  The contacts "must amount to 'a deliberate targeting of the forum.'"  *Id.* at 103.  "[I]n assessing the sufficiency of a defendant's contacts with the forum, a

11

court should look at the extent to which the defendant availed himself of the privileges of American law and the extent to which he could reasonably anticipate being involved in litigation in the United States." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 370 (3d Cir. 2002). "[R]andom, isolated, or fortuitous" contacts do not constitute purposeful availment. *Pearce v. Karpeles*, 2019 WL 3409495, at *6 (E.D. Pa. July 26, 2019).

A.     **The Single Informational Site Visit to Wirecard North America Does Not Establish Purposeful Availment.**

Though physical entry into the forum is "a relevant contact," *Walden v. Fiore*, 571 U.S. 277, 285 (2014), Plaintiffs inaccurately suggest that a single visit to the forum is sufficient to establish purposeful availment, Br. 12. The Supreme Court "long ago rejected the notion that personal jurisdiction" can be adjudicated by reference to such a "mechanical" test. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). In fact, courts regularly conclude that isolated business-related visits to the forum do not constitute purposeful availment. *See, e.g.*, *GCIU-Emp. Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 871 (10th Cir. 2017) ("One meeting, however, is not a sufficient minimum contact to support the exercise of specific jurisdiction, particularly when the Fund has not alleged how its injuries arose from that meeting."); *Allaham v. Naddaf*, 635 F. App'x 32, 41 (3d Cir. 2015) (holding that testimony defendant had visited Pennsylvania "more than once" was insufficient to support personal jurisdiction); *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 196, 199 (4th Cir. 2018) (holding that visits by foreign company's CEO to the forum were insufficient to support personal jurisdiction, even when one was business-related, as "that discussion was informal and limited, leading to no arrangement"); *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1193–94 (D.C. Cir. 2013) (holding that mere retention of a service provider in the forum is insufficient to constitute personal availment, and suggesting disagreement with a case that found jurisdiction where the defendant "attended just one

12

meeting" in the forum); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (holding that sending a defendant's CEO to the forum for a contract negotiation, and sending employees for training in the forum, were insufficient to establish general jurisdiction).

The cases Plaintiffs cite are inapposite. In *Department of Economic Development v. Arthur Andersen & Co. (U.S.A.)*, the principal argument the defendants raised was that their conduct was extraterritorial and thus not subject to U.S. securities laws. 683 F. Supp. 1463, 1470 (S.D.N.Y. 1988). Further, the primary auditor in that case was a U.S. firm, and the foreign component auditors apparently did not dispute that they had repeatedly visited the forum to perform work related to the plaintiffs' allegations. *Id.* at 1470–71 & n.6.

The Plaintiffs in *Department of Economic Development* had invested in the Michigan-based DeLorean Motor Company and its Northern Ireland subsidiary, which subsequently became insolvent. *Id.* at 1468–69. The primary auditor was Arthur Andersen–United States, which relied on audits of DeLorean subsidiaries conducted by Arthur Andersen firms in the UK and Ireland. *Id.* at 1470. In addition, the DeLorean entities were "totally interdependent," and formed "essentially a one project company," for manufacturing the DMC-12 sports car. *Id.* at 1468–69, 1471. The court held that this auditing, organized by a U.S. firm, was not so extraterritorial as to defeat subject matter jurisdiction. *Id.* at 1471. The UK and Ireland Arthur Andersen entities abandoned any personal jurisdiction argument, but the court suggested in dicta that their partners' repeated visits to New York to transact business related to the allegedly deficient audit would support a finding of purposeful availment. *Id.* at 1471 n.6. The fact that the primary auditor was located in the United States, that there apparently was no dispute the claims arose from the work of the UK and Irish firms, and that the foreign partners made repeated visits to the forum render

13

the audit addressed in *Department of Economic Development* distinguishable from the group audit of Wirecard.

