UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re WIRECARD AG SECURITIES LITIGATION | ) ) ) ) | Civ. Action No. 2:20-cv-03326-AB |
| | | CLASS ACTION |
| This Document Relates To: | ) ) ) | REPLY IN SUPPORT OF LEAD PLAINTIFFS' SUPPLEMENTAL |
| ALL ACTIONS. | ) ) ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PERSONAL JURISDICTION #64 |

4866-9394-6737.v1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARDS ..........................................................................................2

III.   ARGUMENT..........................................................................................................3

      A.     EY Germany Purposefully Availed Itself of the Forum of the U.S. by
            Deliberately Reaching out to Do Business Here......................................................3

            1.     EY Germany Made a Site Visit to Wirecard North America in
                 December 2017 in Connection with Its Audit of Wirecard ........................4

            2.     EY Germany Engaged EY U.S. to Audit Wirecard North America............6

            3.     EY Germany Controlled EY U.S.' Auditing Work of Wirecard
                 North America .............................................................................................7

             4.     EY Germany Performed Auditing Work Directly on Wirecard
                 North America .............................................................................................9

             5.     The Cases Cited by EY Germany Are Inapposite, and
                 EY Germany's Attempt to Distinguish Plaintiffs' Cited Cases Fails........11

      B.     EY Germany's Contacts with the U.S. Are Related to Plaintiffs' Claims
             Against EY Germany ............................................................................................13

             1.     Allegations Connecting Wirecard North America to the Citigroup
                 Customer Portfolio....................................................................................14

             2.     Allegations Connecting the Citigroup Customer Portfolio to
                 Wirecard's Round-Tripping Scheme .........................................................15

             3.     Allegations Connecting Wirecard North America, the Citigroup
                 Customer Portfolio, and Wirecard's Round-Tripping Scheme to
                 EY Germany's Alleged False and Misleading Statements and
                 Audit Failures...........................................................................................16

             4.     EY Germany Downplays Kurniawan's Significance to the
                 Jurisdictional Analysis .............................................................................17

      C.     EY Germany's Knowledge that Wirecard's Largest Investor Base Was in
             the U.S. Supports a Finding that Exercising Personal Jurisdiction Is Proper........18

      D.     Exercising Jurisdiction Comports with Traditional Notions of Fair Play
             and Substantial Justice .........................................................................................20

IV.    CONCLUSION.....................................................................................................21

4866-9394-6737.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Allaham v. Naddaf,*
 635 F. App'x 32 (3d Cir. 2015) ....................................................................................11

*Burger King Corp. v. Rudzewicz,*
 471 U.S. 462 (1985) ............................................................................................. *passim*

*Carteret Sav. Bank, FA v. Shushan,*
 954 F.2d 141 (3d Cir. 1992) ....................................................................................12, 13

*Control Screening LLC v. Tech. Application & Prod. Co. (Tecapro), HCMC-Vietnam,*
 687 F.3d 163 (3d Cir. 2012) .........................................................................................2

*D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.,*
 566 F.3d 94 (3d Cir. 2009) ...........................................................................................2

*Dennis v. City of Phila.,*
 19 F.4th 279 (3d Cir. 2021) .........................................................................................16

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.),*
 683 F. Supp. 1463 (S.D.N.Y. 1988) .............................................................................12

*First Am. Corp. v. Price Waterhouse LLP,*
 988 F. Supp. 353 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 16 (2d Cir. 1998) .....................................8

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
 _ U.S. _, 141 S. Ct. 1017 (2021) .................................................................................. *passim*

*GCIU-Employer Ret. Fund v. Coleridge Fine Arts,*
 700 F. App'x 865 (10th Cir. 2017) ...............................................................................11

*Gen. Elec. Co. v. Deutz AG,*
 270 F.3d 144 (3d Cir. 2001) ...........................................................................................9

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
 564 U.S. 915 (2011) ....................................................................................................12

*Hanson v. Denckla,*
 357 U.S. 235 (1958) .......................................................................................................9

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
 466 U.S. 408 (1984) .....................................................................................................11

*Hepp v. Facebook,*
 14 F.4th 204 (3d Cir. 2021) .......................................................................................3, 5

4866-9394-6737.v1

**Page**

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003)................................................................................................2

*Leasco Data Processing Equip. Co. v. Maxwell*,
    468 F.2d 1326 (2d Cir. 1976)............................................................................................18

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. __, 143 S. Ct. 2028 (2023)...................................................................................8

*Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*,
    960 F.2d 1217 (3d Cir. 1992)..............................................................................................3

*Metcalfe v. Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009)................................................................................................2

*Miller Yacht Sales, Inc. v. Smith*,
    384 F.3d 93 (3d Cir. 2004)..................................................................................................7

*O'Connor v. Sandy Lane Hotel Co.*,
    496 F.3d 312 (3d Cir. 2007).......................................................................................passim

*OmniWind Energy Sys., Inc. v. Redo*,
    2015 WL 790101 (E.D. Pa. Feb. 24, 2015) .....................................................................20

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002)....................................................................................4, 18, 20

*Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*,
    911 F.3d 192 (4th Cir. 2018) ............................................................................................11

*Stoyas v. Toshiba Corp.*,
    424 F. Supp. 3d 821 (C.D. Cal. 2020) .............................................................................18

*Thompson Hine, LLP v. Taieb*,
    734 F.3d 1187 (D.C. Cir. 2013)........................................................................................11

*Victaulic Co. v. HiTerm, LLC*,
    2022 WL 2953690 (E.D. Pa. July 26, 2022).....................................................................12

*Walden v. Fiore*,
    571 U. S. 277 (2014).....................................................................................................13, 19

- iii -

4866-9394-6737.v1

## I.    INTRODUCTION[1]

Plaintiffs' Supplemental Brief demonstrates that this Court may exercise jurisdiction over EY Germany.  Jurisdictional discovery made clear that EY Germany was not only physically present in the U.S., but also repeatedly directed auditing activities toward the U.S. in its capacity as group auditor of Wirecard.  Jurisdictional discovery also shed additional light on the connection between Wirecard's acquisition of Wirecard North America and a customer portfolio from Citigroup in 2017.  The evidence presented by Plaintiffs demonstrates that, among other relevant contacts, a key player in Wirecard's fraudulent round-tripping activities in Asia was actively involved in the purchase of Wirecard North America.  He was not only present at EY Germany's site visit to Wirecard North America, but he also created the PowerPoint presentation that Wirecard North America presented to EY U.S. and EY Germany regarding Wirecard's goals for Wirecard North America's role in the greater Wirecard Group.

