# EXHIBIT 1



BAKER TILLY

wirecard

# Project "Kestrel"

Purchase Price Allocation Report

Munich, March 8th, 2018

- Confidential -

An independent member of Baker Tilly International

EYGMBH_0001051

Confidential Discovery Material



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# Table of contents

| | | |
|---|---|---|
| I. | Executive Summary | 2 |
| II. | Engagement and Project Structure | 4 |
| III. | Principles of the Purchase Price Allocation | 9 |
| IV. | Transaction background | 14 |
| V. | Identification | 23 |
| VI. | Valuation | 31 |
| VII. | Appendices | 39 |

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 1

EYGMBH_0001052

Confidential Discovery Material



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# About 50% of the Consideration transferred is allocated to Goodwill

## Executive summary

### Transaction snapshot

- On June 29th, 2016 Wirecard signed the PSA to purchase the prepaid credit card portfolio of Citigroup in North America and various other countries in Latin America, Australia, Europe, Asia and Africa.
- The base purchase price is fixed to kUSD 185.000 (before cash free / debt free and net working capital adjustments) without any Earn-Out but has been slightly amended during the closing procedures.
- Wirecard obtained control as of March 9th, 2017, which is the valuation date for the purchase price allocation.

### Valuation results

167.005
746
11.894
0
179.646
Base consideration
Additional consideration
NWC adjustment
Cash adjustment
Consideration transferred

### Valuation overview

(250)
(2.180)
(2.748)
3.564
106.503
93.880
(33.803)
164.966
14.679
179.646
Holiday provision
Unfavorable contract
Non recorded provisions
Ecount platform
Customer Relationships
Goodwill
Deferred taxes
Step up
Book value of net assets - North America
Consideration transferred

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 2

EYGMBH_0001053

Confidential Discovery Material



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# The PPA has an EBIT impact between mEUR 5 and 6 per annum due to amortization

## Executive summary

### Annual earnings impact due to Purchase Price Allocation

(1.780)
(2.284)
(6.038)
(5.306)
(5.503)
(3.790)
(5.325)
(3.285)
(1.331)
(821)
2017
2018…2021
2022
2023…2036
2037
EBIT impact
Earnings impact

### Overview about major valuation parameters

| Item | Fair Value | Major valuation assumptions |
|---|---|---|
| **Customer Relationship**<br><br>**North America** | • kEUR 106,503 | • Remaining Useful Lifetime: 20 years of current customers |
| **Ecount platform** | • kEUR 3,564 | • Remaining Useful Lifetime: 5 years |

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 3

EYGMBH_0001054

Confidential Discovery Material



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# Table of contents

| | | |
|---|---|---|
| I. | Executive Summary | 2 |
| II. | Engagement and Project Structure | 4 |
| III. | Principles of the Purchase Price Allocation | 9 |
| IV. | Transaction background | 14 |
| V. | Identification | 23 |
| VI. | Valuation | 31 |
| VII. | Appendices | 39 |

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 4

EYGMBH_0001055

Confidential Discovery Material



# Purpose and scope of our engagement

## Engagement and Project Structure 1/3

### Engagement

- Wirecard AG ("**Wirecard"**) has instructed us, Baker Tilly GmbH & Co. KG Wirtschaftsprüfungsgesellschaft ("**BT"**) to perform a purchase price allocation according to IFRS 3 for the transaction stated below.
- On June 29th, 2016, Wirecard Acquiring & Issuing GmbH ("WD A&I") and Citibank, N.A. (together with its affiliates "Citi") have signed a share purchase and sale agreement ("**PSA"**) regarding the purchase of 100% of the shares in Ecount, Inc., USA ("**Ecount**") via a share deal, the purchase of assets in the USA and Canada via an asset deal (together with Ecount "**North American operations**") and the purchase of assets in Mexico, Philippines, Australia, United Arab Emirates and various Western European countries ("**International operations**") via an asset deal. The North American operations and the International operations are jointly also called the **acquired operations**.
- Based on our common understanding with Wirecard, the acquired operations constitute a **business** in terms of IFRS 3.
- This requires a purchase price allocation pursuant to IFRS from Wirecard's perspective with regard to the acquired shares.
- We have performed our work from March 9th, 2017 to March 8th, 2018 (with interruptions) in our office and the office of Wirecard.

### Scope of work

- We have been engaged to perform the following accounting based valuations concerning the acquired operations:
  - Identification of the acquirer, determination of the acquisition date and calculation of the consideration transferred,
  - identification of significant intangible assets and all tangible assets, liabilities and contingent liabilities with carrying amounts differing significantly from their fair value,
  - determination of the fair values of the identified intangible assets, tangible assets and (contingent) liabilities,
  - calculation of deferred taxes,
  - calculation of the Weighted Average Cost of Capital (WACC).
- Based on the shared understanding of Wirecard and BT the identification and valuation process was carried out in accordance to the principle of materiality. The required specifications insofar were agreed upon during our assignment.
- We carried out our work in accordance to the comments of the Institut der Wirtschaftsprüfer (Institute of Public Auditors in Germany), especially on IDW S 5. However, the assignment does not involve a plausibility check of the financial data by market or competitor analysis and a detailed description of valuation methods. We further agreed with Wirecard to exclude certain details on valuation procedures from this report as this is included in our PPA model.

Confidential Discovery Material



BAKER TILLY

# We provided our services as advisors based on the financials provided

## Engagement and Project Structure 2/3

### Underlying data

- The data and documentation used for the preparation of this presentation included mainly the following:
  - PSA dated June 29th, 2017 (including various exhibits and side agreements)
  - Financial and Tax Due Diligence Report prepared by BT,
  - Technical Due Diligence Report prepared by Wirecard,
  - Closing side letter dated March 9th, 2017 (including various exhibits and side agreements),
  - Closing date accounts as of February 28th, 2017 audited by PwC,
  - Business plan of the acquired operations,
  - various information received via data room, e-mail and telephone during our engagement regarding project "Kestrel" and
  - general information on the market and the entities.
- Our work was based on audited closing date accounts as of February 28th, 2017 (before purchase price allocation).
- The managements of the acquired operations and Wirecard are responsible for the corporate planning procedure including written documentation of the strategic principles of the planning and a description of planning premises applied. As far as technical plan adjustments are required due to the chosen valuation method, such issues were applied in close cooperation with Wirecard.
- We provided our services as advisors. Therefore, the purchase price allocation is based on the financial information provided to us.

### Qualifications and Reservations

- The accuracy of this purchase price allocation report is necessarily dependent on the Disclosed Documents being true, complete and not misleading. We did not verify whether or not the Disclosed Documents are correct, complete and not misleading and whether or not the copies made available to us correctly represent the content of the respective originals. We have assumed that we received authentic and complete copies. We shall assume no liability of any nature that results from any inaccuracies of these assumptions.
- Unless explicitly mentioned in the respective sections of this purchase price allocation report, it is based on the assumptions that (i) the Disclosed Documents and information provided by the Sellers or their representatives (including any replies to written and oral inquiries) are complete and accurate, (ii) no other documents exist with respect to the matters we have examined, (iii) our findings would not change in the light of additional information and explanations not made available and (iv) the Sellers and their representatives have acted in good faith at all times when responding to our requests for information and documentation, and that they have not omitted to inform us of any matter which is material in relation to the enquiries raised by us.

# All requested clarification and evidence were provided

## Engagement and Project Structure 3/3

### Qualifications and Reservations (cont'd)

- We furthermore assumed that (i) any signatures on any Disclosed Documents are authentic, have been made by persons legally authorized to represent the respective entity, (ii) each of the Disclosed Documents is in full force and effect and has not been terminated or amended without us being informed thereof, (iii) the parties to any Disclosed Document have not breached or threatened to breach any of the terms of such document and (iv) each contracting party to a Disclosed Document has the right, power and authority and has taken all actions necessary to exercise its rights and perform its obligations under the relevant document.
- Any terms of any agreement or arrangement may have been amended subsequent to its execution or implementation, on an oral basis by the parties or by conduct or otherwise, without us being aware of this. In addition, there may be agreements, oral or otherwise, of which we are not aware.
- This report is provided exclusively for purposes of purchase price allocation for Wirecard as well as for the use of the auditors of Wirecard. It may not be published, copied or used for any purpose other than that referred to above, and may not be forwarded to any third party without our prior written consent. Hence, we disclaim any responsibility, liability or other obligations towards third parties unless otherwise expressly agreed with a third party in writing or where such exemption from liability would be invalid.

### Qualifications and Reservations

- All requested clarifications and evidence have been provided. The management of Wirecard has furthermore declared in writing that all material information and explanations given to us in connection with the preparation of this report are both complete and correct.
- The completion of this engagement and our responsibility, including third parties, are governed by the German General Engagement Terms for Public Accountants and Public Accountancy Firms (in German: "Allgemeine Auftragsbedingungen für Wirtschaftsprüfer und Wirtschaftsprüfungsgesellschaften") as of January 1st, 2017 as provided in the appendix.
- Compensation claims of Wirecard against BT for damages caused by negligence in connection with the performance of the assignment are limited to EUR 4,000,000 (in words: Euro four million) for each damage event and for all damage events in total. We shall only be liable for oral information if confirmed by us in writing.

