# EXHIBIT  31

EXHIBIT 3



PricewaterhouseCoopers GmbH
Wirtschaftsprüfungsgesellschaft

Bernhard-Wicki-Straße 8
80636 München
Postfach 21 02 63
80672 München
www.pwc.de

PricewaterhouseCoopers GmbH Wirtschaftsprüfungsgesellschaft
Bernhard-Wicki-Straße 8, 80636 München

Wirecard North America Inc.
Mrs. Steidl
555E North Lane
Conshohocken, PA 19428
United States

## INDEPENDENT AUDITOR'S REPORT

To Wirecard North America Inc., Conshohocken, PA, United States

### Qualified opinion

We have audited the closing date accounts as defined in section 2.10 of the Purchase and Sale Agreement between Citibank, N.A., Wirecard Acquiring & Issuing GmbH and Wirecard AG dated June 29, 2016, (the "Agreement"), which comprise the balance sheet as at February 28, 2017, and the statement of income for the period from July 1, 2016, to February 28, 2017, (the "Closing Date Accounts"), prepared by Wirecard North America Inc., Conshohocken, for the business as defined in Article I, Section 1.1 of the Agreement (the "North America Business").

In our opinion, except for the possible effects of the matter described in the "Basis for qualified opinion" section of our report, the accompanying Closing Date Accounts for the North America Business are prepared, in all material respects, in accordance with the financial reporting provisions of section 2.10(b)(i) of the Agreement and the further specifications as set out in note 1 to the Closing Date Accounts (together the "Basis of Preparation").

### Basis for qualified opinion

The Closing Date Accounts contain inventories of USD 0.7 million (gross value USD 2.2 million; inventory reserve USD 1.5 million) as of February 28, 2017 which are held by Citi North America Operations & Technology. Citi North America Operations & Technology has outsourced its service to the third party Gemalto. We were unable to obtain sufficient appropriate audit evidence about the existence and completeness and therefore the recorded amount of these inventories as of February 28, 2017, because we did not receive a confirmation of inventories from Gemalto and it has communicated to us by Wirecard North America Inc. that Gemalto is not able to retrieve the information for February 28, 2017 retrospectively. Consequently, we were unable to determine whether any adjustments to this amount were necessary.

We conducted our audit in accordance with International Standards on Auditing (ISAs). Our responsibilities under those standards are further described in the "Auditor's responsibilities for the

...

Vorsitzender des Aufsichtsrats: WP StB Dr. Norbert Vogelpoth
Geschäftsführer: WP StB Prof. Dr. Norbert Winkeljohann, WP StB Dr. Peter Bartels, WP StB CPA Markus Burghardt, Dr. Klaus-Peter Gushurst, WP StB Petra Justenhoven, WP StB Harald Kayser, StB Marius Möller, StB Petra Raspels, WP StB Martin Scholich
Sitz der Gesellschaft: Frankfurt am Main, Amtsgericht Frankfurt am Main HRB 107858
PricewaterhouseCoopers GmbH Wirtschaftsprüfungsgesellschaft is member of PricewaterhouseCoopers International, a Company limited by guarantee registered in England and Wales

Confidential Personal Information
Confidential Discovery Material



audit of the Closing Date Accounts" section of our report. We are independent of the North America Business in accordance with the ethical requirements that are relevant to our audit of the Closing Date Accounts in Germany, and we have fulfilled our other ethical responsibilities in accordance with these requirements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our qualified opinion.

### *Emphasis of matter - restriction on distribution and use*

We draw attention to section 2.10(b)(i) of the Agreement and the further specifications as set out in note 1 to the Closing Date Accounts, which describe the basis of preparation indicating that the Closing Date Accounts are to be prepared on the assumption to continue as a going concern. Moreover, we draw attention to the fact, that the Closing Date Accounts do not comprise a complete set of financial statements of the North America Business in accordance with International Financial Reporting Standards or accounting principles generally accepted in the United States of America and are not intended to give a true and fair view of the net assets and financial position as at February 28, 2017, and results of operations for the period from July 1, 2016, to February 28, 2017, of the North America Business in accordance with International Financial Reporting Standards or accounting principles generally accepted in the United States of America. The North America Business has not operated as a separate stand-alone entity. The Closing Date Accounts are, therefore, not necessarily indicative of results that would have occurred if the North America Business had been a separate stand-alone entity during the period presented or of future results of the North America Business. Our opinion is not modified in respect of this matter.

The Closing Date Accounts are prepared to assist Wirecard North America Inc., Conshohocken, in complying with the financial reporting provisions of the Agreement. As a result, the Closing Date Accounts may not be suitable for another purpose. Our report is intended solely for Wirecard North America Inc., Conshohocken, Wirecard AG, Aschheim, and Citibank, N.A., New York and should not be distributed to or used by parties other than Wirecard North America Inc., Conshohocken, Wirecard AG, Aschheim, or Citibank, N.A. New York.

### *Responsibilities of management and those charged with governance for the Closing Date Accounts*

Management of Wirecard North America Inc., Conshohocken, is responsible for the preparation of the Closing Date Accounts in accordance with the Basis of Preparation and for such internal control as management determines is necessary to enable the preparation of Closing Date Accounts that are free from material misstatement, whether due to fraud or error.

Those charged with governance are responsible for overseeing the financial reporting process to prepare the Closing Date Accounts for the North America Business.

### *Auditor's responsibility for the audit of the Closing Date Accounts*

Our objectives are to obtain reasonable assurance about whether the Closing Date Accounts as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if,

...



individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these Closing Date Accounts.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional scepticism throughout the audit. We also:

1. Identify and assess the risks of material misstatement of the Closing Date Accounts, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

2. Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of internal control.

3. Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.

4. Evaluate the overall presentation, structure and content of the Closing Date Accounts.

5. Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the North America Business to express an opinion on the Closing Date Accounts. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

...



*General terms of engagement*

We issue this report on the basis of the engagement agreed with the Wirecard North America Inc., Conshohocken, PA, United States, which comprises the attached General Terms of Engagement for Wirtschaftsprüfer and Wirtschaftsprüfungsgesellschaften as of January 1, 2017, which are also applicable to third parties.

This report shall be exclusively governed by German law with the exception of the international law of conflicts (*Internationales Privatrecht*). Exclusive place of jurisdiction for any action or other legal proceedings arising out of or in connection with this report shall be Frankfurt am Main.

Munich, October 26, 2017

PricewaterhouseCoopers GmbH
Wirtschaftsprüfungsgesellschaft




Confidential Personal Information
Confidential Discovery Material

# Note 1 to the Closing Date Accounts for Wirecard North America Inc.

## as of February 28, 2017

## in accordance with

## section 2.10. of the Purchase and Sale Agreement between Citibank N.A., Wirecard Acquiring & Issuing GmbH and Wirecard AG dated June 29, 2016

**Wirecard North America Inc.**

NOTE 1 TO THE CLOSING DATE ACCOUNTS

as of February 28, 2017

1

Confidential Personal Information
Confidential Discovery Material

EYGMBH_0001097

**Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017**

**I.    Table of Content**

| | | |
|---|---|---|
| I. | Table of Content | 2 |
| II. | List of Abbreviations | 3 |
| III. | Definitions | 3 |
| IV. | Final Closing Date Balance Sheet | 4 |
| V. | Pro forma Statement of Income | 5 |
| VI. | Basis of Preparation | 6 |
| | 1.   Final Closing Date Balance Sheet | 8 |
| | 2.   Pro forma statement of income | 11 |
| VII. | Summary of Significant Accounting Policies | 13 |
| VIII. | Final Net Working Capital Amount | 21 |
| IX. | Final Closing Cash Amount | 22 |
| X. | Final Closing Indebtedness Amount | 22 |

2

Confidential Personal Information
Confidential Discovery Material

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

## II.    List of Abbreviations

| | |
|---|---|
| ACH | Automated Clearing House |
| AML | Anti–Money Laundering |
| ATM | Automated Teller Machine |
| BTB | Build-the-bank |
| CFPB | Consumer Financial Protection Bureau |
| CRS | Citi Realty Services |
| FTE | Full-time Equivalent |
| FVD | Face Value Discount |
| FY | Fiscal Year |
| GP | Great Plains |
| IVR | Interactive Voice Response |
| LIBOR | London Interbank Offer Rates |
| NAM | North America |
| NBPCA | Network Branded Prepaid Card Association |
| NOA&T | Citi North America Operations & Technology |
| PA | Pennsylvania |
| PSA | Purchase and Sale Agreement |
| PTS | Project Tracking System |
| RTB | Run-the-bank |
| SG&A | Sales, General & Administrative |
| SQL | Structured Query Language |
| T&E | Travel & Entertainment |
| TCS | Tata Consultancy Services |
| TTS | Treasury and Trade Solutions |
| UAE | United Arab Emirates |
| US GAAP | United States Generally Accepted Accounting Principles |
| WD A&I | Wirecard Acquiring & Issuing GmbH |

## III.    Definitions

Please note that the sold entity Ecount, Inc. was merged onto Kestrel Merger Acquisitions Corp. on the date of closure and then re-named to **Wirecard North America Inc**. For simplification the company is referred to as Wirecard North America Inc. only in this report.

