# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: WIRECARD AG SECURITIES LITIGATION | No. 2:20-cv-03326-AB <br><br> <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: <br><br> ALL CASES | |

**December 4, 2023**                                        **Anita B. Brody, J.**

## <u>MEMORANDUM</u>

Plaintiffs in this class action sued Wirecard AG ("Wirecard"), several of its executives, and Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("EY Germany") for violations of § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and of Rule 10b-5, 17 C.F.R. § 240.10b-5. They claim that Wirecard and EY Germany, both based in Germany, made false and misleading statements about the financial condition of Wirecard. Plaintiffs allegedly relied upon those statements when they purchased certain financial instruments relating to Wirecard that were available in the United States.[1]

---

[1] In 2021, Wirecard filed a notice of bankruptcy. This case has been placed in suspense as to Wirecard alone since that filing. ECF No. 60; ECF No. 61.

EY Germany moved to dismiss for lack of personal jurisdiction and, alternatively, for insufficient service of process, failure to state a claim, and *forum non conveniens*.  I initially granted the motion to dismiss for lack of personal jurisdiction.  But Plaintiffs asked for leave to conduct jurisdictional discovery, and I vacated the dismissal order to allow for it.  The parties have now submitted supplemental briefs on the question of personal jurisdiction over EY Germany.  Upon reconsideration and review of the jurisdictional record, I will again grant EY Germany's motion to dismiss for lack of personal jurisdiction.

## I.    BACKGROUND AS TO WIRECARD

### A.    Wirecard's business operations

Wirecard was a global enterprise headquartered in Germany and primarily engaged in processing credit card payments.  Amended Complaint, ECF No. 53 ("Compl."), ¶ 34. It grew to encompass  approximately 53 subsidiaries across the world.  Decl. of Annedore Streyl ¶ 12, ECF No. 64-3 ("Streyl Decl.").[2]

---

[2] Annedore Streyl, a member of the Management Board at EY Germany, provided a declaration on behalf of EY Germany in support of its motion to dismiss. Plaintiffs then referenced the Streyl Declaration throughout their brief responding to EY Germany's motion as evidence in support of their argument for personal jurisdiction.  *See* Pl. Opp. Br., ECF No. 76, at 3-19.  Accordingly, the averments from the Streyl Declaration are included here as undisputed.

As an electronic payments processor, Wirecard acted as an "acquirer." When a merchant in Wirecard's network charged a credit card, Wirecard collected the funds from the bank that issued the card and distributed them to the merchant. It made money by taking a small portion of each transaction it processed.  In countries where Wirecard did not hold a license to process payments, Wirecard partnered with "third-party acquirers" ("TPAs").   Compl. ¶ 35.  The partnership between Wirecard and these TPAs enabled it to profit from the commissions from transactions the TPAs processed.

As part of its acquiring operations and partnership with TPAs, Wirecard maintained various trust accounts holding "reserves."  These balances represented funds that Wirecard owed to merchants who initiated credit card transactions but which were held for a period of time before distribution to provide for potential refunds, known as "chargebacks."  Compl. ¶ 191. Wirecard reported it had trust accounts in banks in Singapore and later the Philippines, among other locations. *Id.* ¶ 248.  Beginning in 2017, Wirecard's reporting of its cash balances – a key metric of financial health – included the cash held in these trust accounts.   *Id.* ¶¶ 191-92.

In March 2017, Wirecard closed on two transactions with Citigroup.  One involved the acquisition of Citigroup's portfolio of customers based in Asia.  The other was the acquisition of Citigroup's "issuing" business, which had been known

as Citi Prepaid, and which was renamed "Wirecard North America."  In contrast to Wirecard's "acquiring" business operations in other parts of the world, Wirecard North America was an "issuing" business.  It provided prepaid cards that clients used as incentives, disbursements, compensation, or payments.  *See, e.g.,* ECF No. 102-5 at 15.  Wirecard touted the acquisition of the issuing business from Citigroup as "significantly extend[ing] the company's geographical reach and also the available licensing framework."  Compl. ¶ 89. It also envisioned a connection between its newly acquired United States business and its existing Asian businesses.  In its 2017 Annual Report, Wirecard touted that its Asian companies "will be used for, amongst other things, activities connected to the acquisition of Citi Prepaid Card Services in the USA and the already completed and further planned acquisition of the customer portfolios for card acceptance in the Asia-Pacific region of the Citigroup."  *Id.*

>    **B.    Concerns about Wirecard**

Beginning in 2015, independent research groups and journalists at the *Financial Times* raised questions about Wirecard's accounting and business practices.  They suggested that Wirecard inflated its revenues in its Asian business operations and misrepresented the value of an acquisition in India.  Compl. ¶¶ 92-164.