Similarly inapposite is *Victaulic Co. v. HiTHerm, LLC*, in which the court exercised personal jurisdiction over an individual defendant who was a part owner of the primary defendant corporation, in part because he had "engaged extensively" with the plaintiff. 2022 WL 2953690, at *3 (E.D. Pa. July 26, 2022). In particular, he had visited the plaintiff's partners' Pennsylvania offices on multiple occasions, for purposes related to the plaintiff's claims—which alleged that he misappropriated funds that had been lent by the plaintiff. *Id.* at *2–3.[6] Those substantive and repeated contacts, with a strong relationship to the plaintiff's claim, are unlike the single site visit here. And in the case that Plaintiffs cite for the proposition that "even a single visit may suffice," Br. 12, the entire substance of the torts that the plaintiff alleged occurred during a single meeting in the forum state. *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 143 (3d Cir. 1992) ("At the heart of its various causes of action, [plaintiff] averred that [defendant] failed to divulge several significant facts during a meeting in May of 1985 that took place in Roseland, New Jersey."). As the *Carteret* court described its uncontroversial holding, "exercising personal jurisdiction over one who acts tortiously while within the forum state does not deny due process." *Id.* at 142; *see also id.* at 146–48. That could not be further afield from the site visit here, during which Plaintiffs do not allege that any element of their claims occurred, much less every element necessary to prove their claims.

The December 2017 site visit to WNA did not involve the performance of any substantive audit work in the U.S. Indeed, the first fiscal year for which EY U.S. performed a component

---

[6] In the same case, the court found personal jurisdiction absent over another part owner of the corporation, despite the fact that he had "regular" emails and phone calls with the in-forum plaintiff. *Victaulic Co.*, 2022 WL 2953690, at *2.

audit of WNA ended December 31, 2017.  At the time of the site visit, the 2017 fiscal year had not concluded, so there were no 2017 financial statements to begin auditing.  While it was prudent for EY Germany to meet the component audit team at EY U.S. and to learn about the WNA business so that EY Germany would better understand the deliverables produced, the activities at the site visit are too thin a reed to support personal jurisdiction.  EY Germany would not expect to be haled into a U.S. court and forced to defend its audit opinions regarding the Wirecard group financial statements because its employees participated in a day-and-a-half of preliminary meetings in the United States.[7]

Plaintiffs also strangely suggest that the December 2017 site visit constitutes purposeful availment by EY Germany because at an October 2019 "Capital Markets Day" event the Wirecard AG CFO mentioned that Wirecard entities in the Middle East and Dubai had received a full scope audit.  Br. 13; Pls.' Ex. 26, at 31.  This is yet another instance in which Plaintiffs ignore that purposeful availment "must arise out of contacts that the 'defendant *himself*' creates with the forum State," not "unilateral activity of another party or a third person."  *Walden*, 571 U.S. at 284.  EY Germany did not provide any services to Wirecard AG in connection with the Capital Markets Day event, which in any event occurred *after* EY Germany published the final audit opinion that Plaintiffs' allege was misleading.  Pls.' Ex. 2, at 6; CCAC ¶ 319.

---

[7] Plaintiffs seek a class period that spans August 2015 through June 2020, CCAC ¶ 2, and make allegations regarding EY Germany's 2015 and 2016 audit opinions, *id.* ¶¶ 103, 314–315.  EY Germany certainly would not expect to be retroactively haled into court about those opinions based on a 2017 site visit for a subsidiary that was not even a part of the Wirecard group during those years.  This temporal mismatch also underscores the lack of connection between the component audit of WNA and the fraud and purported auditing errors alleged in the CCAC.  *See* Section II, *infra*.