Unable to hide from the evidence, Defendant Ernst & Young Gmbh Wirtschaftsprüfungsgesellschaft's Supplemental Memorandum Regarding Personal Jurisdiction (ECF 110) ("EY Germany Br.") either downplays its importance or ignores facts entirely. EY Germany also seeks to distort the legal standards controlling the jurisdictional inquiry. Specifically, EY Germany conflates the requirements to show minimum contacts with what is required to show relatedness, seeks to impose the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") on a motion governed by Federal Rule of Civil Procedure 8, asks the Court to make improper merits determinations when assessing the threshold issue of jurisdiction, and improperly asks the Court to draw inferences in its favor.  Then,

---

[1]    All terms not defined herein have the same meaning as in Lead Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of Personal Jurisdiction #64 (ECF 100) ("Supplemental Brief" or "Supp. Br.").

while ignoring allegations clearly set forth in Plaintiffs' complaint (most notably, the false and misleading statements that Plaintiffs attributed to EY Germany), EY Germany suggests that the evidence revealed through jurisdictional discovery was unrelated to Plaintiffs' theory of the fraud. But EY Germany cannot escape the reality that it perpetuated one of the largest frauds in the modern era, and that the fraud extended into the U.S. both through EY Germany's own activities and the harm inflicted on U.S. investors.

For the reasons set forth in the Supplemental Brief, this Reply, and the Opposition to the Motion to Dismiss, EY Germany's Motion to Dismiss should be denied.

## II.  LEGAL STANDARDS

In the absence of an evidentiary hearing, "'plaintiff[] need only establish a prima facie case of personal jurisdiction,'" and the "'court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff.'" *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009); *see In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).[2]  It is within a court's discretion to decide whether to hold an evidentiary hearing to decide personal jurisdiction.  A court "cannot have abused its discretion for 'refusing' to do something that it was not required to do and that [a party] never requested." *Control Screening LLC v. Tech. Application & Prod. Co. (Tecapro), HCMC-Vietnam*, 687 F.3d 163, 169 n.3 (3d Cir. 2012).  Here, neither party has requested an evidentiary hearing.

As EY Germany agrees: "The threshold inquiry for specific jurisdiction is whether the defendant has 'purposefully directed its activities at the forum.'" EY Germany Br. at 11 (quoting *D'Jamoos ex  rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009)). The second requirement of relatedness is subject to a separate inquiry.  *O'Connor v. Sandy Lane*

---

[2]  All citations and footnotes omitted and emphasis added unless otherwise indicated.

*Hotel Co.*, 496 F.3d 312, 323 (3d Cir. 2007) ("[r]elatedness is an independent constitutional mandate").  This "requirement of a 'connection' between a plaintiff's suit and a defendant's activities" necessary for the exercise of personal jurisdiction does not require causation, rather there must be "a strong 'relationship among the defendant, the forum, and the litigation.'"  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, _ U.S. _, 141 S. Ct. 1017, 1026, 1028 (2021).

Finally, EY Germany fails to acknowledge, much less meet, its burden, once Plaintiffs have demonstrated purposeful availment and relatedness, to demonstrate that the exercise of personal jurisdiction would be unreasonable.  *See Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1226 (3d Cir. 1992); *see also Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021) (discussing "two prongs to the specific jurisdiction analysis").

Because EY Germany fails to apply the proper legal standards, its arguments against the Court's exercise of personal jurisdiction fail as well.

## III.   ARGUMENT

Contrary to controlling legal standards, EY Germany presumes that all factual inferences should be drawn in its favor.  For example, EY Germany incorrectly asserts that the Court should ignore the plain language of documents establishing that EY U.S. was indeed "engaged" by EY Germany, without offering any plausible alternative interpretation for the documents submitted.  EY Germany Br. at 16.  EY Germany also misleadingly and repeatedly states that the fraud alleged by Plaintiffs did not take place in the U.S. and complains that it would be unfair to hold EY Germany liable in the U.S. despite its repeated contacts here and evidence that it is not difficult for it to litigate in this forum.  EY Germany is wrong on all counts.

### A.    EY Germany Purposefully Availed Itself of the Forum of the U.S. by Deliberately Reaching out to Do Business Here

EY Germany does not, and cannot, deny that it deliberately reached out to the U.S. to conduct business here by, for example, making the December 2017 site visit to Wirecard North

America.    Instead, EY Germany provides factually unsupported and legally irrelevant characterizations of its undisputed U.S. contacts.

### 1.    EY Germany Made a Site Visit to Wirecard North America in December 2017 in Connection with Its Audit of Wirecard

As explained by the Third Circuit in *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361 (3d Cir. 2002): "In assessing whether a commercial entity has availed itself of the privileges of a forum's laws, jurisdiction is proper if the defendant has taken 'action . . . purposefully directed toward the forum State.'"  *Id.* at 370 (alteration in original).  That threshold is met here not just because of the December 2017 site visit (which alone is sufficient to establish personal jurisdiction), but also because of other deliberate contacts that EY Germany made with the U.S.  These contacts must be considered as a whole, and not in isolation as EY Germany suggests.  *See Ford*, 141 S. Ct. at 1031 (analyzing all of Ford's contacts with the forum).

The evidence adduced in connection with jurisdictional discovery undisputedly shows that, in December 2017, EY Germany's lead partner on the Wirecard account, Andreas Loetscher ("Loetscher"), along with the main contact for EY U.S. at EY Germany and another EY Germany employee, made a site visit to Pennsylvania in connection with EY Germany's audit of Wirecard. *See, e.g.*, Supp. Br. at 3-7, 12-13.  Yet EY Germany continues to submit that it did not even have "some contact with the forum."  EY Germany Br. at 24.