Munich, March 8th, 2018

Baker Tilly GmbH & Co. KG
Wirtschaftsprüfungsgesellschaft



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# Table of contents

| | | |
|---|---|---|
| I. | Executive Summary | 2 |
| II. | Engagement and Project Structure | 4 |
| III. | Principles of the Purchase Price Allocation | 9 |
| IV. | Transaction background | 14 |
| V. | Identification | 23 |
| VI. | Valuation | 31 |
| VII. | Appendices | 39 |

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 8

EYGMBH_0001059

Confidential Discovery Material



# A Purchase Price Allocation generally comprises the steps: identification, analysis, valuation and accounting

## Principles of the Purchase Price Allocation 1/4

### The following steps of the Purchase Price Allocation are covered by our engagement

| Identification | Analysis | Valuation | Accounting |
|---|---|---|---|
| • Identification of significant intangible assets<br>• Identification of all tangible assets, liabilities and contingent liabilities with carrying amounts differing significantly from their fair value | • Understanding of the significant value drivers<br>• Data collection<br>• Determination of valuation methods<br>• Determination of valuation assumptions (e.g. useful life) | • Determination of fair values of the identified intangible assets<br>• Determination of the fair values of the identified tangible assets and (contingent) liabilities<br>• Calculation of deferred taxes | • Determination of a required periodical amortization for fair values |

The main focus of our work was to identify and to value the not yet recognized intangible assets. The identification process and the valuation methods applicable are described on the following slides.

Confidential Discovery Material

Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# How to identify intangible assets

## Principles of the Purchase Price Allocation 2/4

Analysis
Business model
Business planning
Existing rights, licenses, etc.
Key value drivers
Future economic benefit?
Yes
No
Definition of an intangible asset
Economic benefit obtained contractually or legally?
Yes
No
Capable to separate?
Yes
No
Sufficient control?
Yes
No
Separate intangibles asset
Indefinite useful economic life?
Yes
No
Goodwill
Impairment only approach
Amortize over useful economic life

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 10

EYGMBH_0001061
Confidential Discovery Material



# Intangible assets can be distinguished into five different categories

## Principles of the Purchase Price Allocation 3/4

### Illustrative examples for intangible assets

| Marketing related intangible assets | Customer related intangible assets | Artistic related intangible assets | Contract related intangible assets | Technology related intangible assets |
|---|---|---|---|---|
| • Trademarks and trade names<br>• Service marks, collective marks, certification marks<br>• Trade dress<br>• Newspapers mastheads<br>• Non-competition agreements | • Customer lists<br>• Order or production backlog<br>• Customer contracts and the related customer relationships<br>• Non-contractual customer relationships | • Plays, operas and ballets<br>• Books, magazines, newspapers and other literary works<br>• Musical works such as compositions, song lyrics, advertising jingles<br>• Pictures and photographs<br>• Video and audiovisual material | • Licensing, royalty, standstill agreements<br>• Advertising, construction, management, service or supply contracts<br>• Lease agreements<br>• Construction permits<br>• Franchise agreements<br>• Operating and broadcast rights<br>• Use rights (drilling, water, etc.)<br>• Servicing contracts (such as mortgage servicing rights)<br>• Employment contracts | • Patented technology<br>• Mask works<br>• Internet domain names<br>• Unpatented technology<br>• Databases, including title plants<br>• Trade secrets including secret formulas, processes, recipes |

Source: Illustrative examples to IFRS 3

Confidential Discovery Material



# Intangible assets can be valued through market, income or cost approaches

## Principles of the Purchase Price Allocation 4/4

### Valuation methods applicable for intangible assets according to IFRS 3 / IAS 38 / IDW S 5

**Valuation Methods**

- Market Price on Active Market
- Analogy Method

**Valuation Methods**

- Direct Cashflow Method
- Relief-from-Royalty Method ("RfR")
- Multi-Period Excess Earnings Method ("MEEM")
- Incremental Cash-flow Method

**Valuation Methods**

- Reproduction Cost Method
- Replacement Cost Method



# Table of contents

| | | |
|---|---|---|
| I. | Executive Summary | 2 |
| II. | Engagement and Project Structure | 4 |
| III. | Principles of the Purchase Price Allocation | 9 |
| IV. | Transaction background | 14 |
| V. | Identification | 23 |
| VI. | Valuation | 31 |
| VII. | Appendices | 39 |

Confidential Discovery Material



# The transaction is structured as a combined asset and share deal

## Transaction background 1/7

### Simplified organization chart (after closing)

### Transaction structure

- The transaction is structured as a combined asset and share deal.
- In the **USA** Wirecard has purchased all shares in Ecount, Inc. and certain assets from Citibank, N.A. (or its applicable affiliates). Those assets are purchased by Kestrel Merger Acquisition Corp., which is a NewCo founded solely for the purchase of the assets and having no material assets before closing. Kestrel Merger Acquisition Corp. has been merged with Ecount immediately after closing and Ecount has been renamed to **Wirecard North America, Inc.**.
- Before the transaction the North American operations are conducted via Ecount (but branded as Citi). However most assets and employee contracts are held by Citibank N.A. (or its applicable affiliates).
- The acquisition of the **International operations** is structured as an asset deal. The assets are purchased by various local Wirecard entities, which are partly NewCo's. The assets are sold by Citibank, N.A. or its applicable local affiliates. Before the transaction the International Operations are part of the applicable local Citi entity.

Confidential Discovery Material



# The North American and the International operations form a business in terms of IFRS 3

## Transaction background 2/7

### Definition of business

- According to IFRS 3.3, an entity shall determine if a transaction constitutes a business. If a transaction does not constitute a business, the transaction should be treated as an asset acquisition.
- IFRS 3.B7 defines input, process and output as the material elements of a business. For being defined as a business, the transaction does not have to include all inputs or processes that the seller has used if the acquirer is able to produce continuing outputs, e.g. by integrating the business with own inputs and processes.

### North American operations

- The North American operations form, based on the joint understanding of Wirecard and BT, a business in terms of IFRS 3 without any detailed assessment being necessary.

### International operations

- The acquisition of the International operations is basically structured as an asset deal. In our view, the International operations **form a business** in terms of IFRS 3 based on the following assessment:
  - **Input**: Wirecard acquires the customer contracts and the international instance of the platform. Furthermore the employees shall be transferred to Wirecard, depending on the local law via an autopilot or via giving offers to the employees. Furthermore the necessary processing services are transferred to Wirecard via the Transitional Service Agreement ("**TSA**"). Due to regulatory issues, no BINs of the credit card associations can be transferred. Based on our understanding of the transactions, the necessary input is transferred to Wirecard.
  - **Process**: Based on the PSA Wirecard acquires the "…business and financial records, books and documents…" which is specified in the Seller Disclosure Letter as operational processes and related documentation. From our understanding, Wirecard acquires all necessary documents to create output with the acquired input. The missing transfer of management processes does not prohibit the assessment as business as the processes will be rendered through the Wirecard buyer entities.
  - **Output**: Through the transfer of inputs and processes Wirecard receives the results of the International operations in form of economic benefits. The PSA has no clause which could retain the output at Citi. The ongoing rendering of services by Citi via the TSA does not transfer the output to Citi, we consider these services as ordinary arm's length vendor services.

Confidential Discovery Material



# Wirecard has obtained control over the acquired operations as at March 9th, 2017

## Transaction background 3/7

### Identification of the acquirer

- According to IFRS 3.6, one entity shall be identified as acquirer in each business combination. The acquirer should be identified by applying the guidance in IFRS 10.
- Wirecard has acquired the North America Operations via WD A&I. The International Operations are acquired via subsidiaries of WD A&I, Wirecard Sales International Holding GmbH, Wirecard Technologies GmbH or via Wirecard Processing FZ-LLC as a direct subsidiary of Wirecard AG. The relevant buyer entities have control over the purchased operations according to IFRS 10.6. We have not identified any circumstances that prevent control over the acquired operations.
- Neither WD A&I nor any other buyer entity has to present consolidated financial statements as all conditions of IFRS 10.4 (a) are fulfilled. Wirecard AG as the parent company of all buyer entities needs to present consolidated financial statements including the acquired operations.
- **Wirecard AG** is the acquirer according to IFRS 3.6.

### Identification of the acquisition date

- Wirecard and the seller signed the PSA for the acquisition on June 29th, 2016.
- The acquisition date is in general the date on which the acquirer obtains control (IFRS 3.8). In most cases this is the closing date, but also dates earlier or later than the closing date are possible (IFRS 3.9).
- For the current transaction all closing conditions as set out in the PSA have been fulfilled on March 9th, 2017. The closing has been documented through the exchange of executed versions of various agreements.
- During the course of the negotiations, Wirecard and Citi have agreed to date the closing accounts to February 28th, 2017 and to transfer all economic benefits as of this date to Wirecard. Citi was not allowed to make any dividend payments or other transactions that could reduce the equity as of closing ("**Locked Box**"). Wirecard has reimbursed Citi for profits generated from March 1st, 2017 to March 9th, 2017. During the Locked Box period from March 1st, 2017 to March 9th, 2017 Citi had control over the purchased operations.
- We have not identified any circumstances, that Wirecard obtained control on a date before or after the closing date, neither through the Locked Box nor through other provisions.
- Therefore the acquisition date is **March 9th, 2017.**

Confidential Discovery Material



# The base consideration is fixed to kUSD 185.000 (before adjustments) without Earn-Outs

## Transaction background 4/7

### Total consideration

- Based on the PSA the **total consideration** for the acquired business constitutes of
  - kUSD 185,000 as base consideration,
  - a cash free / debt free adjustment and a reference net working capital adjustment on closing,
  - transaction expenses which were incurred by Ecount.
- Wirecard and Citi have agreed certain changes of the total consideration in the closing side letter. This consideration does not necessarily correspond with the consideration transferred according to IFRS 3.
- Costs for the transaction (e.g. for due diligence) are not included in the purchase price, according to IFRS 3.53.
- No earn-out or similar contingent consideration has been agreed in the PSA.
- Wirecard has hedged the purchase price with a maximum hedge of kUSD 200,000. Wirecard has informed us that those hedge has been designated as effective in the amount of kUSD 185,000 (covering only the base consideration). We have applied the FX rate from this hedge for the conversion of the base consideration and the effective closing date FX rate for the conversion of other items. Potential deviations from the closing date FX rates are recognized in the goodwill.