Please note that whenever it is referred to the time period before closing (March 9, 2017) "**management**" describes Citi staff members as well as Ecount Inc. staff members.

3

Confidential Personal Information
Confidential Discovery Material

F   Footed

**Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017**

IV.   **Final Closing Date Balance Sheet**

## Wirecard North America Inc. - Final Closing Date Balance Sheet
*($ in millions)*

|  | Feb, 28 2017 | |
|---|---|---|
| **Assets** | | |
| Cash and Cash Equivalents | $0.0 | ✓ |
| Accounts Receivables | 0.1 | ✓ |
| Inventories | 2.4 | ✓ |
| Face Value Discount | 20.2 | ✓ |
| Unbilled Loaded Funds | 0.0 | ✓ |
| Other Assets | 0.1 | ✓ |
| Current Tax Assets | 0.0 | |
| Deferred Tax Assets | 0.0 | |
| Property, Equipment & Technology | 22.6 | ✓ |
| **Total** | **$45.4** | **F** |
| **Liabilities** | | |
| Gross Client Deposit Liabilities | $0.0 | |
| Accounts Payables | 1.0 | ✓ |
| Other Current Liabilities (Accrued Compensation) | 9.4 | ✓ |
| Current Tax Liabilities | 0.0 | |
| Other Liabilities | 0.0 | |
| **Total** | **$10.4** | **F** |
| **Equity** | **$35.0** | ✓ |
| **Total** | **$45.4** | **F** |

Minor differences may occur due to rounding.

4

Confidential Personal Information
Confidential Discovery Material

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

V.    Pro forma Statement of Income

**Wirecard North America Inc.**
**Pro forma Statement of Income**
**as of February 28, 2017**

|  | Wirecard NA Stand Alone |
|---|---|
|  | July 1, 2016 to February 28, 2017 |
| in $ million |  |
| Revenue | 89.7 |
| Transaction expenses | 33.0 |
| *Card expenses* | 7.0 |
| *ATM expenses* | 13.2 |
| *Processing expenses* | 6.8 |
| *Customer service expenses* | 6.0 |
| Direct expenses | 14.1 |
| *Compensation and benefits* | 2.4 |
| *Operations and technology* | 9.4 |
| *Administrative and other* | 2.3 |
| Allocations | 0.6 |
| **Income before income taxes** | **42.1** |
| Income tax (expense) income | 12.2 |
| **Net Income** | **29.8** |

5

Confidential Personal Information
Confidential Discovery Material

EYGMBH_0001101

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

## VI.  Basis of Preparation

### Background

CITIGROUP Inc. ("Citigroup", "Citi") and its primary business segments ("Citicorp", "Citi Holdings") is a global diversified financial services holding company whose businesses provide consumers, corporations, governments and institutions with a broad, yet focused, range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, trade and securities services and wealth services.

Citigroup Inc.'s ("Citigroup", "Citi") Treasury and Trade Solutions ("TTS") business unit serves corporations, public sector clients and financial institutions by providing cash management solutions (receivables, payments, cards, liquidity and investments, and channel services) and supply chain finance (trade services, trade finance and export & agency finance).

Citigroup has contemplated a divestiture of its Prepaid Card Services business (the "Company", "Prepaid Cards Business", "Prepaid"), which historically operated under TTS until December 2014. As of the beginning of 2015, the Prepaid Cards Business was transferred to Citi Holdings in connection with the contemplated sale. The Prepaid Cards Business provides custom electronic payment solutions to replace traditional funding methods used by businesses and governments for a variety of payments. Its key product segments include incentive payments, compensation, and public sector payments. The Company has an institutional client base and it does not provide any prepaid card programs directly to consumers. The Company offers two primary forms of prepaid cards: (i) one-time cards and (ii) reloadable cards.

The Prepaid Cards Business operations included in the contemplated transaction are located in the United States and Canada (the North America, or "NAM" region) as well as Australia, Western Europe, South Africa, United Arab Emirates ("UAE"), Philippines, and Mexico (collectively, the "International" region).

The Prepaid Cards Business in NAM is conducted through Ecount, Inc. [doing business as ("dba") Citi Prepaid Services and formerly known as ("fka") C/Base] and Ecount Services Corporation legal entities. Only the Ecount Inc. legal entity is included in the contemplated transaction group. The international Prepaid Cards Business operates across several Citi legal entities in each foreign jurisdiction, which are not included in the transaction. Only client contracts, certain employees and working capital attributable to the in-scope countries will be included in the sale.

The contemplated divestiture includes contracts and agreements with clients, vendors, and payment networks; prepaid operations and technology platforms in NAM as well as management and staff required to operate the business.

According to the purchase and sale agreement ("PSA") dated June 29, 2016, Citigroup Inc. will transfer Citi's Prepaid Cards Business in North America ("Citigroup, N.A.") to the German entity WIRECARD ACQUIRING & ISSUING GMBH ("WD A&I).

The sale of Citigroup, N.A. to the German entity was completed on February 28, 2017 after all necessary approvals from the relevant authorities have been obtained.

### Definition of the Prepaid Card business

The Prepaid Cards Business is the Company's process flow from the funding of prepaid cards to the settlement of the corresponding cardholder liability. The Prepaid Cards Business of Citi focuses on North American and various international markets. Prepaid only operates as a B2B business with corporate customers. The Company has no legal relationships with individuals as end-customers of the offered prepaid credit cards.

Prior to the transaction the North America Prepaid Cards Business is conducted via ECOUNT Inc., which is subject to the transaction as a share deal. Nevertheless, certain assets and employment contracts of Prepaid are actually located in other Citi legal entities. These contracts are purchased by Kestrel Merger Acquisition Corp. via asset deals at closing of the transaction. Kestrel Merger Acquisition Corp. has been merged with Ecount Inc. on March 9, 2017. Ecount Inc. has been renamed as Wirecard North America, Inc. on March 9, 2017.

The following figure represents an overview of the legal entities included within CITIGROUP, which are part of the transaction:

6

Confidential Personal Information
Confidential Discovery Material

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017



## Basis of Financial Statements

CITIGROUP Inc. (the "Seller") has prepared pro forma financial statements of the Prepaid Cards Business for its NAM region as of December 31, 2014 and December 31, 2015 and presented on a stand-alone basis. The financial statements are presented in accordance with United States Generally Accepted Accounting Principles (US-GAAP). The starting point for preparing the pro forma financial statements are the financial statements for ECOUNT Inc., which are included in the audited financial statements of CITIGROUP Inc. The pro forma financial statements were prepared by the management of Prepaid on a stand-alone basis. For this purpose, all allocations and other costs charged from any Citi entity to ECOUNT Inc. were replaced by estimated stand-alone costs.

The Closing Date Accounts have been prepared based on the assumption that ECOUNT Inc. will continue as a going concern. The Closing Date Accounts the statement of financial position of the prepaid business in the United States as of February 28, 2017, on the contrary the statement of income is comprised of the United States and Canada business for the period July 1, 2016 to February 28, 2017.

The Closing Date Accounts may not be indicative of ECOUNT's future performance and does not necessarily reflect what its financial position would have been had ECOUNT Inc. operated as an independent group/business in the past. In addition to favorable industry and market conditions including material costs, the future profitability and cash flows of ECOUNT depend on its ability to receive financing.

The Closing Date Accounts have been prepared in millions of dollars ($ million). Rounding differences may arise when individual amounts or percentages are added.

7

Confidential Personal Information
Confidential Discovery Material

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

1.  **Final Closing Date Balance Sheet**

Management uses the Great Plains ("GP") US balance sheet as the starting point for preparing the Closing Date Accounts for ECOUNT, as it was the most representative of the entire NAM business (included US but excluded non-Prepaid Cards Business' balances). Management made certain reclassification adjustments (i.e., breakdown of accounts based on details reported in Great Plains) and carve-out / carve-in adjustments to better reflect the Prepaid Cards Business on a stand-alone basis. In accordance with the PSA, the Seller shall sell, or shall cause their applicable Affiliates to, sell, transfer and assign to Buyer, and that Buyer shall accept and purchase from Sellers or their applicable Affiliates, the Shares and the Purchased Assets, and assumes the Assumed Liabilities (as defined below), The assets and liabilities shown in the Closing Date Accounts represent the sum of all assets and liabilities reported by Citi.