A February 2019 article in the *Financial Times* described "a pattern of book-padding across Wirecard's Asian operations."  *Id.* ¶ 130.  This included a plan orchestrated by Edo Kurniawan, Wirecard's head of accounting in Asia, to "round trip" several million euros from Wirecard in Germany, through entities in Hong Kong, and ultimately onto Wirecard's Indian subsidiary.  *Id.* ¶ 130.  The scheme to route funds through Hong Kong would enable Wirecard to obtain from the Hong Kong Monetary Authority a license to sell prepaid credit cards in the region.  *Id.* ¶ 131.

According to another article published in March 2019 by the *Financial Times*, whistleblowers indicated that the 2018 revenues reported by Wirecard's subsidiary based in Singapore likely reflected sham financial transactions. Compl. ¶¶ 163-64.  A subsequent *Financial Times* article in October 2019 suggested Wirecard was reporting substantial revenue from TPAs that did not exist.  *Id.* ¶¶ 179-81.

In response to these reports, in October 2019 Wirecard commissioned accounting firm KPMG to conduct an additional independent audit of its practices. Compl. ¶ 190.  KPMG examined: (1) the amount and existence of revenues from TPAs; (2) Wirecard's merchant cash-advance business, in which it issued short-term loans to merchants; (3) "roundtripping" and other misconduct alleged in Singapore; and (4) potential overpayment for two subsidiaries based in India.  *Id.*

¶ 196.  KPMG produced a report that Wirecard published in April 2020, as well as a confidential addendum.

### C.      The Wirecard fraud revealed

In the spring and into summer of 2020, with its annual audit and financial reporting overdue, Wirecard ran out of answers for its detractors.

As noted above, Wirecard had represented that it held trust funds related to potential "chargebacks" in its acquiring business in several banks, including two in the Philippines.  In June 2020, it was forced to acknowledge that €1.9 billion said to be held as cash balances on trust accounts in the Philippines could not be verified by auditors.  *Id.*  ¶ 228.  The two Philippines banks then confirmed that the trust accounts did not even exist.  Wirecard announced that it needed to withdraw its 2019 and 2020 preliminary financial results in light of this discrepancy as to its reported cash holdings.  *Id.* ¶ 237.  Share prices dropped precipitously following these admissions.  *Id.* ¶ 239.  Wirecard also defaulted on a €2 billion loan and entered insolvency proceedings.  *Id.* ¶ 243.

Subsequent investigations suggested that Wirecard's accounting fraud began as early as 2015, when key executives allegedly agreed to inflate Wirecard's revenue in an attempt to deceive investors.  *Id.* ¶ 265.  The global scope of the fraud became apparent in July 2020, when several investigations were commenced or became public.  German prosecutors charged Wirecard's former CEO with

fraud and brought charges against the head of Wirecard's CardSystems entity in Dubai. *Id.* ¶ 264. Law enforcement in Ireland launched an investigation of Wirecard UK & Ireland, a Wirecard entity responsible for funneling revenue and earnings from TPAs to Wirecard. Subsequent investigations concerned the existence and value of its net assets and escrow holdings. *Id.* ¶ 268. Prosecutors in Singapore brought fraud and forgery charges against the man who acted as the trustee for the bank accounts that were claimed to hold €1.9 billion of Wirecard's cash. Investigators learned that Wirecard also loaned "millions" to a company incorporated by this man, which prosecutors suspected was "part of a scheme to loot Wirecard." *Id.* ¶ 269.

## II.    BACKGROUND AS TO EY GERMANY

### A.    EY Germany's role as Wirecard's auditor

While Wirecard engaged KPMG for the specific investigation following the *Financial Times* reporting, its primary independent auditor for over ten years was EY Germany, an accounting firm incorporated and operating in Germany. EY Germany has no offices or employees in the United States. It is a member firm of Ernst & Young Global Limited. Streyl Decl. ¶¶ 3-5.

Wirecard retained EY Germany on an annual basis to audit the consolidated financial statements of "the Wirecard Group," comprised of Wirecard AG and its subsidiaries. EY Germany involved teams at other auditing firms to perform audit

work on certain Wirecard subsidiaries located outside of Germany.  It referred to those subsidiaries as "components" and the respective auditing teams as "component auditors."  Decl. of Andreas Loetscher ¶¶ 7-8, ECF No. 110-1 ("Loestscher Decl.").  As contemplated under international accounting standards, the component auditors were to perform the audit work on the components in their respective localities.  As the "group auditor," EY Germany evaluated whether the component auditors obtained sufficient evidence for EY Germany to form an opinion on the group consolidated financial statements.  *Id*. ¶ 8.