**B.    EY Germany's Instructions to and Review of Work Product from EY U.S. Do Not Establish Purposeful Availment.**

Plaintiffs assert that "[d]ocuments produced in discovery demonstrate that EY Germany directly engaged and directed EY U.S.' audit" of WNA. Br. 14. In fact, EY U.S. was retained by WNA and billed WNA for its services. Loetscher Decl. ¶ 12; Ex. 9, EY Germany's Resps. & Objs. to Pls.' RFPs at 8 (Mar. 21, 2021). Meanwhile, EY Germany was retained by Wirecard AG and billed Wirecard AG for the audit of the group financial statements. *Id.* at 9. While certain EY U.S. documents colloquially refer to it having been "engaged" by EY Germany, this is an apparent imprecision; the audit instructions always made clear that EY Germany had "an engagement letter with Wirecard AG that covers the Group Audit," but that "local component teams [were] required to obtain a separate engagement letter from local management for purposes of the group audit including respective fee agreements." Pls.' Ex. 6, at 438; Ex. 14, at 1033.

Plaintiffs' assertions that EY Germany "directed" or "controlled" the component audit, Br. 14–15, are merely an attempt to put a new spin on the facts described in the Streyl Declaration, which explained from the start that "EY Germany instructed EY US through Interoffice Instructions to conduct audit work for Wirecard Group reporting purposes on the reporting packages of Wirecard North America Inc." ECF No. 64-3, ¶ 12. Plaintiffs contend that because EY Germany provided the component audit teams with "detailed" instructions, the primary audit team should be subject to jurisdiction everywhere the component teams operated, including the United States. Br. 15. But the "details" that Plaintiffs reference—such as materiality thresholds and group-wide accounting policies—are items about which group auditors are either required or encouraged to instruct component audit firms under the applicable international auditing standard,

16

ISA 600.[8]  Accordingly, if the rule sought by Plaintiffs applies, any auditor of a corporate group with a U.S. subsidiary would be subjected to U.S. jurisdiction, even if the group auditor performed no substantive audit work in the United States.  The documents produced by EY U.S. clearly state that it, not EY Germany, performed the audit procedures in the United States.  Pls.' Ex. 11, at 530 (stating that EY U.S. reached its FY 2018 conclusion about "the financial statements at the Wirecard North America component level" based on "the audit procedures that we [EY U.S.] performed"); Pls.' Ex. 10, at 319 (reaching a similar conclusion for FY 2017).

### C.    EY Germany Did Not Directly Perform Any Work in the United States.

Plaintiffs contend that EY Germany was "directly involved in auditing certain aspects of Wirecard North America."  Br. 17.  The relevant legal question, however, is not whether EY Germany performed any work related to WNA.  Rather, Plaintiffs must show that EY Germany has " purposefully avail[ed] itself of the privilege of *conducting activities within the forum State*, thus invoking the benefits and protections of its laws."  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *accord Pinker*, 292 F.3d at 370 ("[A] court should look at the extent to which the defendant availed himself of the privileges of American law . . . ."). The items that Plaintiffs characterize as "direct auditing work on Wirecard North America," Br. 17, were in fact activities that EY Germany performed wholly in Germany based on materials provided to it in Germany by Wirecard AG.  For example, the purchase price allocation ("PPA") involves allocating the purchase price that the acquiring company paid onto the books of the acquiring company—here, Wirecard AG.  The PPA

---

[8] *See* ISA 600, *supra* note 4, at 9, 14, 45–46 (requiring group auditors to set "component performance materiality" in order "to reduce aggregation risk to an appropriately low level"); *id.* at 39 (requiring the group auditor to "[c]onsider whether uniform accounting policies are used to prepare the financial information of the components for the group financial statements and, if not, how differences in accounting policies are identified and adjusted").

must be conducted by the acquiring company (Wirecard AG), not the company acquired (WNA). Thus Baker Tilly Germany was retained by Wirecard AG to perform the "purchase price allocation pursuant to [International Financial Reporting Standards] from Wirecard's perspective." Pls.' Ex. 1, at 1056.[9] EY Germany's audit of Baker Tilly Germany's work, in Germany, did not involve conducting any activities in the United States. Loetscher Decl. ¶ 22.