Moreover, EY Germany ignores the evidence Plaintiffs presented and even the post-discovery declaration of its own witness, Loetscher.  It was EY Germany's own contemporaneous documents that stated: "EY as Group Auditor of Wirecard" was "here" in Conshohocken for the "[f]ull scope audit of Wirecard NA as of 31 December 2017."  Ex. 3 at 270[3]; *cf.* EY Germany Br.

---

[3]    All "Ex. _" citations herein are to the Declaration of Shawn A. Williams in Support of the Supplemental Brief (ECF 100-1) unless otherwise indicated.

at 5.  The contemporaneous evidence from December 2017 shows that the "main focus of the site visit" was for members of Wirecard North America, EY U.S., and EY Germany to discuss auditing matters such as revenue recognition and the "[m]ost significant balance sheet items."  Ex. 3 at 267. EY Germany mischaracterizes EY Germany's PowerPoint presentation at the December 2017 site visit by claiming the slide deck shows "the site visit was a meet-and-greet event."  EY Germany Br. at 5.  But this begs the question: For what purpose were the parties meeting and greeting other than to carry out audit-related activities?  *See id.* at 5-6.  In any case, EY Germany's characterization is irrelevant.  The question is not whether EY Germany conducted "substantive audit work" (EY Germany Br. at 14, 17, 19) in the U.S. but whether there are "minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state."  *Hepp*, 14 F.4th at 207.[4]    The site visit was such a deliberate act, during which EY Germany made numerous detailed inquiries of Wirecard North America about its business, its accounting, and auditing.  Ex. 3 at 272-291.  Finally, EY Germany's characterization of the site visit is not even consistent with the Loetscher declaration filed simultaneously therewith.  ECF 110-1.  As Loetscher explained: "The principal purpose of the site visit was for myself and other members of the EY Germany team to meet with representatives from EY U.S. and WNA *to ensure that all parties were prepared for the upcoming component audit*."  *Id.*, ¶15.  Thus, the Loetscher declaration provides additional evidence of EY Germany's direct involvement in the audit of Wirecard North America while in the U.S.[5]

---

[4]    Moreover, whether or not the site visit was related to the audit is irrelevant to the first step of the minimum contacts inquiry.  *See Sandy Lane*, 496 F.3d at 323 ("[r]elatedness is an independent constitutional mandate").

[5]    Additionally, EY Germany's direct involvement in the site visit to initiate the Wirecard audit also constitutes "[t]he doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts" under the Pennsylvania long-arm statute.  42 Pa. Consol. Stat. Ann. §5322.

As part of its implausible denial that the December 2017 site visit was connected to the audit, EY Germany also asserts: "[I]t was prudent for EY Germany to meet the component audit team at EY U.S. and to learn about the WNA business so that EY Germany would better understand the deliverables produced." EY Germany Br. at 15. But by explaining that it was "prudent" for EY Germany to visit the U.S., EY Germany concedes that it deliberately targeted the forum. *See Shady Lane*, 496 F.3d at 317. EY Germany's visit to the U.S. was its "own choice and not 'random, isolated, or fortuitous.'" *Ford*, 141 S. Ct. at 1025.

EY Germany also misrepresents Plaintiffs' arguments about the relevance of the site visit to the personal jurisdiction inquiry. First, EY Germany claims that the fact Edo Kurniawan ("Kurniawan") was at the site visit does not support a finding of purposeful availment by EY Germany. EY Germany Br. at 6. As explained below, Kurniawan's critical role in the December 2017 site visit, whether he presented or not, is relevant to the relatedness prong of the personal jurisdiction inquiry, not the minimum contacts prong, and is but one of many examples of EY Germany's attempt to blur legal standards. Additionally, EY Germany misunderstands the relevance of Wirecard CFO von Knoop's statements at the Capital Markets Day in New York. There, in direct contrast to EY Germany's unsupported assertions that the December 2017 site visit was an insubstantial meet-and-greet that had nothing to do with an audit, von Knoop explained that "on-site visits" were a critical part of the "full scope audit by our group auditors of EY" of Wirecard's subsidiaries and further illustrates how EY Germany's role as group auditor would have influenced U.S. investors' decision to purchase Wirecard securities, thereby supporting a showing of relatedness to Plaintiffs' claims. Ex. 26 at 31.

### 2. EY Germany Engaged EY U.S. to Audit Wirecard North America

Plaintiffs set forth numerous facts supporting their showing that EY Germany engaged EY U.S. to audit Wirecard North America. Supp. Br. at 7-8, 14-15. Plaintiffs' "argument" on this

- 6 -

point relies on language that was repeated throughout EY Germany's production that: "We [EY U.S.] have been engaged by EY Germany (EY Primary Team) to perform a full scope audit." Exs. 10-11; Ex. 12 at 750. EY Germany asks the Court to ignore the facts in evidence and draw inferences in its favor, contrary to controlling legal standards. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

EY Germany argues that it did not ***formally*** retain EY U.S. to audit Wirecard North America and that it was Wirecard North America that retained EY U.S. EY Germany Br. at 16. But there is no requirement that there be a formal contract of engagement for personal jurisdiction to be found. Rather, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). And here, the late-filed Loetscher declaration tends to show that EY Germany reached out to the U.S. to engage EY U.S. to audit Wirecard North America. As Loetscher explained: "Under ISA [International Standards on Auditing] 600 and ISA 220, EY Germany was required to determine whether the component auditors had the appropriate competence and capabilities to perform the component audit work." ECF 110-1, ¶13. Drawing factual inferences in Plaintiffs' favor, this statement by Loetscher supports Plaintiffs' claim that EY Germany reached out to EY U.S. as part of the process that led to EY U.S. auditing Wirecard North America. By meeting auditing standards that required EY Germany to create a continuing relationship with EY U.S. and Wirecard North America, EY Germany subjected itself to personal jurisdiction in the U.S.