### Total consideration (cont'd)

- The closing consideration as stated in the closing side letter amounts to kUSD 186,407 (kEUR 168,338), which constitutes of
  - the base consideration (kUSD 185,000; kEUR 167,005), which is part of the consideration transferred;
  - VAT on the purchase price for the customer contracts in Mexico (kUSD 544; kEUR 516), which is <u>not</u> part of the consideration transferred as it is deductible in Mexico,
  - A reduction of the base consideration (kUSD 2,000; kEUR 1,896) as Wirecard is not able to obtain legal title for the Mexico customer contracts, which is part of the consideration transferred;
  - the purchase price of the inventories of the International operations (kUSD 720; kEUR 682), which is part of the consideration transferred;
  - VAT on the purchase price for the inventories in Mexico (kUSD 75; kEUR 71), which is <u>not</u> part of the consideration transferred as it is deductible in Mexico,
  - Ticking fees (kUSD 945; kEUR 896) as Wirecard missed certain agreed milestones in signing a new BIN sponsorship agreement before closing, which is part of the consideration transferred;
  - [... continue on next page...]

Confidential Discovery Material



# The base consideration is fixed to kUSD 185.000 (before adjustments) without Earn-Outs

## Transaction background 4/7

### Total consideration

- [… continued from previous page …]
  - Locked Box profits (kUSD 1,004; kEUR 951) which reimburses Citi for profits for the period from March 1st, 2017 to March 9th, 2017 which are transferred to Wirecard due to an increase in net assets, which is part of the consideration transferred;
  - Locked Box personnel expenses (kUSD 119; kEUR 113) which reimburses Citi for personnel expenses for the period from March 1st, 2017 to March 3rd, 2017 that were paid from a Citi corporate account although the locked box mechanism requires that Wirecard bears the costs, which is part of the consideration transferred;
- In total the consideration transferred (before cash free / debt free and net working capital adjustments) amounts to kUSD 185,787. Based on the applicable FX rates this amounts to kEUR 167,751.
- We don't consider the Locked Box profits and Locked Box personnel expenses as separate transaction according to IFRS 3.52 as the amounts have been paid for business transactions after the economic closing date.
- Wirecard has agreed to reimburse Citi for certain expenses that occurred on request of Wirecard between Signing and Closing (e.g. travel expenses). Those expenses (kUSD 394) constitute a separate transaction according to IFRS 3.51ff. in combination with IFRS 3.BC370 and hence should be reported as expenses in the P&L of Wirecard.

### Total consideration (cont'd)

- In addition to the base purchase price, a **cash free / debt free mechanism** has been included in the PSA.
  - The closing date cash amounted to USD zero and had therefore no impact on the purchase price.
  - The closing date net debt amounted to USD zero and therefore no impact on the purchase price.
- Furthermore a purchase price adjustment mechanism for average net working capital has been included in the PSA.
  - The reference net working capital has been set to USD zero. Based on the agreed purchase price mechanism, the purchase price is increased / reduced by the amount of the net working capital exceeds / falls short the average net working capital.
  - Upon the date of this report (which is furthermore the last date of the measurement period according to IFRS 3.45), Wirecard and Citi are in disputes regarding the final net working capital amount. For purposes of this report the latest correspondence with Citi regarding the net working capital is used as best estimate and is used as basis for the purchase price adjustment. The net working capital applied for the consideration transferred amounts to kUSD 12,550 which kUSD 200 higher than in the PwC audit report as the accrual for the audit shall be borne by Wirecard.
- In total, the purchase price has been increased by kUSD 12,550 or kEUR 11,894. This results in a **total consideration of kUSD 198,337 or kEUR 179,646**.

Confidential Discovery Material



# The Locked Box profits and the Locked Box personnel expenses increase the equity of North American operations as of closing

## Transaction background 5/7

### Reconciliation of Net Assets

- As mentioned before, the Closing Date Accounts have been prepared as of February 28th, 2017 whereas the actual closing happened on March 9th, 2017. The North American operations could realize a profit of approximately kUSD 1,000 during this period (Locked Box Profits).
- Furthermore Wirecard has reimbursed Citi for personnel expenses paid from a Citi corporate account in the amount of kUSD 119 (Locked Box personnel expenses). Hence no cash-outflow has been recorded at the North American operations which leads to an increase in the actual net working capital / cash position as of March 9th, 2017.
- No intra-month balance sheet as of March 9th, 2017 is available due to reporting restrictions but the equity and the net working capital / cash of the North American operations has increased by these amounts.
- We consider the Locked Box Profits in combination with the Locked Box personnel expenses as material so that the materiality exception to use a closing balance sheet dated different from the actual closing as mentioned in IFRS 3.BC110 is not applicable.
- We have made an adjustment to the closing date accounts for these amounts to present a higher equity in the amount of kUSD 1,122 or kEUR 1,064 as of March 9th, 2017 which is included within the Other Current Assets as no detailed breakdown to the applicable asset and liability items is available.
- The profit of kUSD 1,003 represents an estimate as the "true" profit for this period is not measurable. We have made plausibility analysis regarding this amount before closing.

### Defined allocation of total consideration

- Based on the PSA, the total consideration shall be split into the North American share deal (94.9%), the North American Asset Deal (0.1%) and the International Asset Deal (5.0%).
- Based on the knowledge of Wirecard as of closing, the contractual allocation does not reflect the implied value proportions of the acquired operations. Wirecard is at the date of this report in the process to conclude within an intercompany agreement that the total consideration has been paid for the North American share deal as the fair value of the acquired assets and liabilities of the International Operations is zero.

Confidential Discovery Material



# Wirecard assumes a decrease of EBITDA within the business plan

## Transaction background 6/7

### Business Plan

| Kestrel North America I Business Plan in kEUR | FY17 Plan | FY18 Plan | FY19 Plan | FY20 Plan | FY21 Plan | FY22 Plan |
|---|---|---|---|---|---|---|
| Revenue | 124,661 | 117,310 | 109,120 | 104,235 | 101,670 | 99,889 |
| Direct costs | (59,421) | (55,136) | (51,287) | (48,990) | (47,785) | (46,948) |
| **Gross profit** | **65,240** | **62,174** | **57,834** | **55,244** | **53,885** | **52,941** |
| Indirect costs | (39,806) | (37,816) | (37,816) | (37,816) | (37,816) | (37,816) |
| **EBITDA** | **25,434** | **24,358** | **20,018** | **17,428** | **16,069** | **15,125** |
| **KPIs:** | | | | | | |
| Gross margin | 52.3% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| EBITDA margin | 20.4% | 20.8% | 18.3% | 16.7% | 15.8% | 15.1% |
| YoY Revenue growth | n/a | (5.9%) | (7.0%) | (4.5%) | (2.5%) | (1.8%) |
| YoY Gross profit growth | n/a | (4.7%) | (7.0%) | (4.5%) | (2.5%) | (1.8%) |
| YoY EBITDA growth | n/a | (4.2%) | (17.8%) | (12.9%) | (7.8%) | (5.9%) |

Source: Closing Date Accounts, BT Analysis

### Analysis

- The adjacent table shows the business plan of the North American Operations for FY17 to FY22. The business plan is based on the budget of the North American Operations for FY17. For the following years Wirecard assumes a steady decrease of revenues and EBITDA.
- According to the management of Wirecard the North American Operations are planned to develop similar to the business plan shown in our due diligence report.
- The increasing gross margin for FY18 onwards is caused by necessary changes of the BIN sponsorship agreement with Citi as Citi should be replaced with third party vendors. As the new vendors are third parties the decrease of costs constitutes a market synergy that is available to every potential purchaser and needs therefore be considered in the purchase price allocation.
- The indirect costs are expected to decrease from FY17 to FY18 due to operational changes as certain services that are currently provided by Citi should be replaced by third party vendors.

Confidential Discovery Material

Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# PwC has expressed a qualified opinion regarding the inventories

## Transaction background 7/7

### Adjusted Closing Date Accounts

| Kestrel North America I Balance Sheet in kEUR | Mar9, 2017 Before PPA and adjustments | | Mar9, 2017 Before PPA after adjustments | |
|---|---|---|---|---|
| **Assets** | | | | |
| Goodwill | - | 0% | - | 0% |
| Ecount Platform | 20,632 | 48% | - | 0% |
| Customer Relationship | - | 0% | - | 0% |
| **1. Intangible assets** | **20,632** | **48%** | **-** | **0%** |
| **2. Tangible assets** | **790** | **2%** | **790** | **3%** |
| **3. Deferred tax assets** | **-** | **0%** | **-** | **0%** |
| **Total non-current assets** | **21,422** | **50%** | **790** | **3%** |
| **1. Inventories & Work in progress** | **2,269** | **5%** | **2,042** | **9%** |
| Reported as of PwC audit | 19,364 | | 20,428 | 88% |
| Adjustment for Locked Box | | | 1,064 | 5% |
| **2. Trade receivables & other current assets** | **19,364** | **45%** | **20,428** | **88%** |
| **3. Cash & Cash equivalents** | **-** | **0%** | **-** | **0%** |
| **Total current assets** | **21,634** | **50%** | **22,470** | **97%** |
| **Total assets** | **43,056** | **100%** | **23,261** | **100%** |

Source: Closing Date Accounts, BT Analysis

| Kestrel North America I Balance Sheet in kEUR | Mar9, 2017 Before PPA and adjustments | | Mar9, 2017 Before PPA after adjustments | |
|---|---|---|---|---|
| **Liabilities & Shareholder Equity** | | | | |
| As of PwC audit | 33,171 | 77% | 14,624 | 63% |
| Fair Value Step-Up | - | 0% | - | 0% |
| **Total shareholders' equity** | **33,171** | **77%** | **14,624** | **63%** |
| **1. Non-current liabilities** | **-** | **0%** | **(1,249)** | **-5%** |
| **2. Current liabilities** | **9,885** | **23%** | **9,885** | **42%** |
| **Total liabilities** | **9,885** | **23%** | **8,636** | **37%** |
| **Total shareholders' equity & liabilities** | **43,056** | **100%** | **23,261** | **100%** |

Source: Closing Date Accounts, BT Analysis

### PwC Audit Report

- The closing date accounts for the North American operations have been audited by PwC who have issued an audit report with a qualified opinion regarding the valuation of inventories. PwC was, in particular, not able to verify inventories in the amount of kUSD 700 as no inventory confirmation could be obtained from the external fulfillment provider. However, PwC has not made an audit adjustment in the closing date accounts for these inventories. We have considered the closing date accounts of PwC in the Purchase Price Allocation. Hence we have included the non-confirmed inventories in the opening balance sheet but made a smaller closing date fair value adjustment. Citi has provided a inventory confirmation after the finalization of the PwC Audit Report.