*Purchased Assets:*

Any assets and properties that are specifically listed or described below shall be Purchased Assets (please refer to purchase and sale agreement ("PSA") Section 2.2 clauses (a) through (n)):

1)  Cash,

2)  Face Value Discount ("FVD"),

3)  Inventories,

4)  The leasehold interest of Parent Seller,

5)  Equipment including furniture, equipment, fixtures, supplies, computer hardware and other tangible personal property located at the Facility and primarily used by the North America Business.

6)  Contracts under the heading North America Client Contracts, Contracts under the heading International Client Contracts, together with the North America Client and the vendor and other Contracts relating to the North America Business, including those with respect to Seller Licensed Intellectual Property.

7)  Shared Client Contracts only with respect to those portions that relate to the Business.

8)  Seller Owned Intellectual Property (other than Trademarks), the Ecount CORE Platform unregistered copyrights, trade secrets and other Intellectual Property of a similar nature which relate primarily to the North America Business,

9)  All business and financial records, books, and documents.

10) Accounts receivable exclusively relating to the North America Business as of the Closing Date.

11) Claims, causes of action or rights of set-off against Third Parties,

12) All goodwill associated with the Purchased Assets,

13) Other purchased assets such as Parent Seller's, its applicable Affiliates' and Target's rights to

   a.  any cardholder fees associated with active and inactive customer prepaid cards issued under contracts between customers of the Business and Parent Seller, which contracts remain in force as of the Closing Date and

   b.  the revenue associated with active and inactive customer prepaid cards issued under contracts between current or former customers of the Business and Parent Seller, which contracts were terminated, expired or inactive prior to the date hereof or as of the Closing Date (please refer to Seller Disclosure Letter Section 2.2 (m)).

14) Any advance payments (including advance payments with respect to the International Business).

8

Confidential Personal Information
Confidential Discovery Material

EYGMBH_0001104

## Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

*Assumed Liabilities:*

Upon the terms, and subject to the conditions, set forth below, Buyer agrees, effective at the Closing, to assume and to satisfy and discharge when due only the following Liabilities of Sellers (please refer to purchase and sale agreement ("PSA") Section 2.4):

1) Liabilities, resulting from, or arising out of the Business Contracts (see PSA Section 2.4 clause (a)).

2) Liabilities, arising after the Closing to the extent relating to, resulting from or arising out of the Purchased Assets (other than the Business Contracts (see PSA Section 2.4 clause (b)).

3) Accounts payable relating exclusively to the North America Business as of the Closing Date (see PSA Section 2.4 clause (c)).

4) Other Current Liabilities included in the Final Closing Date Balance Sheet (including accrued commission, accrued bonus, accrued payroll, accrued processor fees, accrued cost of sales, accrued miscellaneous expenses and deferred revenue) (see PSA Section 2.4 clause (d)).

5) The Liabilities of Parent Seller (other than issuing bank-related Liabilities of Parent Seller specifically described in the Transitional Card Program Agreement) and Target to the cardholders associated with active and inactive customer prepaid cards issued under contracts between current or former customers of the Business and Parent Seller, which contracts were terminated, expired or inactive prior to or on the date hereof or as of the Closing Date (see PSA Section 2.4 clause (g) and Seller Disclosure Letter section 2.4 (g)).

### *Adjustments to present Prepaid Cards Business on stand-alone basis*

*Cash and cash equivalents*

Management made a pro forma adjustment to remove cash balances equal to the gross cardholder liability from the closing balance sheet given that, post-transaction, the cash balances and corresponding gross cardholder liability will be held by a third-party issuing bank (please refer to PSA Section 2.3 clause (c)).

*Accounts receivables*

Management eliminated intercompany receivables (please refer PSA Section 2.5 clause (a)).

*Inventories*

Management made a reclassification adjustment ( ~ USD 700k) of prepaid items and other assets associated with inventory to present the inventory balance as of February 28, 2017 on a stand-alone basis. In this context, inventory balances attributable to the Canada business, intercompany balances and the P2P holding account have been eliminated (please refer to PSA section 2.3 clause (k) (iii) and Seller Disclosure Letter section 1.1. (A)).

*Face Value Discount ("FVD")*

As FVD for Canada has been reported within accounts receivable, Management made a reclassification adjustment ( ~ USD 80k) of Canadian accounts receivable associated with Face Value Discount to present FVD balance as of February 28, 2017 (please refer to Seller Disclosure Letter section 1.1 (A)). However, management eliminated the FVD balance of the Canadian business as of February 28, 2017 in order to present FVD balance attributable to United States business on a stand-alone basis.

*Unbilled loaded funds*

Based on management information received, funding for these programs is assumed by a third-party issuing bank post-transaction. Hence, management made a pro forma adjustment to remove amounts relating to receivables for the instant issued programs, which are primarily offered to the Company's

9

## Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

plasma donation clients (please refer to PSA Section 2.3 clause (m) and Seller Disclosure Letter section 2.3 (m) 4.).

Furthermore, management indicated the post-transaction process for funding this type of program will be discussed and negotiated with a third-party issuing bank, which may determine whether these items will be reported on- or off-balance sheet.

*Property, equipment & technology*

Management made the following stand-alone adjustments to PP&E:

– Carve-in of capitalized development costs for technology assets, which are centrally recorded in a Citi reporting entity (Ecount Core platform was transferred from Citi to Ecount Inc. before the closing on March 9, 2017). According to the PSA Section 2.2 clause (h) and the Seller Disclosure Letter Section 3.15 the purchased intellectual property comprises seller owned intellectual property (excluding any Citi Marks), internally-developed capitalized software primarily related to the development of various applications within the Prepaid Core system. Unregistered copyrights, trade secrets and other Intellectual Property of a similar nature (other than Trademarks) which relate primarily to the North America Business.

– Carve-in of leasehold improvement costs associated with the Conshohocken, PA, building, which are centrally recorded in Citi Realty Services (please refer to PSA Section 2.2 clause (d) and (e)) (leasehold improvements was transferred from Citi to Ecount Inc. before the closing on March 9, 2017). According to the seller disclosure letter section 2.3 (m) item 8, the assets located in the Facility comprise user hardware, Avaya phone equipment, network equipment and Cisco Terminal Server.

– Elimination of goodwill associated with the purchased assets, which will be reassessed by the buyer in purchase accounting (please refer to PSA Section 2.2 clause (l)).

*Tax-Related Receivables and Payables*

Management eliminated all current and deferred tax assets liabilities as Management indicated these items are to be retained by Parent Seller post transaction (please refer to PSA Section 2.3 clause (a)). This adjustment included the elimination of a prepaid tax item, which was historically reported as a prepaid expense within the "Unbilled Loaded Funds" account.

*Gross client deposit liabilities*

Pro forma adjustments were made to eliminate all gross client deposit liabilities (please refer to PSA Section 2.3 clause (c)), as post-transaction these liabilities will be withheld by a third party issuing bank (Citibank N.A. through closing). Gross client deposit liabilities includes the following:

– Cardholder liability represents the Company's liability to cardholders for the remaining balances on outstanding prepaid cards. This liability is gross of any FVD provided to clients, as the FVD is recorded in other assets.

*Negative balance fee reserve*

In some cases, the Company incurs losses on overdrawn prepaid cards. As the cardholder uses the card, the cardholder liability account is debited. When the card balance results in a negative balance, the Company records an expense on the pro forma statement of income with a credit to this negative balance fee reserve to offset the debit entries to cardholder liability. This reserve represents the aggregate of negative balances on outstanding cards.

*Equity*

In the Closing Date Accounts, the excess of assets over liabilities is reflected as a residual value in equity.

10

Confidential Personal Information
Confidential Discovery Material

EYGMBH_0001106

## Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

*Accounts payables*

Management eliminated intercompany payables (please refer PSA Section 2.5 clause (a)).

*Other liabilities*

This position primarily relates to miscellaneous liabilities awaiting settlement. Intercompany payables, which are reported in this account, were eliminated from the carve-out balance sheet (please refer to PSA Section 2.5 clause (a)). Furthermore, Management eliminated its majority investment in a non-prepaid business subsidiary for the December 31, 2015 North America Business financial statements. This investment was made for internal structuring purposes and the subsidiary does not relate to the Prepaid Cards Business (please refer to Seller Disclosure Letter section 1.1 (A)).