EY Germany's annual audit opinions represented that it had "audited the consolidated financial statements prepared by Wirecard AG" for each fiscal year and that it conducted its audit in accordance with the generally accepted German standards for the audit of financial statements.  Compl. ¶ 314.  EY Germany routinely issued an "unqualified" opinion, which reflected its determination that Wirecard complied with international and German accounting requirements and that Wirecard's consolidated financial statements gave an accurate view of the company's financial position.  *Id.* ¶ 319.[3]  Wirecard then published EY Germany's audit opinion in its annual report to investors.  *Id.* ¶ 51; Streyl Decl. ¶ 11.

---

[3] Alternatively, an auditor could issue a "qualified" opinion if it identified a "material" issue regarding accounting policies but something short of a

As EY Germany prepared its audit of Wirecard's 2016 financial results in early 2017, it threatened Wirecard that it would publish only a "qualified" audit opinion due to concerns about accounting malpractice in India.  But ultimately it issued an "unqualified" opinion.  Compl. ¶ 255.  Two years later, the audit of the FY18 annual results coincided with news accounts suggesting improprieties in Wirecard's Singapore subsidiary.  In April 2019, however, EY Germany issued an "unqualified" audit opinion as to Wirecard's annual financial reports.  EY Germany specifically noted in that year's opinion letter that Wirecard's financial reports did not, at that time, require correction due to the "ongoing investigations by the authorities in Singapore."  *Id.* ¶ 320.  EY Germany continued to issue "unqualified" opinions as to Wirecard through the 2019 audit year.

The special investigation by KPMG of Wirecard's practices ultimately revealed various deficiencies by EY Germany in its role as an auditor.  KPMG concluded that EY Germany relied on flawed data when it reviewed whistleblower allegations regarding Wirecard Singapore.  Compl. ¶ 218.  It found that EY Germany's audit was deficient as to the value of the Indian business that Wirecard

---

misrepresentation of the company's financial position.  *See* PRACTICAL LAW CORPORATE & SECURITIES, PRACTICE NOTE: AUDITING: AN OVERVIEW (2022), Westlaw Practical Law (accessed November 6, 2023).

purchased.  *Id*. ¶219.  It also recounted a report that a senior Wirecard executive
had tried to bribe an EY Germany employee in connection with Wirecard's
acquisition of the Indian company and that Wirecard executives were among the
seller's shareholders.  *Id.* ¶ 250.  During the years it audited Wirecard, EY
Germany partners were also aware of an investigation in response to the 2016
whistleblower complaint concerning the purchase of the Indian subsidiary.  That
investigation, alleged to have been conducted by an entity identified by Plaintiffs
as "E&Y Forensic & Integrity Services," yielded a March 2018 preliminary
memorandum detailing "red-flag indicators" at Wirecard warranting further
investigation.  *Id.* ¶ 251.  Shortly after receiving this memorandum, however, EY
Germany issued an internal note claiming that "nothing has come to our attention
that causes us to believe that any of the items raised in the whistleblower letter are
of such substance that further extended procedures are required."  *Id.* ¶¶ 252-53.

Plaintiffs allege that EY Germany's annual audits of Wirecard's group
financial statements were intentionally, or at a minimum recklessly, deficient in
failing to detect the accounting deficiencies and misconduct by Wirecard described
above.  They believe that "Wirecard was only able to successfully perpetrate its
massive accounting scheme because of [EY Germany's] knowing complicity or
egregious refusal to see the obvious or to investigate the doubtful."  Compl. ¶ 246.
They allege that EY Germany's "prestige and reputation" was "instrumental in

convincing investors" of the legitimacy of Wirecard's reported financial results. *Id.* ¶¶ 246-47.