Plaintiffs also conflate analyses related to goodwill and other intangible assets that were performed at the component level and those that were performed at the group level. First, as reflected in the audit instructions, EY Germany had identified as a risk "that the company may overstate their revenues (especially revenues from 3rd party acquiring and software development business) or may not record impairment losses on acquired customer relationships / portfolios or goodwill." Pls.' Ex. 6, at 421; *see also* Pls.' Ex. 13, at 581 (similar instructions for 2018). EY Germany instructed the component audit teams, including EY U.S., that they were each "required to make your own assessment considering the applicability of the group level significant risks to your component." *Id.* Contrary to Plaintiffs' assertion that "EY U.S. did not do that work," Br. 18, in fact the U.S. firm determined that the risk regarding "acquired customer relationships / portfolios" was "not applicable to WNA's business for 2017." Pls.' Ex. 10, at 317. In 2018, EY U.S. determined that the risk of overstated revenue was inapplicable to WNA's business, as its revenue streams consisted of "high volume, low value transactions that do not involve a significant amount of judgment and include a high degree of transparency to the client and customer." Pls.' Ex. 11, at 525–26. Similarly, the risk of understated goodwill was inapplicable because WNA did

---

[9] *See also* IFRS 3: Business Combinations (last visited June 22, 2023), https://www.ifrs.org/issued-standards/list-of-standards/ifrs-3-business-combinations/#about ("IFRS 3 establishes principles and requirements for how *an acquirer* in a business combination . . . recognises and measures *in its financial statements* the assets and liabilities acquired . . . .").

18

not have any business combinations in 2018, nor did EY U.S. "note any factors that would indicate any impairment concerns on customer relationships." *Id.* at 526. These judgments were made by EY U.S., based on work performed by EY U.S.

Separately, "impairment analyses for goodwill and other intangible assets [were] prepared by Wirecard AG management at a more aggregated level," and then were audited by EY Germany in Germany. Pls.' Ex. 10, at 317; Pls.' Ex. 11, at 528. That in no way indicates that EY Germany conducted audit activities in the United States.

EY Germany's review of the deliverables produced by EY U.S. is not remotely analogous to the cases in which courts exercise jurisdiction over defendants that "reach out . . . and create continuing relationships and obligations with citizens [of the forum]." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). In the principal case Plaintiffs cite for this proposition, the defendant had contractually guaranteed the obligations of a subsidiary that entered into a joint venture with a corporation in the forum, and the defendant had been so involved with the work in the forum that it "came close to creating a *de facto* alter ego arrangement." *Deutz AG*, 270 F.3d at 152. By contrast, EY Germany's interactions with WNA were isolated and indirect, and the substantive auditing work in the United States was conducted wholly by EY U.S.[10]

---

[10] Of note, the audit instructions issued by EY Germany were the same to all of the component auditors, with appropriate modifications depending on whether the component audit was full, limited, or specific scope. *See, e.g.*, Pls.' Ex. 6, at 416, 439–40 (listing recipients of group audit instructions. If Plaintiffs were correct that the activities conducted pursuant to these instructions establish purposeful availment, then every group auditor would be subject to worldwide jurisdiction, or at least to jurisdiction everywhere the parent company had a subsidiary, no matter whether that subsidiary's activities formed the basis of the plaintiff's claims. As the Court previously observed, "[p]otential worldwide jurisdiction of this kind would violate due process." Op. 12.

19

## II.    Plaintiffs' Allegations Have No Connection to the EY U.S. Component Audit of Wirecard North America.

Even when a defendant has purposefully availed itself of the privilege of conducting business in the forum, the defendant is only subject to specific jurisdiction "if a plaintiff's claims arise out of or relate to the defendant's contacts with the forum." *Aldossari on Behalf of Aldossari v. Ripp*, 49 F.4th 236, 258 (3d Cir. 2022). "Put otherwise, 'the defendant's suit-related conduct must create a substantial connection with the forum State,' giving rise to a 'relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Walden*, 571 U.S. at 283–84). Even when a defendant has contacts with the forum, and there is some relationship between those contacts and the plaintiff's claims, that alone is insufficient—there must be a "strong connection" between the purposeful availment and the claims alleged. *Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021); *accord Travers v. FedEx Corp.*, 584 F. Supp. 3d 1, 5 (E.D. Pa. 2022).