### 3. EY Germany Controlled EY U.S.' Auditing Work of Wirecard North America

EY Germany directed and controlled EY U.S.' auditing work of Wirecard North America. Its brief tries to avoid this result by denying the results of jurisdictional discovery and positing a parade of horribles not connected to the facts of this case. As the Court recognized in its Order

- 7 -

granting Plaintiffs' motion for reconsideration: "Plaintiffs made a request for jurisdictional discovery on the basis of 'factual allegations that suggest "with reasonable particularity" the possible existence of the requisite [contacts]' following up on 'information known' to Plaintiffs, namely the interaction between EY Germany and EY U.S. as stated in the Declaration of Annedore Streyl." ECF 95 at 1 n.1 (alteration in original). EY Germany's suggestion that the details about how it directed and controlled EY U.S.' audit of Wirecard North America cannot suffice to establish personal jurisdiction is thus inconsistent with the Court's prior Order. The evidence presented by Plaintiffs shows that the audit of Wirecard North America was a collaborative effort between EY Germany and EY U.S. and based on EY Germany's detailed instructions. *See* Supp. Br. at 7-9. Other courts have found that similarly detailed interoffice instructions support a finding of personal jurisdiction – analysis that EY Germany does not address. *First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 363 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 16 (2d Cir. 1998); *see* Supp. Br. at 15-17.

EY Germany's worry that if personal jurisdiction is found in this case, then any auditor of a corporate group with a U.S. subsidiary would be subjected to U.S. jurisdiction ignores the evidence and fails on its face. Specific jurisdiction expands the scope of cases a court may hear, so long as it is fair and foreseeable to foreign defendants. *Burger King*, 471 U.S. at 474; *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. __, 143 S. Ct. 2028, 2039-40 (2023) (plurality). EY Germany does not deny that it set the materiality threshold EY U.S. used to perform its audit of Wirecard North America or that EY U.S. relied on EY Germany to audit certain parts of Wirecard North America. Supp. Br. at 8-9. Additionally, EY Germany's argument is internally inconsistent. It admits that its actions in instructing component audit firms under the applicable

international standards was merely encouraged – *i.e.*, optional.[6]  Therefore, EY Germany admits again that its contacts with the U.S. were its "own choice and not 'random, isolated, or fortuitous.'" *Ford*, 141 S. Ct. at 1025.

### 4.    EY Germany Performed Auditing Work Directly on Wirecard North America

EY Germany does not dispute that it performed auditing work on Wirecard North America. Instead, it suggests, citing *Hanson v. Denckla*, 357 U.S. 235 (1958), that physical presence in the forum is required for the minimum contacts analysis.  EY Germany Br. at 17.  For the reasons explained above in the discussion of the December 2017 site visit, Plaintiffs have demonstrated that EY Germany did perform work related to the Wirecard audit in the U.S.  However, it has long been recognized that:

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not ***physically*** enter the forum State.  Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.  So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King*, 471 U.S. at 476 (emphasis in original); *see also Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150-51 (3d Cir. 2001) ("The record here demonstrates both physical contacts and a deliberate assumption of long-term obligations.").  Here, EY Germany does not address the

---

[6]    And even if certain work was "required" by the applicable international auditing standards, such as the setting of materiality thresholds for component auditors, it does not change the fact that EY Germany deliberately reached out to the U.S. and directed those aspects of EY U.S.' audits.  When EY Germany chose to instruct EY U.S. to conduct the Wirecard North America audit, it knew it would have been required, as group auditor, to direct certain auditing activities toward the U.S.  Being subject to jurisdiction in the U.S. is one of the "consequences of their activities." *Burger King*, 471 U.S. at 473.

4866-9394-6737.v1

evidence Plaintiffs provided of substantial and frequent communication between EY Germany and EY U.S. via numerous means, including email and conference calls.  Supp. Br. at 9.

And here, Plaintiffs have provided evidence that EY Germany "purposefully directed" its efforts to the U.S. in auditing Wirecard North America.  For example, while EY Germany's argument discusses how it audited the purchase price allocation ("PPA") in Germany (EY Germany Br. at 17-18), it neglects to mention that it sent its audited results to EY U.S. (*Id.* at 8) for EY U.S. to rely on, which is a purposeful contact in and of itself, even if other entities were involved in that process as well.  As EY Germany explained during the December 2017 site visit: "The (preliminary) PPA [Purchase Price Allocation for WNA] was prepared centrally by Wirecard and audited centrally by EY Germany – Wirecard Group Accounting communicated the (preliminary) PPA results to Wirecard [North America] management and EY Germany provides EY USA with reliance on the PPA amount."  Ex. 3 at 284, 287.  EY Germany also claims when EY U.S. stated: "'[I]ntercompany balances [had] been confirmed with the EY Primary team," that meant: "EY U.S. confirmed the balance on the WNA books and the Primary Team was responsible for confirming it with the other Wirecard entity elsewhere."  EY Germany Br. at 9.  But EY Germany offers no support for this factual inference and it should be denied.

EY Germany does not deny that it did goodwill impairment analysis on Wirecard North America, merely making the non-dispositive point that it did that work in Germany.  EY Germany Br. at 18-19.  Moreover, contrary to EY Germany's assertion, EY U.S. explicitly explained that it did not audit goodwill impairment in part because EY Germany did that work.  For example, in its December 31, 2017 Audit Strategies Memorandum, EY U.S. explained: "We further note that impairment on goodwill and material business combinations are the responsibility of Wirecard Group and therefore the respective audit procedures will be performed by the EY primary team. As a result, we have not included related procedures in our audit approach."  Ex. 21 at 402.