### Closing date accounts adjustments

- We have applied the following adjustments to the closing date accounts:
  - Write-down of inventories in the amount of kUSD 239 (kEUR 227) which equals 10% of the remaining inventories,
  - Deferred tax assets on the inventory write down in the amount of kUSD 1,376 (kEUR 1,304) as the write-down can not be recognized for tax purposes (Directly presented as deferred tax liability in the adjacent balance sheet),
  - Write-down of the Ecount platform to avoid double counting due to the revaluation of the platform.

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 21

EYGMBH_0001072

Confidential Discovery Material



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# Table of contents

| | | |
|---|---|---|
| I. | Executive Summary | 2 |
| II. | Engagement and Project Structure | 4 |
| III. | Principles of the Purchase Price Allocation | 9 |
| IV. | Transaction background | 14 |
| V. | Identification | 23 |
| VI. | Valuation | 31 |
| VII. | Appendices | 39 |

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 22

EYGMBH_0001073

Confidential Discovery Material



# Wirecard is contractually obliged to bear certain migration costs

## North America – Identification

### Tangible asset, Net Working Capital and (Contingent) liabilities

| | |
|---|---|
| **Tangible and financial assets** | • During our due diligence we have not identified any material hidden reserves or burdens within the tangible and financial assets. |
| **Net working capital assets** | • The net working capital has been part of the audit of the closing date accounts made by PwC. |
| **Liabilities** | • During our due diligence we have not identified any material hidden reserves or losses within the liabilities. |
| **Provisions** | • During our due diligence we noted that outstanding holiday is not accrued in the balance sheet. We have considered the accruals for outstanding holiday as provision with differing book and fair valued within our purchase price allocation.<br>• Wirecard and Citi have agreed in the signed contracts that each party shall bear certain costs that are related to the migration of the acquired operations. Wirecard is contractually obliged to pay for those costs. We have considered provisions for those costs within our purchase price valuation. Those provisions are not reported in the closing date accounts. |
| **Tax accruals and liabilities** | • We have not identified any tax accruals or liabilities which need to be recognized. |
| **Contingent liabilities** | • During our due diligence we have not identified any material hidden reserves or losses within the contingent liabilities. |

EYGMBH_0001074
Confidential Discovery Material



# Wirecard has not acquired any material marketing related intangible assets

## North America – Identification

### Marketing related intangible assets

| | |
|---|---|
| **Trademarks, trade names, brands:**<br>**Pre-Check** | • Wirecard has acquired the trademark "Pre-Check" which is owned by Ecount.<br>• Based on our due diligence and our discussions with the management of Wirecard, we consider the trademark as not material and have not valued it in our purchase price allocation. The trademark is used for one sub-product but not as a key communication instrument to the clients.<br>• No trademark for the legal entity name "Ecount" has been transferred, based on a rough search we noted, that the registration of the trademark has been cancelled in 2015. |
| **Internet domains:**<br>**2 domains** | • Wirecard has acquired the domains www.ecount.com and www.myecount.com which were owned by Citi.<br>• Based on our due diligence, we consider the domains as not material and have not valued it in our purchase price allocation. The name "Ecount" which is included in the domain names has been used for communication purposes before Ecount was acquired by Citi. Current information about Citi's prepaid business is stored on Citi's corporate homepages. Furthermore we could not access the domains as of March 17th, 2017. |
| **Non-competition agreement:** | • The PSA includes a non-competition agreement with Citi that prevents Citi from operating prepaid businesses in North America and the acquired international regions for the next three years. If Citi would breach this covenant, Wirecard could make an indemnification claim. The non-competition agreement is in force, without any differences, for North America and International.<br>• Citi has entered into the transaction in order to sale the whole prepaid business as it is not considered as core business. During agreement negotiations, Citi has multiple times mentioned that the do not re-enter the prepaid cards business. Therefore we consider the non-competition agreement as not material and have not valued it in our purchase price allocation. |
| **Further marketing related intangible assets** | • We have not identified any further marketing related intangible assets. |

Confidential Discovery Material



# We consider the North American customers as one customer relationship

## North America – Identification

### Customer related intangible assets

| | |
|---|---|
| **Customer relationship**<br>North American Customers | • According to the PSA and its amendments until closing, Wirecard has purchased 166 client contracts for the North American operations (**"North American Customers"**). The North American Customers are solely corporate customers who provide the issued prepaid cards to individuals for various purposes.<br>• The North American operations realize revenues mostly from the cardholders (individuals) as fees for the usage and non-usage of the cards. No major (cash-settled) revenue is realized from the corporate customers as they receive the services mostly free of charge as the North American operations are able to earn fees from the cardholders.<br>• Within our due diligence, we identified reloadable cards and non-reloadable cards as the dominant card types. These two card types are different by the predominant source of revenue as most revenue from reloadable cards is earned by usage fees whereas the majority of revenues from non-reloadable is earned by non-usage fees. However, from an operational perspective the cards are not materially different. All operations are conducted and recorded through the platform software with the same staff.<br>• We also noted within our due diligence, that some customers order both types of cards. Based on an analysis about the average age of the current customers and programs, we could not identify any major differences.<br>• Based on the given circumstances, we consider all North American Customers as one customer relationship which has to be considered with the purchase price allocation. |
| **Further customer related intangible assets** | • We have not identified any further customer related intangible assets. |



# We identified one technology related intangible asset, "Ecount platform"

## North America – Identification

### Technology related intangible assets

| | |
|---|---|
| **Software**<br>**Ecount platform** | • The North American and International operations of are conducted through an own developed software, "**Ecount platform**".<br>• The international instance of the platform is technically integrated into the North American instance but not all functions of the North American instance are used. Some core modules are used for both instances.<br>• Due to the technical integration with shared modules we consider the "Ecount platform" as one technology related intangible asset to be recognized in the purchase price allocation.<br>• Wirecard has obtained full control over the platform upon closing. During the agreement negotiations Citi informed Wirecard that the platform might potentially not be transferred on closing due to contractual arrangements with one client in the United Kingdom. Wirecard provided a written documentation from this client that the client agreed to be transferred to a platform owned by Wirecard before termination of the contract in June 2017. The client contract is not purchased by Wirecard. |
| **Databases**<br>**Ecount platform** | • Information generated through the sale process are stored in a database within the "Ecount platform". The database contains mainly customer related information. We have identified customer related intangible assets separately. Therefore the database has no material importance. |
| **Further technology related intangible assets** | • We have not identified any further technology related intangible assets. |

EYGMBH_0001077
Confidential Discovery Material



# The agreed trademark license agreement does not constitute an intangible asset

## North America – Identification

### Contract related intangible assets

| | |
|---|---|
| **Contracts** | • Wirecard and Citi have concluded a Transitional Card Program Agreement (TCPA) which governs the usage of certain Citi licenses until the transfer to card volumes to third party suppliers. This agreement is necessary for the operations of Wirecard and Wirecard has no possibility to terminate the TCPA from an economic perspective and uses best and fastest efforts to switch suppliers. The TCPA has a pricing that is unfavorable for Wirecard. |
| **Licensing agreements**<br>**Trademark License Agreement** | • Wirecard has negotiated a Trademark License Agreement with Citi which was signed as of closing. According to this agreement, Wirecard is permitted to use some of Citi's trademark and other similar intellectual property for a transitional period of time without paying royalty fees.<br>• Primary goal of the Trademark License Agreement is to ensure the ordinary conduct of business as the agreement gives Wirecard the possibility to use Citi trademark on cards that have been issued in the past but are still valid. Further the agreement allows Wirecard to use preprinted inventories in order to avoid impairment. This is also mentioned in section 2.04 of the agreement, which states that it has been negotiated in order to allow Citi to wind down the use of Citi's intellectual property. Wirecard must notify third parties that the intellectual property is owned by Citi and that Wirecard has only a use right, whenever this is practicably possible.<br>• Based on all facts and the background of the agreement, we consider the Trademark License Agreement as intangible asset but do not value it in the purchase price allocation. |
| **Further contract related intangible assets** | • We have not identified any further contract related intangible assets. |

Confidential Discovery Material



# Wirecard has not acquired assets or liabilities with fair value

## International – Identification

### Tangible asset, Net Working Capital and (Contingent) liabilities

| | |
|---|---|
| **Tangible and financial assets** | • No tangible and financial assets are transferred to Wirecard, hence no hidden reserves or burdens exist. |
| **Net working capital assets** | • Due to the business model, the International operations have **inventories** (non-issued plastic cards) on stock. Those inventories are transferred to Wirecard. However, they are not included in the closing date accounts as those are only related to the North American operations and are not subject to the purchase price adjustment.<br>• As mentioned on page #x#, Wirecard has concluded that the International Operations (and therefore the purchased inventories) have a fair value of zero as of closing. Therefore the inventories are not considered within the purchase price allocation<br>• As mentioned within the "Transaction background" section Wirecard has paid **input VAT** on the purchase of the customer contracts and the inventories in Mexico. Citi has issued tax invoices regarding those purchases; the input VAT is recoverable. The VAT is accounted outside of the purchase price allocation |
| **Liabilities** | • We have not identified any liabilities that were assumed by Wirecard. |
| **Provisions** | • We have not identified any provision that were assumed by Wirecard. |
| **Contingent liabilities** | • We have not identified any contingent liabilities that were assumed by Wirecard. |