### 2. Pro forma statement of income

The following discusses the methodology used by Management in determining the adjustments required to present the Prepaid Cards Business pro forma statement of income for the NAM region on a stand-alone basis (please refer to Seller Disclosure Letter section 1.1 (A)). Management removed general expense allocations charged to the prepaid cards business by Citi and replaced these allocations with estimates of the associated stand-alone costs, which are discussed below. In addition, Management made estimates for incremental costs related to losing Citi Enterprise Pricing or expenses that Citi has not historically charged to the business.

The nature and composition of the accounts presented in the prepaid cards business' pro forma statement of income for its NAM region is described as follows.

The pro forma statement of income reflect the revenue and expenses attributable to Prepaid and include both the revenues and expenses for the United States and Canada business. The following adjustments have been made in order to present Prepaid on a stand-alone basis.

*General allocations from Citi*

The Company was historically charged general allocations for relationship management, operations (starting in FY13) and other functional areas based on an internal allocation methodology representative of Citi's internal cost structure. Management has removed these general allocations from the pro forma income statement and replaced with stand-alone cost estimates (please refer to Seller Disclosure Letter section 1.1 (A)).

*Revenue: stand-alone adjustments*

Management estimated an increase in non-interest revenue based on an assumed 1.6% unregulated interchange rate benefit as a result of the business utilizing an issuing bank that is not subject to the Durbin Amendment, if the Prepaid Cards Business utilizes an issuing bank with less than $10 billion in assets (please refer to Seller Disclosure Letter section 1.1 (A)).

*Transaction expense: stand-alone adjustments*

Management prepared stand-alone adjustments for certain expenses that Citi had not historically charged the Prepaid Cards Business (please refer to Seller Disclosure Letter section 1.1 (A)).

*Automated clearing house ("ACH") fees*

ACH fees include expenses for client's direct deposit loading of cards and cardholder transfers of cards processed through Citibank's ACH services. Management estimated a 5 cent ($0.05) cost per transaction and utilized actual ACH volumes to calculate the incremental stand-alone expense in the pro forma statement of income (please refer to Seller Disclosure Letter section 1.1 (A)).

11

Confidential Personal Information
Confidential Discovery Material

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

*Other processing costs*

Management increased its other processing costs to reflect the following (please refer to Seller Disclosure Letter section 1.1 (A)):

- – Checking processing fees include the cost of checks issued to cardholders to close out their account or cardholder checks written from their prepaid card account (add-on features provided on specific cards). Management estimated a $1 cost per check and utilized actual check volumes generated from the ATLYS system to calculate this incremental stand-alone expense.

- – Issuing bank expense includes fees paid to the issuing bank for the issuance of the prepaid cards. Management estimated a $0.045 cost per transaction to calculate this incremental stand-alone expense based on pricing information provided by the Network Branded Prepaid Card Association ("NBPCA") and actual historical issuance volumes for the Company.

<u>Direct expense: stand-alone adjustments</u>

Certain fixed expenses within the Prepaid Cards Business are recorded through an intercompany charge. The following provides an overview of stand-alone estimates prepared by Management replacing the Company's historical fixed expenses, which were primarily intercompany charges allocated by Citi (please refer to Seller Disclosure Letter section 1.1 (A)).

*Compensation and Benefits*

Management made an adjustment to estimate the stand-alone compensation and benefits costs for the following functions (please refer to Seller Disclosure Letter section 1.1 (A)):

- • Operations function – Management made standalone cost estimates for 37 employees, including AML & sanction screening operations, interactive voice response ("IVR"), customer service, client account services, network, collateral fraud, risk, vendor, and financial operations.

- • Back-office – Management made standalone cost estimates for employees within the legal, HR, compliance, insurance/risk, finance, pricing, marketing and implementation departments.

- • Business development – Management made a standalone cost estimate for one employee dedicated to business development.

- • Implementation analyst – Management made a standalone cost estimate for one employee who was hired at the beginning of FY2016 to oversee implementation projects. This adjustment was only reflected in the FY2015 standalone income statement.

*External Legal*

For purposes of the pro forma statement of income, Management made an adjustment for legal costs and included the costs of a 25% FTE, i.e. quarterly costs of USD 13k (please refer to Seller Disclosure Letter section 1.1 (A)).

*Operation and Technology*

Management adjusted the historical and forecasted technology expenses to represent all-in compensation costs for full-time employees including technical, infrastructure, release, quality assurance, production support, desktop managers and supporting analysts within the technology department to operate the North America Business on a stand-alone basis (please refer to Seller Disclosure Letter section 1.1 (A)). Management adjusted the historical and forecasted technology expenses to represent all-in compensation costs for full-time employees ("FTEs") required to operate the North America Business on a standalone basis. Management estimated standalone costs for 59 FTEs, including a Chief Technology Officer, Project Management Office lead, as well as technical, infrastructure, release, quality assurance, production support and desktop managers and supporting analysts.

12

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

*Software/Updates*

Management estimated the stand-alone costs of software (e.g. Microsoft Office and Great Plains) and updates based on previous years' run-rates (before the costs were managed by Citi) adjusted for any estimated increase in costs (please refer to Seller Disclosure Letter section 1.1 (A)).

*Other SG&A*

Management estimates USD 2 million for insurance and audit expenses which either has been borne by CITI before or did not occur so far. The estimate includes insurance costs of $750k to $ 1,000k (based on historical rates of 0.5% to 0.75% of revenue), a required financial audit ($ 350,000k), internal audit function ($150k) and 2-4  regulatory audits (CFPB=Consumer Financial Protection Bureau), CFPB Remittance, AML=Anti Money Laundering, ACC/Issuing bank) each $ 75K - 100K (please refer to Seller Disclosure Letter section 1.1 (A)).

*Depreciation and amortization*

Management removed depreciation and amortization expense from the pro forma statement of income (please refer to Seller Disclosure Letter section 1.1 (A)).

## VII.    Summary of Significant Accounting Policies

## Balance Sheet

The following presents an overview of the significant accounting policies applied by Prepaid when preparing the pro forma balance sheet ("Closing Balance Sheet"). The Closing Balance Sheet presented includes the Financial Position of the Prepaid Business in the United States as of February 28, 2017. The following commentary provides a description of the primary accounts in the Prepaid Cards Business' pro forma balance sheet.

## Assets

*Accounts receivables*

The balance primarily relates to outstanding billings to clients, net of reserves, which are typically billed on the last day of each month. Company records a full reserve on any receivables outstanding greater than 180 days. Management eliminated all intercompany accounts receivable using Great Plains ("GP") information for a more detailed breakdown.

*Inventories*

Inventories include the Company's stock (cards, card carriers, papers and others) that are stored at the fulfillment vendors [FDR, Fiserv and Citi North America Operations & Technology ("NAO&T"), which outsourced  its services to Gemalto] and are capitalized when purchased. Inventory is expensed when cards are issued. The fulfillment vendors report the balance gross of inventory reserves.

Management performed a lower of cost or market analysis to ensure inventory balances are reported at fair value for the preparation of the closing date accounts as of February 28, 2017. Therefore, a month on hand ('MOH') inventory analysis was executed in order to determine the required inventory reserves. The MOH analysis included assumptions on the expected migration date related to the mandatory BIN sponsor change. Based on management's analysis, an inventory reserve in the amount of USD 3.2 million was recognized in the closing date financials as of February 28, 2017.

13

Confidential Personal Information
Confidential Discovery Material

**Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017**

*Face Value Discount ("FVD")*

Consumer Incentive prepaid cards can be funded by the corporate with a value less than the face value, which is loaded to the card. The difference between the funded amount and the value loaded to the card is the so called Face Value Discount ("FVD"). The FVD is granted to the corporate customer as, based on historical information, not all funds from cards are utilized and Prepaid receives the remaining balance as of the expiry date. Face Value Discount is only granted if it is highly unlikely to incur losses (i.e. at expiration the remaining balance is less the FVD given). For other verticals than Consumer Incentive no FVD is granted.

Management indicated that they perform a review of the FVD balance on a monthly basis, comparing the FVD amount to the remaining card funds on a program-level for the Company's larger clients/programs to assess the recoverability of these balances through the balance sweep at card expiration. If the card funds are below the FVD for a program at month-end, the Company records an expense (as an offset to Cardholder revenue in the income statement) in the amount of the difference.

*Unbilled loaded funds*

Unbilled loaded funds occur for plasma programs where the clients can load up the cards immediately. Management eliminates all amounts related to receivables for the instant issue. These programs typically utilize credit extended by Citibank, N.A. or provide Citibank, N.A. a deposit to fund the instant issuance of cards.

Receivables for the instant issue programs which are primarily offered to the Company's plasma donation clients. On a daily basis, the Company calculates the receivable for cards issued during the day and processed in Prepaid Core, but not yet billed to the client.