Plaintiffs recount the many warnings and red flags that should have caused EY Germany to question Wirecard's practices. As noted above, EY Germany personnel had reason to believe that senior Wirecard executives profited from Wirecard's overpayment for the Indian subsidiary from a company in which they were shareholders; that Wirecard inflated sales at the subsidiary to increase post-sale payments to the entity in which they were shareholders; and that a senior Wirecard executive had tried to bribe an auditor to sign off on the accounts of the Indian subsidiary. *Id.* ¶ 250. An investigation in 2018 showed that Wirecard recorded profits without justification and inflated financial metrics. *Id.* ¶ 251. In addition, Wirecard attributed outsized earnings to payment processing through a particular TPA, Al Alam, based in Dubai, that dwarfed the earnings attributed to the much larger stream of payments processed by Wirecard itself and every other TPA. These figures should have raised questions and led to the discovery that Al Alam's customers were fake. *Id.* ¶ 256. Similarly, EY Germany failed to properly verify the funds allegedly held in escrow in Singapore between 2016 and 2018, before they were allegedly transferred to the Philippines, which allowed falsification of cash reserves to go undetected. *Id.* ¶ 248. Yet during these years

EY Germany continued to certify Wirecard's financial statements and issue unqualified audit reports.  *Id.* ¶ 257.

### B.    EY Germany's forum contacts

As Wirecard's group auditor, EY Germany compiled component audits of Wirecard's various subsidiaries.  In March 2017, Wirecard acquired the entity that became Wirecard North America.  For FY2017, then, EY Germany's group audit of Wirecard would include review of a component audit of that subsidiary.

Ernst & Young US LLP ("EY U.S."), another member of Ernst & Young Global Limited,[4] assumed responsibility for the component audit of Wirecard North America.  The evidence adduced during discovery shows that EY U.S. received from EY Germany for purposes of the initial component audit: (1) confirmation of the opening balance; (2) adjustments for net income for the period March 1-8, 2017; (3) revenue recognition policies in accordance with the International Financial Reporting Standards; and (4) data on amortization of the entity's intangible assets.  ECF No. 102-7 at 7.

In preparation for that first-year audit of Wirecard North America, discovery also revealed that representatives from EY Germany, Wirecard, and their American counterparts met for a site visit at Wirecard North America's

---

[4] EY U.S. is a separate legal entity from EY Germany.  Loetscher Decl. ¶¶ 5, 11.

headquarters in Conshohocken, Pennsylvania.  This two-day meeting, held in December 2017, included presentations by Wirecard personnel from the German parent and the U.S. subsidiary and by EY Germany for the benefit of the EY U.S. component audit team.  Andreas Loetscher, who was an EY Germany partner and the Lead Audit Partner for the audits of Wirecard's consolidated financial statements during this time period, and Gregor Fichtelberger, a senior manager of EY Germany and its principal contact on the Wirecard account, attended the site visit "to ensure that all parties were prepared for the upcoming component audit" of Wirecard North America in that first year. Loetscher Decl. ¶ 15.

The slides from the respective presentations by EY Germany and Wirecard at the site visit that were produced in discovery reflect that the meeting focused upon Wirecard North America's business and its accounting practices.  The EY Germany presentation at the site visit acknowledged the responsibility of EY Germany for the audit of the global Wirecard enterprise but focused specifically upon the reporting from Wirecard North America, which would be reviewed by EY U.S.  The presentation did not address EY Germany's auditing practices as to any other subsidiary or business line of Wirecard.  *See* ECF No. 102-2 (EY Germany slides and minutes from meeting).

While no auditing or financial reporting activity relating to the Asia portfolios acquired from Citigroup or of Wirecard enterprises in Asia were on the

site visit agenda, the head of accounting for Wirecard's operations in Asia, Edo

Kurniawan, attended the meeting.  He created the set of slides that were used by

Wirecard to facilitate a discussion about Wirecard North America's business and

accounting practices.  *See* ECF No. 102-5 (Wirecard slides, beginning at Bates

number EYGMBH_0000336); ECF No. 102-6 (documentation of Kurniawan as

creator of document Bates numbered EYGMBH_0000336).

## III.   LEGAL STANDARDS

EY Germany has moved to dismiss Plaintiffs' complaint for lack of personal

jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  As with other

Rule 12 motions, in ruling on a Rule 12(b)(2) motion to dismiss for lack of

personal jurisdiction, the court accepts as true the factual averments of the

complaint.  *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996).

Once a jurisdictional defense is raised, however, the plaintiff acquires a burden to

come forward with "actual proofs," through affidavits or other competent

evidence, of the facts necessary to establish personal jurisdiction over the moving

defendant.  *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 603-04 (3d Cir. 1990).

If the plaintiff makes out a *prima facie* case in support of personal jurisdiction, the

defendant can avoid jurisdiction only if it points to some other considerations that

would render the exercise of personal jurisdiction unreasonable.  *Carteret Savings*

*Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

The Due Process Clause of the Fourteenth Amendment "sets the outer boundaries" of this court's authority to assert jurisdiction over a defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011).  The now-familiar expression of this notion of due process requires that an out-of-state defendant "have certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).[5]

The parties recognize that EY Germany lacks continuous and systematic general business contacts with the United States.  Therefore, Plaintiffs must establish that this court has *specific* jurisdiction over EY Germany due to forum contacts that relate to this particular litigation.  There are three considerations.