None of the supposed forum contacts discussed so far—the December 2017 site visit, EY Germany's reliance upon work performed by EY U.S., or EY Germany's auditing activities at the group level related to WNA—has the faintest relationship to the fraud that Plaintiffs allege. As alleged by Plaintiffs, the Wirecard fraud involved over-valuation of subsidiaries in Asia, CCAC ¶¶ 93–96; acquisitions of businesses in India, *id.* ¶¶ 105–114; suspicious transactions in Singapore, Hong Kong, and India, *id.* ¶¶ 117–147; inflation of revenues from third-party partners in Dubai, the Philippines, and Singapore, *id.* ¶¶ 159–183; and ultimately €1.9 billion missing from banks in the Philippines, *id.* ¶¶ 229–237. None of these allegations is connected to EY Germany's supposed forum contacts.

Further, none of the audit failures that Plaintiffs allege bears any connection to the WNA component audit. To state a securities fraud claim against EY Germany, Plaintiffs must plead, among other elements, a strong inference that EY Germany acted with scienter. The requisite state

20

of mind is "[an] intent to deceive, manipulate, or defraud, either knowingly or recklessly." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018). The standards for pleading auditor scienter are "particularly stringent;" accounting irregularities standing alone are insufficient to plead scienter unless accompanied by "red flags" that the auditor disregarded. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 426–27 (S.D.N.Y. 2014). Indeed, Plaintiffs here take a "red flags" approach in attempting to plead scienter, but none of the signs they contend EY Germany should have detected relates to WNA or EY Germany's purported forum contacts. In contending that EY Germany acted with scienter, Plaintiffs criticize EY Germany for its auditing of Wirecard's Indian subsidiaries, Pls.' Opp. to MTD 26–28, ECF No. 76; for its auditing of third-party acquiring partners, especially the three largest in Dubai, the Philippines, and Singapore, *id.* at 28–31; for failing to request confirmation of bank balances in Singapore, CCAC ¶¶ 247–248; and for failing to respond to reports of an attempted bribe in India, *id.* ¶¶ 247, 250. None of Plaintiffs' factual allegations in support of its assertion that EY Germany conducted "deficient audits" has any nexus to the United States or WNA. *See id.* ¶¶ 246–262.

In their supplemental brief, Plaintiffs contend that their claims are strongly connected to EY Germany's forum contacts by: (1) Edo Kurniawan's attendance at the December 2017 site visit, Br. 19–21, and (2) unspecified interactions between WNA and Wirecard's Asian subsidiaries, *id.* at 21–23. Neither supports the exercise of jurisdiction.

> A.    **Kurniawan's Presence at the Site Visit Does Not Connect the Alleged Misstatements and the Wirecard North America Component Audit.**

Plaintiffs go on at length about Kurniawan's suspected role in Wirecard AG's fraud. For example, they allege that he was a suspect in a Singapore investigation "into forgeries, falsified documents, money laundering and roundtripping between 2014 and 2018 at Wirecard's businesses in Singapore, Indonesia, Hong Kong, Malaysia, India and the Philippines." CCAC ¶ 334. And

21

they allege that he orchestrated the "round-tripping" of several million euros "from Wirecard in Germany, through entities in Hong Kong and ultimately onto Wirecard's Indian business." *Id.* ¶ 130.[11]  When it comes time to discuss Kurniawan's activities in the United States, however, Plaintiffs allege only that he attended the site visit of WNA and "enjoyed the local Pennsylvania sites."  Br. 20 & n.12.  Kurniawan's mere presence during the site visit—during which he did nothing of substance—does not constitute a strong connection between EY Germany's forum contacts and Plaintiffs' fraud claims.  The fraud did not travel to Pennsylvania just because Kurniawan visited here.