- 10 -

**5.    The Cases Cited by EY Germany Are Inapposite, and EY Germany's Attempt to Distinguish Plaintiffs' Cited Cases Fails**

None of EY Germany's (out-of-circuit or non-precedential) cited cases negates a finding that EY Germany made sufficient minimum contacts with the U.S.  In *GCIU-Employer Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865 (10th Cir. 2017), the Fourth Circuit actually reversed and remanded the district court's dismissal of a pension suit for lack of personal jurisdiction based on an analysis of the relatedness prong that predated and was rejected in *Ford*.  *Id.* at 871. Similarly, unlike here, in *Allaham v. Naddaf*, 635 F. App'x 32 (3d Cir. 2015), the Third Circuit found that evidence of multiple visits to Pennsylvania did not establish personal jurisdiction because the plaintiff "admitted that he did not know why [the defendant] had traveled to Pennsylvania, and could not connect any of these trips to the contract at issue." *Id.* at 41.[7]  These cases illustrate EY Germany's improper conflation of the two jurisdictional requirements and their independent standards.

The other cases cited by EY Germany are equally unpersuasive.  *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192 (4th Cir. 2018), involved "primarily social" visits and "[o]ne, 'at most,' involved an informal and limited business discussion." *Id.* at 196.  At issue here is a formal site visit with numerous corporate-branded presentations that lasted a day and a half, in addition to numerous other contacts discussed above.  *See* ECF 110-1, ¶¶15-16.  The D.C. Circuit's opinion in *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013), is similarly inapplicable.  Among other distinguishing features, there were no site visits that were factored into the personal jurisdiction analysis.  *Id*. at 1193.[8]

---

[7]    Both *Coleridge* and *Allaham* turned not on the minimum contacts inquiry but on the relatedness prong of the personal jurisdiction inquiry.

[8]    EY Germany's citation to *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984), is irrelevant as Plaintiffs do not need to show that EY Germany had contacts with the

4866-9394-6737.v1

On the other hand, EY Germany's extended efforts to distinguish the cases cited by Plaintiffs in support of personal jurisdiction fail. The facts in *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 683 F. Supp. 1463, 1470 (S.D.N.Y. 1988), are virtually indistinguishable from those presented here. In that case brought under §10(b), the plaintiff sued, among others, a foreign auditor and the U.K. and Irish branches of the Arthur Andersen accounting firm. As here, the alleged fraud in *Dep't of Econ. Dev.* primarily concerned "questionable business transactions" involving entities in another country. *Id.* at 1469. As here, "Plaintiff has submitted numerous documents and 'Interoffice Communications' from AA-US to AA-UK and AA-Ireland that indicate a greater supervisory role on the part of AA-US than mere ratification of the overseas audit work," including detailed instructions and additional investigations. *Id.* at 1470; *see* Ex. 6 at 418; Ex. 13 at 578; Ex. 14 at 1012; Exs. 15-17. And, as here, partners from the foreign auditors travelled to the U.S. to "transact business related to the audit." *Dep't of Econ. Dev.*, 83 F. Supp. at 1471 n.6.

EY Germany's efforts to distinguish *Victaulic Co. v. HiTerm, LLC*, 2022 WL 2953690 (E.D. Pa. July 26, 2022), and *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141 (3d Cir. 1992), not only fail but actually further strengthen Plaintiffs' case for personal jurisdiction. The court in *Victaulic* dismissed a defendant for lack of jurisdiction, but a critical factor for the court there was that there were no facts showing that defendant had "ever been to Pennsylvania for leisure or for business." 2022 WL 2953690, at *2-*3. Here, there is significant evidence that EY Germany visited Pennsylvania for both leisure and business on its December 2017 site visit. Similarly, in *Carteret*, while one of the plaintiff's claims took place entirely in New Jersey, the Third Circuit

---

state that "are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see* EY Germany Br. at 13.

4866-9394-6737.v1

was satisfied that sufficient minimum contacts existed because the defendant did not dispute that: "he telephoned and corresponded with Carteret managers in New Jersey or that he traveled to Roseland, New Jersey in May of 1985 to meet with Carteret management in preparation for the [deal] closing." *Carteret*, 954 F.2d at 149.  These are precisely the sorts of facts that characterize this case: Continued correspondence with the jurisdiction and one visit in preparation for the conduct at issue – in this case, the Wirecard audit.

**B.     EY Germany's Contacts with the U.S. Are Related to Plaintiffs' Claims Against EY Germany**

The "requirement of a 'connection' between a plaintiff's suit and a defendant's activities" in the forum need not be causal for personal jurisdiction to attach.  *Ford*, 141 S. Ct. at 1026. Nevertheless, Plaintiffs ***have*** established such a connection.  EY Germany's site visit was connected to the acquisition of Wirecard North America.  The acquisition of Wirecard North America was connected to the acquisition of the Citigroup customer portfolio in Asia, as established by contemporary documents.  Kurniawan's round-tripping scheme, as alleged by Plaintiffs and reported by the *Financial Times*, was in part carried out to facilitate the use of the Citigroup customer portfolio in Asia.  The round-tripping scheme was also directly tied to the falsification of customer revenues and receivables that Plaintiffs allege EY Germany failed to adequately audit, which rendered its audit opinions false and misleading.  This ""relationship among the defendant, the forum[s], and the litigation"" is close enough to support personal jurisdiction.  *Walden v. Fiore*, 571 U. S. 277, 284 (2014).  Moreover, the relationship between Wirecard North America, the Citigroup customer portfolio, Kurniawan, the falsification of revenues, and EY Germany's role in the fraud demonstrates the global scale of the Wirecard fraud.

- 13 -

EY Germany cannot bifurcate the auditing of Wirecard North America from its role in the larger fraud – it was a critical component.[9]

### 1. Allegations Connecting Wirecard North America to the Citigroup Customer Portfolio

Plaintiffs allege that Wirecard North America was considered one of Wirecard's "five key locations" and was part of Wirecard's "global growth strategy." ¶¶88-89. Plaintiffs also allege that much of Wirecard's revenue and customer growth before and during the Class Period was due to its acquisition of numerous companies and customers around the world, including the Citigroup customer portfolio. ¶87. Wirecard publicly explained that *both* Wirecard North America and the Citigroup customer portfolio were to be used in connection with Wirecard's Asian subsidiaries in countries where EY Germany agrees that fraud has been alleged. ¶89.