Confidential Discovery Material



# Wirecard has not acquired any intangible assets with positive fair value for the International operations

## International – Identification

### Intangible assets

| | |
|---|---|
| **Customer relationship**<br>**International Customers** | • Wirecard has acquired several customer contracts in the various jurisdiction. Based on updated business plans and on knowledge as of closing those customers do not have a positive fair value. Wirecard expects not to realize positive cashflow in the future. At the date of this report, Wirecard is in the process to finalize intercompany contracts which allocate the purchase price of the International Operations to the North American share deal.<br>• We have made high-level reviews of the respective budgets for the International Operations and discussed this with the management of Wirecard. According to Wirecard there are no options available to improve the planned financials significantly in order to generate a positive cashflow in order to achieve a positive fair value. The contracts of the International Operations are short-term so that no accrual for unfavorable contracts can be recognized. |
| **Further intangible assets** | • We have not identified any further intangible assets related to the International Operations. |

Confidential Discovery Material



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# Table of contents

| | | |
|---|---|---|
| I. | Executive Summary | 2 |
| II. | Engagement and Project Structure | 4 |
| III. | Principles of the Purchase Price Allocation | 9 |
| IV. | Transaction background | 14 |
| V. | Identification | 23 |
| VI. | Valuation | 31 |
| VII. | Appendices | 39 |

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 30

EYGMBH_0001081

Confidential Discovery Material



# We derived the cost of capital based on a peer group analysis

## Derivation of WACC

### WACC as of March 9th, 2017

| Kestrel North America I WACC in kEUR | Mar9, 2017 |
|---|---|
| Risk-free rate | 1.20% |
| Market risk premium | 7.00% |
| Beta (unlevered) | 1.12 |
| Debt / equity ratio | 7.64% |
| Tax rate | 40.00% |
| Beta (relevered) | 1.17 |
| Risk premium | 8.22% |
| Inflation differential | 0.36% |
| Country risk premium | 0.00% |
| **Cost of equity** | **9.77%** |
| Risk-free rate | 1.20% |
| Inflation differential | 0.36% |
| Credit Spread | 0.71% |
| Tax rate | 40.00% |
| **Cost of debt** | **1.36%** |
| Equity ratio | 92.90% |
| Debt ratio | 7.10% |
| **WACC before growth discount** | **9.18%** |
| Growth discount | 1.00% |
| **WACC after growth discount** | **8.18%** |

Source: BT Analysis

### Description

- The WACC has been calculated by us based on a peer group derived from Wirecard's consolidated financial statement as of December 31st, 2016.
- Risk free rate: Runtime specific (rounded) as of March 9th, 2017 (IDW compliant)
- Market risk premium: 7.00% (IDW compliant)
- Beta unlevered: 1.12 (Raw Beta, derived from peer group (mean), 5 years weekly)
- Debt ratio: 7.10% (Derived from peer group, parameters as for Beta unlevered)
- Tax rate: 40.00% (Derived from KPMG Global Tax Rate Survey)
- Country risk premium: 0.00% (Derived from Aswath Damodaran)
- Peer group:
  - INGENICO GROUP, AMERICAN EXPRESS CO, VISA INC-CLASS A SHARES, MASTERCARD INC – A, FISERV INC, JPMORGAN CHASE & CO, CITIGROUP INC, BARCLAYS PLC, GREEN DOT CORP-CLASS A, BANK OF AMERICA CORP
- Credit spread: 0.71% (Spread of "A+" rated corporate bonds (average rating of peer group) against sovereign bonds with maturity of 10 years)
- Inflation differential: 0.36% (Mean of expected differentials for the years 2017 to 2022 between Germany and USA, derived from International Monetary Fund)
- Growth discount: 1.0%
- For each asset we have applied a runtime specific WACC, based on the asset's remaining useful life. The adjacent table shows exemplarily the WACC for the Terminal Value.

Confidential Discovery Material



# The North American Customers are the leading asset of the transaction

## Customer Relationship "North American Customers"

### Valuation approach and parameters

| | | |
|---|---|---|
| **Valuation method** | MEEM | |
| **Useful lifetime** | 20 years | The derivation of the economic useful lifetime is based on the current lifetime of customers and programs as of February 28th, 2018 and by discussions with the management of the North American Operations and Wirecard, partly during our due diligence.<br><br>As of February 28th, 2018 customers have in average issued cards for the first time 6.5 years ago. We based our analysis solely on quantitative data. Due to reporting structure, the oldest customer the oldest, quantitative measureable customer, has been on-boarded in 2000. We did a quick qualitative review on the provided data as well. Within the qualitative data, we identified some of the current customers with older dates of first issuance.<br><br>Next to an analysis on customer level, we measured the average age on a program level. Based on this, the average is roughly between 5.5 and 6 years.<br><br>Based on these analyses and qualitative assumptions from the management of Wirecard, we consider a useful lifetime of 20 years as appropriate. |
| **Churn rate** | The churn rate is calculated on a straight-line basis over the useful lifetime. However, as the churn is already considered in the detail planning period within the planned revenues, we have not considered a churn rate for the years 2017 to 2022. From FY23 onwards we have calculated an annual churn rate of 7.1% which is based on the remaining useful lifetime. | |
| **Contributory Asset Charges** | 0.9% | Workforce, Ecount platform and working capital |

Confidential Discovery Material



# The North American Customers are the leading asset of the transaction

## Customer Relationship "North American Customers"

### Valuation approach and parameters (cont'd)

| | |
|---|---|
| **Derivation of cashflows** | The revenues for the North American Customers are derived from the business plan. The business plan has been prepared by us in close cooperation with Wirecard as starting point for the purchase price determination. Due to the timeframe of about 9 months between signing and closing, the business plan has been updated and is based on the FY17 budget of the North American Operations. According to the management of Wirecard, the long-term assumptions of the business plan have not changed between our due diligence and our purchase price allocation.<br><br>The business plan includes only existing customers. The line "new customers" in the business plan reflects only new customers which have been added in 2017 before closing. For the years after 2017 we have not factored new customer growth into the business plan as Wirecard will not be able to onboard customers during the TSA on Citi's BIN. The business plan reflects the years 2017 to 2022. In this timeframe the revenues and EBITDA margins are decreasing to a sustainable value as per the estimation of Wirecard's management. From the year 2023 onwards we have applied a slight growth of 1.0%.<br><br>We have applied the business plan EBITDA margin to the customer relationship for the North American business plan. The North American business plan covers only the revenues which are attributable to the customer relationship.<br><br>The management of WD NAM presented to us an overview about the costs for customer acquisition in FY15 and FY16, which is mostly based on the personnel expenses and some operational expenses. We have multiplied those costs with the revenues of FY15 and FY16 and applied this ratio as customer acquisition costs. |
| **Tax Rate** | 40.0% (Standard US tax rate) |
| **TAB** | Tax useful life of 20 years |
| **WACC** | 7.2% (WACC for the USA without asset premium as we consider the inherent risk as equal to the company risk) |
| **Deferred taxes** | kEUR 40,732 (at 38.3% individual US tax rate) |
| **Valuation result** | kEUR 106,503 (Including TAB) |

Confidential Discovery Material

Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# Wirecard has concluded an unfavorable contract with Citi

## Unfavorable contract “TCPA”

### Valuation approach and parameters

| | | |
|---|---|---|
| **Valuation method** | Market comparison | |
| **Useful lifetime** | 1 year | The useful lifetime is based on the agreed and planned schedule for the change of suppliers (BIN Sponsors). Wirecard expects to switch suppliers fully until the end of 2017. |
| **Derivation of market rates** | According to the PSA, Wirecard is obliged to sign contracts with new BIN Sponsors and has signed two of these agreements. The new agreements are considered as market priced for North American Operations. The market rate has been therefore derived from the pricing schedule of the new agreements (with certain rounding).<br><br>According to the new agreements, we consider a market rate of 3.0 USD-Cent as appropriate. This equals total market fees for 2017 of kUSD 2,770 (kEUR 2,626). | |
| **Derivation of current rates** | The current rates are derived from the business plan for 2017 which makes an explicit planning for these costs and takes certain minimum and additional fees into consideration.<br><br>According to the business plan, fees of kUSD 5,670 (kEUR 5,374) are payable under the TCPA, which is based on a transaction fee of 4.5 USD-Cent and certain additional / minimum fees. | |
| **Derivation of migration schedule** | Wirecard has provided a migration schedule. The volume should be migration to the new BIN Sponsors on a monthly basis in tranches. | |
| **Deferred taxes** | kEUR 1,053 (at 38.3% individual US tax rate) | |
| **Valuation result** | kEUR 2,748 | |

Confidential • Project “Kestrel” Purchase Price Allocation Report • March 8, 2018 Page 34

EYGMBH_0001085

Confidential Discovery Material



# The fair value of the software platform amounts to approximately kUSD 3,500 which is below the book value

## Software "Ecount platform"

### Valuation approach and parameters

| | | |
|---|---|---|
| **Valuation method** | Cost approach | |
| **Useful lifetime** | 5 years | The useful lifetime is derived on discussions with the management of the North American Operations and Wirecard. Based on the strategic rationale of transactions in the electronic payment sector, we concluded that strategic investors would harmonize acquired software with own software products. Wirecard also intends to replace the software with another software from the Wirecard portfolio. After our discussions and based on our experience, we consider a useful lifetime of 5 years as appropriate. |
| **Derivation of replacement costs** | The replacement costs for the "Ecount platform" were calculated by Wirecard. Wirecard has conducted a technical due diligence regarding the IT systems .<br><br>We checked the provided calculation for plausibility and mathematical correctness. | |
| **Adjustment for obsolescence** | No, as the fair value is calculated on replacement costs for the in-use parts of the "Ecount platform". | |
| **Tax Rate** | 40.0% (Standard US tax rate) | |
| **TAB** | Tax useful life of 5 years | |
| **Deferred taxes** | kEUR 6,538 deferred tax asset (at 38.3% individual US tax rate) I Deferred tax assets as the platform is recognized in the tax balance sheet and no revaluation is made for tax purposes. | |
| **Valuation result** | kEUR 3,564<br><br>Before the purchase price allocation, the platform is recognized in the balance sheet of Citi with an value of kEUR 20,632. Before closing, Citi has transferred the platform as part of a pre-closing restructuring from Citi to Ecount, therefore the platform is part of the North America share deal. | |