*Property, Equipment & Technology*

Technology includes capitalized development costs primarily related to the development of various applications within the Prepaid Core platform. These capitalized development costs are recorded centrally in a Citi reporting entity. These capitalized assets have been transferred to the buyer (please refer to PSA Section 2.2 clause (h)).

Other property, plant & equipment includes the net book value of fixed assets and a carve-in adjustment for the leasehold improvements at the Company's headquarters in Conshohocken, PA. The leasehold improvements are recorded centrally at Citi Realty Services. These leasehold improvements, along with the current lease of this location, have been transferred to the buyer (please refer to PSA Section 2.2 clause (d)).

Intangible assets & goodwill originated from Citi's acquisition of Ecount in 2007 include goodwill and an intangible asset for the Ecount trade name with an indefinite useful life. Management eliminated the goodwill during FY14 and recorded a write-off of the intangible balance during FY15. For the Closing Date Accounts, Management eliminated goodwill associated with the purchased assets, which will be reassessed by the buyer in purchase accounting (please refer to PSA Section 2.2 clause (l)).

**Liabilities**

*Accounts payables*

Accounts payable include i) payables to FDR for various processing services with regards to daily card activity, ii) payables to Citi for Worldlink related to the Company's payroll programs for maritime employees, which are facilitated by Worldlink, a Citi product that manages global deposits, iii) payables for Citi's shared ATM network comprising fees incurred by the Company for cardholders' usage of ATMs within the Citi ATM network and iv) payables to clients, which relate to refunds on prepaid card orders and revenue share agreements.

*Other current liabilities*

Other current liabilities include i) accrued expenses for accrued commissions for salespeople and accrued transaction expenses to FDR and other vendors, ii) unearned income including up-front card fees (plastic fees) paid by clients, which are not recognized as revenue until the cards are issued, iii) accrued bonus payable, for which Management indicated that this is an accrual for estimated bonuses,

14

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

which will be payable to employees and sales people for several bonus programs at December 2016 and iv) intercompany payables, which are eliminated from the carve-out balance sheet as well as vi) other current liabilities, which primarily relate to miscellaneous liabilities awaiting settlement., (please refer to PSA Section 2.5 clause (a)).

As of February 28, 2017 accruals for salaries and wages for 2nd half of February 2017 are not recorded on the closing date accounts of Wirecard North America Inc. Seller made the payment for such wages and salaries during the 1st half of March. It has been agreed with the Buyer that no accrual is recorded on the closing date accounts related to the mentioned salaries and wages payments.

In addition, Seller and Buyer came to a mutual agreement regarding vacation accruals for periods January and February 2017 and an accrual for the 401k contribution for fiscal year 2016 and for January and February 2017. Both parties agreed, that Wirecard North America Inc. will bear the costs for the remaining vacation days of Wirecard North America's employees. Citibank, N.A., will solely be responsible for and bear the costs for the 401k contribution for the periods before February 28, 2017. Therefore, a mutual agreement exists between the Buyer and the Seller that no accruals has been recorded on the closing date accounts related to the mentioned vacation days and the 401k contributions as of February 28, 2017.

Moreover, Wirecard NA recorded an accrual for the fees incurred during the audit of the closing date accounts in the amount of USD 200k. Furthermore, Management eliminated all tax-related receivables as these items will remain at the Seller post transaction (please refer to seller disclosure letter section 1.1 (A)).

*Other deposits*

Other deposits include the following deposit type liabilities held by the Prepaid Cards Business: (i) Customer deposits – clients funds received for a card issuance but not yet processed in the system or deposits made by clients with instant issue programs (e.g. Plasma donation product); (ii) Refund checks payable – payables for cardholder refunds in the form of checks; (iii) Claimable payments – process that requires recipients of refunds to "claim" a cash transfer into their account in order for the funds to be deposited (liability reclassified from cardholder liability to claimable payments); (iv) Client refund payable – Management indicated that certain clients have an agreement with the Company to share in unused funds at the expiration of the prepaid cards (this does not include those clients who received a FVD). These payables represent amounts owed to clients under those agreements for unused funds; and (v) Other items – primarily related to checks payable and suspense payables for electronic transfers between cardholders that have not yet been "claimed" by the receiving party (a similar requirement as for claimable payments). Post-transaction, the operational process of handling the funding of these other deposit liabilities are assumed by a third-party issuing bank.

15

EYGMBH_0001111

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

### Income Statement

**Revenue**

- *Non-interest revenue* includes revenue generated from clients and cardholders.

  - *Client revenue* primarily includes file processing fees, card fees and other fees, which are recorded and billed to clients on a monthly basis out of GP. File processing fees are billed to clients based on a fixed rate per file (client order) or a percentage of the total value issued for a file. Card fees on some programs are recorded upfront to cover the Company's costs to produce the prepaid cards (also called a "plastic fee", as the majority of these costs relate to plastic card materials). Card fees are charged to clients based on a rate card established for the attributes associated with each card. Other fees primarily include data entry, close out reconciliation fees and Flu Care pharmacy fees. Client revenue is presented net of any bad debt expense, which is recorded when a receivable is 180 days outstanding.

  - *Cardholder revenue* primarily includes transaction fees such as interchange fees, ATM fees, account maintenance fees, and other fees, which are based on daily card usage and are recorded through daily feeds from Prepaid Core. Interchange fees are earned on each credit card transaction and are deducted from the daily net settlement to FDR for customer spending. Interchange fees are recorded in GP through a system generated entry from Prepaid Core. For issued cards with the ATM withdrawal feature, ATM fees are charged to cardholders when they make withdrawals from out-of-network ATMs.

  - Account maintenance or breakage fees include balance sweeps and fees charged for card inactivity. Balance sweeps occur when a card expires with a remaining balance on the card. The Company records breakage revenue related to this sweep as calculated by the difference between the initial face value of the card and the remaining balance on the card at expiration. The breakage revenue is reduced by any face value discount provided to the client and plastic fee revenue recognized at issuance.

  - Fees can also be assessed to the cardholder when the card reaches a period threshold of inactivity, which is 3 months (after an initial 6-month grace period) on most cards – both grace period and inactivity window are configurable at the program manager's request. Account maintenance fees are recorded automatically on a monthly basis in GP through feeds from Ecount Core Platform.

  - Other fees primarily include pin spend fees, withdraw fees, escheatment fees and other cardholder fees, recorded on a daily basis in GP through feeds from Ecount Core Platform.

  - During the Historical Period, the Company's ability to earn interchange fees on some programs was limited by regulations established in the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Durbin Amendment"), which specifically limited interchange that could be charged by certain larger banking institutions (i.e., Citi). For purposes of the carve-out income statement, Management estimated the pro forma increase in interchange revenues, assuming the Prepaid Cards Business is no longer subject to the Durbin Amendment after the transaction.

- Management estimated an increase in non-interest revenue based on an assumed 1.6% unregulated interchange rate benefit as a result of the Business utilizing an issuing bank that is not subject to the Durbin Amendment, as a bank with less than USD 10 billion in assets will be used. The assumed 1.6% unregulated interchange rate benefit is a result of management analyses of actual consumer incentive spend volume and interchange rates actually earned during FY2014 and FY2015. The interchange benefit for the period July 1, 2016 to February 28, 2017 is estimated to amount to USD 5.1 million.

- *Net interest revenue* includes interest income on cash balances (known as NRFF revenue within Citi), which is reported net of internal transfer pricing and other costs. Gross NRFF revenues are calculated by Citi based on the average daily cash balance in the Company's intercompany bank accounts at Citi. This revenue is calculated based on a spread to the overnight London Interbank Offer Rates ("LIBOR") set by Citi Treasury.

- *Plastic fee revenue* is charged to corporates to offset the costs of the physical card. Within consumer incentive programs no cash is transferred from the corporate to ECOUNT. In this case vertical plastic

16

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

fee revenue is deducted from the FVD and the revenue is realized on accrual basis. For other verticals than Consumer Incentive plastic fee revenue is cash-settled at issuance.

**Transaction Expenses**

Transaction expenses include primarily variable expenses, which are driven by client order volumes as well as cardholder transaction activity. Management prepared stand-alone adjustments for certain expenses that Citi had not historically charged the Prepaid Cards Business.

- Card expenses are comprised of the following:

  - *Plastic (stock, embossing, postage)* includes the cost of card inventory, embossing names/numbers on the card, printing of cardholder materials (card carrier, letter inserts, etc.) and postage costs for shipping the cards and related materials to cardholders. Card inventory is expensed when the cards are issued; embossing and postage costs are expensed when incurred. The Company primarily uses three fulfilment vendors (FDR, Fiserv and Citi NAO&T) to store the card inventory, perform embossing / printing and make shipments to cardholders. Typically the fulfilment vendors provide the Company with monthly bills for performing these services.