First, the defendant must have "purposefully directed [its] activities" at residents of the forum, *Burger King*, 471 U.S. at 472, or "purposefully avail[ed]

---

[5] In this litigation, where Plaintiffs' claims are based on the 1934 Act authorizing nationwide service of process, "the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole."  *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002).

itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 375 U.S. 235, 253 (1958). These must be "contacts that the 'defendant himself' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King*, 471 U.S. at 475). This ensures that there has been "fair warning" to the defendant who has not otherwise consented to suit there. "And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden*, 571 U.S. at 285 (citation omitted).

Second, the litigation must "arise out of or relate to" at least one of those activities by the defendant in, or directed at, the forum. *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021). The Supreme Court has described this "relatedness" component in various ways. There must be "an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (internal quotation marks omitted). There must be "a connection between the forum and the specific claims at issue," *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 265 (2017), while the defendant's "suit-related conduct" also must create "a substantial connection with the forum State." *Walden*, 571 U.S. at 284. This analysis

16

"focuses on 'the relationship among the defendant, the forum, and the litigation.'"
*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer v.
Heitner*, 433 U.S. 186, 204 (1977)).   Our Court of Appeals recently clarified that
"[f]or the contacts to satisfy the second prong, there must be a strong relationship"
between those three components.   *Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir.
2021) (internal quotations omitted).

Finally, if those elements are satisfied, a court may consider whether the
exercise of jurisdiction in the circumstances of the particular case would "comport
with fair play and substantial justice." *Burger King*, 471 U.S. at 476 (quoting *Int'l
Shoe*, 326 U.S. at 320).   *See generally O'Connor v. Sandy Lane Hotel Co.*, 496
F.3d 312, 317 (3d Cir. 2007).

## IV.   DISCUSSION

In the prior round of briefing on the jurisdictional question, Plaintiffs
contended that EY Germany purposefully availed itself of the forum of the United
States "through its numerous auditing activities, including its auditing of Wirecard
and through its participation in EY Global's integrated network."  (Pl. Opp. Br.,
ECF No. 76, at 7.)  They also suggested that EY Germany intended that its audit
reports of Wirecard would reach American investors.  *Id.*  Following jurisdictional
discovery, Plaintiffs point to an additional factual basis to support their contention
that EY Germany purposefully availed itself of the U.S. forum: its personnel

17

traveled to the United States for the two-day site visit in Conshohocken,

Pennsylvania concerning the operations of Wirecard North America.  (Pl. Supp.

Mem., ECF No. 102, at 12.)

I will consider the questions of purposeful availment and relatedness by

examining these two alleged contacts of EY Germany to the United States: the site

visit and the audit activity as to the U.S.-based subsidiary, Wirecard North

America.

### A.    The role of the site visit to support personal jurisdiction over EY Germany

#### 1.    Purposeful availment

Plaintiffs elicited in discovery the fact that EY Germany representatives

came to the United States in December 2017 for a meeting at the Wirecard North

America headquarters in Conshohocken, Pennsylvania "to ensure that all parties

were prepared for the upcoming component audit" of Wirecard North America.

Loetscher Decl. ¶ 15.  This was a one-time visit that was not repeated in

subsequent audit years.

The Court in *Burger King* indicated that a single contact that creates a

substantial connection with the forum can establish purposeful availment.  471

U.S. at 475 n.18.  And the Third Circuit Court of Appeals has applied that notion

since then.  In *Carteret Savings Bank, FA v. Shushan*, 954 F.2d 141, 149-50 (3d

Cir. 1992), the plaintiff satisfied the purposeful availment requirement where the defendant attended a meeting in the forum.  Similarly, in *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004), the defendants' trip to the forum state to retrieve intellectual property from that plaintiff that they would later misappropriate constituted purposeful availment.

In light of these precedents and the facts uncovered in jurisdictional discovery, Plaintiffs have established purposeful availment.  They presented uncontroverted evidence that EY Germany personnel physically entered the forum in December 2017 for a two-day business meeting at Wirecard North America's headquarters in Conshohocken, Pennsylvania.  This voluntary visit by its corporate personnel for company business relating to EY Germany's upcoming annual group audit of Wirecard sufficiently reflects EY Germany's purposeful availment of the United States forum for this specific jurisdiction analysis.