### B.     Plaintiffs Offer Only Conclusory Speculation, and No Well-Pleaded Facts, Regarding Any Connection Between the Wirecard North America Component Audit and the Alleged Misstatements.

Plaintiffs invoke a variety of statements by Wirecard AG amounting to the fact that it had acquired WNA as part of its "global growth strategy."  Br. 22 (quoting Wirecard AG's 2017 Annual Report).  Plaintiffs acknowledge, however, that it "remains unclear in which specific ways Wirecard used Wirecard North America . . . to expand its global operations." *Id.*  That admission is dispositive.  Plaintiffs have failed to allege with particularity any purportedly fraudulent conduct by EY Germany that is strongly connected to any purposeful activity EY Germany conducted in the United States.

---

[11] *See also* CCAC ¶¶ 117–18 (alleging Kurniawan's involvement in suspicious transactions in Hong Kong, Singapore, and India, based on investigation by a Singapore law firm); *id.* ¶ 147 (alleging that Kurniawan sent emails related to round-tripping between foreign entities); *id.* ¶ 175 (alleging Kurniawan's receipt of document regarding revenue from third-party acquirers in Dubai, the Philippines, and Singapore); *id.* ¶ 191 (alleging Kurniawan's involvement with "trust accounts" for Dubai-based third-party acquirer).  None of the fraudulent activities that Plaintiffs allege Mr. Kurniawan orchestrated took place in the United States.

Plaintiffs also conflate Wirecard AG's purchase of WNA with its purchase of Citigroup's customer portfolios in Asia.  Wirecard AG purchased all the shares of Ecount from Citibank N.A. and then renamed the entity to WNA.  Pls.' Ex. 1, at 1065.  In a separate and subsequent transaction, Wirecard AG purchased international assets from Citibank, including in Dubai and the Philippines.[12]  Before the transaction, those international assets were a part of the applicable local Citigroup entity (not Ecount), and after the transaction, those assets became a part of various local Wirecard Group entities (not WNA).  *Id.*; *see also id.* at 1066 (describing the North American and international operations as separate businesses); *id.* at 1067 (identifying the other Wirecard AG subsidiaries that acquired the international operations).  Plaintiffs gloss over these details, asserting that the Citigroup customer portfolio in Asia was "associated with Wirecard North America and its purchase."  Br. 20; *see also id.* at 23 (inaccurately asserting that the "purchase of Wirecard North America . . . included the purchase of prepaid card assets and operations in the United Arab Emirates").  Because the international customer portfolios were not a part of WNA, no auditing related to them occurred in the United States; they would have been audited either by EY Germany in Germany, or by a component audit team in the applicable region.  Even if the Citigroup customer portfolios in Asia somehow became connected to the fraud—which Plaintiffs have not even clearly alleged—there were no forum contacts by EY Germany that related to that fraud.

---

[12] *Compare* Business Wire, *Citi Announces Sale of Prepaid Card Services to Wirecard* (June 29, 2016), https://www.businesswire.com/news/home/20160629006123/en/Citi-Announces-Sale-of-Prepaid-Card-Services-to-Wirecard (announcing sale of business that would become WNA), *with* S&P Global, *Wirecard to Buy Customer Portfolio of Citi's Asia-Pacific Merchant Acquiring Biz* (Mar. 17, 2017), https://www.spglobal.com/marketintelligence/en/news-insights/trending/ HtjlMvQN4sQR75NZAPPg_A2 (noting that acquisition of Asia-Pacific customers would "close in stages by June 2018"); *see also* ECF No. 76-2, at 45, 140 (describing the March 2017 completion of the WNA acquisition, and separately noting that the "acquisition of the Asia-Pacific acquiring portfolio of the Citigroup . . . [was] due to be concluded in the middle of 2018").