EY Germany accuses Plaintiffs of conflating the connection between Wirecard North America and the purchase of the Citigroup customer portfolio, but it was *EY Germany* that presented them together as a single key audit matter in its 2017 audit opinion. ECF 76-2 at 290. Even the documents on which EY Germany relies to suggest the acquisitions were separate deals describes them as a single "combined asset and share deal" involving both North American Operations and International Operations acquired from Citibank, N.A. (also based in the U.S.). Ex. 1 at 1065. The purchase of the North American business included international client contracts. ECF 111-2 at 1104 (identifying assets purchased as part of the Wirecard North America acquisition). That the purchase of the International Operations might have been structured as a

---

[9] EY Germany's suggestion, citing no authority, that Wirecard North America could not have been connected to the fraud because it was subsequently sold as part of Wirecard's bankruptcy proceeding, is irrelevant. EY Germany Br. at 10. Even assets that were part of a fraudulent scheme can be sold, and it is in precisely such circumstances in which courts lift the PSLRA discovery stay to preserve documents that may be lost in the sale. For this reason, Plaintiffs filed a motion to lift the PSLRA discovery stay in this action with respect to Wirecard North America. *See* ECF 49-1.

- 14 -

separate transaction from the North American Operations does not change the fact that the two transactions were part of the same deal and therefore related to each other, as well as that Wirecard publicly proclaimed Wirecard North America and the Asian Citigroup business would be used in connection with each other and the acquisitions were related to each other as part of Wirecard's "global growth strategy." ¶89; *see* Supp. Br. at 22 (quoting Wirecard 2017 annual report); EY Germany Br. at 23 n.12 (citing press release noting Citigroup customer portfolio was part of acquiring business). Plaintiffs did not manufacture this connection – Wirecard and EY Germany did.

### 2. Allegations Connecting the Citigroup Customer Portfolio to Wirecard's Round-Tripping Scheme

Plaintiffs allege that Wirecard's fraudulent round-tripping activities in Asia were related to Wirecard's purchase of the Citigroup customer portfolio. ¶¶130-135. Specifically, Plaintiffs allege that in January 2018 (just one month after the Wirecard North America site visit), Kurniawan led a meeting in which he orchestrated a plan to round trip several million euros from Wirecard in Germany, through entities in Hong Kong, and ultimately onto Wirecard's Indian business. ¶130. As part of this scheme, Kurniawan needed to "fool the Hong Kong Monetary Authority into issuing a license to Wirecard so it could sell prepaid credit cards in the region." ¶131. "This regulatory approval was crucial to the Company's plan to take over Citigroup's business in Asia, which Wirecard agreed to buy from the United States bank in 2017," *i.e.*, the Citigroup customer portfolio. *Id.*

EY Germany ignores these allegations, purporting that because the international customer portfolios were not a part of Wirecard North America, there was no auditing of them done in the U.S. EY Germany Br. at 23. But this argument fails because it "merely restates [EY's] demand for an exclusively causal test of connection – which [the Supreme Court has] already shown inconsistent with [its] caselaw." *Ford*, 141 S. Ct. at 1029; *see Sandy Lane*, 496 F.3d at 324 ("Our

- 15 -

relatedness analysis, however, requires neither proximate causation nor substantive relevance.");

*see also Burger King*, 471 U.S. at 476 (physical presence in the forum not required).

> **3.    Allegations Connecting Wirecard North America, the Citigroup Customer Portfolio, and Wirecard's Round-Tripping Scheme to EY Germany's Alleged False and Misleading Statements and Audit Failures**

Plaintiffs' Complaint directly ties Wirecard's round-tripping scheme to allegedly false and misleading statements, as well as audit failures made by EY Germany. ¶¶130-134. Specifically, Plaintiffs alleged that the scheme implicated two executives in Singapore who had exchanged emails with EY Germany concerning the falsification of €4 million in revenue. ¶132. The Singaporean executives informed EY Germany that the revenue came from a new client engaged in 2017, but it was later revealed that the supposed client had never even heard of Wirecard. *Id.*

EY Germany's failure to gather sufficient independent audit evidence was an alleged audit failure and is one example of why EY Germany's statement in the 2017 annual report that EY Germany "[o]btain[ed] sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group" was false and misleading. ¶¶258, 318, 323. EY Germany's contention that "none of the audit failures that Plaintiffs allege bears any connection to the WNA component audit" (EY Germany Br. at 20) is thus wrong because it ignores the alleged audit failures that were related to Kurniawan's round-tripping scheme, which was related to both Wirecard North America and the Citigroup customer portfolio.

In fact, in analyzing Plaintiffs' claims against EY Germany, EY Germany repeatedly and selectively ignores the false and misleading statements alleged. EY Germany Br. at 20 (identifying purportedly relevant paragraphs from the Complaint); *see Dennis v. City of Phila.*, 19 F.4th 279, 291 (3d Cir. 2021) (recognizing "the longstanding principle that the plaintiff, as the master of the complaint, is free to choose between legal theories"). Plaintiffs allege EY Germany made false and misleading statements concerning the acquisition of Wirecard North America and the

- 16 -

4866-9394-6737.v1

Citigroup customer portfolio and the valuation of customer relationships and recoverability of receivables, as well as recognition and presentation of revenues from acquiring partners.  ¶¶317, 323.  Plaintiffs also allege that EY Germany falsely and misleadingly stated it maintained "professional skepticism" in reviewing Wirecard's financials and that it not only "[i]dentif[ied] and assess[ed] the risks of material misstatement of the consolidated financial statements and of the group management report, whether due to fraud or error," but also that it "design[ed] and perform[ed] audit procedures responsive to those risks, and *obtain[ed] audit evidence that is sufficient and appropriate to provide a basis for our opinions*."  ¶318.  Plaintiffs alleged why these statements were false and misleading, which include that EY Germany knew or recklessly disregarded and failed to disclose that EY Germany had failed to comply with numerous applicable accounting standards.  ¶¶258, 323.  Plaintiffs' securities fraud claims thus arise from EY Germany's U.S. contacts or, at the very least, "'relate to the defendant's contacts' with the forum." *Ford*, 141 S. Ct. at 1025.