Confidential Discovery Material



# Wirecard has acquired about 120 employees in the United States

## Workforce

### Valuation approach and parameters

| | | |
|---|---|---|
| **Valuation method** | Asset charge | |
| **Number of employees** | 122 (Based on management information) | |
| **Useful lifetime** | 5 years | The useful lifetime is based on management information. |
| **Derivation of recruitment expenses, training expenses and new hire productivity loss** | Average expenses for recruitment and training have been provided by the management of the North American Operations on a per department level. We have not found any reason to object the provided numbers.<br><br>New hire productivity loss is calculated with average job performances between 5% and 50% at hiring, as indicated by the management. Further the management indicated, that on average a job performance of 100% is reached after 3 to 20 months, depending on the respective job role. | |
| **Tax Rate** | 40.0% (Standard US tax rate) | |
| **TAB** | Tax useful life of 5 years | |
| **Average sales** | kEUR 111,399 (Average sales for the period from FY17 to FY21 in order to align average sales and useful lifetime) | |
| **Valuation result** | The fair value of the assembled workforce (after tax, including TAB) amounts to kEUR 9,991.<br><br>The asset charge for the workforce amounts to 0.40% after tax | |

Confidential Discovery Material

# Goodwill amounts to slightly more than 50% of the consideration transferred

## Derivation of Goodwill

### Goodwill

| Kestrel I Goodwill<br>in kEUR | Mar9, 2017<br>Before PPA | |
|---|---|---|
| Consideration transferred | 179,646 | 100% |
| Net assets (Before closing date adjustements) | 33,171 | 18% |
| Closing date adjustments | (18,546) | -10% |
| **Net assets (After closing date adjustements)** | **14,624** | **8%** |
| + Fair Value of holiday provisions | 250 | 0% |
| + Fair Value of non-recorded provisions for migration | 2,180 | 1% |
| + Fair Value of unfavorable contract | 2,748 | 2% |
| ./. Fair Value of Ecount platform | (3,564) | -2% |
| ./. Fair Value of customer relationship | (106,503) | -59% |
| **Fair Value of PPA assets and liabilities** | **(104,889)** | **-58%** |
| + Deferred taxes on PPA assets and liabilities | 32,210 | 18% |
| **Goodwill** | **92,342** | **51%** |

Source: Closing Date Accounts, BT Analysis

### Description

- The net assets of the North American Operations are based on the audited closing date accounts, but include certain unaudited closing date adjustments.
- During the purchase price allocation intangible assets with a fair value of kEUR 110,068 are recognized which include customer relationships and acquired software. Furthermore unrecorded liabilities and provisions in the amount of kEUR 5,178 are recognized.
- The goodwill amounts to kEUR 92,342 or 51.4% of the consideration transferred.
- Amongst other, Wirecard has acquired the North American Operations for the following reasons:
  - Market entry into the US market by the acquisition of a leading provider of prepaid credit cards;
  - Highly experienced management team and about 120 employees;
  - Growth potential through cross-selling initiatives;
  - Solid financials.





Confidential Discovery Material



Executive Summary I Engagement I PPA Principles I Transaction background I Identification I Valuation I Appendix

BAKER TILLY

# Table of contents

| | | |
|---|---|---|
| I. | Executive Summary | 2 |
| II. | Engagement and Project Structure | 4 |
| III. | Principles of the Purchase Price Allocation | 9 |
| IV. | Transaction background | 14 |
| V. | Identification | 23 |
| VI. | Valuation | 31 |
| **VII.** | **Appendices** | **39** |

Confidential • Project "Kestrel" Purchase Price Allocation Report • March 8, 2018 Page 38

EYGMBH_0001089

Confidential Discovery Material



# Appendix: General Engagement Terms

[Translator's notes are in square brackets]

## General Engagement Terms

for

Wirtschaftsprüfer and Wirtschaftsprüfungsgesellschaften

[German Public Auditors and Public Audit Firms]

as of January 1, 2017

### 1. Scope of application

(1) These engagement terms apply to contracts between German Public Auditors (Wirtschaftsprüfer) or German Public Audit Firms (Wirtschaftsprüfungsgesellschaften) – hereinafter collectively referred to as "German Public Auditors" – and their engaging parties for assurance services, tax advisory services, advice on business matters and other engagements except as otherwise agreed in writing or prescribed by a mandatory rule.

(2) Third parties may derive claims from contracts between German Public Auditors and engaging parties only when this is expressly agreed or results from mandatory rules prescribed by law. In relation to such claims, these engagement terms also apply to these third parties.

### 2. Scope and execution of the engagement

(1) Object of the engagement is the agreed service – not a particular economic result. The engagement will be performed in accordance with the German Principles of Proper Professional Conduct (*Grundsätze ordnungsmäßiger Berufsausübung*). The German Public Auditor does not assume any management functions in connection with his services. The German Public Auditor is not responsible for the use or implementation of the results of his services. The German Public Auditor is entitled to make use of competent persons to conduct the engagement.

(2) Except for assurance engagements (*betriebswirtschaftliche Prüfungen*), the consideration of foreign law requires an express written agreement.

(3) If circumstances or the legal situation change subsequent to the release of the final professional statement, the German Public Auditor is not obligated to refer the engaging party to changes or any consequences resulting therefrom.

### 3. The obligations of the engaging party to cooperate

(1) The engaging party shall ensure that all documents and further information necessary for the performance of the engagement are provided to the German Public Auditor on a timely basis, and that he is informed of all events and circumstances that may be of significance to the performance of the engagement. This also applies to those documents and further information, events and circumstances that first become known during the German Public Auditor's work. The engaging party will also designate suitable persons to provide information.

(2) Upon the request of the German Public Auditor, the engaging party shall confirm the completeness of the documents and further information provided as well as the explanations and statements, in a written statement drafted by the German Public Auditor.

### 4. Ensuring independence

(1) The engaging party shall refrain from anything that endangers the independence of the German Public Auditor's staff. This applies throughout the term of the engagement, and in particular to offers of employment or to assume an executive or non-executive role, and to offers to accept engagements on their own behalf.

(2) Were the performance of the engagement to impair the independence of the German Public Auditor, of related firms, firms within his network, or such firms associated with him, to which the independence requirements apply in the same way as to the German Public Auditor in other engagement relationships, the German Public Auditor is entitled to terminate the engagement for good cause.

### 5. Reporting and oral information

To the extent that the German Public Auditor is required to present results in writing as part of the work in executing the engagement, only that written work is authoritative. Drafts are non-binding. Except as otherwise agreed, oral statements and explanations by the German Public Auditor are binding only when they are confirmed in writing. Statements and information of the German Public Auditor outside of the engagement are always non-binding.

### 6. Distribution of a German Public Auditor's professional statement

(1) The distribution to a third party of professional statements of the German Public Auditor (results of work or extracts of the results of work whether in draft or in a final version) or information about the German Public Auditor acting for the engaging party requires the German Public Auditor's written consent, unless the engaging party is obligated to distribute or inform due to law or a regulatory requirement.

(2) The use by the engaging party for promotional purposes of the German Public Auditor's professional statements and of information about the German Public Auditor acting for the engaging party is prohibited.

### 7. Deficiency rectification

(1) In case there are any deficiencies, the engaging party is entitled to specific subsequent performance by the German Public Auditor. The engaging party may reduce the fees or cancel the contract for failure of such subsequent performance, for subsequent non-performance or unjustified refusal to perform subsequently, or for unconscionability or impossibility of subsequent performance. If the engagement was not commissioned by a consumer, the engaging party may only cancel the contract due to a deficiency if the service rendered is not relevant to him due to failure of subsequent performance, to subsequent non-performance, to unconscionability or impossibility of subsequent performance. No. 9 applies to the extent that further claims for damages exist.

(2) The engaging party must assert a claim for the rectification of deficiencies in writing (*Textform*) [*Translators Note: The German term "Textform" means in written form, but without requiring a signature*] without delay. Claims pursuant to paragraph 1 not arising from an intentional act expire after one year subsequent to the commencement of the time limit under the statute of limitations.

(3) Apparent deficiencies, such as clerical errors, arithmetical errors and deficiencies associated with technicalities contained in a German Public Auditor's professional statement (long-form reports, expert opinions etc.) may be corrected – also versus third parties – by the German Public Auditor at any time. Misstatements which may call into question the results contained in a German Public Auditor's professional statement entitle the German Public Auditor to withdraw such statement – also versus third parties. In such cases the German Public Auditor should first hear the engaging party, if practicable.

### 8. Confidentiality towards third parties, and data protection

(1) Pursuant to the law (§ [Article] 323 Abs 1 [paragraph 1] HGB [German Commercial Code: *Handelsgesetzbuch*], § 43 WPO [German Law regulating the Profession of Wirtschaftsprüfer: *Wirtschaftsprüferordnung*], § 203 StGB [German Criminal Code: *Strafgesetzbuch*]) the German Public Auditor is obligated to maintain confidentiality regarding facts and circumstances confided to him or of which he becomes aware in the course of his professional work, unless the engaging party releases him from this confidentiality obligation.

(2) When processing personal data, the German Public Auditor will observe national and European legal provisions on data protection.

### 9. Liability

(1) For legally required services by German Public Auditors, in particular audits, the respective legal limitations of liability, in particular the limitation of liability pursuant to § 323 Abs. 2 HGB, apply.