- ATM and other processing expenses are comprised of the following:

  - ATM expenses and cash advance include expenses charged to the Company by ATM networks for cardholders ATM usage. These amounts are billed by FDR and recorded on a monthly basis.

  - ATM expenses (Citi, residency and direct billed) include an intercompany charge from Citi to the Company for cardholders' usage of the Citi ATM network, charges from STAR ATM network and other ATM networks for access to their ATMs, and transaction-based charges passed through from FDR for ATM withdrawals, balance inquiries, etc. Intercompany charges for the Citi ATM network are billed on a monthly basis by Citi to the Prepaid Cards Business. These invoices are settled periodically through the year through Citi's P2P process. Charges from other ATM networks (e.g., STAR) and FDR are billed and recorded on a monthly basis.

  - *Automated clearinghouse ("ACH") fees* include expenses for client's direct deposit loading of cards and cardholder transfers off cards processed through Citibank's ACH services. Citi did not historically charge the Company for ACH costs incurred by cardholders. For purposes of the carve-out income statement, Management estimated a 5 cent ($0.05) cost per transaction and utilized actual ACH volumes to calculate the incremental stand-alone expense in the carve-out income statement.

  - *Merchant processing* include fees paid to the credit card networks (Visa and MasterCard) based on cardholder transaction volumes, net of any volume discounts earned. Management anticipates their contracts with the credit card networks to be renegotiated at rates similar to the Historical Period. These amounts are billed by the credit card networks and recorded on a monthly basis.

  - *Other processing costs* include amounts charged by FDR for processing daily card activity, issuing bank and check processing costs and processing costs to cover certain fraud coverages with the transaction networks incurred in the normal course of business. Citi did not historically charge the Company for issuing bank or check processing costs. For purposes of the carve-out income statement, Management made an adjustment to reflect stand-alone costs of the Prepaid Cards Business for these costs.

  - *Set-up fees* include expenses paid to third-party vendors to setup clients for certain services not offered by the Prepaid Cards Business. For example, the Company has an agreement with a vendor to provide online pay stubs for the Company's payroll clients. Set up costs related to these services are paid by the Company on behalf of the clients, and are billed to the client separately including a mark-up.

  - *Negative balance fees* include losses incurred on prepaid cards where system limitations have allowed the balance to go below zero. Management indicated cardholder balances are provided to FDR several times throughout the day. FDR processes transactions throughout the day and does not have the ability to assess fees on the cards in real-time in every case. Therefore, certain prepaid cards, can be drawn below a zero balance, resulting in a negative

17

Confidential Personal Information
Confidential Discovery Material

## Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

balance which is borne by the Company for one-time use cards (i.e., reloadable cards have the ability to recover the negative balance on the subsequent load). Additionally, certain merchant classes (e.g., restaurants, hotels, rental car agencies, pay-at-the-pump gas station terminals, etc.) are labelled as 'protected' by the various transaction networks (e.g., Visa, MasterCard, STAR, etc.). This allows the merchant to process transactions with a difference between the initial authorization amount and the final settlement amount. For example, restaurants (as a 'protected merchant') typically request authorization for the initial amount of a cardholder's bill, excluding tip. The settlement, including tip, is subsequently charged to the card. If the amount including tip exceeds the available funds on the card, the Company is required to fund this balance, which is typically not recoverable for non-reloadable cards. Negative balances on the prepaid cards are fully expensed when the balance turns negative.

- *Other costs* primarily include express mail costs to rush cards to cardholders and e-stub processing costs for payroll cardholders.

- Processing expenses are comprised of the following:

  - Authorization includes amounts charged by FDR for the authorization of spend amounts on cards. These amounts are billed by FDR and recorded on a monthly basis.
  - Transaction costs include a flow-through charge of switch fees FDR pays to the credit card networks (i.e., Visa) on the Company's behalf. These amounts are billed by FDR and recorded on a monthly basis.

- The customer service expenses comprise the following:

  - *Wages and payroll taxes* include wages and related payroll taxes for customer service employees. These wages and payroll taxes have decreased significantly over the past few years as the Company increased the use of its outsourced customer service vendor, Sykes.
  - *Outsourced customer service* includes invoices from Sykes, the Company's third party customer service vendor, which is billed by number and duration of calls. The Company operates under a Citi contract with Sykes, which is managed by the Citi operations team. Management indicated the Company benefits from favorable Sykes rates through Citi Enterprise Pricing.
  - *Interactive voice response ("IVR")* includes expenses incurred from the Company's telecommunications provider, Verizon, for setup and maintenance of the automated messaging service for cardholders when they dial the Company's customer service number. Verizon charges the Company per call for the IVR service. If cardholders' questions or issues are not answered through the IVR, the call is routed to Sykes.

### Direct expenses

Certain fixed expenses within the Prepaid Cards Business are recorded through an intercompany entry made within GP and are comprised of the following items:

- Compensation and benefits include *salaries and benefits* (including fringe benefits) for front office, sales, business development and operations personnel. During FY13, the Company's commission policy was no longer effective on new sales, however, legacy commissions continued under the previous policy. The policy provided incentive to salespeople to earn a percentage of realized revenue for three years from their clients' first revenue-generating month. Management anticipates a new commission plan to be instituted post-transaction, which is not considered in the carve-out income statement. During FY13, the majority of the Company's operations functions were transferred from direct employees of the Prepaid Cards Business to a central Citi team. Additionally, certain back-office functions (such as legal, HR, compliance and risk) have been centralized at Citi since the 2007 ECOUNT acquisition by Citi. As a result, the Company historically received a cost allocation from Citi for these functions. Additionally, the Company's HR and Finance employees were transitioned to allocated functions during FY15 and are no longer included in the fixed compensation and benefit expenses. For purposes of the carve-out income statement, Management made an adjustment to reflect stand-alone costs of the Prepaid Card Business for these costs. Management included stand-alone cost estimates for the local front office personnel and off-shore support (e.g., Tata Consultancy Services) assuming a single international organization affiliated with a US-headquartered head office, stand-alone cost estimates for personnel for screening operations,

18

Confidential Personal Information
Confidential Discovery Material

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

interactive voice response ("IVR"), customer service, client account services, network, collateral fraud, risk, vendor, and financial operations, stand-alone cost estimates for personnel for back-office functions such as legal, HR, compliance, insurance/risk, finance, pricing, marketing and implementation departments and stand-alone adjustment for one employee dedicated to business development.

- Operations and technology expenses are comprised of the following:

    – *Technology expenses* include compensation for employees in the Company's technology group (both on-shore and off-shore) who are working on run-the-bank ("RTB") and build-the-bank ("BTB") projects, as well as fixed expense overhead allocations from Citi. These expenses are recorded at the Company through an allocation from Citi based on usage tracked through Citi's Project Tracking System ("PTS"). The technology employees allocated to the Company (onshore and offshore) are 100% dedicated to supporting the Prepaid Cards Business. The following provides an overview of the RTB and BTB projects:

    *RTB* includes production support, maintenance and licensing of current technology platforms.

    *BTB* includes both the implementation of new technology platforms and expansion of existing platforms. Management indicated certain BTB expenses are capitalized and the amortization of these expenses is recorded as technology expense. So far, the costs have been borne by CITI and have been capitalized centrally by CITI. For purposes of the carve-out income statement, Management made an adjustment for the historical and forecasted technology expenses to represent all-in compensation costs for full-time employees including technical, infrastructure, release, quality assurance, production support and desktop managers and supporting analysts within the technology department to operate the North America Business on a stand-alone basis.

    – *Data center charges* include usage charges from Citi for disaster recovery, storage, etc. Management assumed a similar cost structure for these services as a stand-alone entity and therefore concluded no adjustments were required for the carve-out income statement.

    – *Software/updates* include costs related to the Company's SQL server, Microsoft reporting software, and GP. Historically, Citi has paid for the Company's software and updates and charged the Company with a general allocation (refer General allocations from Citi below). For purposes of the carve-out income statement, Management made an adjustment for stand-alone costs of software and updates applying software rates which have been used previously (managed by CITI prior to transaction).

- Administrative and other expenses are comprised of the following:

    – *External legal* includes external legal costs for matters directly related to the Prepaid Cards Business (e.g., external legal opinions for the Durbin Amendment and other legislation). All legal invoices are approved by Citi's General Counsel Office for payment. These expenses are initially recorded at Citi, and provided to the Company on a monthly basis to be recorded by the Prepaid Cards Business. These invoices are settled periodically throughout the year under Citi's P2P process. For purposes of the carve-out income statement, Management made an adjustment for legal costs and included the costs of a 25% FTE, i.e. quarterly costs of USD 13k.