### 2.    Relatedness

Next, Plaintiffs must establish that this connection between EY Germany and the forum through Wirecard North America bears a strong relationship to the fraud claims they set out in their complaint.  The factual record adduced during discovery does not bear that out.

The slides from the respective presentations by EY Germany and Wirecard at the site visit that were produced in discovery confirm that the meeting focused

upon Wirecard North America's business.  The presentations did not concern

Wirecard's acquiring business, which was the area in which the financial reporting

is alleged to have been fraudulent.  They did not concern the acquisition of

Citigroup's Asian customer portfolios earlier that year, which Plaintiffs allege

Wirecard intended to use to facilitate further fraudulent activities in Asia.  The

presentations at the site visit that addressed the audit responsibilities of EY

Germany as to Wirecard were focused upon the reporting from Wirecard North

America.  They did not address EY Germany's auditing practices as to any other

subsidiary or business line.  No auditing or financial reporting activity relating to

the Asia portfolios or Wirecard enterprises in Asia occurred during the site visit.

It is undisputed that the site visit followed upon Wirecard's March 2017

acquisition from Citigroup of both the entity that became Wirecard North America

and Citigroup's Asian customer portfolio. Wirecard viewed the acquisition of

Wirecard North America as significant for Wirecard's global expansion ambitions

and the scope of its licensing framework.  Compl. ¶ 89.  And the acquisition of

Citigroup's customer portfolio may have been intended to be used in connection

with Wirecard's existing Asian business ventures, which was where the fraud was

primarily perpetrated.

But the only connection between the site visit and any of the Wirecard fraud

was the presence of a single individual.  Edo Kurniawan of Wirecard created the

slideshow presentation used at the site visit by Wirecard personnel for the EY

personnel to learn about Wirecard North America's business and accounting

practices.  ECF Nos. 102-5 and 102-6.  He is not otherwise identified in the

materials as having presented on any topic or having any role to play in the

introduction of Wirecard North America's business to the auditors of EY U.S. or,

more importantly, EY Germany.  *See* ECF No. 102-2 (EY Germany slides and

minutes from meeting); ECF No. 102-5 (Wirecard slides, beginning at Bates

number EYGMBH_0000336); ECF No. 102-6 (documentation of Kurniawan as

creator of document Bates numbered EYGMBH_0000336).  Plaintiffs allege that a

month later, he led a meeting about a scheme to "round trip"[6] several million euros

from Wirecard in Germany, through entities in Asia, before landing with

Wirecard's Indian subsidiary.[7]  This was "part of a pattern of book-padding across

Wirecard's Asian operations."  Compl. ¶ 130.

---

[6]  Plaintiffs describe "round-trip transactions" as "a fraudulent accounting
technique where money is moved between or among companies in illegitimate
transactions to inflate revenue."  Compl. ¶ 118.

[7]  The complaint does not specify with whom or where this meeting occurred.  It is
not alleged to have occurred in the United States or to have involved any personnel
from Wirecard North America.

Yet these facts do not connect EY Germany's activities in the forum to the causes of action included in the complaint.  The complaint concerns Wirecard's fraud in the overvaluation of Asian subsidiaries; acquisitions of businesses in India; suspicious transactions in Singapore, Hong Kong, and India; inflation of revenues from TPAs in Dubai, the Philippines, and Singapore; and €1.9 billion missing from banks in the Philippines.  None of these facets of Wirecard's operations were the subject of the December 2017 meetings at Wirecard North America.  And none of the "red flags" cited by Plaintiffs to prove *scienter* of the fraud on the part of EY Germany relate to Wirecard North America or to EY Germany's contacts with the United States in any other manner.

As the Court of Appeals instructed in *Hepp v. Facebook* on the question of specific jurisdiction over a foreign defendant:

> For the contacts to satisfy the second prong, there must be "a strong 'relationship among the defendant, the forum, and the litigation.'"

*Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (quoting *Ford Motor Corp. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1028 (2021) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  In *Ford*, the defendant company had urged residents of the forum states "[b]y every means imaginable" to buy the types of cars alleged to be defective.  *Ford*, 141 S. Ct. at 1028.  The company "systematically served a market" in those states

"for the very vehicles that the plaintiffs allege malfunctioned and injured them" there. *Id.* The Court recognized the "strong" connection between the defendant, the forum, and the claims. *Id.* In *Hepp*, however, the relationship was "too weak" to justify jurisdiction. *Hepp*, 14 F.4th at 208. The plaintiff there brought claims for misappropriation of her image. An unknown person had uploaded a photo of her to a photo-sharing website, following which it appeared in unauthorized advertisements in an online discussion forum. She sued both the photo-sharing website, Imgur, and the operator of the online forum, Reddit. She contended that jurisdiction was established where the defendants targeted advertising business to Pennsylvania, Imgur operated an online merchandise store that sold products to Pennsylvanians, and Reddit sponsored a premium membership business and an online community organized around Philadelphia. *Id.* The Third Circuit accepted that these contacts constituted purposeful availment but found that they did not satisfy the relatedness requirement to allow for jurisdiction against either defendant:

> [N]one of these contacts forms a strong connection to the misappropriation of Hepp's likeness. Hepp did not allege the merchandise [sold to Pennsylvanians] featured her photo. Nor did she allege Imgur and Reddit used her likeness to sell advertising. Finally, she did not claim the photo was taken, uploaded, or hosted in Pennsylvania.

*Id.*

While this case presents more of a connection than the "weak" one present in *Hepp*, it is not the "strong" one found in *Ford*.  The site visit does not link EY Germany to the violations of federal securities laws arising from Wirecard's false and misleading statements of its sales and profits that Plaintiffs allege in their complaint.  And while it is not clear why Kurniawan attended the meeting or why he was involved in creating the slides for the Wirecard side of the presentation at the site visit, his mere presence in the United States for a two-day meeting concerning Wirecard North America does not connect the United States to the fraud described in the complaint.

The fraud undertaken by Wirecard and allegedly facilitated by EY Germany in its role as Wirecard's auditor lacks a connection to the visit of EY Germany personnel to the United States at the December 2017 site visit.  The evidence of the U.S. site visit, even with the presence and possible planning of a Wirecard accountant alleged to have perpetrated fraud, does not reflect a sufficient connection between any fraud or actionable neglect by EY Germany in the U.S. forum as to support jurisdiction.

**B.    The role of EY Germany's audit activity as to Wirecard North America to support personal jurisdiction**

The other contacts that Plaintiffs raise here renew the contentions from the earlier round of briefing on EY Germany's motion to dismiss.  *See* ECF No. 76.

They relate to EY Germany's alleged "engagement" of EY U.S. to audit Wirecard North America, the extent to which EY Germany "controlled" the auditing work of EY U.S. as to that subsidiary, and EY Germany's alleged direct auditing of Wirecard North America.

### 1.    Purposeful availment

As I noted in the prior decision, the fact that EY Germany utilized component audit work by EY U.S. in the course of conducting its group audit of Wirecard does not sufficiently constitute purposeful availment of the U.S. forum. Plaintiffs have not pointed to any evidence adduced in jurisdictional discovery that changes my view as to EY Germany's utilization of the audit work of EY U.S.

Plaintiffs contend that the work of EY U.S. as to Wirecard North America was intertwined with EY Germany in such a way as to amount to a purposeful availment by EY Germany of the U.S. forum. They point to a component audit report in which EY U.S. personnel indicated that EY U.S. had been "engaged" *by EY Germany* to conduct the 2017 audit of Wirecard North America. That same report also reflected that EY U.S. "rel[ied] upon" EY Germany for the opening balances and adjustment to revenue data leading up to the closing date of the acquisition by Wirecard on March 9, 2017. Pl. Ex. 10, Final Summary Mem., Dec. 31, 2017, ECF No. 102-7, at 7. But according to Andreas Loetscher, who led this work for EY Germany during the relevant audit years:

> EY U.S. was not retained by EY Germany.  Rather, EY U.S. was
> retained directly by [Wirecard North America] and billed [Wirecard
> North America] for its services.  EY Germany was directly retained
> by Wirecard AG and did not bill Wirecard AG for any work that EY
> U.S. performed.

Loetscher Decl. ¶ 12.  Documentation obtained during discovery confirm that EY

Germany's audit instructions to EY U.S. stated both that EY Germany had an

engagement letter with Wirecard applying to a "Group Audit" and that local

component teams were to obtain their own engagement letter from local

management.  Pl. Ex. 6 at 438, ECF No. 102-4.  No engagement letter for the

component audit of Wirecard North America has been presented to support

Plaintiffs' contention that EY Germany contracted for the component audit of

Wirecard North America.

The evidentiary record shows that EY U.S. received from EY Germany for

purposes of the initial component audit: (1) confirmation of the opening balance;

(2) adjustments for net income for the period March 1-8, 2017; (3) revenue

recognition policies in accordance with the International Financial Reporting

Standards; and (4) data on amortization of the entity's intangible assets.  ECF No.