23

Plaintiffs also offer a grab-bag of other assertions with no clear relevance to personal jurisdiction: (1) that someone from EY Germany requested that they eat "local cuisine" during the trip to Pennsylvania, Br. 19; (2) that a Singapore law firm investigated suspect transactions in Hong Kong and India, *id.* at 20; (3) that EY Germany listed the WNA acquisition and the purchase of Citigroup customer portfolios in Asia under the heading of a single key audit matter, *id.* at 21; and (4) that WNA had the goal of eventually launching acquiring operations in North America in the future, *id.* at 22.  This grasping at straws only undermines Plaintiffs' assertion that EY Germany engaged in "extensive activities" in the United States.  *Id.* at 21 (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1032 (2021)).  Plaintiffs' suggestion that EY Germany's activities in the United States were akin to the operations of the Ford Motor Company needs no further refutation.  *See Ford Motor Co.*, 141 S. Ct. at 1022–23 (observing that Ford annually distributes over 2.5 million new vehicles in the United States, "engages in wide-ranging promotional activities," and maintains a network of dealers, "thus fostering an ongoing relationship between Ford and its customers").  On the contrary, even if the Court were to conclude that EY Germany had some contact with the forum (and EY Germany submits there was no such contact), the claims articulated in the CCAC do not arise from that contact, nor are they related to it.  That provides a sufficient basis to dismiss for lack of personal jurisdiction.

### III.    Wirecard's English-Language Annual Reports Do Not Render EY Germany Subject to Personal Jurisdiction.

The mere foreseeability that an out-of-forum act may have effects within the forum is insufficient to support personal jurisdiction, as the Supreme Court has "consistently held." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  Thus even if a foreign auditor knew or could foresee that U.S. investors would rely on its opinions, that is an insufficient basis for the exercise of personal jurisdiction.  *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341–

24

42 (2d Cir. 1972), *abrogated on other grounds*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010); *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1534–35 (10th Cir. 1996). As the Court previously recognized, "The fact that Wirecard, acting on its own, used [EY Germany's] audit materials in annual English language reports that were made available to potential American investors does not constitute deliberate contact with the forum by EY Germany." Op. 17.

This issue was thoroughly briefed by the parties prior to jurisdictional discovery. The two additional points that Plaintiffs offer cannot change the black-letter law: Unilateral acts by plaintiffs or third parties, even if resulting in foreseeable effects in the forum, cannot serve as the basis for personal jurisdiction. *Walden*, 571 U.S. at 291. First, Plaintiffs note that EY Germany knew that ADRs and F-shares traded in the United States prior to the publication of its final unqualified audit opinion on April 25, 2019 as a part of Wirecard AG's annual report. Br. 24; Pls.' Ex. 2, at 6 (admitting that "EY Germany knew of the existence of ADRs and F-shares traded in the United States after the commencement of this litigation"). Plaintiffs' suggestion that they needed jurisdictional discovery to obtain this information is bizarre. The first U.S. complaint against Wirecard on behalf of holders of ADRs and F-shares was filed in February of 2019. Compl. ¶ 7, *DalPogetto v. Wirecard AG*, No. 2:19-cv-00986 (C.D. Cal. Feb. 8, 2019). Then, in April 2019, Wirecard AG published its 2018 Annual Report, which disclosed litigation risks including the California lawsuit brought by holders of "unsponsored American depositary receipts issued by third parties."[13]   EY Germany reviewed this annual report, and thus became aware of the existence of ADRs and F-shares. None of these facts constitutes purposeful availment of the

_____

[13] Wirecard AG, *2018 Annual Report* at 113 (Apr. 2019), https://www.wirecard.com/wp-content/uploads/2020/12/Annual-Report-2018.pdf.

privilege of doing business in the United States.  To the contrary, as previously briefed, U.S. banks and brokers facilitated trading in unsponsored ADRs and F-shares without any involvement by EY Germany.  *See* Reply ISO MTD at 5–11, ECF No. 77; *see also* Pls.' Ex. 2, at 6 ("EY Germany did not provide any services to Wirecard in connection with ADRs or F-shares.").  It would turn the concept of purposeful availment on its head to exercise jurisdiction over EY Germany based on the unilateral acts of third parties and Plaintiffs to acquire financial instruments (ADRs and F-shares) that mirrored the price of Wirecard AG shares traded on the Frankfurt Stock Exchange.