### 4. EY Germany Downplays Kurniawan's Significance to the Jurisdictional Analysis

As set forth in Plaintiffs' Supplemental Brief, Kurniawan was present at the December 2017 site visit, and by early 2017 he had already traveled to the U.S. in connection with the purchase of Wirecard North America. Ex. 2 at 4; Ex. 5 at 136-137.  The December 2017 site visit was a week after Loetscher and Kurniawan had met in India at the site of another company acquired by Wirecard, which EY Germany recognizes as part of the fraud Plaintiffs have alleged. Ex. 5 at 154; *see, e.g.*, ¶¶87, 105-116; EY Germany Br. at 20.  However, EY Germany conveniently ignores the evidence that Kurniawan was more than just present at the Wirecard North America site visit – he *created* Wirecard's PowerPoint that was presented at the site visit. Ex. 8.  That Kurniawan didn't personally deliver the presentation is irrelevant.

- 17 -

EY Germany's suggestion that Kurniawan needed to do more on U.S. soil in order to relate EY Germany's contacts with the U.S. to the claims brought against EY Germany again seeks to mandate the direct causal chain rejected by the Supreme Court in *Ford* and the Third Circuit in *Sandy Lane*. Though none is required, Kurniawan's role in both the site visit and greater Wirecard fraud creates a causal chain between Wirecard North America (and EY Germany's auditing activity in the U.S.) to the fraud Plaintiffs alleged against both EY Germany and Wirecard.

### C.      EY Germany's Knowledge that Wirecard's Largest Investor Base Was in the U.S. Supports a Finding that Exercising Personal Jurisdiction Is Proper

Plaintiffs have set forth facts that show EY Germany contemporaneously conceded it knew Wirecard's largest investor base was in the U.S. *See* Supp. Br., §V.C. Thus, unlike the auditor in *Leasco Data Processing Equip. Co. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1976), it was not reasonable for EY Germany to believe the effects of its audits would have been contained to German buyers in the German market. *See* ECF 87 at 12 (Court analyzing *Leasco* in granting EY Germany's motion to dismiss). When an auditor is aware that its client touts its largest investor base as being from America and knows those institutional investors have substantial funds invested in the client, then being brought into court in the U.S. for related harms is reasonably foreseeable. Despite EY Germany's suggestion it had to specifically know "trades subject to U.S. securities laws had occurred" (EY Germany Br. at 26), in *Pinker,* the Third Circuit recognized: "[I]t would appear that the alleged fraudulent misstatements . . . would violate the disclosure requirements of ***any*** securities regulatory regime." 292 F.3d at 372.[10]   Accordingly, EY Germany knew U.S.

---

[10]   And even claims pursuant to foreign securities laws have been subject to the jurisdiction of U.S. courts. *See, e.g.*, *Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 829 (C.D. Cal. 2020) (upholding claims brought on behalf of U.S. citizens purchasing ADRs and Toshiba common stock pursuant to both U.S. and Japanese securities laws).

4866-9394-6737.v1

investors could be harmed by its audits and risked losing millions of dollars in the event EY Germany issued false and misleading statements related to those investments.

Citing the Supreme Court's holding in *Walden*, EY Germany posits that, even if it were foreseeable that U.S. investors would rely upon and be harmed by its audit opinions, such foreseeable results in the forum cannot serve as the basis for personal jurisdiction. EY Germany Br. at 25. EY Germany again misses the point and adopts the very argument the Supreme Court rejected in *Ford*. Like in *Ford*: "*Walden* has precious little to do with the case[] before us. In *Walden*, only the plaintiffs had any contacts with the [forum state]; the defendant-officer had never taken any act to 'form a contact' of his own. The officer had 'never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [the forum].'" *Ford*, 141 S. Ct. at 1031. By contrast, here, EY Germany made its own contacts with the U.S. separate from the issuance of its audit opinions, both through its auditing work of Wirecard North America and specifically visiting the U.S. for that work.

Moreover, EY Germany's knowledge of Wirecard's U.S. investor base also supports the relatedness inquiry. As the Supreme Court noted: "[S]o what if (as *Walden* held) the place of a plaintiff's injury and residence cannot create a defendant's contact with the forum State? Those places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit." *Id.* at 1031-32. Here, where Plaintiffs have established that their allegations against EY Germany were related to its auditing activities in the U.S., the Court cannot ignore that the harm from the issuance of EY Germany's false and misleading audit opinions was felt by Plaintiffs on U.S. soil in conducting the relatedness inquiry required for personal jurisdiction. *See id.* When EY Germany perpetuated a fraud of global scale through its auditing activities of an issuer client, and knew that its issuer client had a significant U.S. investor base, EY Germany should also have known that individuals in the U.S. could be harmed as a result of that fraud. As

- 19 -

a consequence for those actions, being subject to jurisdiction in the U.S. is both appropriate and reasonable. *Burger King*, 471 U.S. at 473; *see also infra*, III.D..

> **D.      Exercising Jurisdiction Comports with Traditional Notions of Fair Play and Substantial Justice**

Plaintiffs set forth policy reasons demonstrating why exercise of jurisdiction is appropriate over EY Germany in its Supplemental Brief.  Specifically, the U.S. has an interest in furthering the policies of its securities regulatory system and protecting U.S. investors, and the U.S. has an interest in providing citizens with convenient and effective relief when a defendant has directed fraud to the U.S.  ECF 76, §IV.B.3. (citing *Pinker*, 292 F.3d at 372); Supp. Br., §VI. (citing *OmniWind Energy Sys., Inc. v. Redo*, 2015 WL 790101, at \*9 (E.D. Pa. Feb. 24, 2015)).  As establishing minimum contacts makes jurisdiction presumptively constitutional, it is EY Germany's burden to present "'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Sandy Lane*, 496 F.3d at 324.  EY Germany has not met that burden.