(2) Insofar neither a statutory limitation of liability is applicable, nor an individual contractual limitation of liability exists, the liability of the German Public Auditor for claims for damages of any other kind, except for damages resulting from injury to life, body or health as well as for damages that constitute a duty of replacement by a producer pursuant to § 1 ProdHaftG [German Product Liability Act: *Produkthaftungsgesetz*], for an individual case of damages caused by negligence is limited to € 4 million pursuant to § 54 a Abs. 1 Nr. 2 WPO.

(3) The German Public Auditor is entitled to invoke demurs and defenses based on the contractual relationship with the engaging party also towards third parties.

(4) When multiple claimants assert a claim for damages arising from an existing contractual relationship with the German Public Auditor due to the German Public Auditor's negligent breach of duty, the maximum amount stipulated in paragraph 2 applies to the respective claims of all claimants collectively.

(5) An individual case of damages within the meaning of paragraph 2 also exists in relation to a uniform damage arising from a number of breaches of duty. The individual case of damages encompasses all consequences from a breach of duty regardless of whether the damages occurred in one year or in a number of successive years. In this case, multiple acts or omissions based on the same source of error or on a source of error of an equivalent nature are deemed to be a single breach of duty if the matters in question are legally or economically connected to one another. In this event the claim against the German Public Auditor is limited to € 5 million. The limitation to the fivefold of the minimum amount insured does not apply to compulsory audits required by law.

(6) A claim for damages expires if a suit is not filed within six months subsequent to the written refusal of acceptance of the indemnity and the engaging party has been informed of this consequence. This does not apply to claims for damages resulting from scienter, a culpable injury to life, body or health as well as for damages that constitute a liability for replacement by a producer pursuant to § 1 ProdHaftG. The right to invoke a plea of the statute of limitations remains unaffected.

### 10. Supplementary provisions for audit engagements

(1) If the engaging party subsequently amends the financial statements or management report audited by a German Public Auditor and accompanied by an auditor's report, he may no longer use this auditor's report.

If the German Public Auditor has not issued an auditor's report, a reference to the audit conducted by the German Public Auditor in the management report or any other public reference is permitted only with the German Public Auditor's written consent and with a wording authorized by him.

(2) If the German Public Auditor revokes the auditor's report, it may no longer be used. If the engaging party has already made use of the auditor's report, then upon the request of the German Public Auditor he must give notification of the revocation.

(3) The engaging party has a right to five official copies of the report. Additional official copies will be charged separately.

### 11. Supplementary provisions for assistance with tax matters

(1) When advising on an individual tax issue as well as when providing ongoing tax advice, the German Public Auditor is entitled to use as a correct and complete basis the facts provided by the engaging party – especially numerical disclosures; this also applies to bookkeeping engagements. Nevertheless, he is obligated to indicate to the engaging party any errors he has identified.

(2) The tax advisory engagement does not encompass procedures required to observe deadlines, unless the German Public Auditor has explicitly accepted a corresponding engagement. In this case the engaging party must provide the German Public Auditor with all documents required to observe deadlines – in particular tax assessments – on such a timely basis that the German Public Auditor has an appropriate lead time.

(3) Except as agreed otherwise in writing, ongoing tax advice encompasses the following work during the contract period:

a) preparation of annual tax returns for income tax, corporate tax and business tax, as well as wealth tax returns, namely on the basis of the annual financial statements, and on other schedules and evidence documents required for the taxation, to be provided by the engaging party

b) examination of tax assessments in relation to the taxes referred to in (a)

c) negotiations with tax authorities in connection with the returns and assessments mentioned in (a) and (b)

d) support in tax audits and evaluation of the results of tax audits with respect to the taxes referred to in (a)

e) participation in petition or protest and appeal procedures with respect to the taxes mentioned in (a).

In the aforementioned tasks the German Public Auditor takes into account material published legal decisions and administrative interpretations.

(4) If the German Public auditor receives a fixed fee for ongoing tax advice, the work mentioned under paragraph 3 (d) and (e) is to be remunerated separately, except as agreed otherwise in writing.

(5) Insofar the German Public Auditor is also a German Tax Advisor and the German Tax Advice Remuneration Regulation (*Steuerberatungsvergütungsverordnung*) is to be applied to calculate the remuneration, a greater or lesser remuneration than the legal default remuneration can be agreed in writing (*Textform*).

(6) Work relating to special individual issues for income tax, corporate tax, business tax, valuation assessments for property units, wealth tax, as well as all issues in relation to sales tax, payroll tax, other taxes and dues requires a separate engagement. This also applies to:

a) work on non-recurring tax matters, e.g. in the field of estate tax, capital transactions tax, and real estate sales tax;

b) support and representation in proceedings before tax and administrative courts and in criminal tax matters;

c) advisory work and work related to expert opinions in connection with changes in legal form and other re-organizations, capital increases and reductions, insolvency related business reorganizations, admission and retirement of owners, sale of a business, liquidations and the like, and

d) support in complying with disclosure and documentation obligations.

(7) To the extent that the preparation of the annual sales tax return is undertaken as additional work, this includes neither the review of any special accounting prerequisites nor the issue as to whether all potential sales tax allowances have been identified. No guarantee is given for the complete compilation of documents to claim the input tax credit.

### 12. Electronic communication

Communication between the German Public Auditor and the engaging party may be via e-mail. In the event that the engaging party does not wish to communicate via e-mail or sets special security requirements, such as the encryption of e-mails, the engaging party will inform the German Public Auditor in writing (*Textform*) accordingly.

### 13. Remuneration

(1) In addition to his claims for fees, the German Public Auditor is entitled to claim reimbursement of his expenses; sales tax will be billed additionally. He may claim appropriate advances on remuneration and reimbursement of expenses and may make the delivery of his services dependent upon the complete satisfaction of his claims. Multiple engaging parties are jointly and severally liable.

(2) If the engaging party is not a consumer, then a set-off against the German Public Auditor's claims for remuneration and reimbursement of expenses is admissible only for undisputed claims or claims determined to be legally binding.

### 14. Dispute Settlement

The German Public Auditor is not prepared to participate in dispute settlement procedures before a consumer arbitration board (*Verbraucherschlichtungsstelle*) within the meaning of § 2 of the German Act on Consumer Dispute Settlements (*Verbraucherstreitbeilegungsgesetz*).

### 15. Applicable Law

The contract, the performance of the services and all claims resulting therefrom are exclusively governed by German law.



# Appendix: Allgemeine Auftragsbedingungen

## Allgemeine Auftragsbedingungen
für
Wirtschaftsprüfer und Wirtschaftsprüfungsgesellschaften
vom 1. Januar 2017

### 1. Geltungsbereich

**(1)** Die Auftragsbedingungen gelten für Verträge zwischen Wirtschaftsprüfern oder Wirtschaftsprüfungsgesellschaften (im Nachstehenden zusammenfassend „Wirtschaftsprüfer" genannt) und ihren Auftraggebern über Prüfungen, Steuerberatung, Beratungen in wirtschaftlichen Angelegenheiten und sonstige Aufträge, soweit nicht etwas anderes ausdrücklich schriftlich vereinbart oder gesetzlich zwingend vorgeschrieben ist.

**(2)** Dritte können nur dann Ansprüche aus dem Vertrag zwischen Wirtschaftsprüfer und Auftraggeber herleiten, wenn dies ausdrücklich vereinbart ist oder sich aus zwingenden gesetzlichen Regelungen ergibt. Im Hinblick auf solche Ansprüche gelten diese Auftragsbedingungen auch diesen Dritten gegenüber.

### 2. Umfang und Ausführung des Auftrags

**(1)** Gegenstand des Auftrags ist die vereinbarte Leistung, nicht ein bestimmter wirtschaftlicher Erfolg. Der Auftrag wird nach den Grundsätzen ordnungsmäßiger Berufsausübung ausgeführt. Der Wirtschaftsprüfer übernimmt im Zusammenhang mit seinen Leistungen keine Aufgaben der Geschäftsführung. Der Wirtschaftsprüfer ist für die Nutzung oder Umsetzung der Ergebnisse seiner Leistungen nicht verantwortlich. Der Wirtschaftsprüfer ist berechtigt, sich zur Durchführung des Auftrags sachverständiger Personen zu bedienen.

**(2)** Die Berücksichtigung ausländischen Rechts bedarf – außer bei betriebswirtschaftlichen Prüfungen – der ausdrücklichen schriftlichen Vereinbarung.

**(3)** Ändert sich die Sach- oder Rechtslage nach Abgabe der abschließenden beruflichen Äußerung, so ist der Wirtschaftsprüfer nicht verpflichtet, den Auftraggeber auf Änderungen oder sich daraus ergebende Folgerungen hinzuweisen.

### 3. Mitwirkungspflichten des Auftraggebers

**(1)** Der Auftraggeber hat dafür zu sorgen, dass dem Wirtschaftsprüfer alle für die Ausführung des Auftrags notwendigen Unterlagen und weiteren Informationen rechtzeitig übermittelt werden und ihm von allen Vorgängen und Umständen Kenntnis gegeben wird, die für die Ausführung des Auftrags von Bedeutung sein können. Dies gilt auch für die Unterlagen und weiteren Informationen, Vorgänge und Umstände, die erst während der Tätigkeit des Wirtschaftsprüfers bekannt werden. Der Auftraggeber wird dem Wirtschaftsprüfer geeignete Auskunftspersonen benennen.

**(2)** Auf Verlangen des Wirtschaftsprüfers hat der Auftraggeber die Vollständigkeit der vorgelegten Unterlagen und der weiteren Informationen sowie der gegebenen Auskünfte und Erklärungen in einer vom Wirtschaftsprüfer formulierten schriftlichen Erklärung zu bestätigen.