    – *Premises* include lease payments for the Company's headquarters in Conshohocken, Pennsylvania. The lease for this building is under contract with Citi Realty Services ("CRS"), and has been charged to the Company through a direct allocation by square footage starting in FY14. Prior to FY14, the lease for the building was held with the Company and directly paid/recorded in accordance with the lease contract.

    – *Telecommunications* include phone systems and other telecommunications charges, which have historically been charged to the Company through a consumption-based fixed expense allocation.

    – *Travel & Entertainment (T&E)* include T&E expenses for the Company's employees, which are recorded through Citi's T&E process. These expenses are initially recorded at Citi, and charged to the Company on a monthly basis to be recorded by the Prepaid Cards Business. These invoices are settled periodically throughout the year under Citi's P2P process.

19

EYGMBH_0001115

**Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017**

– *Outside services* include invoices from third party consultants, primarily for support/enhancements for controlling software ATLYS, the Company's proprietary business analytical tool, as well as charges to Tata Consultancy Services ("TCS") for back office support services.

– *Other sales, general & administrative ("SG&A") expenses* primarily include insurance (errors & omissions, directors & officers and an umbrella policy), tax & audit, and other expenses. In FY15, the reported results also included fraud expenses (an ongoing expense of the business) within this financial statement category. In previous years, fraud expenses were recorded in 'other processing costs' above. Management reclassified this expense in the stand-alone income statement for comparability purposes.

    o  In FY15, in addition to the previously described adjustment, the Company also reclassified the fraud expenses from fixed costs to transaction costs for comparability purposes.

    o  For purposes of the carve-out income statement, Management estimates USD 2 million for insurance and audit expenses, which either have been borne by CITI before or have not occurred so far. The estimate includes insurance costs of USD 750k to USD 1,000k (based on historical rates of 0.5% to 0.75% of revenue), a required financial audit (USD 350k), internal audit function ($150k) and 2-4 regulatory audits (CFPB=Consumer Financial Protection Bureau), CFPB (Remittance, AML=Anti Money Laundering, ACC/Issuing bank) each USD 75K-100K.

20

Confidential Personal Information
Confidential Discovery Material

EYGMBH_0001116

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

VIII.    Final Net Working Capital Amount

| Wirecard North America Inc. - Final Closing Date Balance Sheet In USD millions | Feb 28, 2017 |
|---|---|
| 1.   Accounts receivable | 0.1 |
| 2.   Inventories | 2.4 |
| 3.   Face Value Discounts | 20.2 |
| 4.   Prepaid Assets | 0.1 |
| i)   **Current Assets** | **22.8** |
| 1.   Accounts payable, including client refunds | (1.0) |
| Other current liabilities (Includes Accrued Commission, Accrued Bonus, Accrued payroll, Accruals related to Litigation and Benefits, Accrued Vacation, Accrued portion of employer's share of payroll Taxes arising in connection with Accrued Bonuses, Accrued Cost of Sales, and Deferred | |
| 2   Revenue) | (9.4) |
| ii)  **Current Liabilities** | **(10.4)** |
| **Final Net Working Capital Amount** | **12.4** |

21

Confidential Personal Information
Confidential Discovery Material

EYGMBH_0001117

Note 1 to the CLOSING DATE ACCOUNTS AS OF FEBRUARY 28, 2017

IX.    Final Closing Cash Amount

| Wirecard North America Inc. - Final Closing Date Balance Sheet in USD millions | Feb 28, 2017 |
|---|---|
| Final Cash Amount | 0,00 |

X.    Final Closing Indebtedness Amount

| Wirecard North America Inc. - Final Closing Date Balance Sheet in USD millions | Feb 28, 2017 |
|---|---|
| Any indebtedness (including any applicable fees, penalties, interest and premium) regarding | |
| i)    Borrowed money | 0,00 |
| ii)   Evidenced by notes, bonds, debentures or similar instruments, whether or not convertible | 0,00 |
| iii)  Obligations related to the deferred purchase price of property or services | 0,00 |
| iv)   Arising out of any financial hedging, swap or similar arrangements | 0,00 |
| v)    Connected to letter of credit, banker's acceptance, surety, performance or appeal bond, or similar credit transaction | 0,00 |
| vi)   Pension obligations/accruals | 0,00 |
| vii)  Arising from finance leases | 0,00 |
| viii) Guarantees of the obligations | 0,00 |
| ix)   All intercompany liabilities | 0,00 |
| Final Indebtedness Amount | 0,00 |

22

Confidential Personal Information
Confidential Discovery Material

EYGMBH_0001118

[Translator's notes are in square brackets]

# General Engagement Terms

for

## Wirtschaftsprüfer and Wirtschaftsprüfungsgesellschaften
[German Public Auditors and Public Audit Firms]
as of January 1, 2017

### 1. Scope of application

(1) These engagement terms apply to contracts between German Public Auditors (*Wirtschaftsprüfer*) or German Public Audit Firms (*Wirtschaftsprüfungsgesellschaften*) – hereinafter collectively referred to as "German Public Auditors" – and their engaging parties for assurance services, tax advisory services, advice on business matters and other engagements except as otherwise agreed in writing or prescribed by a mandatory rule.

(2) Third parties may derive claims from contracts between German Public Auditors and engaging parties only when this is expressly agreed or results from mandatory rules prescribed by law. In relation to such claims, these engagement terms also apply to these third parties.

### 2. Scope and execution of the engagement

(1) Object of the engagement is the agreed service – not a particular economic result. The engagement will be performed in accordance with the German Principles of Proper Professional Conduct (*Grundsätze ordnungsmäßiger Berufsausübung*). The German Public Auditor does not assume any management functions in connection with his services. The German Public Auditor is not responsible for the use or implementation of the results of his services. The German Public Auditor is entitled to make use of competent persons to conduct the engagement.

(2) Except for assurance engagements (*betriebswirtschaftliche Prüfungen*), the consideration of foreign law requires an express written agreement.

(3) If circumstances or the legal situation change subsequent to the release of the final professional statement, the German Public Auditor is not obligated to refer the engaging party to changes or any consequences resulting therefrom.

### 3. The obligations of the engaging party to cooperate

(1) The engaging party shall ensure that all documents and further information necessary for the performance of the engagement are provided to the German Public Auditor on a timely basis, and that he is informed of all events and circumstances that may be of significance to the performance of the engagement. This also applies to those documents and further information, events and circumstances that first become known during the German Public Auditor's work. The engaging party will also designate suitable persons to provide information.

(2) Upon the request of the German Public Auditor, the engaging party shall confirm the completeness of the documents and further information provided as well as the explanations and statements, in a written statement drafted by the German Public Auditor.

### 4. Ensuring independence

(1) The engaging party shall refrain from anything that endangers the independence of the German Public Auditor's staff. This applies throughout the term of the engagement, and in particular to offers of employment or to assume an executive or non-executive role, and to offers to accept engagements on their own behalf.

(2) Were the performance of the engagement to impair the independence of the German Public Auditor, of related firms, firms within his network, or such firms associated with him, to which the independence requirements apply in the same way as to the German Public Auditor in other engagement relationships, the German Public Auditor is entitled to terminate the engagement for good cause.

### 5. Reporting and oral information

To the extent that the German Public Auditor is required to present results in writing as part of the work in executing the engagement, only that written work is authoritative. Drafts are non-binding. Except as otherwise agreed, oral statements and explanations by the German Public Auditor are binding only when they are confirmed in writing. Statements and information of the German Public Auditor outside of the engagement are always non-binding.

### 6. Distribution of a German Public Auditor's professional statement

(1) The distribution to a third party of professional statements of the German Public Auditor (results of work or extracts of the results of work whether in draft or in a final version) or information about the German Public Auditor acting for the engaging party requires the German Public Auditor's written consent, unless the engaging party is obligated to distribute or inform due to law or a regulatory requirement.

(2) The use by the engaging party for promotional purposes of the German Public Auditor's professional statements and of information about the German Public Auditor acting for the engaging party is prohibited.

### 7. Deficiency rectification

(1) In case there are any deficiencies, the engaging party is entitled to specific subsequent performance by the German Public Auditor. The engaging party may reduce the fees or cancel the contract for failure of such subsequent performance, for subsequent non-performance or unjustified refusal to perform subsequently, or for unconscionability or impossibility of subsequent performance. If the engagement was not commissioned by a consumer, the engaging party may only cancel the contract due to a deficiency if the service rendered is not relevant to him due to failure of subsequent performance, to subsequent non-performance, to unconscionability or impossibility of subsequent performance. No. 9 applies to the extent that further claims for damages exist.