102-7 at 7.  The fact that EY Germany provided these standards and pieces of

information to EY U.S. does not indicate that the audit of Wirecard North America

in the United States was "controlled by" EY Germany in any manner that is

relevant to jurisdiction here.

Finally, EY Germany did not itself conduct any audit of Wirecard North America as to reflect purposeful availment of the United States.  Jurisdictional discovery did not undermine EY Germany's contention that the group audit work was performed in a centralized manner, in Germany, incorporating the various component audits, and that instructions and policies were communicated to the various component auditors as appropriate.

Apart from the site visit discussed above, jurisdictional discovery does not support the proposition that EY Germany took a deliberate act reaching out to do business in the United States in facilitating the EY U.S. audit of the Pennsylvania-based Wirecard North America.  The delegation of responsibility between the auditor of the multinational parent company and the auditor of the component entity is contemplated by international accounting standards.  The authorities discussed in my previous opinion do not countenance asserting jurisdiction over an foreign auditor of a corporate group with a U.S. subsidiary where the group auditor performed no substantive audit work in the United States or as to the U.S. subsidiary.  *See, e.g., Leasco Data Processing Equipment Co. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); *General Elec. Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993); *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523 (10th Cir. 1996).  EY Germany's limited role in facilitating the

component audit of Wirecard North America by EY U.S. does amount to purposeful availment of the U.S. forum.

### 2. Relatedness

Even if EY Germany's audit work on behalf of Wirecard could be said to reflect purposeful availment of the United States through the audit of Wirecard North America, Plaintiffs cannot satisfy the requirement that the forum contact relate to the claims asserted in the complaint.

Plaintiffs attempt to tie the audit work as to Wirecard North America to the fraud through a series of strained connections. They contend that the acquisition by Wirecard of what became Wirecard North America was "integral" to its global ambitions and thus to the fraud scheme described in the complaint. (Pl. Supp. Br., ECF No. 102, at 21.) They suggest that this alleged connection of Wirecard North America to the fraud would implicate EY Germany through the cooperation of EY U.S. in the Wirecard North America component audit.

But jurisdictional discovery did not lend any support to these theories. Wirecard North America is not connected to the fraud alleged in the complaint. The fraud was located in several subsidiaries of Wirecard's "acquiring" business, where it collected money from an issuer, e.g., a bank. The business of Wirecard North America, however, was "issuing" work, where it issued prepaid cards. The complaint does not allege any improprieties in the issuance of the prepaid cards, in

the reporting of revenues from that business, or in the annual audits of that component entity.  Thus, whatever role EY Germany had in audit activity as to Wirecard North America could not have been "related" to the fraud that gave rise to the complaint.

The business and financial reporting of Wirecard North America, the subsidiary that is based in this forum, did not play any role in the fraudulent activities of Wirecard.  There is no evidence of any auditing failures as to Wirecard North America by EY Germany – or anyone else.  EY Germany provided instructions and information to EY U.S. as to the Wirecard North America audit report but those actions bear no relation to the fraud perpetrated by Wirecard.  The fact that EY Germany audited combined financial statements that included those of Wirecard North America does not provide the necessary basis on which personal jurisdiction may attach in the United States for the claims asserted in this complaint.

## V.   CONCLUSION

Having reconsidered Plaintiffs' arguments in light of the facts adduced by them in jurisdictional discovery, I again reach the conclusion that specific jurisdiction over Defendant EY Germany does not lie here for the fraudulent activities alleged in the complaint.  Plaintiffs have established purposeful availment by EY Germany of the United States as a forum through its participation

29

in a business meeting with its American counterpart and Wirecard North America personnel in Conshohocken, Pennsylvania.  They fail to demonstrate purposeful availment by EY Germany in relation to the actual audit activity conducted as to the Wirecard entities.  But Plaintiffs have not satisfied the relatedness prong of the specific jurisdiction test as to either contact.  They have not established any relationship – much less the "strong relationship" that the Court of Appeals required in *Hepp* – between EY Germany's contacts to the United States and the fraud perpetrated by Wirecard personnel in Europe and Asia as set out in the complaint and allegedly overlooked in EY Germany's annual reviews.  The Due Process Clause does not countenance haling EY Germany into an American court to answer for these alleged auditing failures and misrepresentations as to Wirecard.

I will grant EY Germany's motion to dismiss for lack of personal jurisdiction.


\_\_s/ANITA B. BRODY, J.\_\_\_\_\_
ANITA B. BRODY, J.