Plaintiffs' second argument on this point is that EY Germany must have known Wirecard AG had U.S. investors, due to disclosures in Wirecard's annual reports as early as 2015.  Br. 24–25.[14]  This is even less probative than knowledge of ADRs and F-shares.  U.S. investors were free to acquire Wirecard AG shares on the Frankfurt Stock Exchange.  So it does not follow from disclosures that U.S. entities held Wirecard AG shares that any trades subject to U.S. securities laws had occurred.  Ultimately, this is all beside the point.  Even if EY Germany had known from an early date that U.S. investors were trading in financial instruments that tracked the price of Wirecard AG shares on the Frankfurt Stock Exchange, that would not constitute purposeful availment of the U.S. market.  EY Germany provided its audit opinions to its German client, Wirecard AG.  The subsequent acts of Wirecard or U.S.-based third parties, even if foreseeable, are legally insufficient to subject EY Germany to personal jurisdiction.

## IV.     Exercising Jurisdiction Over EY Germany Would Be Unreasonable.

In addition to purposeful availment and a strong relationship between the forum contacts and the litigation, the exercise of personal jurisdiction also requires a finding that "exercise of

---

[14] Again, the relevant reports were published years before Plaintiffs sought jurisdictional discovery, so it is unclear why Plaintiffs now make this argument for the first time.

jurisdiction would otherwise comport with 'traditional notions of fair play and substantial justice.'" *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The inquiry turns on "jurisdictional reasonableness." *Id.* Plaintiffs contend that exercising jurisdiction promotes the "policy of preventing foreign entities from conducting fraud on U.S. soil." Br. 25. As discussed above, however, Plaintiffs have not alleged that EY Germany conducted any fraud in the United States.

Balancing the relevant interests demonstrates that it would be unreasonable to exercise specific jurisdiction over EY Germany. *Cf. Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987) (listing and balancing the relevant factors). The United States has only a limited interest in protecting investors who voluntarily seek out instruments that track the prices of securities traded on foreign exchanges. Adjudicating this dispute in the United States would not provide an efficient mode of resolution, given the foreign locus of all the potentially relevant conduct. Nor would adjudicating this dispute in the United States afford adequate consideration to the interests of Germany, where substantial regulatory proceedings and civil litigation related to the collapse of Wirecard AG have already occurred and remain ongoing. Finally, the burden on EY Germany to defend this litigation in the United States—with documents and witnesses that are entirely located abroad—would be extreme.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Consolidated Class Action Complaint against EY Germany for lack of personal jurisdiction. In addition, the Court should dismiss for lack of proper service, under the doctrine of *forum non conveniens*, and for failure to state a claim. *See* ECF No. 64-1, at 9–11, 18–35.

Dated: June 28, 2023

Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

 /s/ Craig D. Singer
Craig D. Singer (PA State Bar No. 71394)
Steven M. Farina (admitted *pro hac vice*)
George A. Borden (admitted *pro hac vice*)
Amanda M. MacDonald (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
csinger@wc.com
sfarina@wc.com
gborden@wc.com
amacdonald@wc.com

*Attorneys for Defendant Ernst & Young GmbH Wirtschaftsprüfungsgesellschaft*

## CERTIFICATE OF SERVICE

I, Craig D. Singer, hereby certify that on this 28th day of June, 2023, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system. The foregoing is available for viewing and downloading from the CM/ECF system, which will also send email notification of such filing to all attorneys of record in this action.

                                        /s/   Craig D. Singer

29