EY Germany's contention that the U.S. only has a limited interest in protecting investors who voluntarily seek out instruments that track the prices of securities traded on foreign exchanges carries little weight because it contradicts the Third Circuit's analysis set forth in *Pinker*, which recognized: "If ADRs are subject to the United States regulatory regime in theory, but are exempt in practice due to the inability of American courts to exercise personal jurisdiction over the foreign corporation . . . , one would expect them to be considered a less attractive option for American investors." 292 F.3d at 372-73.

Additionally, the burdens EY Germany set forth related to the locale of other proceedings in Germany and witnesses in Germany do not "make litigation 'so gravely difficult and inconvenient' that [EY Germany] unfairly is at a 'severe disadvantage' in comparison to his opponent." *Burger King*, 471 U.S. at 478.  Indeed, EY Germany's ability to obtain and submit

- 20 -

4866-9394-6737.v1

declarations from now multiple witnesses based in Germany, as well as produce significant discovery material, shows that it is not so gravely difficult to litigate in this forum. *See* ECF 64-2 (Hellgardt Declaration); ECF 64-3 (Streyl Declaration); ECF 77-2 (Supplemental Hellgardt Declaration); ECF 110-1 (Loetscher Declaration).

Even if it is more convenient for EY Germany to litigate in Germany, requiring Plaintiffs – individuals with far fewer resources than EY Germany – to litigate in Germany "would saddle them with a burden at least equal to [defendant's] burden in Pennsylvania." *Sandy Lane*, 496 F.3d at 325. As the Third Circuit held in *Sandy Lane*: "In light of these countervailing interests . . . this is not one of those 'rare' and 'compelling' cases where jurisdiction would be unreasonable despite the presence of minimum contacts. . . . [W]hen minimum contacts exist, due process demands no more than a reasonable forum." *Id.* This forum is reasonable.

## IV.   CONCLUSION

For the foregoing reasons, in addition to those reasons set forth in Plaintiffs' Supplemental Brief and Plaintiffs' Opposition to Defendants' motion to dismiss, Plaintiffs respectfully request that the Court deny EY Germany's motion to dismiss.

DATED:  July 19, 2023                    Respectfully submitted,

                                         SAXTON & STUMP
                                         LAWRENCE F. STENGEL (P.A. Bar # 32809)


                                              s/ Lawrence F. Stengel
                                         LAWRENCE F. STENGEL

                                         280 Granite Run Drive, Suite 300
                                         Lancaster, PA  17601
                                         Telephone:  717/556-1000
                                         717/441-3810 (fax)
                                         lfs@saxtonstump.com

                                         *Local Counsel for Lead Plaintiffs*

- 21 -

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com

*Additional Counsel for Plaintiff*

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS
HADIYA K. DESHMUKH
JACOB G. GELMAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com
jgelman@rgrdlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVEN W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com

*Lead Counsel for Lead Plaintiffs Thanh Sam and
Lawrence Gallagher*

- 22 -

4866-9394-6737.v1

- 23 -

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Thanh Sam*

4866-9394-6737.v1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 19, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Lawrence F. Stengel
LAWRENCE F. STENGEL
SAXTON & STUMP
280 Granite Run Drive, Suite 300
Lancaster, PA  17601
Telephone:  717/556-1000
717/441-3810 (fax)
E-mail:  lfs@saxtonstump.com

4866-9394-6737.v1

# Mailing Information for a Case 2:20-cv-03326-AB IN RE: WIRECARD AG SECURITIES LITIGATION

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lee Albert**
  lalbert@glancylaw.com,lee-albert-5832@ecf.pacerpro.com,info@glancylaw.com

- **GEORGE A. BORDEN**
  gborden@wc.com

- **PERETZ BRONSTEIN**
  peretz@bgandg.com

- **Vincent A. Coppola**
  vcoppola@pribanic.com,gregory@pribanic.com

- **HADIYA K. DESHMUKH**
  hdeshmukh@rgrdlaw.com,hdeshmukh@ecf.courtdrive.com

- **STEVEN M. FARINA**
  sfarina@wc.com

- **JACOB G. GELMAN**
  jgelman@rgrdlaw.com

- **JOHN H. GEORGE**
  jgeorge@rgrdlaw.com,jgeorge@ecf.courtdrive.com,smorris@ecf.courtdrive.com

- **JACOB A. GOLDBERG**
  jgoldberg@rosenlegal.com,etexidor@rosenlegal.com

- **REED KATHREIN**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **JEFFREY L. KODROFF**
  jkodroff@srkattorneys.com

- **AMANDA MACDONALD**
  amacdonald@wc.com

- **WILLIAM S. NORTON**
  bnorton@motleyrice.com,mhickey@motleyrice.com

- **MICHAEL J. QUIRK**
  mquirk@motleyrice.com,hfonseca@motleyrice.com,lmandara@motleyrice.com

- **LAURENCE MATTHEW ROSEN**
  LRosen@Rosenlegal.com

- **CHRISTOPHER A. SEEGER**
  cseeger@seegerweiss.com,styjer@seegerweiss.com,seegerweiss@myecfx.com,rbarreca@seegerweiss.com,sabrina-tyjer-1389@ecf.pacerpro.com,msheridan@seegerweiss.com,DKekatos@seegerweiss.com,dsparks@seegerweiss.com,abadaruzzaman@seegerweiss.com,dion--kekatos-1017@ecf.pacerpro.com

- **LAWRENCE F. STENGEL**
  lfs@saxtonstump.com,cag@saxtonstump.com,jss@saxtonstump.com

- **DAVID A. STRAITE**
  dstraite@kaplanfox.com

- **Craig Singer**
  csinger@wc.com

- **Danielle Smith**
  danielles@hbsslaw.com,sf_filings@hbsslaw.com

- **SHAWN A. WILLIAMS**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,jgelman@rgrdlaw.com,shawnw@ecf.courtdrive.com,JGelman@ecf.courtdrive.com

- **WESLEY A. WONG**
  wesleyw@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Lucas          E Gilmore**
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue    Suite 202
Berkeley, CA 94710