### 4. Sicherung der Unabhängigkeit

**(1)** Der Auftraggeber hat alles zu unterlassen, was die Unabhängigkeit der Mitarbeiter des Wirtschaftsprüfers gefährdet. Dies gilt für die Dauer des Auftragsverhältnisses insbesondere für Angebote auf Anstellung oder Übernahme von Organfunktionen und für Angebote, Aufträge auf eigene Rechnung zu übernehmen. [illegible]

**(2)** [illegible]

### 5. Berichterstattung und mündliche Auskünfte

[illegible]

### 6. Weitergabe einer beruflichen Äußerung des Wirtschaftsprüfers

**(1)** [illegible]

**(2)** [illegible]

### 7. Mängelbeseitigung

**(1)** [illegible]

**(2)** [illegible]

**(3)** [illegible]

### 8. Schweigepflicht gegenüber Dritten, Datenschutz

**(1)** [illegible]

**(2)** [illegible]

### 9. Haftung

**(1)** [illegible]

**(2)** [illegible]

**(3)** [illegible]

**(4)** [illegible]

### 10. Ergänzende Bestimmungen für Prüfungsaufträge

(1) Eine nachträgliche Änderung oder Kürzung des durch den Wirtschaftsprüfer geprüften und mit einem Bestätigungsvermerk versehenen Abschlusses oder Lageberichts bedarf, auch wenn eine Veröffentlichung nicht stattfindet, der schriftlichen Einwilligung des Wirtschaftsprüfers. Hat der Wirtschaftsprüfer einen Bestätigungsvermerk nicht erteilt, so ist ein Hinweis auf die durch den Wirtschaftsprüfer durchgeführte Prüfung im Lagebericht oder an anderer für die Öffentlichkeit bestimmter Stelle nur mit schriftlicher Einwilligung des Wirtschaftsprüfers und mit dem von ihm genehmigten Wortlaut zulässig.

(2) Widerruft der Wirtschaftsprüfer den Bestätigungsvermerk, so darf der Bestätigungsvermerk nicht weiterverwendet werden. Hat der Auftraggeber den Bestätigungsvermerk bereits verwendet, so hat er auf Verlangen des Wirtschaftsprüfers den Widerruf bekanntzugeben.

(3) Der Auftraggeber hat Anspruch auf fünf Berichtsausfertigungen. Weitere Ausfertigungen werden besonders in Rechnung gestellt.

### 11. Ergänzende Bestimmungen für Hilfeleistung in Steuersachen

(1) Der Wirtschaftsprüfer ist berechtigt, sowohl bei der Beratung in steuerlichen Einzelfragen als auch im Falle der Dauerberatung die vom Auftraggeber genannten Tatsachen, insbesondere Zahlenangaben, als richtig und vollständig zugrunde zu legen; dies gilt auch für Buchführungsaufträge. Er hat jedoch den Auftraggeber auf von ihm festgestellte Unrichtigkeiten hinzuweisen.

(2) Der Steuerberatungsauftrag umfaßt nicht die zur Wahrung von Fristen erforderlichen Handlungen, es sei denn, daß der Wirtschaftsprüfer hierzu ausdrücklich den Auftrag übernommen hat. In diesem Falle hat der Auftraggeber dem Wirtschaftsprüfer alle für die Wahrung von Fristen wesentlichen Unterlagen, insbesondere Steuerbescheide, so rechtzeitig vorzulegen, daß dem Wirtschaftsprüfer eine angemessene Bearbeitungszeit zur Verfügung steht.

(3) Mangels einer anderweitigen schriftlichen Vereinbarung umfaßt die laufende Steuerberatung folgende, in die Vertragsdauer fallenden Tätigkeiten:

a) Ausarbeitung der Jahressteuererklärungen für die Einkommensteuer, Körperschaftsteuer und Gewerbesteuer sowie der Vermögensteuererklärungen, und zwar auf Grund der vom Auftraggeber vorzulegenden Jahresabschlüsse und sonstiger, für die Besteuerung erforderlicher Aufstellungen und Nachweise

b) Nachprüfung von Steuerbescheiden zu den unter a) genannten Steuern

c) Verhandlungen mit den Finanzbehörden im Zusammenhang mit den unter a) und b) genannten Erklärungen und Bescheiden

d) Mitwirkung bei Betriebsprüfungen und Auswertung der Ergebnisse von Betriebsprüfungen hinsichtlich der unter a) genannten Steuern

e) Mitwirkung in Einspruchs- und Beschwerdeverfahren hinsichtlich der unter a) genannten Steuern.

Der Wirtschaftsprüfer berücksichtigt bei den vorgenannten Aufgaben die wesentliche veröffentlichte Rechtsprechung und Verwaltungsauffassung.

(4) Erhält der Wirtschaftsprüfer für die laufende Steuerberatung ein Pauschalhonorar, so sind mangels anderweitiger schriftlicher Vereinbarungen die unter Abs. 3 d) und e) genannten Tätigkeiten gesondert zu honorieren.

(5) Die Bearbeitung besonderer Einzelfragen der Einkommensteuer, Körperschaftsteuer, Gewerbesteuer, Einheitsbewertung und Vermögensteuer sowie aller Fragen der Umsatzsteuer, Lohnsteuer, sonstigen Steuern und Abgaben erfolgt auf Grund eines besonderen Auftrages. Dies gilt auch für

a) die Bearbeitung einmalig anfallender Steuerangelegenheiten, z. B. auf dem Gebiet der Erbschaftsteuer, Kapitalverkehrsteuer, Grunderwerbsteuer,

b) die Mitwirkung und Vertretung in Verfahren vor den Gerichten der Finanz- und der Verwaltungsgerichtsbarkeit sowie in Steuerstrafsachen und

c) die beratende und gutachtliche Tätigkeit im Zusammenhang mit Umwandlung, Verschmelzung, Kapitalerhöhung und -herabsetzung, Sanierung, Eintritt und Ausscheiden eines Gesellschafters, Betriebsveräußerung, Liquidation und dergleichen.

(6) Soweit auch die Ausarbeitung der Umsatzsteuerjahreserklärung als zusätzliche Tätigkeit übernommen wird, gehört dazu nicht die Überprüfung etwaiger besonderer buchmäßiger Voraussetzungen sowie die Frage, ob alle in Betracht kommenden umsatzsteuerrechtlichen Vergünstigungen wahrgenommen worden sind. Eine Gewähr für die vollständige Erfassung der Unterlagen zur Geltendmachung des Vorsteuerabzuges wird nicht übernommen.

### 12. Schweigepflicht gegenüber Dritten, Datenschutz

(1) Der Wirtschaftsprüfer ist nach Maßgabe der Gesetze verpflichtet, über alle Tatsachen, die ihm im Zusammenhang mit seiner Tätigkeit für den Auftraggeber bekannt werden, Stillschweigen zu bewahren, gleichviel, ob es sich dabei um den Auftraggeber selbst oder dessen Geschäftsverbindungen handelt, es sei denn, daß der Auftraggeber ihn von dieser Schweigepflicht entbindet.

(2) Der Wirtschaftsprüfer darf Berichte, Gutachten und sonstige schriftliche Äußerungen über die Ergebnisse seiner Tätigkeit Dritten nur mit Einwilligung des Auftraggebers aushändigen.

(3) Der Wirtschaftsprüfer ist befugt, ihm anvertraute personenbezogene Daten im Rahmen der Zweckbestimmung des Auftraggebers zu verarbeiten oder durch Dritte verarbeiten zu lassen.

### 13. Annahmeverzug und unterlassene Mitwirkung des Auftraggebers

Kommt der Auftraggeber mit der Annahme der vom Wirtschaftsprüfer angebotenen Leistung in Verzug oder unterläßt der Auftraggeber eine ihm nach Nr. 3 oder sonst wie obliegende Mitwirkung, so ist der Wirtschaftsprüfer zur fristlosen Kündigung des Vertrages berechtigt. Unberührt bleibt der Anspruch des Wirtschaftsprüfers auf Ersatz der ihm durch den Verzug oder die unterlassene Mitwirkung des Auftraggebers entstandenen Mehraufwendungen sowie des verursachten Schadens, und zwar auch dann, wenn der Wirtschaftsprüfer von dem Kündigungsrecht keinen Gebrauch macht.

### 14. Vergütung

(1) Der Wirtschaftsprüfer hat neben seiner Gebühren- oder Honorarforderung Anspruch auf Erstattung seiner Auslagen; die Umsatzsteuer wird zusätzlich berechnet. Er kann angemessene Vorschüsse auf Vergütung und Auslagenersatz verlangen und die Auslieferung seiner Leistung von der vollen Befriedigung seiner Ansprüche abhängig machen. Mehrere Auftraggeber haften als Gesamtschuldner.

(2) Eine Aufrechnung gegen Forderungen des Wirtschaftsprüfers auf Vergütung und Auslagenersatz ist nur mit unbestrittenen oder rechtskräftig festgestellten Forderungen zulässig.

### 15. Aufbewahrung und Herausgabe von Unterlagen

(1) Der Wirtschaftsprüfer bewahrt die im Zusammenhang mit der Erledigung eines Auftrages ihm übergebenen und von ihm selbst angefertigten Unterlagen sowie den über den Auftrag geführten Schriftwechsel zehn Jahre auf.

(2) Nach Befriedigung seiner Ansprüche aus dem Auftrag hat der Wirtschaftsprüfer auf Verlangen des Auftraggebers alle Unterlagen herauszugeben, die er aus Anlaß seiner Tätigkeit für den Auftrag von diesem oder für diesen erhalten hat. Dies gilt jedoch nicht für den Schriftwechsel zwischen dem Wirtschaftsprüfer und seinem Auftraggeber und für die Schriftstücke, die dieser bereits in Urschrift oder Abschrift besitzt. Der Wirtschaftsprüfer kann von Unterlagen, die er an den Auftraggeber zurückgibt, Abschriften oder Fotokopien anfertigen und zurückbehalten.

### 16. Anzuwendendes Recht

Für den Auftrag, seine Durchführung und die sich hieraus ergebenden Ansprüche gilt nur deutsches Recht.

Confidential Discovery Material