(2) The engaging party must assert a claim for the rectification of deficiencies in writing (*Textform*) [*Translators Note: The German term "Textform" means in written form, but without requiring a signature*] without delay. Claims pursuant to paragraph 1 not arising from an intentional act expire after one year subsequent to the commencement of the time limit under the statute of limitations.

(3) Apparent deficiencies, such as clerical errors, arithmetical errors and deficiencies associated with technicalities contained in a German Public Auditor's professional statement (long-form reports, expert opinions etc.) may be corrected – also versus third parties – by the German Public Auditor at any time. Misstatements which may call into question the results contained in a German Public Auditor's professional statement entitle the German Public Auditor to withdraw such statement – also versus third parties. In such cases the German Public Auditor should first hear the engaging party, if practicable.

### 8. Confidentiality towards third parties, and data protection

(1) Pursuant to the law (§ [Article] 323 Abs 1 [paragraph 1] HGB [German Commercial Code: *Handelsgesetzbuch*], § 43 WPO [German Law regulating the Profession of Wirtschaftsprüfer: *Wirtschaftsprüferordnung*], § 203 StGB [German Criminal Code: *Strafgesetzbuch*]) the German Public Auditor is obligated to maintain confidentiality regarding facts and circumstances confided to him or of which he becomes aware in the course of his professional work, unless the engaging party releases him from this confidentiality obligation.

(2) When processing personal data, the German Public Auditor will observe national and European legal provisions on data protection.

### 9. Liability

(1) For legally required services by German Public Auditors, in particular audits, the respective legal limitations of liability, in particular the limitation of liability pursuant to § 323 Abs. 2 HGB, apply.

(2) Insofar neither a statutory limitation of liability is applicable, nor an individual contractual limitation of liability exists, the liability of the German Public Auditor for claims for damages of any other kind, except for damages resulting from injury to life, body or health as well as for damages that constitute a duty of replacement by a producer pursuant to § 1 ProdHaftG [German Product Liability Act: *Produkthaftungsgesetz*], for an individual case of damages caused by negligence is limited to € 4 million pursuant to § 54 a Abs. 1 Nr. 2 WPO.

(3) The German Public Auditor is entitled to invoke demurs and defenses based on the contractual relationship with the engaging party also towards third parties.

All rights reserved. This form may not be reprinted, either in whole or in part, or copied in any manner, without the express written consent of the publisher.
© IDW Verlag GmbH · Tersteegenstraße 14 · 40474 Düsseldorf
50262

Lizenziert für/Licensed to: PricewaterhouseCoopers GmbH Wirtschaftsprüfungsgesellschaft inkl. Tochtergesellschaften | 4319723

Confidential Personal Information
Confidential Discovery Material

(4) When multiple claimants assert a claim for damages arising from an existing contractual relationship with the German Public Auditor due to the German Public Auditor's negligent breach of duty, the maximum amount stipulated in paragraph 2 applies to the respective claims of all claimants collectively.

(5) An individual case of damages within the meaning of paragraph 2 also exists in relation to a uniform damage arising from a number of breaches of duty. The individual case of damages encompasses all consequences from a breach of duty regardless of whether the damages occurred in one year or in a number of successive years. In this case, multiple acts or omissions based on the same source of error or on a source of error of an equivalent nature are deemed to be a single breach of duty if the matters in question are legally or economically connected to one another. In this event the claim against the German Public Auditor is limited to € 5 million. The limitation to the fivefold of the minimum amount insured does not apply to compulsory audits required by law.

(6) A claim for damages expires if a suit is not filed within six months subsequent to the written refusal of acceptance of the indemnity and the engaging party has been informed of this consequence. This does not apply to claims for damages resulting from scienter, a culpable injury to life, body or health as well as for damages that constitute a liability for replacement by a producer pursuant to § 1 ProdHaftG. The right to invoke a plea of the statute of limitations remains unaffected.

### 10. Supplementary provisions for audit engagements

(1) If the engaging party subsequently amends the financial statements or management report audited by a German Public Auditor and accompanied by an auditor's report, he may no longer use this auditor's report.

If the German Public Auditor has not issued an auditor's report, a reference to the audit conducted by the German Public Auditor in the management report or any other public reference is permitted only with the German Public Auditor's written consent and with a wording authorized by him.

(2) If the German Public Auditor revokes the auditor's report, it may no longer be used. If the engaging party has already made use of the auditor's report, then upon the request of the German Public Auditor he must give notification of the revocation.

(3) The engaging party has a right to five official copies of the report. Additional official copies will be charged separately.

### 11. Supplementary provisions for assistance in tax matters

(1) When advising on an individual tax issue as well as when providing ongoing tax advice, the German Public Auditor is entitled to use as a correct and complete basis the facts provided by the engaging party – especially numerical disclosures; this also applies to bookkeeping engagements. Nevertheless, he is obligated to indicate to the engaging party any errors he has identified.

(2) The tax advisory engagement does not encompass procedures required to observe deadlines, unless the German Public Auditor has explicitly accepted a corresponding engagement. In this case the engaging party must provide the German Public Auditor with all documents required to observe deadlines – in particular tax assessments – on such a timely basis that the German Public Auditor has an appropriate lead time.

(3) Except as agreed otherwise in writing, ongoing tax advice encompasses the following work during the contract period:

a) preparation of annual tax returns for income tax, corporate tax and business tax, as well as wealth tax returns, namely on the basis of the annual financial statements, and on other schedules and evidence documents required for the taxation, to be provided by the engaging party

b) examination of tax assessments in relation to the taxes referred to in (a)

c) negotiations with tax authorities in connection with the returns and assessments mentioned in (a) and (b)

d) support in tax audits and evaluation of the results of tax audits with respect to the taxes referred to in (a)

e) participation in petition or protest and appeal procedures with respect to the taxes mentioned in (a).

In the aforementioned tasks the German Public Auditor takes into account material published legal decisions and administrative interpretations.

(4) If the German Public auditor receives a fixed fee for ongoing tax advice, the work mentioned under paragraph 3 (d) and (e) is to be remunerated separately, except as agreed otherwise in writing.

(5) Insofar the German Public Auditor is also a German Tax Advisor and the German Tax Advice Remuneration Regulation (*Steuerberatungsvergütungsverordnung*) is to be applied to calculate the remuneration, a greater or lesser remuneration than the legal default remuneration can be agreed in writing (*Textform*).

(6) Work relating to special individual issues for income tax, corporate tax, business tax, valuation assessments for property units, wealth tax, as well as all issues in relation to sales tax, payroll tax, other taxes and dues requires a separate engagement. This also applies to:

a) work on non-recurring tax matters, e.g. in the field of estate tax, capital transactions tax, and real estate sales tax;

b) support and representation in proceedings before tax and administrative courts and in criminal tax matters;

c) advisory work and work related to expert opinions in connection with changes in legal form and other re-organizations, capital increases and reductions, insolvency related business reorganizations, admission and retirement of owners, sale of a business, liquidations and the like, and

d) support in complying with disclosure and documentation obligations.

(7) To the extent that the preparation of the annual sales tax return is undertaken as additional work, this includes neither the review of any special accounting prerequisites nor the issue as to whether all potential sales tax allowances have been identified. No guarantee is given for the complete compilation of documents to claim the input tax credit.

### 12. Electronic communication

Communication between the German Public Auditor and the engaging party may be via e-mail. In the event that the engaging party does not wish to communicate via e-mail or sets special security requirements, such as the encryption of e-mails, the engaging party will inform the German Public Auditor in writing (*Textform*) accordingly.

### 13. Remuneration

(1) In addition to his claims for fees, the German Public Auditor is entitled to claim reimbursement of his expenses; sales tax will be billed additionally. He may claim appropriate advances on remuneration and reimbursement of expenses and may make the delivery of his services dependent upon the complete satisfaction of his claims. Multiple engaging parties are jointly and severally liable.

(2) If the engaging party is not a consumer, then a set-off against the German Public Auditor's claims for remuneration and reimbursement of expenses is admissible only for undisputed claims or claims determined to be legally binding.

### 14. Dispute Settlement

The German Public Auditor is not prepared to participate in dispute settlement procedures before a consumer arbitration board (*Verbraucherschlichtungsstelle*) within the meaning of § 2 of the German Act on Consumer Dispute Settlements (*Verbraucherstreitbeilegungsgesetz*).

### 15. Applicable law

The contract, the performance of the services and all claims resulting therefrom are exclusively governed by German law.

Lizenziert für/Licensed to: PricewaterhouseCoopers GmbH Wirtschaftsprüfungsgesellschaft inkl. Tochtergesellschaften | 4319723

Confidential Personal Information
Confidential Discovery Material